

COPY

1  CLAIRE M. SYLVIA (SBN 138990)
    csylvia@pcsf.com
2  EDWARD H. ARENS (SBN 259155)
    earens@pcsf.com
3  PHILLIPS & COHEN LLP
    100 The Embarcadero, Suite 300
4  San Francisco, California 94105
    Tel: (415) 836-9000
5  Fax: (415) 836-9001

6  Attorneys for *Qui Tam* Plaintiff

FILED
CLERK U.S. DISTRICT COURT

JAN 1 9 2016

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

7

8

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11                  WESTERN DIVISION

12  UNITED STATES OF AMERICA *ex*     Case No. CV16 - 0040 1RGK(RAOx)
    *rel.* STEVEN SCOTT,

13                Plaintiff,          COMPLAINT FOR VIOLATION OF
                                      THE FALSE CLAIMS ACT (31
14        v.                          U.S.C. § 3729, *et seq.*)

15  HUMANA, INC.,

16                Defendant.          JURY TRIAL DEMANDED

17

18                                    **FILED IN CAMERA AND UNDER**
                                      **SEAL PURSUANT TO 31 U.S.C.**
19                                    **§ 3730(b)(2)**

20

21

22

23

24

25

26

27

28

_____
                    COMPLAINT

{00067353; 4 }

I.      INTRODUCTION ........................................................................... 1

II.     PARTIES ........................................................................................ 5

III.    JURISDICTION AND VENUE ..................................................... 6

IV.     THE MEDICARE VOLUNTARY PRESCRIPTION DRUG
        BENEFIT PROGRAM (PART D) .................................................. 6

        A.     Medicare Part D Benefits ..................................................... 8

               1.      Defined Standard Coverage and Cost Sharing
                       Requirements .............................................................. 8

               2.      Actuarially Equivalent Standard Coverage .................. 9

               3.      Tiered Formularies and Pharmacy Networks ............ 10

               4.      Low Income Subsidies and Cost Sharing ................... 11

        B.     Testing for Actuarial Equivalence .................................... 12

        C.     Medicare Part D Contracts ................................................ 14

               1.      Bid Requirements ...................................................... 15

               2.      Contract Requirements .............................................. 17

        D.     CMS Payments to Part D Sponsors ................................... 19

               1.      Direct Subsidy Payments ........................................... 19

               2.      LICS Payments ......................................................... 19

               3.      Reinsurance Payments ............................................... 21

               4.      Risk Sharing Payments .............................................. 21

V.      HUMANA'S WALMART PLAN ................................................. 22

        A.     Benefit Structure ............................................................... 23

        B.     Development of the Bids .................................................... 24

               1.      The PDP Strategy Team ............................................ 24

               2.      The Role of Milliman ................................................ 25

               3.      Actuarial Valuation ................................................... 27

        C.     Bid Submissions ................................................................ 27

VI.     THE DEFENDANT'S FRAUDULENT PRACTICES ................. 29

- iii -

{00067353; 4 }

A.    Humana Knowingly Submits Bids Based on Information
that is Not Accurate, Truthful and Complete as Certified ..................31

    1.    Humana's Internal Analysis ........................................31

    2.    Humana's False Analysis Provided to CMS ............................33

B.    Humana Knowingly Misrepresented that the Walmart Plan
Was Actuarially Equivalent to the Defined Standard When
it Was Not ..........................................................36

    1.    Humana's Bids for the 2011 Contract Year Were
Knowingly False or Fraudulent ..................................39

    2.    Humana's Bids for the 2012 Contract Year Were
Knowingly False or Fraudulent ..................................42

    3.    Humana's Bids for the 2013 Contract Year Were
Knowingly False or Fraudulent ..................................47

    4.    Humana's Bids for the 2014 Contract Year Were
Knowingly False or Fraudulent ..................................49

    5.    Humana's Bids for the 2015 Contract Year Were
Knowingly False or Fraudulent ..................................52

    6.    Humana's Bids for the 2016 Contract Year Were
Knowingly False or Fraudulent ..................................54

C.    Humana's Violations of the False Claims Act...................................59

{00067353; 4 }

*Qui Tam* Plaintiff and Relator Steven Scott ("Relator"), through his attorneys Phillips & Cohen LLP, on behalf of the United States of America ("Government"), for his Complaint against Defendant Humana, Inc. ("Humana"), alleges, based upon personal knowledge, relevant documents, and information and belief, as follows:

## I.   INTRODUCTION

1.     This is an action to recover damages and civil penalties on behalf of the United States arising from false and/or fraudulent statements, records, and claims made and caused to be made by Defendant and/or its agents, employees, and co-conspirators in violation of the federal False Claims Act, 31 U.S.C. § 3729, *et seq.*

2.     Residents of the United States spend billions of dollars each year on prescription drugs. A large share of the cost of these drugs is paid by the federal government through a variety of health care programs. One of those programs is the Medicare Part D prescription drug program, which provides subsidized access to prescription drug insurance coverage on a voluntary basis to Medicare beneficiaries who enroll and pay a premium. The government contracts with private entities, known as "Part D sponsors," to administer the Part D benefit.

3.     Humana is a health insurance company and Part D sponsor. Humana insures approximately 12 million people nationwide, including 3.3 million Medicare beneficiaries enrolled in Medicare Part D Prescription Drug Plans ("PDPs"). In 2014, Humana's revenue from PDPs was approximately $3 billion. This Complaint concerns Humana's ongoing fraudulent scheme against the Medicare Part D program and the beneficiaries that the government intended the program to support.

4.     Under the applicable statutes and regulations, a Part D sponsor that seeks to offer a PDP must submit a bid to CMS that certifies, among other things, that the value of the benefits provided by a proposed plan is the actuarial equivalent of, or exceeds, the "defined standard" Part D benefit. The defined standard provides, among other things, that beneficiaries on average pay no more than 25 percent of drug costs that exceed the deductible up to an initial coverage limit, with

{00067353; 4 }

1 the Part D sponsor paying the remaining 75 percent.  Actuarial equivalence is a
2 condition of receiving a Part D contract.

3      5.    As alleged below, since 2011 when Humana first offered its Part D
4 PDP known as the basic Walmart Plan, Humana has knowingly provided Part D
5 benefits under that plan that have been significantly less valuable than Humana
6 promised in its bids, which it certified as accurate, complete and truthful.  Instead of
7 paying 75 percent of the cost of drugs in the initial coverage limit ("ICL") phase,
8 Humana has paid as little as 64.5 percent, with beneficiaries enrolled in the Walmart
9 Plan paying the balance.  In the case of low-income beneficiaries whose cost sharing
10 is subsidized by the government, the government pays the excessive cost sharing
11 amounts directly.  In each contract year, Humana has provided fewer benefits—and
12 Humana's members have borne higher costs—than Humana presented in its bid for
13 the contract and was required for it to be awarded a Part D contract.

14      6.    By misrepresenting the value of its benefits, Humana decreased its
15 costs under the contract relative to the payments it received from the government
16 and beneficiaries and profited handsomely as a result.  Based on allowed costs in the
17 ICL phase between 2011 and November 2015, Humana's Part D benefit has been
18 worth approximately $412 million less than the defined standard it contracted to
19 provide.  Humana has realized much of that difference as profit, which has come at
20 the expense of CMS and the enrolled beneficiaries who have paid excessive cost
21 sharing under the Walmart Plan.

22      7.    Between 2010 and 2014, for the contract years 2011–2015, Humana
23 submitted a bid each year for each of the 35 CMS geographic regions in which it
24 proposed to offer the Walmart Plan—175 bids in total—and each of those bids
25 represented the Walmart Plan as actuarially equivalent to the defined standard.  For
26 the 2016 contract year, Humana has similarly represented the Walmart Plan as
27 actuarially equivalent to the defined standard, bringing the total number of bids that
28 make this representation to 210.  CMS has approved the bids that Humana submitted

for the Walmart Plan and, based on those approvals, has entered into, or renewed, a Part D contract with Humana that incorporates those bids.  Because cost sharing by beneficiaries has thus far exceeded 25 percent each year in every geographic region, the Walmart Plan has never been actuarially equivalent to the defined standard and Humana's Walmart Plan has never met CMS requirements for a Part D contract. Moreover, Humana has already budgeted for the Walmart Plan to be worth less than the defined standard in 2016 in every region.  Thus, Humana is 0 for 175 and expects to be 0 for 210 by the end of 2016.

8.     Humana knew that the Walmart Plan did not meet CMS requirements at the time it submitted a bid for a contract each year, as demonstrated by the two sets of books Humana maintained.  Humana created one analysis that it used to report the actuarial value of the Walmart Plan to CMS, which would justify the award of a contract, and a second analysis that Humana used to set its own internal operating budget and to report its expected financial performance to its shareholders. The latter, accurate analysis, which was consistent with Humana's actual experience, showed that Humana did not expect its Walmart Plan to be actuarially equivalent, as required to obtain a Part D contract.  It further showed that Humana falsely certified to CMS that it expected the Walmart Plan to be actuarially equivalent.  In no year has Humana budgeted for the Walmart Plan to meet the actuarial equivalence requirement and in no year has the Walmart Plan achieved actuarial equivalence.  Yet each year Humana has certified to CMS that the Walmart Plan is actuarially equivalent.

9.     CMS was unaware of Humana's true expectations for the Walmart Plan, which rendered Humana ineligible for a Part D contract at the time CMS awarded the contracts to Humana.  Although the bids submitted to CMS were based upon false information, the false information was not visible to CMS, which relies upon the sponsor's certification of the information and data as accurate and truthful.

