**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

UNITED STATES OF AMERICA *ex rel.*
STEVEN SCOTT,

               Plaintiff,

     v.

HUMANA INC.,

               Defendant.

Civil Action No. 3:18-cv-00061-GNS-CHL

Oral Argument Requested

**PLAINTIFF-RELATOR STEVEN SCOTT'S OPPOSITION TO**
**DEFENDANT HUMANA INC.'S MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 2

I.     The Medicare Part D Program ................................................................. 2

      A.     Medicare Part D Coverage Requirements ................................... 2

      B.     CMS Regulations and Guidelines Governing Part D Bid
            Submission ................................................................................. 3

      C.     Part D Bid Submission ................................................................ 4

      D.     Humana's Bargain with CMS ...................................................... 6

II.     Humana's Fraudulent Bids for the Walmart Plan ................................... 7

      A.     Humana Used Fraudulent Bid Assumptions in CYs 2011 to 2017 ..... 8

            1.     Humana's Bid Assumptions for CY 2011 .................... 8

            2.     Humana's Bid Assumptions for CY 2012 .................. 10

            3.     Humana's Bid Assumptions for CYs 2013 to 2017 .... 12

      B.     Humana Concealed Its Fraud from CMS and Milliman ............ 14

III.     The Government's Investigation of Humana's Fraud ........................... 15

DISCUSSION ............................................................................................................. 16

I.     Humana's Fraudulent Conduct and Its Misrepresentations Are Material ........ 16

      A.     There Is No Evidence That CMS Had Actual Knowledge of
            Humana's Fraud ....................................................................... 17

      B.     There Is No Evidence That CMS Has Approved or Paid PDPs That
            Are Not *Expected* To Provide Actuarially Equivalent Coverage .......... 22

      C.     Humana's Misrepresentations Go to the Heart of the Bargain ............. 24

II.     There Is No Genuine Dispute That Humana Knowingly Made, or Caused
      To Be Made, False Claims for Payment and False Statements Material to
      Those False Claims for Payment ........................................................... 27

A.      Humana's Two Sets of Books Are Conclusive Evidence of
        Knowledge ........................................................................................................31

B.      Humana Did Not Reasonably Rely on Milliman....................................................32

III.    The Record Evidence Establishes a Reverse-False-Claims Theory ..................................34

CONCLUSION.........................................................................................................................35

CERTIFICATE OF SERVICE

## **TABLE OF AUTHORITIES**

Page

CASES

*Compressor Eng'g Corp. v. Mfrs. Fin. Corp.*, 2019 WL 1326035
    (E.D. Mich. Mar. 25, 2019) ...............................................................34

*D'Agostino v. ev3, Inc.*, 845 F.3d 1 (1st Cir. 2016).....................................20

*Graves v. Plaza Med. Ctrs., Corp.*, 276 F. Supp. 3d 1335 (S.D. Fla. 2017)................35

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776 (4th Cir. 1999)............29

*Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037 (9th Cir. 2012)....................30

*Knight Capital Partners Corp. v. Henkel AG & Co.*, 930 F.3d 775 (6th Cir. 2019) ...................16

*Morgan v. Fairfield Cty.*, 903 F.3d 553 (6th Cir. 2018), *cert. denied*,
    139 S. Ct. 1377 (2019)...............................................................16

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175, 191-92 (2015) .......................................................30

*Rose v. Stephens Inst.*, 2016 WL 5076214 (N.D. Cal. Sept. 20, 2016) .........................18

*Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089 (11th Cir. 2020)................................ 24-25

*Saint Francis Med. Ctr. v. Azar*, 894 F.3d 290 (D.C. Cir. 2018)................................18

*U.S. ex rel. Berg v. Honeywell Int'l, Inc.*, 226 F. Supp. 3d 962 (D. Alaska 2016),
    *aff'd*, 740 F. App'x 535 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 1456
    (2019).............................................................................29, 32

*U.S. ex rel. Brown v. Pfizer, Inc.*, 2017 WL 1344365 (E.D. Pa. Apr. 12, 2017) .........................17

*U.S. ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890 (9th Cir. 2017),
    *cert. denied*, 139 S. Ct. 783 (2019).................................................22

*U.S. ex rel. Cressman v. Solid Waste Servs., Inc.*, 2018 WL 1693349
    (E.D. Pa. Apr. 6, 2018) ...........................................................20, 21

*U.S. ex rel. Dildine v. Pandya*, 2019 WL 8277242 (N.D. Ga. Dec. 19, 2019).............................18

*U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364 (4th Cir. 2015) .....................................33

*U.S. ex rel. Druding v. Care Alts.*, 952 F.3d 89 (3d Cir. 2020), *pet. for cert.
    pending*, No. 20-371 (U.S. Sept. 16, 2020) .......................................30

*U.S. ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103 (1st Cir. 2016) ..............17, 18

iii

*U.S. ex rel. Fisher v. JPMorgan Chase Bank N.A.*, 2020 WL 3265060
(E.D. Tex. June 17, 2020) ...................................................................................18

*U.S. ex rel. Janssen v. Lawrence Mem'l Hosp.*, 949 F.3d 533 (10th Cir. 2020),
*pet. for cert. pending*, No. 20-286 (U.S. Aug. 27, 2020) ............................................19, 21

*U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148
(2d Cir. 1993) ...................................................................................................19

*U.S. ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027 (D.C. Cir. 2017) ......................................20

*U.S. ex rel. Onnen v. Sioux Falls Indep. Sch. Dist. No. 49-5*, 688 F.3d 410
(8th Cir. 2012) ...................................................................................................22

*U.S. ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 838 F.3d 750
(6th Cir. 2016) ...............................................................................................34, 35

*U.S. ex rel. Schimelpfenig v. Dr. Reddy's Labs. Ltd.*, 2017 WL 1133956
(E.D. Pa. Mar. 27, 2017) ...................................................................................21

*U.S. ex rel. Sobek v. Educ. Mgmt., LLC*, 2013 WL 2404082 (W.D. Pa. May 31,
2013) ...................................................................................................................35

*United States v. Berkeley HeartLab, Inc.*, 2017 WL 4803911 (D.S.C. Oct. 23,
2017), *appeal pending*, No. 18-1813 (4th Cir.) ............................................18, 32

*United States v. Brookdale Senior Living Cmtys.*, 892 F.3d 822 (6th Cir. 2018),
*cert. denied*, 139 S. Ct. 1323 (2019) ...............................................................17, 22

*United States v. Dental Dreams, LLC*, 307 F. Supp. 3d 1224 (D.N.M. 2018) ............................35

*United States v. DynCorp Int'l, LLC*, 253 F. Supp. 3d 89 (D.D.C. 2017) ...................................28

*United States v. Hawley*, 544 F. Supp. 2d 787 (N.D. Iowa 2008), *rev'd*,
619 F.3d 886 (8th Cir. 2010) ..............................................................................27

*United States v. Killough*, 848 F.2d 1523 (11th Cir. 1988) ......................................................27

*United States v. Mackby*, 221 F. Supp. 2d 1106 (N.D. Cal. 2002), *aff'd*,
339 F.3d 1013 (9th Cir. 2003) ............................................................................27

*United States v. Paulus*, 894 F.3d 267 (6th Cir. 2018) ..........................................................29, 30

*United States v. Rogan*, 517 F.3d 449 (7th Cir. 2008) ...............................................................27

*United States v. Rozin*, 664 F.3d 1052 (6th Cir. 2012) .............................................................32

*United States v. Vandewater Int'l Inc.*, 2020 WL 4372115 (C.D. Cal. June 23,
2020) ...................................................................................................................22

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989 (2016) .......1, 17, 24, 25, 26

*Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*,
       953 F.3d 1108 (9th Cir. 2020) ..................................................................................30


STATUTES, REGULATIONS, AND RULES

False Claims Act, 31 U.S.C. § 3729 *et seq.* ...........................................1, 19, 20, 21, 28, 29, 30, 35

       § 3729(a)(1)(G)...................................................................................................34

       § 3729(b)(3) ......................................................................................................34

42 U.S.C.:

       § 1320a-7k(d)(4)(B)........................................................................................ 34-35

       § 1395w-102 .................................................................................................2, 17

       § 1395w-102(b)(2)(A)(ii)......................................................................................2

       § 1395w-111(c)(1) .............................................................................................17

       § 1395w-111(e)(2) .............................................................................................17

42 C.F.R.:

       § 423.104(d)(2)(i)(B) ...........................................................................................2

       § 423.265(c)(3) ...........................................................................................3, 5, 6

       § 423.360(a) ......................................................................................................34

       § 423.504(a) ........................................................................................................3

       § 423.505(k)(1) ...............................................................................................4, 5

       § 423.505(k)(4) .....................................................................................4, 5, 6, 26

       § 423.505(k)(5) .................................................................................................26

Fed. R. Civ. P.:

       Rule 56(a)...........................................................................................................16

       Rule 56(c)(2) ......................................................................................................34

LEGISLATIVE MATERIALS

H.R. Conf. Rep. No. 108-391 (2003).............................................................................................17

ADMINISTRATIVE MATERIALS

Medicare Program; Medicare Prescription Drug Benefit, 70 Fed. Reg. 4194
    (Jan. 28, 2005)...........................................................................................................17, 25

## INTRODUCTION

This case arises from Humana Inc.'s ("Humana") massive fraudulent scheme to obtain government contracts from the Centers for Medicare and Medicaid Services ("CMS") that paid Humana more than $28 billion in government subsidies under the Medicare Part D program.  In perpetrating this fraud, Humana undermined foundational requirements of the Part D program intended to ensure that Part D insurance plans are expected to cover a minimum amount of drug costs (specifically, 74.5% of costs in the "Initial Coverage Limit" or "ICL" coverage phase); that all Part D bids comply with applicable actuarial standards; and that all bids are supported by assumptions that are truthful and based on the insurer's best knowledge, information, and belief.

These requirements are conditions of payment prescribed by statute, regulation, CMS guidelines, and Humana's contracts with CMS.  The undisputed evidence shows that:  (1) CMS has *never* accepted a bid from any Part D insurer that does not meet these requirements; (2) CMS had no knowledge of Humana's fraud when it signed the fraudulently induced contracts at issue; and (3) if CMS had discovered Humana's fraud, it would have rejected Humana's bids and (at the very least) required Humana to modify and resubmit them.  The parties' experts further agree that Humana's fraudulent conduct resulted in CMS paying Humana *$450.1 million* more in subsidies than it would have if Humana's bids been truthful.  Thus, Humana's fraud directly affected CMS's payment obligations, making that fraud material as a matter of law.

Remarkably, Humana's lead argument on summary judgment is that these foundational requirements are immaterial.  Humana fails to meaningfully address any of the factors governing materiality in an FCA case as set forth in *Universal Health Services, Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989 (2016).  Instead, Humana argues that CMS continued to pay the false claims submitted by Humana after it became aware of Relator's *allegations*.  This argument ignores clear precedent that government payments made with mere awareness of allegations – as opposed

to *actual knowledge* – of the fraud are irrelevant to the materiality inquiry.  Humana's other assertions that CMS has paid other Part D plans that have not actually covered 74.5% of drug costs in the ICL phase attack strawmen and ignore the statutory and regulatory requirements at issue.