{00067353; 4 }

10.     Because Humana fraudulently induced the government to award it the Part D contracts by promising to provide beneficiaries with a plan that was the actuarial equivalent of the defined standard when Humana knew it was not, Humana was not entitled to receive the contracts or any of the payments under them.

11.     Moreover, because of Humana's fraudulent scheme, LICS members have had significantly higher cost sharing than they would have had under the defined standard.  CMS pays the additional costs through higher LICS subsidy payments to Humana.  Humana has falsely claimed payment for those excess costs from CMS and has also knowingly retained overpayments for LICS subsidies to which it was not entitled and sought to avoid or conceal an obligation to repay CMS.

12.     The FCA was originally enacted during the Civil War, substantially amended in 1986, and amended again in 2009 and 2010.  Congress enacted the 1986 amendments to enhance and modernize the government's tools for recovering losses sustained by frauds against it after finding that federal program fraud was pervasive. The amendments were intended to create incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisal or government inaction, and to encourage the private bar to commit resources to prosecuting fraud on the government's behalf.

13.     The FCA provides that any person who presents or causes to be presented false or fraudulent claims for payment or approval to the United States Government; knowingly makes, uses, or causes to be made or used false records and statements to induce the United States to pay or approve false and fraudulent claims; or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the federal government.

14.     The FCA was further amended by the Fraud Enforcement Recovery Act ("FERA") passed by Congress and signed into law on May 20, 2009 for the

- 4 -

1  express purpose of strengthening the tools available to combat fraud and to overturn
2  judicial decisions that had weakened the False Claims Act.

3      15.    The FCA allows any person having information about a violation of the
4  FCA to bring an action on behalf of the government, and to share in any recovery.
5  The FCA requires that the complaint be filed under seal for a minimum of 60 days
6  (without service on the defendant during that time) to enable the United States (a) to
7  conduct its own investigation without the defendant's knowledge, and (b) to
8  determine whether to join the action.

9      16.    Based on these provisions, *qui tam* plaintiff and relator Steven Scott
10  seeks to recover all available damages, civil penalties, and other relief for the
11  violations alleged in this Complaint.

12  **II.    PARTIES**

13      17.    Humana is a health insurance company incorporated in Delaware and
14  headquartered in Louisville, Kentucky.  The company is organized into three
15  primary business segments:  Retail, which consists of Medicare and commercial
16  health insurance benefits; Group, which consists of similar insurance products
17  marketed to employer groups; and Healthcare Services, which consists of pharmacy,
18  primary care, and other healthcare businesses.  The Retail business segment is
19  responsible for Humana's PDPs.

20      18.    Relator is a Managing Actuary for Humana, with responsibility for
21  modeling the cost of Humana's Medicare health insurance benefits under different
22  actuarial assumptions.  Relator works within Humana's Senior Products Actuarial
23  Rx group and manages a team known as Modeling & Tools.  Relator's group
24  supports Humana's entire Part D product portfolio, including three PDP products
25  and multiple other Part D benefit offerings.  Relator commenced working for
26  Humana in 2007 as an Actuarial Analyst and has been promoted four times.
27  Relator is a resident of Louisville, Kentucky.

28

{00067353; 4 }

III.   **JURISDICTION AND VENUE**

19.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the last of which confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

20.    This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, and because Defendant has minimum contacts with the United States.  Moreover, Defendant can be found in, resides, and/or transacts or has transacted business in this District.

21.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a), and 31 U.S.C. § 3732(a), because Defendant can be found in and/or transacts or has transacted business in this District.  At all times relevant to this Complaint, Defendant regularly conducted substantial business, maintained employees, and/or made significant sales in this District.  In addition, statutory violations, as alleged in this Complaint, occurred in this District.

IV.   **THE MEDICARE VOLUNTARY PRESCRIPTION DRUG BENEFIT PROGRAM (PART D)**

22.    Title XVIII of the Social Security Act, commonly known as Medicare, is a federally funded and administered health insurance program, primarily for elderly and disabled persons.  Title XIX of the Social Security Act, known as Medicaid, is a federal/state entitlement program that pays for medical assistance for individuals and families with low incomes and resources.  The Medicare and Medicaid programs are administered through the Centers for Medicare and Medicaid Services ("CMS"), an operating division of the U.S. Department of Health and Human Services ("HHS").

23.    Medicare consists of four parts: Hospital Insurance Benefits (Part A), Supplemental Medical Insurance Benefits (Part B), Medicare Advantage (Part C), and the Voluntary Prescription Drug Benefit Program (Part D).  Medicare Part A

1  covers inpatient hospital, home health, skilled nursing facility, and hospice care.
2  Medicare Part B covers physician, outpatient hospital, home health, and other
3  services.  Both Part A and Part B operate on a fee-for-service basis, meaning that
4  Medicare pays hospitals, physicians, and other health care providers directly for
5  each service they provide to a Medicare beneficiary.

6      24.    Medicare Part C was created in 1997, when Congress established the
7  Medicare+Choice program, now known as Medicare Advantage.  Under Medicare
8  Advantage, CMS contracts with private insurance companies to offer traditional
9  Medicare benefits (Part A and Part B benefits) through managed care plans, rather
10 than on a fee-for-service basis.  Medicare beneficiaries have the choice of enrolling
11 in a Medicare Advantage plan instead of receiving benefits through traditional
12 Medicare.  Under the program's managed care model, Medicare pays the insurer a
13 monthly premium for each enrolled beneficiary, known as a "capitation" payment,
14 and the insurer assumes responsibility for the cost of providing the benefits.

15     25.    Congress created Medicare Part D in 2003 through section 101 of the
16 Medicare Prescription Drug, Improvement, and Modernization Act ("MMA"), Pub.
17 L. 108-173, 117 Stat. 2066, which established a voluntary prescription drug benefit
18 program for Medicare beneficiaries.  Part D provides subsidized access to
19 prescription drug insurance coverage on a voluntary basis to individuals entitled to
20 Part A or enrolled in Part B who pay a premium (also known as "beneficiaries" or
21 "members").  Part D also provides premium and cost-sharing subsidies for low-
22 income enrollees.  Beneficiaries who qualify for both Medicare and Medicaid
23 automatically receive the Part D benefit.  All Part C Medicare Advantage plans,
24 except Private Fee for Service plans, must also offer an option that includes the Part
25 D drug benefit.

26     26.    The United States does not pay pharmacies directly for providing
27 covered drugs to Medicare Part D beneficiaries.  Rather, the United States pays
28 private companies that contract with CMS.  The private companies that contract

- 7 -
COMPLAINT

{00067353; 4 }

1  with CMS to offer Part D coverage are known as "Part D plan sponsors" or "Part D
2  sponsors," which are typically private insurance companies.  Part D sponsors may
3  offer three types of plans: stand-alone PDPs, Medicare Advantage plans that provide
4  qualified prescription drug coverage ("MA-PD"), or Program of All-inclusive Care
5  for the Elderly ("PACE") plans.  Similar to Medicare Part C, CMS pays Part D
6  sponsors on a capitated basis to provide services to the Medicare beneficiaries who
7  elect to participate in their plans.

8        **A.**  **Medicare Part D Benefits**

9        27.  All Medicare Part D plans must provide enrollees with qualified
10  prescription drug coverage.  42 U.S.C. § 1395w-102; 42 C.F.R. § 423.104.
11  Qualified prescription drug coverage can consist of either standard coverage, which
12  includes both "defined standard" coverage and "actuarially equivalent" standard
13  coverage, or "basic alternative" coverage that provides the same actuarial value.
14  Plans that offer only qualified prescription drug coverage are referred to as "basic"
15  plans.  For an additional beneficiary premium, plans may also offer supplemental
16  coverage exceeding the value of basic coverage.  Plans that offer supplemental
17  coverage are known as "enhanced alternative" plans.  Beneficiaries who enroll in an
18  enhanced alternative plan must pay for the cost of the supplemental coverage; CMS
19  pays Part D sponsors only for qualified prescription drug coverage, no more and no
20  less.  The allegations set forth in this Complaint concern basic plans.

21        **1.**  **Defined Standard Coverage and Cost Sharing Requirements**

22        28.  Defined standard coverage consists of covered Part D drugs, which
23  include most FDA-approved prescription drugs and biologicals, subject to statutory
24  cost-sharing requirements.

25        29.  Under Part D, beneficiaries share in the cost of the drugs and the Part D
26  sponsor pays the remainder.  Under Part D statutory cost-sharing requirements, a
27  beneficiary must pay an initial annual deductible.  In 2015, the amount of the annual
28  deductible was $320.  Once the beneficiary pays the deductible, he or she is

1   responsible for 25 percent of drug costs, up to an initial coverage limit ("ICL").  The

2   ICL for 2015 was $2,960.  The Part D sponsor pays the remaining 75 percent of

3   drug costs attributable to the beneficiary.  In the case of government-subsidized

4   beneficiaries, the government pays close to 100 percent of the drug costs attributed

5   to the beneficiary.  The coverage phase between the deductible and the ICL is

6   referred to as the "ICL phase."