Equally remarkable, and baseless, is Humana's argument that no jury could find that the representations in its bids were knowingly false.  As detailed in Relator's Motion for Summary Judgment, the record evidence on this score is overwhelming – highlighted by Humana's two sets of books:  a phony one for its false bids to CMS and an accurate one for every other corporate purpose.  Far from supporting Humana's arguments, the record evidence establishes, at a minimum, Humana's reckless disregard for the truth or falsity of the information in its bids.

## BACKGROUND[1]

### I.     The Medicare Part D Program

#### A.     Medicare Part D Coverage Requirements

Actuarially equivalent Medicare Part D prescription drug plans ("PDPs") such as Humana's Walmart Plan are statutorily required to cover a minimum amount of member drug costs, known as the "defined standard."  *See* 42 U.S.C. § 1395w-102.  Specifically, Humana was required to demonstrate in each of its bids that the Walmart Plan was expected to cover at least 74.5% of drug costs in the ICL phase of the Part D program, with members as a whole paying no more than 25.5% of costs through copays or coinsurance ("member cost share").  *See id.* § 1395w-102(b)(2)(A)(ii); 42 C.F.R. § 423.104(d)(2)(i)(B).[2]  This "actuarial equivalence"

---

[1] A statement of undisputed material facts is set forth in Relator's Motion for Summary Judgment ("Relator's Motion").  *See* Dkt. No. 365-1 at 2-18.  Relator incorporates that statement by reference.  Additional undisputed material facts are set forth below.

[2] Contrary to Humana's suggestion (at 17), Humana was required to demonstrate that it expected the Walmart Plan to cover at least 74.5% of drug costs in the ICL phase in each of the relevant years, including Contract Year ("CY") 2011.  In CY 2011, the Walmart Plan had to meet the same actuarial equivalence standards because it had a deductible equal to the defined standard and benefits above the ICL that were identical to the defined standard.  *See* Dkt. No. 350 (Ex. 1,

requirement is central to the Part D program because it ensures that, while the benefit structures of individual PDPs may vary, each PDP provides at least the same overall expected dollar value of coverage as the defined standard.  *See* Foster Rep. ¶¶ 24, 47; Dkt. No. 350-5 (Ex. 6, Lazio Decl.) ¶ 2.  In this way, the actuarial equivalence requirement protects members from high premiums, taxpayers from unfair program costs, and CMS from overpaying insurers in the form of government subsidies.  Foster Rep. ¶ 98.

## B.     CMS Regulations and Guidelines Governing Part D Bid Submission

An insurance company that wishes to offer a PDP must submit a bid to CMS six months before the year in which that insurance company wishes to offer the PDP (the "contract year" or "CY").  *See* 42 C.F.R. § 423.504(a).  To ensure that an insurer's bids are "based on reasonable expectations that the statutory intent for Part D coverage will be met," CMS mandates that each bid comply with the applicable Actuarial Standards of Practice ("ASOPs").  *See* Dkt. No. 345-17 (Humana Ex. 16, Foster Rebuttal Rep.) ¶ 26; *see also* 42 C.F.R. § 423.265(c)(3); Ex. 226 (CMS CY 2014 Bid Instructions (Apr. 5, 2013)) at -330.[3]

Among other things, the ASOPs require healthcare actuaries to consider "relevant information available to the actuary," which, in this case, includes "business plans; past experience of the health plan entity or the health benefit coverage; and any relevant industry, government, or academic studies that are generally known and reasonably available to the actuary."  Dkt. No. 358-7 (Ex. 168) § 3.12; Dkt. No. 358-8 (Ex. 169) § 3.2.9.  The ASOPs also incorporate the "requirements of law," including federal statutes and regulations.  Ex. 227 (ASOP No. 1) § 3.1.5.[4]

---

Foster Rep.) ¶ 25 & n.7; Dkt. No. 350-7 (Ex. 8, Ellis Rep.) ¶ 11 & n.16.

[3] Exhibits 226 to 235 are to the September 28, 2020 Declaration of Andrew C. Shen.

[4] The expert report of Margaret Sparks provides a comprehensive discussion of the ASOPs and

In addition to mandating compliance with the ASOPs, CMS regulations require all bid assumptions to be "accura[te], complete[ ], and truthful[ ]," and based on an insurer's "best knowledge, information, and belief."  42 C.F.R. § 423.505(k)(1), (4).  CMS guidelines also "require that the bids reflect the plan sponsor's best estimate of projected costs, including projected claims" – *i.e.*, the drug costs that the insurer expects to pay in a given contract year. Lazio Decl. ¶ 11; *see* Ex. 228 (Sparks Suppl. Exp. Rep.) ¶ 6; Sparks Rep. ¶¶ 136, 147, 214.

C.     **Part D Bid Submission**

Humana submitted its bids using a standardized "Bid Pricing Tool," which required Humana to input a variety of projections relating to the Walmart Plan.  *See* Sparks Rep. ¶¶ 70-72. One of those projections concerned the expected ICL member cost share.  As Humana concedes (at 7 & n.3), it is impossible to submit a bid that is not projected to cover the statutorily required 74.5% of drug costs in the ICL phase.  *See also* Dkt. No. 350-3 (Ex. 4, 2/28/19 Theiss 30(b)(6) Tr.) 186:9-187:18.  The assumptions on the face of the Bid Pricing Tool, however, are "only a subset of the numerous assumptions used by plans in developing their [bids]."  Foster Rebuttal Rep. ¶ 36.  For example, Bid Pricing Tools "do not show prescription drug utilization rates, unit prices, or other information separately for preferred versus non-preferred pharmacies" and contain "only a limited amount of information regarding prescription drug utilization by low-income versus non-low-income enrollees."  Foster Rep. ¶ 84.

The CMS Office of the Actuary performed "desk reviews" of Humana's bids after they were submitted.  *Id.* ¶ 105.  This limited review focused largely on identifying statistical outliers among the limited assumptions actually shown in the Bid Pricing Tool.  *See* Foster Rebuttal Rep. ¶ 36.  As former CMS Chief Actuary Richard Foster has explained, "it is not possible for this

_____

their application to Part D bids.  *See* Dkt. No. 350-1 (Ex. 2, Sparks Rep.) ¶¶ 118-179.  Ms. Sparks's opinion that Humana violated the ASOPs is unrebutted.

review process to ensure that *all* of the assumptions underlying each bid are reasonable and legitimate." Foster Rep. ¶ 35. Because of the limits of desk review, "several additional safeguards are established by the law, regulations, and CMS instructions" to ensure the accuracy of bid assumptions, including the requirement that each bid must be submitted with an actuarial certification. *Id.* ¶¶ 35-36; *see also* 42 C.F.R. § 423.265(c)(3); Lazio Decl. ¶ 12.[5]

Humana's consulting actuary, Milliman, Inc. ("Milliman"), provided the actuarial certifications with each of Humana's bids. *See* Dkt. Nos. 350-11 to -19, 351, 351-1 (Exs. 12-22). Milliman's certifications stated that the bids were developed "in compliance with the applicable laws, rules, . . . bid instructions, current CMS guidance, and also compl[ied] with the appropriate [ASOPs]." *E.g.*, Dkt. No. 350-11 (Ex. 12) at -424 (footnotes omitted). For CYs 2011 to 2014, the certifications also stated that "[t]he data and assumptions used in the development of the bid(s) [we]re consistent with the [Humana's] current business plan." *See* Dkt. Nos. 350-11 to -17 (Exs. 12-18). Each certification also made clear that Milliman had relied on assumptions and data supplied by Humana. *See* Foster Rep. ¶¶ 73, 81. As relevant here, Humana developed the preferred use and low-income membership assumptions and provided those assumptions to Milliman as "reliance" items. *See* Dkt. Nos. 357-6 to -12 (Exs. 147-153). Milliman disclaimed

---

[5] As explained in Relator's Motion, insurers must submit several other certifications in addition to the actuarial certification. *See* Mot. at 5-6. The CEO, CFO, or another high-level executive must certify "(based on best knowledge, information, and belief) that the information in its bid submission and assumptions related to projected reinsurance and low income cost sharing subsidies is accurate, complete, and truthful." 42 C.F.R. § 423.505(k)(4). "As a condition for receiving a monthly payment," Humana also was required to "request payment under the contract on a document that certifies (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of all data related to payment," including "enrollment information, claims data, [and] bid submission data." *Id.* § 423.505(k)(1). Finally, Humana signed a "Prescription Drug Plan Attestation of Benefit Plan," attesting that it had "reviewed [bids] with the certifying actuary" and that the plan's "benefits will be offered in accordance with all applicable Medicare program authorizing statutes and regulations and program guidance." *E.g.*, Dkt. No. 351-2 (Ex. 23) at -289.

responsibility for these bid assumptions and explained that Humana would need to defend them if they were questioned by CMS.  *See* Dkt. No. 356-15 (Ex. 134) at -528; Dkt. No. 350-9 (Ex. 10, Brandel Tr.) 66:11-20, 162:17-163:1; Ex. 229 (Foster Tr.) 225:4-226:14.

### D.    Humana's Bargain with CMS

Under Humana's bargain with CMS, Humana agreed to:  (i) certify that its plan was expected to cover at least 74.5% of drug costs in the ICL phase; (ii) formulate its bids using accepted actuarial standards; and (iii) base its bid projections on its "best knowledge, information, and belief."  *See* 42 C.F.R. §§ 423.265(c)(3), 423.505(k)(4); Foster Rebuttal Rep. ¶¶ 13, 27; Dkt. No. 351-2 (Ex. 23) at -270.  In exchange, CMS paid Humana more than *$28 billion* in subsidies from 2011 through 2017.  *See* Ellis Rep. ¶¶ 60-62.

For actuarially equivalent plans, such as the Walmart Plan, CMS does not additionally require that the *actual* ICL member cost share be equal to or less than 25.5% – the plan's actual experience may be higher or lower than the member cost share estimate in the bid.  *See, e.g.*, Foster Rebuttal Rep. ¶ 79.[6]  Nonetheless, actual experience is probative of whether an insurer has submitted honest bids.  During the relevant period, the median ICL member cost share of *non*-Humana plans converged around 25.5%, with half of the years reflecting a medium ICL member cost share slightly higher than 25.5% and the other half a medium ICL member cost share under 25.5%.  *Id.* ¶¶ 39, 75.  This is precisely what one would expect if insurers were submitting good-faith honest bids.  By contrast, the medium ICL member cost share for the Walmart Plan was well above 25.5% every year.  *Id.* ¶ 75.

---

[6] Humana's illustration (at 13) of the difficulties of predicting the Low-Income Benchmark is beside the point.  "[T]he substantially more relevant fact [is] that Humana had a legal obligation to provide benefits that would reasonably be expected to provide the full, actuarially equivalent level of coverage specified in the law."  Foster Rebuttal Rep. ¶ 79.  As described below, Humana never expected the Walmart Plan to do so.