7       30.    Once the beneficiary reaches the ICL, the beneficiary becomes

8   responsible for various coinsurance percentages until his or her out-of-pocket

9   expenses exceed an annual threshold.  The coverage phase between the ICL and the

10  annual out-of-pocket threshold is commonly known as the "coverage gap" or "donut

11  hole."  The 2015 out-of-pocket threshold is $4,700.  The manufacturers of most

12  brand name drugs must provide a 50 percent discount at the point of sale if the

13  beneficiary is in the donut hole, but the full cost of the drug will count as out-of-

14  pocket spending for purposes of reaching the catastrophic coverage phase.  In the

15  coverage gap phase, the Part D sponsor pays the part of the costs not covered by the

16  beneficiary, or in the case of government-subsidized beneficiaries, the government

17  pays close to 100 percent of the drug costs attributed to the beneficiary.

18      31.    Upon reaching the out-of-pocket threshold, the beneficiary moves into

19  catastrophic coverage, which requires the beneficiary to pay the greater of 5 percent

20  or a small defined copayment amount with the Part D sponsor and the government

21  paying the remaining amount.  In the case of government-subsidized beneficiaries,

22  the government pays 100 percent of the drug costs attributed to the beneficiary.

23      32.    CMS annually adjusts the deductible, ICL, out-of-pocket threshold, and

24  beneficiary cost-sharing after the out-of-pocket threshold.  The benefit parameters

25  are indexed annually to the growth in average per capita Part D costs.

26          **2.    Actuarially Equivalent Standard Coverage**

27      33.    Part D sponsors may offer standard prescription drug coverage under

28  plans that differ from the defined standard, provided that CMS determines that the

{00067353; 4 }

1  plan is "actuarially equivalent" to the defined standard.  A plan is actuarially

2  equivalent to the defined standard when the actuarial value of the plan's coverage is

3  equal to the actuarial value of defined standard coverage.  *See* 42 C.F.R. § 423.4.

4  Part D sponsors must demonstrate to CMS that their proposed plans are actuarially

5  equivalent to the defined standard in order to receive a Part D contract.

6      34.    CMS requires that the value of the drug benefit be equal to the defined

7  standard in each of the coverage phases.  The purpose of this requirement is to

8  prevent Part D sponsors from subsidizing some coverage phases by reducing

9  benefits in other coverage phases.  Thus, to meet the actuarial equivalence

10  requirement, average expected member cost sharing during the ICL phase under the

11  sponsor's proposed plan must be 25 percent.  Similar requirements exist with

12  respect to the coverage gap and catastrophic coverage phases.

13              **3.    Tiered Formularies and Pharmacy Networks**

14      35.    For actuarially-equivalent standard coverage plans, CMS permits the

15  use of "tiered" formularies and pharmacy networks, in which different covered

16  drugs and pharmacies have different cost-sharing requirements.  A tiered formulary

17  provides beneficiaries with lower cost sharing for generic (or preferred) drugs and

18  higher cost sharing for brand-name drugs.  A tiered pharmacy network offers lower

19  cost sharing for prescriptions filled at certain retail and mail-order pharmacies, often

20  referred to as "preferred" pharmacies, and higher cost sharing for prescriptions filled

21  at the other, "non-preferred" pharmacies in the sponsor's network.  (Except in

22  limited circumstances, beneficiaries generally receive no benefits if they fill

23  prescriptions at out-of-network pharmacies.)  For plans with both a tiered formulary

24  and tiered pharmacy network, members benefit the most from using generic drugs

25  and filling those prescriptions at preferred pharmacies.

26      36.    The purpose of tiered cost-sharing structures is to incentivize members

27  to use low-cost services, such as generic drugs and preferred pharmacies, instead of

28  high-cost services, such as brand name drugs and non-preferred pharmacies.  The

{00067353; 4 }

1   key assumption underlying these structures is that members will be driven to use
2   preferred pharmacies because they will pay less (have a lower cost share) at those
3   pharmacies as compared to others. Thus a tiered pharmacy network will typically
4   change how members use services, steering utilization to the services with the
5   lowest cost sharing.

6                **4.**   **Low Income Subsidies and Cost Sharing**

7       37.   CMS subsidizes the cost of Part D premiums and cost sharing for low-
8   income beneficiaries. The low-income cost sharing subsidy ("LICS") is linked to
9   standard prescription drug coverage and varies based on the beneficiary's assets,
10   income, and institutional (or community care) status. Beneficiaries who qualify for
11   a full subsidy will not pay a monthly plan premium if they enroll in an inexpensive
12   Part D plan. Full-subsidy eligible beneficiaries also are not responsible for paying
13   the deductible (which is paid by CMS), bear only minimal cost sharing in the ICL
14   phase and coverage gap, and have no cost sharing once they reach catastrophic
15   coverage.

16       38.   In the ICL phase, cost sharing for full-subsidy eligible beneficiaries is
17   fixed at two copay amounts. In 2014, beneficiaries with income below 100 percent
18   of the federal poverty level paid $1.20 for generic or preferred drugs and $3.60 for
19   other drugs. Beneficiaries with incomes above 100 percent of the poverty level paid
20   slightly more: $2.55 for generic or preferred drugs and $6.35 for other drugs. In
21   both cases, the copay amounts are the same regardless of how the beneficiary
22   chooses to fill the prescription. The LICS member will pay the same cost sharing
23   amount at a preferred pharmacy as they would at a non-preferred pharmacy.

24       39.   Because LICS members have minimal cost sharing obligations that do
25   not vary much with the brand of drug and do not vary at all with the pharmacy they
26   choose, they are not as price sensitive as other members and therefore their
27   utilization patterns are different. LICS members are more likely to use brand name
28   drugs because the difference in the copay between generic and brand name drugs is

{00067353; 4 }

1    relatively small.  Similarly, LICS members are more likely to fill prescriptions at
2    non-preferred pharmacies, which may be more convenient for them than preferred
3    pharmacies, and the choice has no effect on their copay.

4         40.    LICS members are also subject to special enrollment rules.  Unlike
5    other Medicare beneficiaries, CMS may enroll a full-subsidy eligible beneficiary
6    into a PDP automatically if the beneficiary does not elect a PDP on his or her own.
7    The sponsors that receive auto-enrollments from CMS are those that offer basic
8    prescription drug coverage with a premium at or below a benchmark known as the
9    low-income premium subsidy amount.  If more than one sponsor in a given region
10   offers a PDP that meets the criteria for auto-enrollments, CMS will allocate
11   beneficiaries on a random basis among the available sponsors.  Once it allocates
12   beneficiaries to a sponsor, CMS will enroll them randomly among all of the
13   sponsor's plans that meet the criteria.

14        **B.    Testing for Actuarial Equivalence**

15        41.    To determine whether the value of a sponsor's plan is actuarially
16   equivalent to defined standard coverage, CMS requires the sponsor to perform
17   actuarial equivalence tests.  For standard coverage plans, the test compares the
18   "effective coinsurance percentage" of the proposed plan to the effective coinsurance
19   percentage under defined standard coverage, which provides that a member pays 25
20   percent of the cost and the Plan D sponsor pays the remaining 75 percent.  The
21   effective coinsurance percentage is the estimated cost sharing payments of the plan
22   members divided by the sponsor's estimated total cost of drugs.

23        42.    CMS requires the sponsor to determine actuarial equivalence using an
24   actuarially representative pattern of utilization.  42 U.S.C. § 1395w-102(c)(1)(C).
25   The sponsor must establish that the value of coverage for its expected member
26   population under the defined standard is equal to the value of coverage for the same
27   members under the proposed plan, accounting for any changes due to a different

28

{00067353; 4 }

1  level or pattern of utilization of prescriptions.  This requires the sponsor to estimate
2  how members will use services based on the proposed plan.

3      43.    The use of a tiered cost-sharing structure affects the actuarial value of
4  the Part D benefit in several ways.  First, for individual members, changing the level
5  of member cost sharing for different drugs and/or pharmacies means that the value
6  of the member's benefits may be greater or less than the defined standard.  In a
7  typical cost-sharing structure, the member cost share for "low-tier" services will be
8  less than 25 percent, while member cost share for "high-tier" services will be more
9  than 25 percent.  For the plan to be actuarially equivalent to the defined standard,
10 the cost-sharing structure must be designed so that the weighted-average rate of
11 member cost sharing equals 25 percent of drug costs.

12     44.    Second, because tiered cost sharing affects how members use services,
13 the sponsor must account for changes in utilization when determining the average
14 rate of member cost sharing.  To do so, the sponsor must make actuarial
15 assumptions about how its members will use services under the proposed plan, or
16 "utilization assumptions."

17     45.    In designing benefits, the sponsor typically must calibrate the proposed
18 cost-sharing structure until it meets the actuarial equivalence requirement.  Because
19 cost sharing is inversely related to utilization, any modifications that the sponsor
20 makes to cost sharing may affect its utilization assumptions, and vice versa.  The
21 sponsor must therefore adjust the proposed plan through multiple rounds of actuarial
22 modeling until the plan achieves equilibrium at an average effective coinsurance
23 percentage of 25 percent.

24     46.    Notably, because cost sharing is higher for members who use the more
25 costly options of brand-name drugs and non-preferred pharmacies, the amount that
26 those members spend on prescription drugs has an outsized effect on the effective
27 coinsurance percentage.  If the sponsor expects member cost sharing under the
28 proposed plan to be higher than 25 percent due to non-preferred pharmacy spending,

{00067353; 4 }

1   the sponsor must improve benefits, reduce non-preferred utilization, or both in order
2   to reduce the member cost share.  Reducing non-preferred utilization has a larger
3   effect than improving benefits, as members will move directly from the highest cost-
4   sharing tiers to the lowest cost-sharing tiers.  Reducing utilization of more costly
5   non-preferred options, however, depends upon the sponsor being able to change
6   member behavior.  If members will not switch from higher cost options to lower
7   cost options (such as non-preferred to preferred pharmacies), the only way for the
8   sponsor to make the plan actuarially equivalent is to improve benefits substantially,
9   which imposes greater cost on the sponsor.