## II.     Humana's Fraudulent Bids for the Walmart Plan

The undisputed and overwhelming evidence establishing Humana's fraudulent conduct is set forth in detail in Relator's Motion (at 6-17).  Although each of Humana's bids for the Walmart Plan represented that the Plan was expected to cover at least 74.5% of drug costs in the ICL phase, Humana never expected the Plan to cover those costs and, in fact, *planned not to do so* in its contemporaneous internal budgets.  *Compare* Dkt. No. 346-2 (App'x 1) *with* Dkt. No. 346-3 (App'x 2); *compare* Dkt. No. 346-6 (App'x 5) *with* Dkt. No. 346-7 (App'x 6); *see also* Dkt. No. 346-11 (App'x 10).

To perpetrate its fraud, Humana manipulated two critical assumptions in its bids, each of which directly impacts member cost share in the ICL phase:  (1) preferred pharmacy use and (2) low-income membership.[7]  Humana's bids assumed artificially high rates of preferred pharmacy use and artificially low rates of low-income membership, which collectively had the effect of inflating the percentage of ICL drug costs that Humana was projected to cover.  *See* Mot. at 6-8.  Humana's fraud is demonstrated by its two sets of books – one set (the bids) containing the fraudulent assumptions that Humana used to induce CMS to award the Part D contracts at issue, and another vastly different set (Humana's budgets) containing assumptions meant to be "as accurate as possible," Dkt. No. 353-11 (Ex. 72, 3/6/19 Liss Tr.) 146:6-14, 149:12-25, and that Humana used for all other business purposes.[8]  Year after year, Humana's

---

[7] Preferred pharmacy use refers to the rate at which a plan's members use "preferred" pharmacies, which offer better benefits (specifically, a lower member cost share) than other pharmacies.  Low-income membership refers to the proportion of plan members made up by "low-income" members.  *See* Mot. at 6-8.

[8] Humana admits (at 14) that its budgets "relied on assumptions that differed from those in [its] bids," and, while Humana claims it did so "for various reasons," it fails to address why its accurate, *contemporaneous* internal budgets contained assumptions that differed so dramatically from those in its bids.

internal budgets accurately predicted actual experience while its bid assumptions were always inaccurate.  *See*, *e.g.*, App'x 10.  Humana's fraud is also evidenced by (1) its practice of reverse-engineering the Walmart Plan's bid assumptions to pass the actuarial equivalency test; (2) the completely different methodologies Humana used to develop the *same assumptions* in its bids and its budgets; (3) the vast differences between the assumptions for Walmart use in the bids and the assumptions Humana shared with Walmart; and (4) Humana abruptly stopping its fraud after receiving the Civil Investigative Demand ("CID") in this case.  *See* Mot. at 6-17.

### A.    Humana Used Fraudulent Bid Assumptions in CYs 2011 to 2017

#### 1.    Humana's Bid Assumptions for CY 2011

Humana first submitted bids for the Walmart Plan for CY 2011 in June 2010.  The Plan was originally designed as an "enhanced" alternative plan, meaning that it would have very few low-income members.  Dkt. No. 352-9 (Ex. 50) at -471.  CMS rejected Humana's initial bid because it failed critical CMS requirements.  *See* Ex. 230; Dkt. No. 354-7 (Ex. 88, 7/1/20 Diamond 30(b)(6) Tr.) 149:8-13.  In response, Humana resubmitted the Plan as a "basic alternative" plan, which made it eligible to receive many more low-income members.  *See* Dkt. No. 353-7 (Ex. 68, Wheatley Tr.) 24:13-25:20, 350:4-22.  Humana knew that low-income members used preferred pharmacies at much lower rates than other members; this is because the government heavily subsidizes the drug costs of low-income members, diminishing their economic incentives to use low-cost options (such as preferred pharmacies and generics).  *E.g.*, Dkt. Nos. 352-8 to -11 (Exs. 49-52); Ex. 231 at -309.  Humana also knew that an influx of low-income members into the Plan necessarily meant that preferred pharmacy use would decrease across all members on average and that the percentage of ICL drug costs covered by the Plan would correspondingly decrease.  *See* Dkt. No. 350-4 (Ex. 5, Behnke Tr. 68:24-69:4) 110:11-111:10; Sparks Rep. ¶¶ 189-199; Sparks Rep. App'x 3, ¶ 5.

8

To understand how this change would affect the Walmart Plan's financial performance, Humana requested that Milliman "stress test" combinations of preferred pharmacy use and low-income membership assumptions, which Milliman provided on August 3, 2010. *See* Dkt. No. 355-4 (Ex. 105). Consistent with Humana's understanding of low-income behavior, the most "[o]ptimistic" scenario assumed low-income preferred use of "40% at Walmart" and non-low-income preferred use of "95% at Walmart." *Id.* at -073. The "[r]ealistic" scenario assumed low-income preferred use of "30% at Walmart" and non-low-income preferred use of "90% at Walmart." *Id.* Humana's contemporaneous budgets assumed a non-low-income Walmart use rate of 64.46% and a low-income Walmart use rate of 41.29%. *See* App'x 2.

When Humana resubmitted its bids to CMS, however, Humana assumed *95%* preferred pharmacy use for both low-income and non-low-income members – a figure far higher than Milliman's most "optimistic" projections. *See* Dkt. No. 358-12 (Ex. 173); App'x 1.[9] None of Humana's witnesses could explain this conduct. *See* Wheatley Tr. 144:12-23; Dkt. No. 350-8 (Ex. 9, Pottschmidt Tr.) 189:15-190:5; 2/28/19 Theiss 30(b)(6) Tr. 268:19-270:18. Relator's experts have offered unrebutted testimony that no reasonable actuary would have assumed 95% low-income preferred use. Foster Rep. ¶ 62; Sparks Rep. ¶¶ 197-199.[10] Notably, Humana did not use that bid assumption (or any preferred use bid assumption) for *any* other business purpose. *See* App'x 2; Dkt. No. 346-4 (App'x 3); 2/28/19 Theiss 30(b)(6) Tr. 111:14-112:19.

---

[9] Humana now claims (at 15-16) that it relied on its experience from a 2006 cobranded plan with Walmart to develop its bid assumptions, but there is no record evidence that Humana analyzed *low-income behavior* under that arrangement to develop its bids. *See* Wheatley Tr. 354:20-24.

[10] Humana incorrectly states (at 17 & n.5) that CMS concluded the Walmart Plan's bids complied with the ASOPs in CY 2011. CMS audited *one* of Humana's 35 bids for the Plan in CY 2011, *see* Dkt. No. 345-49, and did *not* audit low-income members' preferred pharmacy use in that year or any other year, Dkt. No. 345-16 (Rice Decl.) ¶ 18.

### 2. Humana's Bid Assumptions for CY 2012

When Humana was preparing its bids for CY 2012, it knew that actual preferred pharmacy use rates in 2011 were more than *seven times* lower than the 95% rate it had projected in its CY 2011 bids. *See*, *e.g.*, Dkt. No. 356-20 (Ex. 139) at -846 ("The LI Walmart use . . . averag[es] 13%."). As a direct result, Humana's share of drug costs in the ICL phase was well below 74.5%, yielding Humana tens of millions of dollars in additional profits. *See* Dkt. No. 354-12 (Ex. 93) at -489. Humana knew that submitting truthful bids for CY 2012 would mean paying a higher share of drug costs and receiving lower profits. *E.g.*, Dkt. No. 354-17 (Ex. 98). Unwilling to accept those consequences, Humana ignored its actual experience data and used fabricated preferred use assumptions for its CY 2012 bids. *See* App'x 1.

On May 1, 2011, one month before the bids were filed, the head actuary overseeing Humana's bids, David Pottschmidt, emailed Humana's Chief Operating Officer, Jim Murray, and Retail President Alan Wheatley, explaining that, to maintain Humana's profit margin on the Walmart Plan, Humana would need to increase premiums by $5 per member per month to offset "improved benefits to meet actuarial equivalence." Dkt. No. 352-4 (Ex. 45). Mr. Pottschmidt explained that the "*root cause* is low income members using non-preferred pharmacies and paying a coinsurance [*i.e.*, member cost share] that is much higher than the defined standard benefit." *Id*. (emphasis added). Rather than increase benefits to cover its share of costs, however, Humana committed to "put together a schedule . . . of tactics to drive more use to Walmart and Mail" and "*run[ ] new bids with these assumptions*." *Id.* (emphasis added). Humana knew full well at the time, however, that it could not induce low-income members to use preferred pharmacies. Carl Koontz, the individual responsible for these "tactics" or business "initiatives," acknowledged in a March 30, 2011 email that "the preferred network *has no impact on LIS utilization*." Dkt. No. 352-11 (Ex. 52) (emphasis added); *see* Dkt. No. 352-10 (Ex. 51)

at -230 (explaining low-income "members do not have the same financial incentive as regular members to utilize preferred pharmacies").  In May 2011, Humana hired a consultant to conduct a study of preferred use by low-income members, which reaffirmed Mr. Koontz's conclusions, finding that, for low-income members, there is no "cognitive reason to change behavior" and there is no "fix" for the issue.  Dkt. No. 356-2 (Ex. 123) at -357.[11]

On the eve of submitting its CY 2012 bids, Humana conducted its annual "Lockdown" or "Market Call" meeting to present material aspects of the Walmart Plan bids to senior Humana leadership (including the COO and CFO).  *See* Pottschmidt Tr. 89:11-25.  These executives were informed that emerging experience in 2011 showed that the Plan was covering far less than the statutorily required 74.5% of ICL drug costs and that this was caused by "[h]igher than expected non-preferred use in 2011."  Dkt. No. 354-12 (Ex. 93) at -489.  Humana's presentation also quantified the "savings" that Humana reaped from this inaccurate projection:  "$84 million."  *Id.* The executives were then presented with two "Options to fix":  (1) improve "non-preferred benefits," which would come at significant cost to Humana's bottom line unless Humana also raised premiums; or (2) simply assume "more use to Walmart" in its bids.  *Id.* at -490.  To avoid a hit to profit margins or raising premiums, Humana chose to use fraudulent bid assumptions that were wildly different than those used in Humana's contemporaneous budgets.[12]

---

[11] Humana states (at 17-18) that, in April 2011, it developed an "interdepartmental committee" that supposedly met "to discuss strategies to increase [preferred use]."  As evidence of this, Humana cites a single email referencing the committee, which is not referenced in any of Humana's polices, PowerPoint presentations to leadership, or discussions of low-income behavior among Humana's actuaries.  Notably, Humana points to no relevant work done by that committee or any success that this committee had in increasing preferred use, and Humana's contemporaneous budgets projected that preferred use would not increase.  *See* Sparks Rep. ¶ 210 & tbls. 6-7.

[12] Contrary to Humana's claim (at 17) that it had "strong incentives" to increase preferred use, its 30(b)(6) witness testified that, once benefits were set, Humana was "financially agnostic" as to whether members used preferred pharmacies because any increase in Humana's costs from members using preferred pharmacies would be offset by concession payments from Walmart.