10        **C.    Medicare Part D Contracts**

11        47.    In order to enroll beneficiaries in a Part D plan and be paid on their
12   behalf, the Part D sponsor must enter into a contract with CMS.  42 C.F.R.
13   § 423.504.  Each contract is for a period of 12 months and may be renewed
14   contingent on the Part D sponsor and CMS reaching agreement on the sponsor's bid
15   or bids.

16        48.    For a prospective Part D sponsor, the process for entering into a
17   contract has three primary steps: (1) submission of an initial application to
18   determine whether the prospective sponsor meets the eligibility qualifications for a
19   Part D contract; (2) submission of the proposed bids and drug formulary (if any);
20   and (3) execution of a Part D contract.  Once a Part D sponsor is deemed eligible for
21   a Part D contract, it does not need to resubmit an application each year in order to
22   renew its Part D contract, but it must submit new bids for each contract year.

23        49.    A new prospective sponsor must submit its application for a Part D
24   contract in mid-February.  CMS makes its eligibility determination in May, subject
25   to CMS's review and approval of the prospective sponsor's formulary and bids.  The
26   sponsor must then submit bids no later than June 1.  CMS reviews the bids in June
27   and July by conducting a "desk review" to determine whether the bids meet Part D
28   requirements.  Toward the end of the desk review, CMS releases the national base

1   beneficiary premium for the upcoming contract year, and the sponsor may revise its
2   bids to reflect the base premium amount.  These final bids are submitted in August.
3   If CMS approves the formulary and the final bids, it executes the Part D contract
4   with the sponsor on or about September 1.  The contract incorporates the sponsor's
5   final bids that form the basis for CMS's payments to the sponsor under the contract.

6           **1.    Bid Requirements**

7       50.    Potential Part D sponsors must submit a separate bid to CMS for each
8   PDP they intend to offer Medicare beneficiaries in a given geographic region.
9   Because CMS divides the United States into 34 geographic regions (plus other
10  regions for U.S. territories), a potential Part D sponsor who wants to offer a
11  nationwide PDP must submit at least 34 bids annually for each PDP (and more if it
12  wants to include U.S. territories).  The sponsor must submit the bids using CMS's
13  Prescription Drug Bid Pricing Tool ("BPT"), which consists of multiple bid
14  worksheets.  The sponsor must complete the BPT by entering data into the
15  worksheets in accordance with CMS instructions.

16      51.    Each bid must reflect a uniform benefit package, including the
17  premium and all applicable cost sharing, for all individuals enrolled in the plan.  42
18  C.F.R. § 423.265(c).  The bid must reflect the potential Part D sponsor's estimate of
19  its average monthly revenue requirements to provide qualified prescription drug
20  coverage for a Part D eligible individual with a national average risk profile.  *Id.*

21      52.    The specific requirements for each bid include "a description of the
22  coverage to be provided under the plan, including any supplemental coverage and
23  the deductible and other cost sharing."  The bid must also include the actuarial value
24  of its components, including "[t]he actuarial value of the qualified prescription drug
25  coverage to be offered under each plan for a Part D eligible individual with a
26  national average risk profile for the factors described in § 423.329(b)(1) and the
27  basis for that estimate," and "[t]he assumptions regarding low-income cost-sharing
28  payable under § 423.329(d) used in calculating the bid."  42 C.F.R. § 423.265(d)(2).

{00067353; 4 }

53. The Part D sponsor must prepare the bid in accordance with CMS actuarial guidelines based on generally accepted actuarial principles. 42 C.F.R. § 423.265(c)(3).

54. CMS will approve a bid "only if the plan and the Part D sponsor offering the plan comply with all applicable CMS Part D requirements, including those related to the provision of qualified prescription drug coverage and actuarial determinations." 42 C.F.R. § 423.272(b). Specifically, CMS must determine that the plan meets the actuarial equivalence requirement. 42 C.F.R. §§ 423.104(a), (d). In determining whether the plan meets the actuarial equivalence requirement, CMS may approve the bid "only if it determines that the portions of the bid attributable to basic and supplemental prescription drug coverage are supported by the actuarial bases provided and reasonably and equitably reflect the revenue requirements . . . for benefits provided under that plan, less the sum . . . of the actuarial value of the reinsurance payments." 42 C.F.R. § 423.272(b)(1).

55. In addition, CMS must determine that each plan for which the Part D sponsor submits a bid is substantially different from the other plans for which the Part D sponsor submits a bid with respect to beneficiary out-of-pocket costs or formulary structures. 42 C.F.R. §§ 423.265(b)(2), 423.272(b)(3)(i).

56. CMS requires plans to submit certain documentation with the bid in order to support the bid estimates. The documentation that CMS requires plans to submit does not include information regarding the assumptions the plan makes about member utilization at preferred and non-preferred pharmacies. Thus, CMS does not have access to those assumptions when it reviews the bid.

57. CMS requires the sponsor to submit an actuarial certification following the submission of the bid. The certification is required for each submitted bid pricing tool ("BPT") and must be completed by a qualified actuary who prepared or reviewed the plan's actuarial valuation. 42 C.F.R. § 423.265(c)(3). The actuary must certify both the initial bid in June and the final bid in August.

{00067353; 4 }

1  58.   In the actuarial certification, the actuary must attest that the bid is in
2  compliance with applicable laws, rules, bid instructions, and current CMS guidance.
3  *See, e.g.*, CMS, Instructions for Completing the Prescription Drug Plan Bid Pricing
4  Tool for Contract Year 2016, at 69 (2015).  The actuary must further attest that the
5  data and assumptions used in the development of the bid are reasonable for the
6  plan's benefit package.  *Id.*

7  ## 2.   Contract Requirements

8  59.   If CMS approves one or more of the prospective sponsor's bids, it may
9  offer the sponsor a Part D contract.  Under the contract, the sponsor agrees to
10  operate the PDP as described in its submissions to CMS and in accordance with Part
11  D statutes, regulations, solicitations, and all other applicable federal statutes,
12  regulations, and policies.  *See* Exhibit 1, Contract with Approved Entity Pursuant to
13  Sections 1860D-1 Through 160D-43 of the Social Security Act for the Operation of
14  a Voluntary Medicare Prescription Drug Plan, art. I, ¶ A (2015).  *See also* 42 C.F.R.
15  § 423.505.

16  60.   The contract requires the sponsor to provide basic prescription drug
17  coverage as defined in the Part D regulations.  Ex. 1, art. II, ¶ B.1.  In providing
18  coverage, the sponsor must "provide Part D benefits as described in PDP sponsor's
19  bid(s) approved each year by CMS."  *Id.*  The contract incorporates the sponsor's
20  bid or bids in Attachment A, which is replaced each year to reflect the sponsor's
21  approved bid or bids for the succeeding contract year.  *Id.*

22  61.   The sponsor is contractually required to provide certifications to CMS
23  in accordance with 42 C.F.R. § 423.505(k).  Ex. 1, art. II, ¶ P.  Under that provision,
24  entitled "[c]ertification of data that determine payments," CMS requires as a
25  condition of payment that sponsors certify the accuracy, completeness and
26  truthfulness of data relating to payment, including bid submission data:

27  As a condition for receiving a monthly payment . . . the Part D Plan
sponsor agrees that its chief executive officer (CEO), chief financial
28  officer (CFO), or an individual delegated the authority to sign on behalf
of one of these officers, and who reports directly to the officer, must

{00067353; 4 }

1     request payment under the contract on a document that certifies (based
2     on best knowledge, information and belief) the accuracy, completeness, and truthfulness of all data related to payment. The data may include
3     specified enrollment information, claims data, bid submission data, and other data that CMS specifies.

4 42 C.F.R. § 423.505(k)(1). The sponsor must also certify that the information in its

5 bid submission is accurate, complete, and truthful:

6     The CEO, CFO, or an individual delegated the authority to sign on
    behalf of one of these officers, and who reports directly to the officer,
7     must certify (based on best knowledge, information, and belief) that the information in its bid submission and assumptions related to projected
8     reinsurance and low income cost sharing subsidies is accurate, complete, and truthful and fully conforms to the requirements in
9     § 423.265.

10 42 C.F.R. § 423.505(k)(4).

11     62. In addition, the sponsor is required to certify that the claims data it

12 submits are accurate, complete, and truthful, and acknowledge that the data are used

13 for the purpose of obtaining Federal reimbursement. 42 C.F.R. § 423.505(k)(3).

14     63. The sponsor must further certify "that the information provided for

15 purposes of reporting and returning of overpayments" is accurate, complete, and

16 truthful. 42 C.F.R. § 423.505(k)(6).

17     64. The contract also requires the sponsor to submit information to CMS

18 that is necessary for CMS to administer and evaluate the Part D program, including

19 the benefits covered under the Part D plan. Ex. 1, art. III, ¶ B.

20     65. The contract requires the sponsor to comply with the False Claims Act

21 and all other federal laws and regulations designed to prevent fraud, waste, and

22 abuse. Ex. 1, art. V.