### 3.      Humana's Bid Assumptions for CYs 2013 to 2017

Humana's conduct in subsequent years followed a similar pattern.  Year after year, actual

experience showed that preferred pharmacy use never improved.  Dkt. No. 346-5 (App'x 4); Dkt.

Nos. 352-19, 356-17, 359-17 (Exs. 60, 136, 198); Exs. 232, 233.  Yet Humana continued to use

fraudulent preferred use assumptions in its bids to satisfy the actuarial equivalence test.  *See*

App'x 1.  In its internal budgets, which Humana used for all business purposes and which were

intended to be as "accurate as possible," 3/6/19 Liss Tr. 149:12-25, Humana used far lower

preferred pharmacy use assumptions that accurately tracked actual experience, *see* App'x 2, 4.

In the Lockdown meetings each year, Humana's leadership was informed that the

Walmart Plan was covering far less than 74.5% of ICL drug cost.  Each year, Humana continued

to use fraudulent bid assumptions to project it would cover 74.5% of ICL drug cost.  *See* Dkt.

No. 353-9 (Ex. 70) at -573 (CY 2013) (Humana could improve benefits or "mitigate" member

cost share issues by manipulating bid assumptions at "[n]o impact to premium"); Dkt. No.

354-13 (Ex. 94) at -.019 (CY 2014) (same); Dkt. No. 354-14 (Ex. 95) at -.016 (CY 2015)

(methods to "mitigate" member cost share issue included "FL Bid Membership"); Dkt. No.

354-15 (Ex. 96) at -984 (CY 2016); Dkt. No. 354-10 (Ex. 91) at -068 (CY 2017).

Humana justified its massive assumed increases in preferred pharmacy use by pointing to

"initiatives" it was supposedly implementing to increase preferred use.  But Humana's initiatives

were frequently not implemented during the contract year at issue (if at all) and were not funded,

and, as Humana expected, they had no measurable impact.  *See* App'x 4; Dkt. Nos. 352-13,

355-3, 356-5 to -10 (Exs. 54, 104, 126-131).  This is unsurprising because there was no data or

analysis supporting the purported lifts in preferred use attributed to the initiatives.  *See* Sparks

---

*See* Dkt. No. 353-6 (Ex. 67, 3/7/19 Diamond 30(b)(6) Tr.) 92:16-93:24; Ex. 232 at -949.

Rep. ¶¶ 242-247.  Instead, many of the projected lifts from Humana's initiatives were the result of Humana's actuaries asking for "more juice" in the bid assumptions to satisfy the actuarial equivalency test.  *See* Dkt. No. 356-3 (Ex. 124).[13]  In several years, Humana's bids simply assumed linear year-over-year increases in preferred use of up to 20%.  *E.g.*, Dkt. No. 355-15 (Ex. 116) at -056.  Humana has no explanation for these blanket increases, which its own witnesses have admitted were "unrealistic."  *See* Wheatley Tr. 289:5-16; Dkt. No. 352-6 (Ex. 47, Koontz Tr.) 143:22-156:2.  Tellingly, Humana's budgets never projected these same increases for preferred pharmacy use.  *See* 7/1/20 Diamond 30(b)(6) Tr. 132:20-135:17.

In CY 2017, Humana did not rely on business initiatives to justify the preferred use assumptions in its bids.  Instead, Humana assumed certain preferred use increases associated with the addition of Walgreens as a preferred pharmacy.  *See* Humana Mot. at 19-20.  As in every other year, Humana's contemporaneous budgets for CY 2017 assumed a far lower preferred pharmacy use rate than its bid.  *See* Sparks Rep. App'x 3, ¶¶ 62-66.  Relator and others raised concerns about this discrepancy to senior actuaries, but these concerns were ignored.  *See* Dkt. Nos. 353-16, -19 (Exs. 77, 80).

---

[13] Humana's claim (at 18) that it invested millions of dollars to encourage preferred use is remarkably misleading.  As Humana's corporate witness testified, Humana could not quantify *any* expenditures for the majority of the purported "initiatives" it relied on to justify the preferred use assumptions in its bids.  *See* Dkt. No. 346-10 (App'x 9).  In addition, numerous initiatives were not implemented at all in the relevant contract year, and, of the initiatives that purportedly were implemented, Humana's corporate designee could not identify any actual impact on preferred use.  *Id.*  It is also undisputed that preferred use did not increase *at all* from CYs 2011 to 2016, the period during which Humana relied on its initiatives.  *See* App'x 4.  Finally, while Humana claims (at 18) that one initiative was successful at converting "contacted members" to preferred pharmacies, many of Humana's initiatives failed precisely because Humana could not contact low-income members.  *See* Dkt. No. 345-56 (noting "phone #s is probably an issue/risk" for the initiative Humana claims was successful); 3/7/19 Diamond 30(b)(6) Tr. 218:5-220:19 (LIS Phone Number Sweepstakes unsuccessful for this reason); Dkt. No. 352-8 (Ex. 49) ("We often do not have phone numbers for [low-income] individuals . . . so cannot reach out by phone.").

### B.     Humana Concealed Its Fraud from CMS and Milliman

At the time CMS awarded Humana Part D contracts for the Walmart Plan, CMS was unaware of Humana's fraudulent conduct and "did not have information about Humana's internal budget forecasts or other financial analysis . . . about whether Humana expected the Walmart Plan to be actuarially equivalent." Lazio Decl. ¶ 9. Humana's corporate witnesses testified that Humana *never* informed CMS that it used significantly different assumptions for preferred use and low-income membership in its internal budgets, or that its internal budgets reflected member cost shares in the ICL phase that were substantially higher than 25.5%. *See* 2/28/19 Theiss 30(b)(6) Tr. 32:25-33:19; 3/7/19 Diamond 30(b)(6) Tr. 163:8-165:10; Dkt. No. 354-3 (Ex. 84, 6/12/20 Theiss 30(b)(6) Tr.) 46:19-47:3.

Former CMS Chief Actuary Richard Foster has provided unrebutted testimony that, if CMS *had known* Humana expected the average member cost share in the ICL phase to be higher than 25.5%, CMS would not have accepted Humana's bids for the Walmart Plan. *See* Foster Rep. ¶¶ 15, 107-111. CMS's current Director of Parts C&D Actuarial Group, Jennifer Lazio, has also testified that "CMS' usual practice would be to engage with the plan sponsor and *request a resubmission of the bid*, if we had information to suggest that the original bid was not prepared in accordance with CMS actuarial guidelines or that the bid did not comply with applicable laws, rules, bid instructions, and current CMS guidance." Lazio Decl. ¶ 13 (emphasis added).[14]

---

[14] In addition, CMS had "only limited information" regarding the preferred use and other assumptions in Humana's bids. Foster Rep. ¶ 107. The supporting documentation for CYs 2011 and 2013 did not contain *any* information regarding preferred use assumptions. *See id.* ¶ 85. For CY 2012, "the documentation included a brief reference to these assumptions for low-income and non-low-income enrollees," and, for CYs 2014 to 2017, the supporting documentation contained plan-specific assumptions for preferred use, but Humana never disclosed the basis for these assumptions or "the substantial sensitivity of the Walmart Basic Plans' actuarial value to the assumptions for preferred pharmacy use." *Id.* Likewise, "the supporting documentation for [CYs] 2011 through 2017 contained no information on the assumed membership growth rates, either in total or for the low-income subpopulation." *Id.* ¶ 86.

Milliman likewise had only limited information about Humana's internal financial projections and expectations. Despite Humana's claims (at 15) that it "routinely shared" its internal budgets with Milliman, Humana shared only isolated *final* budget documents, each prepared months after the bids were submitted. *See*, *e.g.*, Brandel Tr. 81:25-84:10. The assumptions for preferred use, membership, and member cost share in the budgets developed *contemporaneously* with its bids were never communicated to Milliman. *See id.* at 87:12-16, 117:4-120:4, 224:18-24; 6/12/20 Theiss 30(b)(6) Tr. 40:7-43:7.

Milliman also lacked material information regarding the bases (or lack thereof) for the preferred pharmacy use assumptions in Humana's bids. During bid development, Milliman repeatedly warned Humana that it could not achieve those assumptions, which were so much higher than prior experience. *See* Dkt. Nos. 356-15, 356-16 at -676, 356-20 at -846, 356-21, 357 at -743, 357-1, 357-2 at -460, 360-15 at -442 (Exs. 134-135, 139-143, 216); Ex. 234 at -467. Humana ignored those warnings. While Milliman reviewed – *in some years* – vague descriptions of Humana's initiatives, *see* Brandel Tr. 236:19-24, Milliman employee Shelly Brandel testified that Milliman did not receive information concerning how much money Humana spent on its initiatives, the success rates of those initiatives, or even the data used to develop the assumed increases in preferred use attributed to them, *see id.* at 53:1-54:21, 193:4-8. For these reasons, the bid assumptions for preferred use along with low-income membership were items for which Milliman disclaimed responsibility each year. As Milliman made clear, "Humana w[ould] need to justify" these assumptions to CMS. Dkt. No. 356-16 (Ex. 135) at -676.

## III.   The Government's Investigation of Humana's Fraud

After Relator filed his sealed Complaint in April 2016, the government began to "dedicate[ ] significant time and resources" to investigate Humana's "massive scheme to defraud Medicare's Part D Program." Dkt. No. 90 at 1. As part of its investigation, the Department of

Justice ("DOJ") served Humana with a CID on May 5, 2017.  *See* Dkt. No. 357-14 (Ex. 155).

Days before receiving the CID, Humana had instructed Milliman to use inflated preferred use

assumptions in its bids that differed from those in its internal budgets.  *See* Mot. at 16-17.  But,

immediately after receiving the CID, Humana changed its bid assumptions to make them

consistent with its internal budgets for the *first time* in the history of the Walmart Plan.  *See id.*

Humana also modified its existing policies to state that the methodology for developing preferred

use should be consistent for the bids and budgets.  *Id.*  In October 2017, after the Complaint was

unsealed, CMS initiated a bid audit of the CY 2018 Walmart Plan bid for the California region

(S5884-114), which was initially submitted on June 5, 2017.  *See* Ex. 235 at -99.  By that time,

however, Humana had abruptly stopped its fraudulent conduct.

## DISCUSSION

Summary judgment is appropriate only when there is no genuine dispute of material fact

and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).

"[Humana], as the moving party, bears the initial burden of demonstrating the absence of genuine

disputes of material fact."  *Knight Capital Partners Corp. v. Henkel AG & Co.*, 930 F.3d 775,

778 (6th Cir. 2019).  "A fact is material if its resolution will affect the outcome of the lawsuit."

*Morgan v. Fairfield Cty.*, 903 F.3d 553, 560 (6th Cir. 2018), *cert. denied*, 139 S. Ct. 1377

(2019).  In evaluating the evidence, the court must draw all reasonable inferences in favor of the

non-moving party.  *See Knight Capital*, 930 F.3d at 779.  Far from supporting Humana's motion

for summary judgment, the undisputed material facts warrant summary judgment for Relator.