23     66. When the sponsor signs the contract, it must also sign a Prescription

24 Drug Plan Attestation of Benefit Plan. *See, e.g.*, CMS, Prescription Drug Plan

25 Attestation of Benefit Plan (2015), incorporated herein as Exhibit 2. In that

26 attestation, the sponsor must state that "the benefits identified in the [Plan Benefit

27 Packages] are those that the [sponsor] will make available to eligible beneficiaries"

28 and that "we have reviewed the bid pricing tools (BPTs) with the certifying actuary

- 18 -
COMPLAINT

{00067353; 4 }

1    and have determined them to be consistent with the [Plan Benefit Packages] attested
2    to here." *Id.* The sponsor must also certify that "these benefits will be offered in
3    accordance with all applicable Medicare program authorizing statutes and
4    regulations and program guidance." *Id.*

5    **D.    CMS Payments to Part D Sponsors**

6    67.    CMS pays Part D sponsors through four payment mechanisms: (1)
7    direct subsidies; (2) LICS subsidies; (3) reinsurance subsidies for catastrophic
8    coverage; and (4) risk sharing payments. 42 C.F.R. §§ 423.315, 423.329.

9    **1.    Direct Subsidy Payments**

10    68.    The direct subsidy is a capitated payment, made on a per-member-per-
11    month basis, which is equal to the product of the sponsor's standardized bid and
12    each member's "risk adjustment score," minus the monthly beneficiary premium.
13    *See* 42 C.F.R. §§ 423.315(b), 423.329(b). The "risk adjustment score" adjusts the
14    direct subsidy amount for the member based on the member's individual health
15    status.

16    69.    CMS determines the amount of the direct subsidy based on the bid that
17    the sponsor submits to CMS and the enrollment records that the sponsor additionally
18    submits to CMS to establish the beneficiaries for which the sponsor claims Part D
19    payment. CMS pays the direct subsidy prospectively, as a monthly payment for
20    each beneficiary enrolled in the PDP as of the first day of the payment month. CMS
21    adjusts the amount of the monthly payment to reflect changes in the member's risk
22    adjustment score. CMS determines the final amount of the direct subsidy, reflecting
23    the member's final risk adjustment score, after the end of the contract year.

24    **2.    LICS Payments**

25    70.    CMS pays the full value of the LICS to the Part D sponsor on behalf of
26    low-income subsidy eligible beneficiaries enrolled in the sponsor's Part D plan for
27    the coverage year ("LICS members").

28

- 19 -

{00067353; 4}

71.    CMS makes interim LICS payments to the sponsor on a monthly basis during the contract year.  CMS's payments are equal to the low-income estimate calculated from the sponsor's bid and the number of LICS members enrolled in the PDP that month.  After the end of the contract year, CMS adjusts (or "reconciles") the amount of its interim LICS payments to reflect the costs the sponsor actually incurred during the contract year.  42 C.F.R. § 423.329(d)(ii).  If CMS's interim payments did not fully cover the sponsor's LICS costs during the contract year, CMS will make up the difference with an additional payment to the sponsor.  If CMS's interim payments exceeded the sponsor's LICS costs, CMS will recoup the overpayment from the sponsor.

72.    CMS determines the necessary payment adjustment based on Prescription Drug Event ("PDE") records from the sponsor.  Each time a pharmacy fills a prescription for an enrolled beneficiary, the sponsor must notify CMS of the drug transaction on a PDE record.  The PDE is an electronic record that includes multiple fields about a specific drug transaction, including the amount that the patient paid, the amount that the plan paid, and the LICS amount (if any) that plan paid.  Through PDE reports, the sponsor claims payment from CMS for the total amount of its LICS costs during the payment year.  CMS adjusts its LICS payments to the sponsor based on the LICS costs set forth in those PDE records.

73.    CMS will overpay the plan for LICS subsidies if plan benefits are worth less than the actuarial equivalent of the defined standard.  The portion of the LICS payment that exceeds the subsidy that CMS would have paid under an actuarially equivalent plan represents a loss to the United States because it inflates overall Part D spending.  Under Part D, different PDPs may offer different cost sharing requirements for the pharmacies that LICS members choose to visit.  If a PDP is not actuarially equivalent and sets high cost sharing requirements for the pharmacies that LICS members use, CMS will pay more than it would have paid had the LICS members used the same pharmacies under a different PDP with lower

1  cost sharing requirements for those pharmacies.  Thus, even though LICS members
2  may go to the same pharmacies no matter what PDP they join, a plan that is not
3  actuarially equivalent will increase CMS's program costs by claiming higher LICS
4  payments than an actuarially equivalent plan.  Moreover, even if the LICS payments
5  to an ineligible Part D sponsor did not increase CMS's overall costs, CMS would
6  not have paid the LICS subsidies to the ineligible sponsor.

7           **3.    Reinsurance Payments**

8           74.    CMS pays the sponsor a reinsurance subsidy to cover the Part D share
9  of drug costs above an enrollee's catastrophic threshold.  CMS pays the subsidy in
10  the form of a monthly estimated amount based on the information in the sponsor's
11  bid.  After the contract year, CMS adjusts its estimated payments based on the actual
12  reinsurance costs set forth in the sponsor's PDE reports.  42 C.F.R. § 423.329(c)(ii).

13          **4.    Risk Sharing Payments**

14          75.    CMS shares part of the insurance risk of the Part D program with plans
15  by limiting the plans' losses or profits if plan spending turns out to be much
16  different from the spending estimated in the plans' bids.  Based on the sponsor's
17  total spending during the year, CMS will make a risk sharing payment to the
18  sponsor if the sponsor's spending was much higher than the bid, or receive a risk
19  sharing payment from the sponsor if the sponsor's spending was much lower than
20  the bid.

21          76.    Under CMS's payment system, the sponsor has full risk if its actual
22  spending falls between 95 percent and 105 percent of the bid.  Within that range,
23  CMS will not pay the sponsor for costs above the bid amount or receive payment for
24  cost savings below the bid amount.

25          77.    If the sponsor's actual costs exceed 105 percent of the bid, CMS pays
26  the sponsor a percentage of the excess costs (*i.e.*, plan losses).  For plan spending
27  that is between 105 and 110 percent of the bid amount, CMS pays 50 percent of the
28  excess costs.  For plan spending above 110 percent of the bid, CMS pays 80 percent

{00067353; 4 }

1  of the excess costs.  Conversely, if the sponsor's actual costs are below 95 percent
2  of the bid, the sponsor must pay CMS a percentage of its gains (profits).  For actual
3  costs between 90 and 95 percent of the bid amount, the sponsor must pay CMS 50
4  percent of its profit (the amount between 90 and 95 percent of the bid amount).  For
5  actual costs below 90 percent of the bid, the sponsor must pay CMS 80 percent of its
6  profit (the amount between the actual cost and 90 percent of the bid amount).

7      78.    CMS determines the amount of risk sharing payments based on the
8  PDE reports that the sponsor submits.

9      79.    If a plan submits a bid that overstates its estimated costs, CMS will
10  overpay the plan because the plan will keep some or all of the difference between
11  the overstated bid and its actual costs as additional profit.  The profits are in addition
12  to the profit margin that the plan already included in its bid.  Moreover, by
13  overstating costs the plan protects itself from loss (the risk that its costs will exceed
14  the bid), thus leaving CMS with most or all of the insurance risk and the plan with
15  little or none.

16  **V.    HUMANA'S WALMART PLAN**

17      80.    Since 2010, Humana has contracted with CMS to operate a national
18  PDP that Humana has marketed as the "Humana Walmart-Preferred Rx Plan" and
19  "Humana Preferred Rx Plan" (collectively, the "Walmart Plan").  The Walmart Plan
20  is a "basic" plan that offers standard coverage.  Since its inception, Humana has
21  offered the Walmart Plan in all fifty states as well as Puerto Rico.  Humana changed
22  the name of the plan from "Humana Walmart-Preferred Rx Plan" to "Humana
23  Preferred Rx Plan" in 2014 after introducing a new co-branded PDP with Walmart
24  known as the "Walmart Enhanced Plan."  From 2014 to the present, Humana has
25  offered the Walmart Plan for "basic" coverage and the Walmart Enhanced Plan for
26  "enhanced alternative" coverage.

27      81.    From its inception, the Walmart Plan has been one of the largest PDPs
28  in the country.  The Walmart Plan's average monthly membership was nearly

1  968,000 in 2011, 1.5 million in 2012, 1.8 million in 2013, and 1.7 million in 2014.

2  Between 2011 and 2014, Humana has received approximately $3.2 billion in direct

3  subsidies from CMS for the Walmart Plan.  Between 2011 and 2014, CMS paid

4  Humana over $4.357 billion in LICS subsidies under the Walmart Plan, of which

5  over $469 million were payments made after adjusting for Humana's actual costs.

6      82.    CMS has assigned contract numbers S2874, S5552, and S5884 to the

7  Walmart Plan.  CMS divides the contracts into 35 geographic regions (comprising

8  the 50 states plus Puerto Rico) and has assigned Humana a separate plan ID for each

9  region in which it has been approved to operate.  Humana submits a separate annual

10  bid for each geographic region.  To date, Humana has submitted 210 annual bids for

11  the Walmart Plan.

12      **A.    Benefit Structure**

13      83.    The Walmart Plan purports to provide actuarially equivalent standard

14  coverage.  The Walmart Plan uses the defined standard for three of the four Part D

15  coverage phases: the deductible, the coverage gap, and catastrophic coverage.  It is

16  only in the ICL phase (between the deductible and the ICL) that the Walmart Plan

17  departs from the defined standard through the use of a different cost-sharing

18  structure.  Accordingly, it is only in the ICL phase that Humana must establish that

19  the value of the benefits offered under the Walmart Plan is actuarially equivalent to

20  defined standard coverage.