## I.      Humana's Fraudulent Conduct and Its Misrepresentations Are Material

As detailed in Relator's Motion, the requirement that an actuarially equivalent PDP cover

at least 74.5% of aggregate member drug costs in the ICL phase is material as a matter of law.

*See* Mot. at 28-33.  This foundational, statutory requirement ensures that each PDP provides at

least the same expected overall dollar value of coverage as the defined standard; it is thus essential to the Part D program's design and its "successful operation."  Foster Rep. ¶ 96; *see* 42 U.S.C. § 1395w-102; Medicare Program; Medicare Prescription Drug Benefit, 70 Fed. Reg. 4194, 4292 (Jan. 28, 2005).  Reflecting its critical importance, an insurer is not entitled to participate in the Part D program and is not entitled to payment if its proposed PDP is not expected to provide actuarially equivalent drug coverage.  *See* 42 U.S.C. § 1395w-111(e)(2).[15] In addition, Congress and CMS require "[t]he processes and methods for determining actuarial equivalence and valuation [to] be in keeping with generally accepted actuarial principles."  70 Fed. Reg. at 4291; *see also* 42 U.S.C. § 1395w-111(c)(1).  Humana's fraudulent conduct and misrepresentations go to the heart of the bargain between the government and insurers participating in the Part D program.

## A.     There Is No Evidence That CMS Had Actual Knowledge of Humana's Fraud

Humana's contention (at 24-26) that it is entitled to dismissal because CMS continued making payments to Humana for the Walmart Plan "with knowledge of the relator's *allegations*" (emphasis added) ignores governing law.  "[M]ere awareness of allegations concerning noncompliance with regulations is different from knowledge of actual noncompliance."  *U.S. ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 112 (1st Cir. 2016) ("*Escobar II*"). As explained by the Sixth Circuit, "[w]ithout *actual knowledge* of the alleged non-compliance, the government's response to the claims . . . has no bearing on the materiality analysis."  *United States v. Brookdale Senior Living Cmtys.*, 892 F.3d 822, 834 (6th Cir. 2018) (emphasis added), *cert. denied*, 139 S. Ct. 1323 (2019); *see also Escobar*, 136 S. Ct. at 2003; *U.S. ex rel. Brown v. Pfizer, Inc.*, 2017 WL 1344365, at *11 (E.D. Pa. Apr. 12, 2017) ("The mere fact that the

---

[15] *See also* H.R. Conf. Rep. No. 108-391, at 459-60 (2003) ("The Secretary may only approve a plan if certain requirements are met.").

government has continued to pay and approve claims . . . even after Relators' allegations in 2005 is insufficient to establish that Relators' claims lack materiality."); *Rose v. Stephens Inst.*, 2016 WL 5076214, at \*6 (N.D. Cal. Sept. 20, 2016) ("[I]naction does not provide any basis for the court to infer that the [agency] . . . chose not to act because it considered the [requirement] unimportant."); *U.S. ex rel. Fisher v. JPMorgan Chase Bank N.A.*, 2020 WL 3265060, at \*8-9 (E.D. Tex. June 17, 2020) ("It is . . . actual knowledge of the fraud – not mere awareness of it – that is particularly relevant to the Government's payment decisions.").  The rule advocated by Humana would produce the absurd result that the government must cease all payments to contractors once mere allegations of fraud have been made, which would disrupt government programs, harm beneficiaries of those programs, and adversely affect innocent defendants.  "The Government does not enjoy the luxury of refusing to reimburse health care claims the moment it suspects there may be wrongdoing."  *United States v. Berkeley HeartLab, Inc.*, 2017 WL 4803911, at \*7 (D.S.C. Oct. 23, 2017), *appeal pending*, No. 18-1813 (4th Cir.).

Moreover, although irrelevant, Humana cites no evidence that CMS approved any bid or continued to pay any claim for the Walmart Plan after it became aware of Relator's allegations.  The only date cited (at 25) by Humana regarding awareness of Relator's allegations is an April 2016 meeting between Relator and "DOJ and *HHS officials*" (emphasis added) to discuss Relator's Complaint.  But CMS and HHS "are distinct administrative actors," *Saint Francis Med. Ctr. v. Azar*, 894 F.3d 290, 294 (D.C. Cir. 2018), and thus HHS's participation in the April 2016 meeting has no relevance to CMS's knowledge or awareness of this suit.[16]  What matters for materiality purposes is whether *the specific entity with payment responsibility* knew about the non-compliance.  *See Escobar II*, 842 F.3d at 112.

---

[16] *See also U.S. ex rel. Dildine v. Pandya*, 2019 WL 8277242, at \*3 (N.D. Ga. Dec. 19, 2019) ("CMS" is "an entity distinct from HHS-OIG").

Notably, Humana does not assert that CMS had *actual knowledge* of Humana's fraudulent conduct when it made payments to Humana under the fraudulently induced contracts for CYs 2011 to 2017.  Nor could it.  As set forth above, CMS's Director of the Parts C&D Actuarial Group has submitted a sworn declaration stating that, "[a]t the time CMS awarded contracts for the Walmart Plan for the years 2011-2017," CMS *lacked actual knowledge* that Humana's bids were not actuarially equivalent as represented.  Lazio Decl. ¶ 9.  Humana's corporate witnesses have likewise admitted that Humana *never* disclosed to CMS the dramatic differences between its bid assumptions and those it used in its internal budgets.  *See* 2/28/19 Theiss 30(b)(6) Tr. 32:25-33:19; 3/7/19 Diamond 30(b)(6) Tr. 163:8-165:10.[17]

The out-of-circuit cases cited by Humana (at 24-25) are distinguishable and involve very different facts.  For example, in *U.S. ex rel. Janssen v. Lawrence Memorial Hospital*, 949 F.3d 533 (10th Cir. 2020), *pet. for cert. pending*, No. 20-286 (U.S. Aug. 27, 2020), a third-party investigative service for CMS conducted an investigation into allegations of "minor" non-compliance with regulations that a whistleblower reported to a CMS hotline; the investigative service alerted CMS to the issues complained of, but CMS continued to pay the defendant's Medicare claims.  *Id.* at 541.  The court held only that "[t]his constitute[d] *some evidence* in favor of immateriality," *id.* (emphasis added), but it did not find such evidence dispositive.  The court instead found that materiality could not be established because the alleged misconduct was "minimal" and involved "minor regulatory compliance issues," and "the record [wa]s silent as to the extent" the non-compliance affected the Medicare programs at issue.  *See id.* at 538, 543.

---

[17] Even if CMS did have actual knowledge of Humana's fraud when it paid the claims (and it did not), such payments would not undermine materiality because CMS needs to ensure continuing healthcare coverage under the Part D program for thousands of innocent beneficiaries.  *See U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1156 (2d Cir. 1993) (FCA liability is "not automatically exonerated by any overlapping knowledge by government officials").

Here, the uncontroverted record evidence shows that, far from being minor issues of non-compliance, Humana's misrepresentations go to the heart of its bargain with CMS and indisputably caused CMS to pay *$450.1 million* more in subsidies to Humana than it would have paid absent Humana's fraud.  *See* Mot. at 31.

*D'Agostino v. ev3, Inc.*, 845 F.3d 1 (1st Cir. 2016), is also inapposite.  There, the FCA claim was based on allegations that the defendant's misrepresentations to the Food and Drug Administration ("FDA") " 'could have' influenced the FDA to grant approval" of the medical device at issue, which in turn may have induced CMS to make reimbursement payments for the device.  *Id*. at 7.  The First Circuit affirmed the district court's decision that any amendment to the complaint would be futile because Relator had not adequately pleaded causation.  *Id.* at 7-8.  Specifically, the court held that the relator's allegations that the misrepresentations " 'could have' influenced the FDA to approve [the device] f[ell] short of pleading a causal link between the representations made to the FDA and the payments made by CMS."  *Id.* at 7; *see id.* at 9 (holding that allegations that misrepresentations "actually" did cause FDA to approve the device were necessary).  In the portion of the opinion cited by Humana, the court explained that the decision of the FDA not to withdraw its approval in the face of relator's allegations is uniquely important in the context of *FDA approval decisions*.  *Id*. at 8.  That discussion has no bearing here, where there is no technical decision-making, analysis, or discretion on the part of CMS with respect to the administration of the Part D program.[18]  The governing statutes, regulations, contracts, and

---

[18] The other cases on which Humana relies (at 25 n.10) are similarly irrelevant.  In *U.S. ex rel. McBride v. Halliburton Co.*, the government investigated the relator's allegations and did not disallow any payments to the defendant, but in that case there was no connection between the (allegedly false) troop headcount data at issue and the government's cost determinations, and thus "it [wa]s doubtful that [the relator could] show a violation of a regulatory requirement occurred in the first place."  848 F.3d 1027, 1033 & n.9 (D.C. Cir. 2017).  In *U.S. ex rel. Cressman v. Solid Waste Services, Inc*., the government continued to pay the defendant for waste disposal

CMS guidelines all make clear that satisfying the actuarial equivalence requirement is a condition of participation in the Part D program, as well as a condition of payment. *See supra* pp. 2-6.

Finally, Humana errs in asserting (23-24) that a failure to pursue administrative sanctions in tandem with this litigation is relevant to the materiality inquiry.[19] What the record clearly shows is that, after Relator filed his Complaint in April 2016, DOJ began to "dedicate[ ] significant time and resources to [its] investigation." Dkt. No. 90 at 1. DOJ served Humana with a CID in May 2017. Dkt. No. 357-14 (Ex. 155). Due to Humana's delays in "respond[ing] to the United States' inquiries," the document productions and employee interviews connected with the CID were not completed until February 26, 2018. Dkt. No. 90 at 2.[20] Even then, DOJ continued to investigate Humana's conduct. *See* Dkt. No. 27 at 1; Dkt. No. 90 at 1-2. After Relator's Complaint was unsealed on September 13, 2017, and the allegations became public, CMS immediately instituted a bid audit in October 2017 for a CY 2018 Walmart Plan bid. A bid

---

services after the relator filed suit, but there the regulatory violation involved one of the defendant's facilities that had nothing to do with the services the defendant contracted to perform for the government, and so there was "simply no connection or nexus between the regulatory violation" at issue and the government contract. 2018 WL 1693349, at *6-7 (E.D. Pa. Apr. 6, 2018).

[19] Again, the cases cited by Humana involve minor purported regulatory violations that were better addressed through existing administrative mechanisms. *See U.S. ex rel. Schimelpfenig v. Dr. Reddy's Labs. Ltd.*, 2017 WL 1133956, at *7 (E.D. Pa. Mar. 27, 2017) ("Absent a showing that compliance with the [requirements at issue] is material to the Government's decision to grant reimbursements for Defendants' products," the court was "unwilling to undermine the well-established regulatory procedures in place for addressing Defendants' exact kind of noncompliance."); *Janssen*, 949 F.3d at 543 (FCA liability not appropriate in the face of "minimal" non-compliance). None involved foundational conditions of participation or payment, as is the case here.