21      84.    For the ICL phase, the Walmart Plan, like other Part D plans, uses a

22  tiered pharmacy and tiered formulary benefit structure.  Humana classifies

23  pharmacies into four groups: a preferred mail order pharmacy, a preferred retail

24  pharmacy, non-preferred mail order pharmacies, and non-preferred retail

25  pharmacies.  Preferred pharmacies are those with which Humana has negotiated

26  price discounts under the PDP, while non-preferred pharmacies are all other network

27  pharmacies at which a beneficiary may fill a prescription.  Under the Humana

28  benefit structure, members who fill their prescriptions at a preferred pharmacy have

1    a lower cost share percentage than those who fill their prescriptions at non-preferred
2    pharmacies.

3        85.    The preferred mail order pharmacy for the Walmart Plan is Humana
4    Pharmacy, which is a wholly-owned subsidiary of Humana.   Prior to June 2015,
5    Humana Pharmacy was known as RightSource.  The preferred retail pharmacy is
6    Walmart's network of retail pharmacies, including Walmart, Sam's Club, and
7    Neighborhood Market.  All other mail order and retail pharmacies in the network,
8    including Walgreens, CVS, and Rite Aid, are "non-preferred."  Humana encourages
9    members to use RightSource and Walmart by reducing its members' cost sharing
10   obligation at those pharmacies while increasing the cost sharing obligation at non-
11   preferred pharmacies.

12       86.    Under the tiered formulary, Humana divides covered drugs into five
13   tiers.  Tiers 1 and 2 constitute generic drugs, which are typically less expensive,
14   while tiers 3 through 5 comprise brand name drugs.  Under Humana's benefit
15   structure, members pay more (have a higher cost share percentage) for brand name
16   drugs than for generics.

17       87.    Humana uses the combination of the tiered formulary and pharmacy
18   type to determine the value of the Part D benefit (and thus cost sharing) for
19   individual members.  For example, a member who fills a prescription at Walmart
20   with a tier 1 generic drug will have copays as low as $1 per prescription in the ICL
21   phase.  A member who fills a prescription for a brand name drug at a non-preferred
22   pharmacy, by contrast, will incur a high copay or coinsurance.  Thus, the Walmart
23   Plan's benefit structure incentivizes members to fill prescriptions at preferred
24   pharmacies, and to choose generic drugs over brand name drugs.

**B.     Development of the Bids**
**1.     The PDP Strategy Team**

25
26       88.    Humana's PDP Strategy Team oversees the actuarial valuation and bid
27   preparation of Humana's Part D plans, including the Walmart Plan.  The PDP
28

{00067353; 4 }

1  Strategy Team includes managers from the following Humana divisions: Senior

2  Products, Senior Products Finance, Senior Products Actuarial Rx ("Actuarial Rx"),

3  Product Design, and Sales & Marketing.

4       89.    Actuarial Rx is responsible for many of the assumptions in Humana's

5  bids.  The division comprises four teams: PDP Pricing & Assumptions, MA-PD

6  Pricing, Medicare Group Rx Pricing, and Modeling & Tools.  The head of Actuarial

7  Rx is Actuarial Director David Pottschmidt.  The head of PDP Pricing &

8  Assumptions is Actuarial Director Matt Hayes.

9       90.    Actuarial Rx uses information from the other divisions within the PDP

10  Strategy Team to form its bid assumptions.  In particular, Actuarial Rx uses

11  information from Senior Products and Sales & Marketing to estimate how

12  Humana's planned business activities will affect member behavior, including the

13  amount that the members will spend at different pharmacy types.

14       91.    Within Senior Products, the Humana employee directly responsible for

15  providing information to Actuarial Rx about the effect of business activities on

16  member utilization is Strategic Consultant Carl Koontz.  From approximately 2011

17  to 2014, Mr. Koontz reported to Vice President of Senior Products Administration

18  Susan Diamond, who in turn reported to Alan Wheatley, Humana's President of

19  Medicare, Medicaid, and Long-Term Care.  In or around 2015, Humana promoted

20  Ms. Diamond to Vice President of Corporate Finance and replaced her within Senior

21  Products Administration with Raymond Daub, who currently manages Mr. Koontz.

22  Ms. Diamond, Mr. Daub, and Mr. Koontz were and/or are the representatives from

23  Senior Products on the PDP Strategy Team.

24       **2.    The Role of Milliman**

25       92.    Humana develops its bids in conjunction with Milliman, an external

26  actuarial firm operating under contract with Humana.  Milliman's services include

27  populating the BPT using its proprietary bid model, assisting Humana in the

28  development of certain bid assumptions, documenting bid assumptions, and

{00067353; 4 }

1  justifying bid assumptions to CMS during desk audits.  Milliman serves as the Part
2  D Certifying Actuary for Humana's Part D bids.

3      93.    The Part D Certifying Actuary for the Walmart Plan is Milliman
4  Principal and Consulting Actuary Douglas Proebsting.  Mr. Proebsting reports to
5  Mr. Pottschmidt and communicates regularly with Mr. Hayes.

6      94.    The process of preparing Humana's bids typically begins in January,
7  when Humana and Milliman begin to prepare assumptions for the upcoming
8  contract year.  Humana and Milliman use claims experience from prior years (if
9  available) as well as the claims experience accumulating in the current year to make
10 projections about Humana's future costs.

11     95.    Milliman works with Humana's actuaries between January and June to
12 refine the assumptions in the bids and to prepare the bids and supporting
13 documentation for submission to CMS.  Once the bids are submitted, Milliman
14 typically works on a reduced schedule during the desk review, and rarely performs
15 services once CMS approves the bids.  Thus, the firm's engagement generally
16 covers only the months between January and June of each year.

17     96.    Consistent with the limited scope of the engagement, Humana does not
18 provide Milliman with information about its operations beyond the minimum
19 amount needed to prepare the Part D bids.  In the case of many assumptions,
20 including the assumption about member utilization, Humana develops the
21 assumptions internally and provides Milliman with only the final numbers and brief
22 descriptions of the justifications.  Milliman often incorporates Humana's
23 assumptions into the bids, even though it may lack the information needed to
24 determine whether the assumptions are reasonable.  When Milliman certifies the bid
25 projections for Humana's Walmart Plan, it lists the data and assumptions that
26 Humana had provided Milliman in final form to incorporate into the bids.
27 Milliman's certifications state that it relies on Humana for data and assumptions
28 related to member utilization of preferred and non-preferred pharmacies.

- 26 -
COMPLAINT

### 3.   Actuarial Valuation

97.   The Walmart Plan's benefit structure is actuarially equivalent to the defined standard if the weighted average of the effective member coinsurance percentages for all pharmacy types is 25 percent.  Humana calculates the effective coinsurance percentage by forecasting the allowed amount at each pharmacy type.

98.   To forecast the allowed amount for each pharmacy type, Humana must make utilization assumptions for the different pharmacy types.  For preferred pharmacies, Humana makes assumptions about the "preferred mail dispensing rate" and the "preferred retail rate"—the rates at which members use RightSource and Walmart, respectively.  Humana additionally makes assumptions about the relative spending at non-preferred mail order and retail pharmacies.  In making its assumptions, Humana relies on member utilization from prior years (if any) as well as assumptions about future drug costs and member behavior, including the expected impact on member behavior of any business activities to increase utilization at preferred pharmacies and the expected impact on member behavior of any proposed changes to the benefit structure.

### C.   Bid Submissions

99.   Since 2010, Humana has submitted 35 bids to CMS each year for the Walmart Plan by preparing and filing BPTs.  Through the BPTs, Humana must list the effective coinsurance percentages for the proposed plan and test whether those percentages are actuarially equivalent to the defined standard.  The BPT requires Humana to list and test the percentages separately for each coverage phase.  Once approved, the bids have been incorporated into Humana's Part D contracts with CMS.

100.   In each PDP bid submitted to date, Humana has represented that the Walmart Plan's Part D benefits are actuarially equivalent to the defined standard even though, as set forth below, Humana knows that is not true.  Humana's 2011 and 2012 bids, for example, reported effective member coinsurance percentages of

{00067353; 4 }

1   24.2 percent and 25 percent, respectively. Humana's 2016 bids reported an
2   effective coinsurance percentage for the ICL phase of 25.5 percent. (25.5 percent is
3   the maximum cost sharing percentage that meets the actuarial equivalence
4   requirement.) Through these statements, Humana represented to CMS that the value
5   of the benefits in its bids were actuarially equivalent to (or better than) the defined
6   standard. At the same time that it reported those expected coinsurance percentages
7   to CMS, Humana was internally using its actual valuation of the plan benefit, which
8   showed that Humana believed the plan was worth much less than Humana
9   represented to CMS.

10      101.   Humana supports the effective coinsurance percentage in its bids by
11  reporting its projected cost-sharing and allowed amounts in the BPT. The BPT
12  requires Humana to break out the projections into eight subcategories for different
13  combinations of drugs (generic, preferred brand, non-preferred brand, and specialty)
14  and points of service (retail and mail order).