[20] It cannot be disputed that Humana's responses to the CID did not reveal the full nature and scope of its fraud. Humana never identified its two sets of books in response to the CID and, after this case was unsealed, attempted to obstruct this discovery. It was only after Humana forced Relator to file a successful motion to compel, and the Court ordered Humana to provide discovery of the dramatic differences in the preferred use, low-income membership, and member cost share assumptions in its bids and budgets, that Humana actually disclosed this information. *See* Order at 5-8, 14, Dkt. No. 216 (Aug. 30, 2019).

audit is a far more comprehensive review than the desk-review process that occurs in connection with each bid, and only a limited number of bids and insurers are selected for audit in a given year.  *See* Foster Rep. ¶ 40.  However, Humana's CY 2018 bids were submitted after Humana abruptly ended its fraud immediately after it received the CID in May 2017, and thus this bid audit did not reveal Humana's fraudulent conduct.  *See supra* pp. 15-16.[21]  In any event, on the successful resolution of this suit, CMS will recover its overpayments to Humana.  "[T]he United States need not follow administrative remedies designed to deal with overpayments and underpayments when using the FCA to recover damages for fraud."  *United States v. Vandewater Int'l Inc.*, 2020 WL 4372115, at *8 (C.D. Cal. June 23, 2020).[22]

### B.  There Is No Evidence That CMS Has Approved or Paid PDPs That Are Not *Expected* To Provide Actuarially Equivalent Coverage

The governing statutes, regulations, Humana's Part D contract, and CMS guidelines all state that the actuarial equivalence requirement is a condition of participation and payment. Moreover, it is a condition of payment that each bid "must be prepared in accordance with CMS actuarial guidelines" and that the insurer's bids be based on their "best estimate of projected costs."  *See supra* pp. 2-6.  These express conditions of payment clearly "weigh[ ] in favor of the conclusion that a misrepresentation with respect to" these requirements "is material."  *Brookdale*, 892 F.3d at 833.

---

[21] Any payments that CMS made to Humana after it abruptly stopped its fraud in June 2017 are irrelevant to the materiality inquiry.  *See U.S. ex rel. Campie v. Gilead Scis., Inc*., 862 F.3d 890, 906 (9th Cir. 2017) ("Once [fraudulent bid assumptions] were no longer being used, the government's decision to keep paying for compliant [Part D plans] does not have the same significance as if the government continued to pay despite continued noncompliance."), *cert. denied*, 139 S. Ct. 783 (2019).

[22] *See also U.S. ex rel. Onnen v. Sioux Falls Indep. Sch. Dist. No. 49-5*, 688 F.3d 410, 414-15 (8th Cir. 2012) ("Congress intended to allow the government to choose among a variety of remedies, both statutory and administrative, to combat fraud.").

Humana asserts (at 26-27) that the actuarial equivalence requirement cannot be material to CMS's payment decisions because some actuarially equivalent plans "experienced *actual* average ICL cost sharing that exceeded the CMS bid limit of 25.5%." This is a straw man. As noted above, the governing statutes, regulations, and regulatory guidance require a Part D sponsor to: (i) certify that *expected* ICL member cost share will equal 25.5% or less; (ii) formulate projections of ICL member cost share using established actuarial standards of practice; and (iii) base all such projections on the sponsor's "best knowledge, information, and belief." *See supra* pp. 2-6. When those requirements are met, there is no additional requirement that *actual* ICL member cost share be 25.5% or less. *E.g.*, Foster Rebuttal Rep. ¶ 79. But the fact that CMS does not require that actual experience satisfy the actuarial equivalence requirement "in no way excuses a plan from acting dishonestly to avoid compliance with the clear intent of the law," as was the case here. *Id.* ¶ 27.

There is also no record evidence that CMS has ever continued to pay any insurance company offering a PDP with actual knowledge that the insurer has engaged in a fraudulent scheme to manipulate its bid assumptions and falsely certify that its plans were expected to satisfy the actuarial equivalence requirement, as Humana did here. As set forth above, the actual ICL member cost share for PDPs offered by Humana's competitors was closely distributed around the 25.5% threshold. *Id.* ¶ 75. By contrast, the actual median ICL member cost share for the Humana Walmart Plans exceeded the 25.5% threshold by *at least* 1.9% in every year – a variance worth tens of millions of dollars – and in one year exceeding the threshold by an astoundingly large 8.1%. *Id.* Every one of the 35 regions covered by the Walmart Plan each year from CYs 2011 to 2017 (a total of 245 observations) had actual member cost shares that exceeded the 25.5% threshold. The odds of this happening by random chance if Humana had submitted good-faith bids are more than "1 in 60,000 trillion trillion trillion trillion trillion," thus

providing clear evidence of Humana's fraud.  *Id.* ¶ 75 n.20.

Humana's further argument (at 27) that the actuarial equivalence requirement is immaterial because CMS has never rejected a PDP bid or denied payment to a PDP based on actual experience data concerning cost sharing, membership, or preferred use again misses the point.  The relevant inquiry is whether CMS regularly pays claims despite "actual knowledge" that the plan sponsor never *expected* the plan to provide actuarially equivalent drug coverage at the time of the bid.  *Escobar*, 136 S. Ct. at 2003-04.  No such evidence exists in the record.  To the contrary, the evidence establishes that CMS "has never approved a PDP bid or awarded a contract for a PDP when the [bid] does not meet the actuarial equivalence tests"; that, "[i]f the actuarial certification is not submitted to CMS, the bid will not be considered for CMS review and approval"; that CMS lacked actual knowledge that Humana's bids were not actuarially equivalent; and that CMS would have requested resubmission of the bid if it had reason to believe the bid was not prepared in accordance with CMS actuarial guidelines – including the best-estimate requirement – or that the bid did not comply with all other applicable laws, rules, bid instructions, and guidance.[23]  Lazio Decl. ¶¶ 9, 10, 12-13; Foster Rep. ¶¶ 96-111.

### C.    Humana's Misrepresentations Go to the Heart of the Bargain

The requirement that insurers follow actuarial standards to provide their best estimate of member cost share in the ICL phase goes to the heart of CMS's bargain with Part D insurers and is integral to the successful operation of the Part D program.  *See supra* pp. 2-6; Mot. at 28-33. Here, it is undisputed that the fraud and misrepresentations at issue directly affected government payments, making them *per se* material.  *See*, *e.g.*, *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089,

---

[23] Mr. Foster's testimony – which Humana deems (at 27 n.11) as "speculat[ion]" – that CMS was unaware of the preferred use and low-income membership projections underlying the Walmart Plan bids, and that CMS would have followed up with Humana if it was aware, *see* Foster Tr. 408:4-411:14, is, in fact, fully consistent with CMS's sworn declaration.

1105 (11th Cir. 2020); Mot. at 31 & n.37 (citing cases).  Humana's own expert has conceded that this fraud caused CMS to overpay Humana *$450.1 million* in LICS and reinsurance subsidies. *See* Dkt. No. 353-10 (Ex. 71, Moné Tr.) 76:11-84:4; Dkt. No. 339 at 6, 16.  Humana's attempts to minimize the critical importance of this requirement fall flat.

*First*, Humana asserts (at 28-29) that CMS expects disparities between bid assumptions and actual experience, and that the reconciliation process and risk corridor programs address these disparities.  But the fraud at issue is *not* that projections in Humana's bids did not perfectly match actual experience.  It is that Humana never expected, at the time it submitted its bids, that the Walmart Plan would come anywhere close to covering 74.5% of member cost share in the ICL phase.  Humana offers no argument at all that the actuarial equivalence requirement – as opposed to its strawman argument – does not go to the "very essence of [its] bargain" with CMS. *Escobar*, 136 S. Ct. at 2003 n.5.

Moreover, the LICS and reinsurance subsidy reconciliation process and the risk corridor programs alluded to by Humana are designed to address *unanticipated* variances in the bid projections in actual experience, *see* Foster Rep. ¶ 44; 70 Fed. Reg. at 4314 (risk-sharing payments designed to "limit exposure to *unexpected* expenses not already included in the reinsurance subsidy or taken into account through risk adjustment") (emphasis added), and here Humana planned on the variances.  The mechanics of the LICS and reinsurance reconciliation process and the risk corridor program are detailed in Relator's Motion to Exclude the Testimony of Robert Moné.  *See* Dkt. No. 339.  As a result of the fraud, Humana budgeted to receive hundreds of millions of dollars more in CMS subsidies than Humana represented it expected to receive in its bids.  *See* App'x 6; Dkt. Nos. 354-8 to -10 (Exs. 89-91).  Risk corridor payments, meanwhile, are designed to protect the insurer and CMS if the insurer's actual costs vary by

more than 5% from the projected costs in the bids. *See* Ellis Rep. ¶ 54. It is not a guardrail for fraud. As Humana's own expert concedes, Humana's fraudulent conduct necessarily caused the projected costs in its bids to be false. *See* Dkt. No. 339 at 6-7. Nothing in the LICS and reinsurance subsidy reconciliation process or the risk corridor program is designed to protect CMS against this type of intentional conduct.[24]

    *Second*, Humana contends (at 29) that its fraudulent conduct does not impact its bargain with CMS because individual Walmart Plan members received the benefits described in Humana's bids. This is a remarkable argument. CMS bargained for a Part D plan that, *in the aggregate* and across all members, was expected to cover at least 74.5% of drug costs in the ICL phase.[25] This is the very definition of what an actuarially equivalent plan is. *See supra* pp. 2-3. Humana knowingly failed to provide benefits that would provide such coverage. The benefits that *individual* members received under a plan that Humana knew did not satisfy the actuarial equivalence requirement are entirely irrelevant.

    *Finally*, any suggestion (at 29) that Humana saved CMS money because it offered lower premiums than its competitors is both legally irrelevant and factually wrong. Congress has precluded CMS from granting contracts to Part D plans that do not meet statutory coverage requirements, no matter what premiums they offer. Indeed, the actuarial equivalency requirement is designed in large measure to ensure that insurers compete on an even playing

---

[24] Indeed, CMS requires all bid estimates for LICS, reinsurance subsidy, and allowable costs to be "accurate, complete, and truthful" based on "best knowledge, information, and belief." 42 C.F.R. § 423.505(k)(4), (5).

[25] Contrary to Humana's suggestion otherwise (at 29), whether an individual Walmart Plan member received what he or she bargained for in enrolling in the Plan has no bearing on the materiality analysis. *See Escobar*, 136 S. Ct. at 2003 n.5 (a misrepresentation is material if it goes to the essence of the bargain between the plaintiff and the party to whom the misrepresentation was made).

field by mandating that every insurer must expect to cover a minimum percentage of drug costs. *E.g.*, Sparks Rep. ¶ 39.  Insurers may not offer phony, low-premium plans that pay an inadequate share of drug costs.  By Humana's logic, any government contractor that defrauds the government by providing a defective good or service could argue that, if they had actually provided the good or service as represented, it would have incurred higher costs and is therefore entitled to rewrite the parties' bargain regardless of statutory and regulatory mandates.  There is, of course, no authority supporting such an argument.  *See United States v. Killough*, 848 F.2d 1523, 1532 (11th Cir. 1988) (rejecting argument that kickbacks paid to obtain a contract were excusable because government would not have obtained a better price elsewhere).[26]  In any event, Humana's theory is incorrect:  Humana's own expert's analysis – when corrected to use the proper inputs – demonstrates that, if the Walmart Plan did not exist, CMS would have paid out at least *$100 million less* for the entire Part D program.  *See* Dkt. No. 339 at 9, 14.