15      102.   The BPT does not require Humana to report its estimates for member
16  utilization at preferred pharmacies versus non-preferred pharmacies, nor does it
17  require Humana to report how it expects member utilization of those pharmacies to
18  differ between LICS and non-LICS members. Although not reported in the BPT,
19  estimated member utilization of preferred pharmacies and the estimated rates at
20  which LICS and non-LICS members use preferred pharmacies have a significant
21  effect on the cost-sharing and allowed amounts that Humana reports in the bids.

22      103.   Humana prepares its utilization assumptions between January and June
23  of each year as part of the bid preparation process. Humana develops the
24  assumptions internally and provides them to Milliman in final form. Milliman then
25  inputs the assumptions into its bid model in order to populate the BPT.

26      104.   Because member utilization at preferred and non-preferred pharmacies
27  affects member cost sharing and allowable costs, the assumptions that Humana
28  provides to Milliman affect the BPT projections for the cost sharing and allowed

{00067353; 4 }

1   amounts in the ICL phase and the effective coinsurance percentage for the ICL
2   phase.

3         105.   In each contract year, Humana's bids have incorporated the assumption
4   that RightSource and Walmart would have high utilization rates and non-preferred
5   pharmacies would have low utilization rates, which is information that Humana
6   knows is not accurate, complete and truthful.  These assumptions  are broken down
7   by LICS status and pharmacy type:

|  | LICS Members | | | Non-LICS Members | | |
|---|---|---|---|---|---|---|
|  | RightSource | Walmart | Total Preferred | RightSource | Walmart | Total Preferred |
| 2011 Bid | 5% | 71% | 76% | 5% | 90% | 95% |
| 2012 Bid | 12% | 66% | 78% | 28% | 65% | 93% |
| 2013 Bid | 30% | 30% | 60% | 30% | 60% | 90% |
| 2014 Bid | 8% | 29% | 37% | 22% | 58% | 81% |
| 2015 Bid | 8% | 23% | 31% | 24% | 53% | 77% |
| 2016 Bid | 12% | 19% | 31% | 27% | 52% | 79% |

16
17        106.   CMS relies on the information in Humana's bids in determining
18   whether to enter into a PDP contract with Humana.  Had CMS known that the
19   information in Humana's bids was not accurate, complete and truthful and that the
20   plan was not actuarially equivalent to the defined standard, CMS would not have
21   awarded Humana a Part D contract, paid Humana substantial capitation payments
22   for providing beneficiaries with plans that required an average 25% cost share, or
23   paid Humana substantial subsidies for the premiums and cost sharing for low-
24   income beneficiaries.

**VI.    THE DEFENDANT'S FRAUDULENT PRACTICES**

25        107.   From the beginning of the Walmart Plan, Humana's bids for a Part D
26   contract have been knowingly false or fraudulent because they have been based
27   upon information that was not accurate, complete and truthful, as demonstrated by
28

{00067353; 4 }

1   Humana's simultaneous use of different and accurate assumptions for its own
2   internal budget projections for reporting to its management and shareholders.

3       108.   For each year that Humana submitted bids based on the Walmart Plan,
4   the assumptions about member utilization at RightSource and Walmart that Humana
5   used to support those bids were much higher than Humana actually believed or that
6   were borne out by experience.  Instead of submitting bids that reflected either its
7   actual estimate of projected utilization rates or its experience with actual utilization
8   rates, Humana created assumptions specifically for use on the bids submitted to
9   CMS that assumed large increases in RightSource and Walmart utilization that
10   Humana knew at the time it submitted the bids would not happen.  Humana
11   incorporated the false assumptions into each of the 35 bids it submitted each year for
12   the Walmart Plan.

13       109.   As set forth below, Humana manages actuarial assumptions throughout
14   the year for use in the bids and in setting its internal operating budget.  For nearly all
15   assumptions, the amount that Humana uses in the bids is the same as the amount
16   Humana uses to set its budget.  In the case of preferred utilization under the
17   Walmart Plan, however, Humana maintains two sets of books.  Internally, Humana
18   prepares its budget on the assumption that utilization at RightSource and Walmart
19   will remain low, as it historically has, resulting in Humana paying a smaller share of
20   covered drug costs in the ICL phase than it would under the defined standard, which
21   would require that Humana pay 75 percent.  Humana budgets for beneficiaries and
22   CMS to fund the difference through member cost sharing that exceeds the 25
23   percent they would pay under the defined standard, with Humana earning greater
24   profits by not covering the costs it contracts to cover.  For purposes of the bids,
25   however, Humana assumes that utilization at RightSource and Walmart will rise
26   significantly, resulting in Humana paying 75 percent of the covered drug costs in the
27   ICL phase and thereby complying with its contractual requirement that the Plan be
28   actuarially equivalent to the defined standard.  Humana's effective coinsurance

{00067353; 4 }

1   percentage in the bids that Humana reports to CMS has been significantly higher
2   each year than the effective coinsurance percentage Humana uses to set its own
3   budget.

4       110.   Milliman warned Humana repeatedly that the assumptions that Humana
5   had created for the bids were "aggressive" and inconsistent with Humana's actual
6   experience.  Humana knew that the bid assumptions contradicted Humana's internal
7   estimates, but did not revise its bids or reveal to Milliman that they did not reflect
8   Humana's internal actuarial valuations of the Walmart Plan.

9       111.   By using false information in each year it presented a bid, Humana
10  represented to CMS that the Walmart Plan was actuarially equivalent to the defined
11  standard, when Humana knew that this was not true.  Not only would Humana not
12  have received the Part D contract had it provided accurate, complete and truthful
13  information about the Walmart Plan, by providing beneficiaries with fewer benefits
14  than required Humana has shifted nearly $412 million in costs onto beneficiaries,
15  and in the case of LICS members, onto CMS, resulting in an equal amount of
16  unlawful profits for Humana.

17  **A.    Humana Knowingly Submits Bids Based on Information that is
        Not Accurate, Truthful and Complete as Certified**

18      112.   The falsity of Humana's PDP bids is demonstrated by Humana's
19  simultaneous employment of two actuarial models:  the model that Humana uses
20  internally to estimate its financial results for its senior management and
21  shareholders, which represents Humana's most accurate assessment of what it
22  expects will occur, and the model that Humana uses to prepare its bids for CMS,
23  which presents a different valuation that Humana has altered to misrepresent that the
24  Walmart Plan meets Part D requirements that it does not meet.

25  **1.    Humana's Internal Analysis**

26      113.   The actuarial model Humana uses to set its annual budget forecasts
27  Humana's future claims expense based on past experience and Humana's
28  assumptions about future events.  Humana refines the model over time by

- 31 -

COMPLAINT

comparing model results to actual results and making changes in the assumptions or techniques used.  Humana runs the model throughout the year, making adjustments as needed.  The results from the model represent Humana's best estimate of actuarial value for its Part D plans.  Humana refers to the model as the "Regular" or "Budget" Model.

114.   The assumptions used in the Regular Model are the responsibility of Actuarial Rx, the same division that is responsible for preparing Humana's Part D bids.  The group within Actuarial Rx that sets the assumptions used in the Regular Model is PDP Pricing & Assumptions, led by Matt Hayes, the same group that sets the assumptions for Part D bids.  Thus the actuaries who set the assumptions in the Regular Model are the same actuaries who prepare the bids for CMS.

115.   Humana begins to prepare its budget shortly after CMS releases information in the early fall about competitor premiums, which informs Humana about the competitiveness of its plan and thus its potential membership in the coming year.

116.   Because Humana's information about the Walmart Plan at the time it submits its final bids in August remains substantially (if not entirely) the same at the time it prepares the budget projections, the assumptions used in the bids should be similar to the assumptions used in the budget projections.  For similar reasons, the actuarial assumptions in the bids should be the same as the actuarial assumptions in the Regular Model (from which Humana sets its budget projections) because the bids submitted to CMS must reflect Humana's best estimate of the actuarial value of its Part D Plans.

117.   In nearly all respects, Humana uses the same assumptions in the Regular Model that it uses in its bids.  The primary exception is the assumptions about member utilization of preferred pharmacies under the Walmart Plan, including related assumptions about the number of LICS members in the plan.

{00067353; 4 }

## 2.  Humana's False Analysis Provided to CMS

118.  For Part D bid assumptions about member utilization of preferred pharmacies, *i.e.*, Walmart and RightSource, Humana does not use the assumptions in the Regular Model, but rather creates different utilization assumptions specifically for purposes of the bids.  Humana does not reconcile the bid assumptions to the assumptions in the Regular Model, nor does it use the bid assumptions for any purpose other than the bids.

119.  Humana has used two sets of books with respect to preferred utilization since the beginning of the Walmart Plan in 2011.  In October 2013, Actuarial Rx documented this practice in an internal procedure, No. xxx-SPA-11Rx-Preferred Utilization ("Utilization Procedure"), which it prepared in response to a directive from Humana's Chief Actuary, Roy Goldman, to formally document its policies and procedures.  The purpose of the Utilization Procedure was to "provide guidance in the development of preferred utilization assumptions for bids and budget," and it set forth "the activities performed by [Actuarial Rx] to develop the preferred utilization assumptions."  Managing Actuary Lazar Ivetic prepared the Utilization Procedure and Matthew Hayes was listed as its original approver.

120.  For the Regular Model, the Utilization Procedure followed Humana's general practice of making actuarial assumptions based on actual results.  According to the Procedure, Humana "gathers the previous year's information and current year's actuals on preferred pharmacy utilization on a days [sic] basis" by region, month, and low-income status, and then analyzes the pattern or trend "to see if the current year's pattern will be ok to use for the projected period in our budgeting process.  If the pattern is not flat, a projection to future years will be needed."