## II.   There Is No Genuine Dispute That Humana Knowingly Made, or Caused To Be Made, False Claims for Payment and False Statements Material to Those False Claims for Payment

Humana contends (at 30) that, because its representations to CMS regarding the Walmart Plan's expected drug coverage were statements of opinion concerning forward-looking projections, Relator must prove that Humana knew of facts that "would *preclude* the truth of its

---

[26] Many courts have similarly rejected Humana's argument in the context of damages analysis. *See United States v. Mackby*, 221 F. Supp. 2d 1106, 1111-12 (N.D. Cal. 2002) (rejecting argument that, if "patients had gone to another rehabilitation center," the government would have paid higher rates, explaining that "[t]he measure of the Government's damages is not a function of the value of . . . the amounts that it would have legitimately paid to another authorized provider of those services"), *aff'd*, 339 F.3d 1013 (9th Cir. 2003); *United States v. Hawley*, 544 F. Supp. 2d 787, 810 (N.D. Iowa 2008) ("The question is not whether the government would have paid or approved the same claim submitted *by somebody else* on the basis of the same documents submitted *by somebody else*, but whether the government actually paid the claim actually submitted on the basis of the false documents submitted by the persons who actually submitted them."), *rev'd on other grounds*, 619 F.3d 886 (8th Cir. 2010); *United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008).

bid projections" or that it "was unaware of *any* facts that would justify" its projections. As an initial matter, Humana ignores multiple false representations of existing fact that form the basis of Relator's FCA claims. As detailed in Relator's Motion, those claims are predicated, at least in part, on false certifications and representations that Humana's bids complied with all applicable laws, rules, bid instructions, CMS guidance, and appropriate actuarial standards of practice; that Humana's bid assumptions were based on its "best knowledge, information, and belief"; and that, for CYs 2011 to 2014, "[t]he data and assumptions used in the development of the bid(s) [we]re consistent with the organization's current business plan." *See* Mot. at 18-28. These misrepresentations are statements of *existing fact*, not opinions of future events.

There is no material dispute that these statements were knowingly false. Humana's "business plans," including for CYs 2011 to 2014, contained drastically different assumptions than it used for purposes of its bids. *Compare* App'x 1 *with* App'x 2. Indeed, Humana's operative policies and procedures that were in effect before DOJ served the CID made clear that an entirely different methodology was used for preferred use budget assumptions than for bid assumptions. *See* Mot. at 14-15. The same metrics in both sets of books were developed by *the same* Humana actuaries, which is conclusive evidence that Humana knew that this representation was false. *See United States v. DynCorp Int'l, LLC*, 253 F. Supp. 3d 89, 109 (D.D.C. 2017).

Moreover, every year, Humana's bid certifications stated that "the entire bid(s) . . . are in compliance with the applicable laws, rules, . . . bid instructions, current CMS guidance, and also comply with the appropriate [ASOPs]." *See supra* p. 5. Humana has since *admitted* that it did not comply with the relevant ASOPs in preparing its bid assumptions. For instance, ASOP No. 8 requires than an actuary "consider the information [in a business plan] along with any other information relevant to the business plan in setting the assumptions and methodologies used in

the filing."  Dkt. No. 358-7 (Ex. 168) § 3.6; *see also* Dkt. No. 358-8 (Ex. 169) § 3.2.3.  Yet

Humana's corporate witness testified that Humana never considered the preferred use,

membership, or member cost share projections in its contemporaneous budgets when developing

those same assumptions in its bids.  6/12/20 Theiss 30(b)(6) Tr. 130:8-20.  Nor did Humana ever

reconcile the different ICL member cost share projections in its bids and in its internal budgets.  *Id.*

at 159:1-166:6.  Again, because its bid and budget assumptions were developed by the same

actuaries, this is conclusive evidence that Humana knew that its bid certifications were false.[27]

While Relator's claims are *also* based on Humana's false representations that, at the time

of the bids, it expected the Walmart Plan to be actuarially equivalent, Humana misstates the legal

standard.[28]  In the Sixth Circuit, "opinions may trigger liability for fraud when they are *not

honestly held by their maker*, or when the speaker knows of *facts that are fundamentally

incompatible* with his opinion."  *United States v. Paulus*, 894 F.3d 267, 275-76 (6th Cir. 2018)

---

[27] *U.S. ex rel. Berg v. Honeywell International, Inc.* (cited at 31-32) does not stand for the proposition that contemporaneous internal documents questioning projections provided to the government are not, as a matter of law, evidence of knowledge.  226 F. Supp. 3d 962 (D. Alaska 2016), *aff'd*, 740 F. App'x 535 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 1456 (2019).  There, the only evidence of what knowledge Honeywell had at the time it contracted with the government was the deposition testimony of a Honeywell employee involved in the contract negotiations.  *Id.* at 970.  Although that employee testified that "everyone knew" about a certain factor that could negatively impact the costs to the government, "she also said that was exactly what Honeywell told the government."  *Id.*  Under those circumstances, the court held that those statements could not reflect an admission that Honeywell knew its statements to the government were false.  *Id.* at 970-71.  *Berg* does not address the facts here, where the defendant maintained two sets of bids *and failed to disclose that fact* during the bidding or contracting process.

[28] Humana cites *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776 (4th Cir. 1999), which Humana states (at 30) holds that statements of opinion can give rise to FCA liability only if the speaker knows "facts which would preclude [the] . . . opinion" or "know[s] [no] facts which justify it" (alterations by Humana).  Humana misquotes *Harrison*.  That case states that an opinion or estimate carries with it "an implied assertion, not only that the speaker knows no facts which would preclude such an opinion, but that *he does know facts which justify it*."  176 F.3d at 792 (emphasis added).  As explained below, that standard – correctly quoted – is consistent with the standard in the Sixth Circuit and Supreme Court precedent.

(emphases added).[29]  *Paulus*, which Humana fails to cite altogether, is consistent with the Supreme Court's holding that liability for fraud can flow from an expression of opinion because that expression "may carry with it an implied assertion" that the speaker "know[s] facts which justify it" – in other words, that the opinion is honestly held – especially where, as here, the speaker has "special knowledge of the matter which is not available to the [recipient]."  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 191-92 (2015).

Relator's Motion describes a litany of "facts that [we]re fundamentally incompatible" with Humana's representations that the Walmart Plan expected to cover at least 74.5% of drug costs in the ICL phase.  This same record evidence establishes that Humana did not honestly believe that the Plan would provide actuarially equivalent benefits when Humana submitted its bids.  *See supra* pp. 8-13.[30]  Humana's motion fails to confront this evidence.

---

[29] This standard has routinely been applied in FCA cases.  *See U.S. ex rel. Druding v. Care Alts.*, 952 F.3d 89, 98 (3d Cir. 2020), *pet. for cert. pending*, No. 20-371 (U.S. Sept. 16, 2020); *Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1117 (9th Cir. 2020); *Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037, 1048-49 (9th Cir. 2012).

[30] Humana attempts to defend its fraudulent assumptions (at 30-31) by arguing that it "had reason to be optimistic" about its preferred use assumptions, and had no contrary actual experience data, when it submitted the first bids for the Walmart Plan in CY 2011.  This ignores the fact that its bid assumptions exceeded its most "optimistic" internal projections.  As noted, stress-testing analysis in August 2010 set 40% Walmart low-income utilization as the most optimistic scenario.  Yet Humana's bids assumed 95% Walmart low-income utilization.  Humana's witnesses have never been able to explain this discrepancy.  *See supra* p. 9.  In addition, by the time Humana submitted its bids for CY 2012, it had emerging actual experience data showing that Walmart use was significantly lower than Humana's bid assumed for CY 2011.  *See supra* p. 10.  Nonetheless, Humana again used preferred use assumptions in its bids that were far higher than its "high end of most likely outcome:  80% of non low income and 40% low income scripts filled at Walmart."  Dkt. No. 358-1 (Ex. 162) at -553; *compare* App'x 1 (preferred use bid assumptions were 90% non-low-income and 75% low-income).  At any rate, Humana never incorporated the "optimistic" or "high end" assumptions into its budgets, which assumed that preferred pharmacy use would stay the same or even *decrease*.  Humana's argument (at 31) that, over time, it decreased its preferred use assumptions and increased its low-income membership assumptions – and those assumptions thus came slightly closer to actual experience – fares no better.  Because of plan membership growth, the smaller discrepancies still produced enormous fraudulent profits for Humana.  *E.g.*, App'x 4; Dkt. Nos. 353-4, 355-4, 356-16 at -675, 360-15 at -439, -442 to -446

A.     Humana's Two Sets of Books Are Conclusive Evidence of Knowledge

Humana has no meaningful explanation (at 31-32) for the dramatic discrepancies

between its bids and contemporaneous budgets.  Humana's principal response to these stark

discrepancies (at 32) is to now disclaim the reliability of its own internal budgets, which

Humana's own corporate witness testified were intended to be "as accurate as possible."  3/6/19

Liss Tr. 146:6-14, 149:12-25.  Humana concedes that its budgets were "more accurate than its

bid projections," but argues that its budgets did not perfectly match Humana's actual experience.

That is a red herring:  Although actuarial projections may not match actual experience precisely,

Humana's budget assumptions for preferred use, membership, and member cost share *did* closely

match actual experience.  *Compare* App'x 2 *with* App'x 4.  Humana's bid assumptions, which

were prepared by *the same actuaries*, consistently failed to predict actual experience by dramatic

margins, and always in the same direction.  *Compare* App'x 1 *with* App'x 4.  This was a direct

result of Humana ignoring prior actual experience in setting its bid assumptions, reverse-

engineering its bid assumptions to pass the actuarial equivalency test, and choosing to maintain

its fraudulently obtained profit margin instead of adequately increasing benefits.[31]

---

(Exs. 65, 105, 135, 216) (showing impact of these assumptions on underwriting margin and premium).  Moreover, falsifying assumptions is fraud even if Humana refined its practices over time so that the false assumptions were less dramatic.