121.  For the bids, however, the Utilization Procedure mandated a different procedure under which Humana would create assumptions about preferred utilization that were different—and more aggressive—than those it used in the Regular Model:

{00067353; 4}

1
2
3
4

> For Bids, a separate projection is prepared by the Senior Products
> Finance, and is used as an assumption for the bids as this includes any
> programs that will be implemented during the projected period to
> increase preferred pharmacy utilization.  Documentation of each of
> these programs is needed from Senior Products Finance.
>
> Due to risk share and bid mechanics it is better to err on the side of
> aggressive in the bids.

Humana Procedure No. xxx-SPA-11Rx-Preferred Utilization (Oct. 21, 2013)

(emphases added).  Thus, as documented in the Utilization Procedure, Humana

prepares its assumptions about member utilization of preferred pharmacies in the

Regular Model based on actual results, but prepares its assumptions about member

utilization of preferred pharmacies in the bids based on a "separate projection" that

Actuarial Rx receives from Senior Products Finance and that intentionally "err[s] on

the side of aggressive."  The Utilization Procedure does not require Humana to

reconcile the different amounts or otherwise determine that it is valid to use a

different and more favorable estimate in the bids.  Instead, the Procedure states that

Humana should change the estimate for the bids in order to gain a more favorable

bidding and risk share position with CMS.

122.   Once Actuarial Rx receives the "separate projection" from Senior

Products Finance, it provides it to Milliman to incorporate into the bids and also

enters it into a second internal actuarial model, known as "Milliman" or "Match

Milliman," which Actuarial Rx creates and runs exclusively in the months when it

prepares the bids.  The purpose of Match Milliman is to emulate Milliman's

proprietary bid model, allowing Humana to replicate and confirm Milliman's work.

During the bid season, Humana refines Match Milliman so that it replicates the final

estimates in Humana's bids.  Consistent with this purpose, Humana prepares Match

Milliman using the assumptions that it provides to Milliman for use in the bids.

123.   Because Humana must use true, accurate, and complete estimates in its

bids, the assumptions Humana uses in the bids should be the same as those it

follows internally, and accordingly the assumptions in Match Milliman should be

{00067353; 4 }

1  the same as those in the Regular Model.  Actuarial Rx is responsible for ensuring
2  that the Regular Model is consistent with Match Milliman and for updating the
3  Regular Model at the time it submits each bid so that Humana uses the same
4  assumptions internally and in the Part D bids.  If Humana were preparing its bids
5  truthfully, the Regular Model and Match Milliman would converge by the time
6  Humana submits the bids, so that either model would produce the same actuarial
7  estimates as the bids.

8      124.   For the Walmart Plan, however, the Regular Model and Match
9  Milliman have not converged because, as set forth in the Utilization Procedure,
10  Humana's assumptions about member utilization at RightSource and Walmart are
11  different for each model.  At the time Humana submits the bids, it updates the
12  Regular Model so that it conforms to Match Milliman and the bid on nearly every
13  assumption—the major exceptions being utilization at Walmart and RightSource
14  and the percentage of LICS members in the Walmart Plan.  For those key
15  assumptions, Humana does not update the Regular Model to reflect the assumptions
16  in the bid and Match Milliman.  Instead, Humana intentionally uses different
17  assumptions in the Regular Model and intentionally disregards the different actuarial
18  estimates that result.

19      125.   Actuarial Rx monitors the differences between the Regular Model and
20  Match Milliman.  One monitoring tool is the "bid-budget-actual variance" report,
21  which tracks the differences between Humana's bids, budgets, and actual results.
22  The reports that Actuarial Rx has prepared for Humana's internal use reveal
23  significant differences in member utilization under the Walmart Plan between the
24  estimates in Humana's bids and the estimates in its budgets.  As a matter of actuarial
25  practice, such consistently large differences would require Humana to reevaluate the
26  actuarial soundness of its bids.  Humana has failed to do so.

27      126.   Instead of reevaluating the actuarial soundness of its bids, Humana
28  changed its internal reporting.  Beginning in 2012, Humana excluded its bid

{00067353; 4 }

1 estimates from the bid-budget-actual variance.  From that point on, Actuarial Rx

2 reported only the "budget-actual variance," which showed only the minor

3 differences between Humana's budget estimates and its claims experience.  Humana

4 no longer reported the large differences between the budget estimates or actual

5 experience and its bid estimates.

6    127.   Because Humana's bids to CMS have not reflected Humana's actual

7 estimates for the Walmart Plan, which Humana has recorded in a separate set of

8 books that it uses to operate its business, Humana has knowingly submitted bids

9 each year that were not truthful, accurate, or complete.  To obtain approval of the

10 bids and Part D contracts, Humana falsely certified to CMS that the bids were

11 truthful, accurate, and complete.

12    **B.    Humana Knowingly Misrepresented that the Walmart Plan Was
         Actuarially Equivalent to the Defined Standard When it Was Not**

13    128.   Since the beginning of the Walmart Plan, Humana's internal analyses,

14 prepared for its senior management and shareholders, have concluded that the

15 Walmart Plan was not actuarially equivalent to the defined standard, contrary to

16 Humana's representation to CMS.  Humana's internal analyses showed that the

17 Walmart Plan's overall effective coinsurance percentage in the ICL phase is higher

18 than the defined standard of 25 percent:

| Contract Year | Actuarial Equivalence Requirement (Bid) | Humana's Internal Projected Effective Coinsurance Percentage (Budget) |
|---|---|---|
| 2011 | 25% | 32.2% |
| 2012 | 25% | 35.3% |
| 2013 | 25% | 33.2% |
| 2014 | 25% | 29.6% |
| 2015 | 25% | 28.0% |

   129.   These internal estimates have been borne out by actual claims

experience:

| Contract Year | Humana's Internal Projected Effective Coinsurance Percentage (Budget) | Humana's Actual Effective Coinsurance Percentage |
|---|---|---|
| 2011 | 32.2% | 35.3% |

- 36 -

| 2012 | 35.3% | 35.5% |
| 2013 | 33.2% | 32.4% |
| 2014 | 29.6% | 27.9% |
| 2015 | 28.0% | 28.1% |

The striking difference between Humana's bid and actual effective coinsurance percentages is primarily due to its assumptions regarding utilization at RightSource and Walmart. In the Regular Model, Humana has accurately forecasted low utilization at RightSource and Walmart, especially among LICS members. In contrast, when preparing its bids, Humana has assumed large increases in utilization at RightSource and Walmart, including among LICS members.

130. In addition to being worth less than the defined standard overall, the Walmart Plan has been worth less than the defined standard every year in each of the 35 geographic regions for which Humana submits a bid. Between 2010 and 2014, for the 2011–2015 contract years, Humana submitted 175 bids to CMS representing that the Walmart Plan was actuarially equivalent to the defined standard in each region. For every single one of those bids, Humana's actual results have shown that the Walmart Plan was worth less than the defined standard. Moreover, Humana has budgeted for the Walmart Plan to be worth less than the defined standard in 2016 in each of the 35 geographic regions. Thus, the Walmart Plan's benefits have been worth less (or are expected to be worth less) than the defined standard for each of the 210 bids that Humana has submitted to CMS.

131. Humana knows that its estimates for LICS utilization of preferred pharmacies are unrealistic because of its understanding of beneficiary behavior. LICS members are less price sensitive than other members because they do not bear the cost of their choice of pharmacies. Accordingly, a LICS member would have no reason to switch from a neighborhood pharmacy, such as CVS or Walgreens, to a Walmart retail store which may not be anywhere near where they live. Nor would they have an incentive to switch to a mail order pharmacy, which would have no

{00067353; 4 }

1  cost savings for them.  While a non-LICS member might have some reason to
2  switch to save a little money, member behavior is still very stubborn, as people tend
3  to stick to their patterns.

4      132.   Humana has papered its false bid assumptions internally by designing
5  "business initiatives" that will purportedly increase utilization at RightSource and
6  Walmart.  Carl Koontz, a Strategic Consultant for Senior Products Finance, is
7  responsible for creating the business initiatives, which he provides to Actuarial Rx
8  to review and incorporate into Humana's bids.  Based on substantial experience and
9  industry knowledge, Humana has known that the initiatives would not actually
10 increase utilization.  Accordingly, Humana does not include the initiatives in its
11 assumptions in the Regular Model or its budget projections, even though they are
12 the only purported basis for the "separate projections" about preferred utilization
13 that Humana incorporates into its bids to CMS.

14     133.   Had CMS known that the benefits in the Walmart Plan were worth
15 significantly less than qualified prescription drug coverage, *i.e.*, the defined
16 standard, it would not have approved or renewed Humana's Part D contract.
17 Humana knew that the actuarial value of the Walmart Plan was less than the defined
18 standard and that CMS would not approve its bids if they admitted that fact, because
19 a PDP must provide benefits equal to or greater than the defined standard in order to
20 be eligible for a Part D contract.  42 U.S.C. § 1395w-102; 42 C.F.R. § 423.104.
21 CMS has consistently advised that inability to provide actuarially equivalent or
22 better benefits renders a plan ineligible for a Part D contract.  For example, in an
23 Actuarial User Group Call on April 26, 2012, a prospective Part D sponsor asked
24 CMS: "If a bid is not able to obtain actuarial equivalence and remain within the
25 copayment thresholds, is there flexibility in the limits to reach equivalence?"  CMS
26 responded: "No."

27
28