[31] Humana asserts (at 32) that "[t]he record here demonstrates *some* of the reasons Humana's budget and bid assumptions differed" (emphasis added), pointing only to testimony of their corporate witness that Humana's budgets sometimes contained different low-income membership projections to account for resource allocation needs if "the Walmart Plan bids unexpectedly fell below the LI Benchmark."  But Humana's witnesses could identify only two regions (Florida and Hawaii) in two years where this actually occurred.  *See* 2/28/19 Theiss 30(b)(6) Tr. 252:10-256:1; 7/1/20 Diamond 30(b)(6) Tr. 176:13-178:8.  Humana cannot offer any explanation for why the low-income or preferred pharmacy use assumptions in its bids were dramatically different than those in the budgets for other regions and years.  *See* 2/28/19 Theiss 30(b)(6) Tr. 248:25-252:9.  Moreover, Humana's Lockdown presentation explicitly identified Florida's "Bid Membership" in that year as a method to "mitigate" the Walmart Plan's ICL member cost share issues.  *See* Dkt. No. 354-14 (Ex. 95) at -016.

Humana also misrepresents the record evidence (at 33) in suggesting that its bid estimates were merely "optimistic or aggressive."  The record shows that Humana used bid assumptions that far exceeded its most optimistic and aggressive projections.  *See supra* p. 30 & n.30.[32]

### B.  Humana Did Not Reasonably Rely on Milliman

Humana's argument (at 30) that it relied on Milliman also fails.  To assert a defense of good-faith reliance, Humana must show (1) full disclosure of all pertinent facts and (2) good-faith reliance on the advice.  *See United States v. Rozin*, 664 F.3d 1052, 1060 (6th Cir. 2012).  Neither occurred here.  As described above, Humana withheld crucial facts from Milliman.  For instance, Humana did not disclose to Milliman that the business initiatives upon which Humana based the preferred use assumptions in its bids lacked any basis and that the only evidence Humana possessed concluded that the initiatives could not influence low-income behavior.  *See supra* pp. 12-13, 15.  In addition, Humana did not disclose to Milliman the drastically different assumptions for preferred use and membership that it used for the purposes of its internal budgets, *see* Brandel Tr. 81:25-84:10, 86:21-87:16, or that the projections that Humana provided to its business partner, Walmart, like Humana's budgets, differed drastically from the bid assumptions, *see* Mot. at 16; App'x 10.  Numerous courts, including the Sixth Circuit, have rejected good-faith reliance defenses on similar facts.[33]

---

[32] Humana's reliance on *Berg* (at 33-34) is again misplaced.  There, the allegedly false projections were provided to the government in 2000.  The evidence plaintiff relied on to show that these projections were knowingly false when made was generated at least six years after that date.  Under those circumstances, the court held that this evidence "said [no]thing regarding what Honeywell knew or believed in 2000."  226 F. Supp. 3d at 980-81.  Here, by contrast, there are *thousands* of documents and communications contemporaneous with Humana's bids showing Humana's knowledge that its bid assumptions were unobtainable and unrealistic, not the least of which are Humana's internal contemporaneous budgets.  *See* Mot. at 12-16.

[33] *See Rozin*, 664 F.3d at 1060 (no good-faith reliance where "Rozin either did not provide full information to those he supposedly relied upon, or he had reason to believe that the advice provided by these individuals was incorrect"); *Berkeley HeartLab*, 2017 WL 4803911, at *9.

Moreover, the record evidence overwhelmingly shows Humana did not rely on Milliman's advice in good faith.  Humana repeatedly ignored Milliman's warnings that its assumptions were too aggressive and unobtainable.  *See* Mot. at 16; *supra* p. 15.  Humana also pressured Milliman to acquiesce to its aggressive assumptions.  *See*, *e.g.*, Dkt. No. 359-5 (Ex. 186) at -314 (Milliman actuary Doug Proebsting's notes from a February 2012 meeting indicating that he was told that Humana "will assume some Walmart improvement – period!");  Dkt. No. 356-21 (Ex. 140) (after Milliman noted in a May 2011 email that Humana's assumed increases in preferred use were "difficult to imagine," Humana executive William Fleming forwarded the email to Humana actuaries and remarked:  "Giddy-up"); *see U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 381 (4th Cir. 2015) (defendant refused to give full consideration to lawyer's negative assessment after having tried to steer lawyer towards desired outcome).

Most critically, Humana did not in fact rely on Milliman for the assumptions at issue.  The exact opposite is true.  Each year, Milliman disclaimed responsibility and expressly *relied on Humana* to provide the artificial preferred use and low-income membership assumptions used for purposes of the bids.  *See supra* pp. 5-6.  In the reliance letters accompanying the bids each year, Milliman made clear that Humana was the source of those assumptions and that Humana was responsible for defending them to CMS.  *See id.*  Furthermore, Milliman's actuary testified that Milliman did not attempt to determine whether Humana's preferred use and membership assumptions were false or misleading, and that, if those assumptions were inaccurate, that could make Milliman's certification of actuarial equivalence inaccurate.  *See* Brandel Tr. 69:2-72:7.  Nor could Milliman have meaningfully conducted such an analysis, because Humana withheld critical material information.[34]

---

[34] Humana cites (at 32-33) the declaration of Ms. Brandel, Dkt. No. 345-89 – which was disclosed for the first time in Humana's motion for summary judgment – to assert that it shared *some*

### III.    The Record Evidence Establishes a Reverse-False-Claims Theory

"The reverse-false-claims provision of the [FCA] makes liable 'any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.'" *U.S. ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 838 F.3d 750, 774 (6th Cir. 2016) (quoting 31 U.S.C. § 3729(a)(1)(G)). An obligation "means an established duty . . . arising from," among other things, "statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

Humana mischaracterizes Relator's legal theory in stating (at 34) that "Relator asserts that Humana is liable for failing to return overpayments because it received *prospective* LICS and reinsurance subsidies." Relator's reverse-false-claims theory is not predicated on the receipt of *prospective* CMS subsidy payments. Instead, it is based on the $28.8 billion in subsidy payments that Humana received from Humana for CYs 2011 to 2018. When Humana received those amounts, it knew that it had falsely represented in the bids that the plan was actuarially equivalent and fraudulently induced CMS to enter those contract.[35] Moreover, as set forth

---

budget assumptions with Milliman. Ms. Brandel's declaration is inadmissible hearsay to the extent she does not intend to testify at trial. *See Compressor Eng'g Corp. v. Mfrs. Fin. Corp.*, 2019 WL 1326035, at *4 (E.D. Mich. Mar. 25, 2019) ("an affidavit or declaration of a witness who does not testify at trial . . . [is] hearsay," and a party can object to such a declaration under Rule 56(c)(2)). In any event, that declaration states only that Humana provided Milliman with *some* unspecified information to support its preferred use and membership bid assumptions, and that Milliman believed it had enough information to review those assumptions and could have requested more information. *See* Brandel Decl. ¶¶ 23-25, 41-43. That declaration cites four documents purporting to show that Milliman was aware of Humana's budget assumptions, but two of those documents show only that Milliman once received a final budget figure for one component of Humana's preferred use assumptions (mail use), and the other two documents relate to a 2010 email chain that has nothing to do with the Walmart Plan. *Id.* ¶ 42.

[35] The "after applicable reconciliation" language in 42 C.F.R. § 423.360(a) and 42 U.S.C.

above, Humana's fraud undisputedly caused CMS to pay *$450.1 million* more in LICS and reinsurance subsidy payments.  Humana's knowing failure to return these overpayments is a violation of the FCA.[36]

Humana also errs in arguing (at 35) that Relator's reverse-false-claims theory should be dismissed as redundant of his claims asserted under other FCA provisions.  The reverse-false-claims theory is an independent, alternative argument, and courts routinely permit multiple theories of FCA liability, including a reverse-false-claim theory, to proceed to a jury.  *See*, *e.g.*, *United States v. Dental Dreams, LLC*, 307 F. Supp. 3d 1224, 1245 (D.N.M. 2018).[37]

### CONCLUSION

For the reasons set forth above, the Court should deny the motion for summary judgment.

---

§ 1320a-7k(d)(4)(B) conveys a time period, not a methodology.  Humana's argument (at 35) that post-reconciliation payments are not overpayments because they are based on records reflecting actual costs therefore misses the mark.  Relator's reverse-false-claim theory does not focus on the miscalculation of specific reconciliation payments, but on the fact that Humana, after reconciliation, never returned the additional money it fraudulently obtained from CMS.

[36] Humana also misstates the law in contending (at 35) that Relator must identify false statements in the records used to reconcile CMS subsidy payments to Humana.  "[T]he current version of the [FCA] makes clear that there is no longer a need to show the affirmative use of a false record or statement in connection to the avoidance of an obligation to pay money to the United States, so the knowing retention of an overpayment is enough."  *Brookdale*, 838 F.3d at 774 (citation omitted).

[37] The cases on which Humana relies are not to the contrary.  *See Graves v. Plaza Med. Ctrs., Corp.*, 276 F. Supp. 3d 1335, 1346-48 (S.D. Fla. 2017) (defendant's argument that reverse-false-claims theory "is redundant" did not "warrant entry of summary judgment"); *U.S. ex rel. Sobek v. Educ. Mgmt., LLC*, 2013 WL 2404082, at *29 (W.D. Pa. May 31, 2013) (relator's reverse-false-claims theory was "simply a redundant 'flip-side' of the claims made in the preceding counts" because, unlike here, the relator "fail[ed] to identify the statute, regulation or provision of the [agreements] that obligates Defendants to repay monies improperly obtained because of false certification").

DATED: September 28, 2020

Claire M. Sylvia (admitted *pro hac vice*)
Edward H. Arens (admitted *pro hac vice*)
Phillips & Cohen LLP
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Tel.: (415) 836-9000
Fax: (415) 836-9001
Email: csylvia@phillipsandcohen.com
Email: earens@phillipsandcohen.com

Respectfully submitted,

*/s/ Andrew C. Shen*

David C. Frederick (admitted *pro hac vice*)
Andrew C. Shen (admitted *pro hac vice*)
James M. Webster (admitted *pro hac vice*)
Kellogg, Hansen, Todd,
  Figel & Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel.: (202) 326-7900
Fax: (202) 326-7999
Email: dfrederick@kellogghansen.com
Email: ashen@kellogghansen.com
Email: jwebster@kellogghansen.com

C. Dean Furman
Furman & Nilsen PLLC
2527 Nelson Miller Parkway, Suite 101
Louisville, KY 40223
Tel.: (502) 245-8883
Fax: (502) 244-8383
Email: dean@lawdean.com

*Counsel for Plaintiff-Relator Steven Scott*

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2020, I electronically filed the foregoing with the

Clerk of the Court by using the CM/ECF system and served copies of the foregoing via email to

the following counsel of record:

L. Blalack
David J. Leviss
Kimya Saied
William T. Buffaloe
Amanda M. Santella
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Tel.: (202) 383-5300
Email: lblalack@omm.com
Email: dleviss@omm.com
Email: ksaied@omm.com
Email: wbuffaloe@omm.com
Email: asantella@omm.com

Michael P. Abate
KAPLAN JOHNSON ABATE
  & BIRD LLP
710 West Main Street, 4th Floor
Louisville, KY 40202
Tel.: (502) 416-1630
Email: mabate@kplouisville.com

*/s/ Andrew C. Shen*
Andrew C. Shen

Kellogg, Hansen, Todd,
  Figel & Frederick, P.L.L.C.

*Counsel for Plaintiff-Relator Steven Scott*