UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
*Electronically Filed*

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* STEVEN SCOTT, <br><br>          *Plaintiff,* <br><br>    v. <br><br> HUMANA INC., <br><br>          *Defendant.* | Civil Action No.  3:18-cv-00061-GNS-CHL |

**DEFENDANT HUMANA INC.'S MOTION IN LIMINE NO. 9 TO PRECLUDE RELATOR FROM OFFERING EVIDENCE OR ARGUMENT CONCERNING HUMANA'S GAIN/LOSS MARGIN**

Defendant Humana Inc. ("Humana") moves this Court to preclude Relator Steven Scott ("Relator") from offering evidence or argument at trial concerning Humana's development and submission to the Centers for Medicare and Medicaid Services ("CMS") of an aggregate gain/loss margin for all of Humana's Part D plans.  In support of this Motion, Humana states as follows:

**FACTUAL BACKGROUND**

Starting in 2011, Humana offered a prescription drug plan ("PDP"), known as the Walmart Plan, as part of the Medicare Part D program administered by the CMS.  Relator is a former Humana actuary who alleges that the bids for the Walmart Plan that Humana submitted to CMS included knowingly false statements that violated the False Claims Act ("FCA").  Specifically, Relator alleges that the Walmart Plan bids for contract years 2011 through 2017 contained forward-looking actuarial projections that Humana knew were false and that were material to CMS's decision to pay Humana.  *See, e.g.*, Compl. ¶¶ 1-16, R. 1, PageID.4-8.  As a

result, Relator contends that Humana knowingly presented false claims for payment to the United States, made false statements material to those claims, and knowingly failed to return overpayments in violation of 31 U.S.C. §§ 3729(a)(1)(A), (B), (G). *See id.* In response to these allegations, Humana will prove at trial that its actuarial projections were reasonable and that CMS has continued to pay Humana for the Walmart Plan and approve hundreds of new bids year after year even after learning of Relator's allegations in 2016. Thus, it will show that Humana's forward-looking projections were neither knowingly false, nor material to CMS's decision to pay Humana. Humana will also present evidence that CMS has suffered no monetary loss as a result of the bid projections that Relator challenges; indeed, the proof at trial will show that the Walmart Plan saved the Part D program billions of dollars in premium subsidies that CMS would have otherwise paid to Part D plans.

This case has a voluminous record. Over two and a half years of discovery, Humana alone produced more than 410,000 documents, representing 1.6 million pages and 174,000 native files; more than a dozen witnesses for depositions, totaling over 110 hours of testimony; and narrative responses to Relator's interrogatories that spanned more than 325 written pages. Buffaloe Decl. ¶¶ 3-8, R. 345-1, PageID.29598-29600. Relator has identified more than 6,900 documents on his exhibit list for trial, and has disclosed 14 witnesses who he may call to testify before the jury. Relator's Exhibit List, R. 541-3, PageID.66729-938; Relator's Witness List, R. 541-1, PageID.66710. Relator has also designated hours of deposition testimony from five Humana employees who provided corporate testimony in response to deposition notices that Relator served pursuant to Federal Rule of Civil Procedure 30(b)(6). Relator's Initial Designations, R. 541-2, PageID.66712-27. The trial is set to commence on July 11, 2023 and is

currently estimated to consume six weeks of the Court's docket.  September 19, 2022 Scheduling Order, R. 512, PageID.66430-31.

CMS requires that sponsors of Medicare Part C and Part D plans calculate the gain/loss margin for their Medicare business as part of the agency's efforts to evaluate the relationship between the gain/loss margin for the sponsor's Medicare business and the gain/loss margin for its "other insurance lines of business."  CMS Bid Pricing Tool ("BPT") Instructions for Contract Year ("CY") 2015, R. 280-11, at 14 (under seal).  Therefore, the gain/loss margin process necessarily involves the calculation of a non-Medicare gain/loss value that is then compared against the Medicare gain/loss value.  For instance, in CY 2015, the "aggregate gain/loss margin levels in the BPT for Part D plans . . . [had to] be within 1.5 percent of the Part D sponsor's margin for all non-Medicare business."  R. 280-11 at 15-16 (under seal).

The actual definition of gain/loss margin is "the additional revenue requirement beyond allowed prescription drug costs and non-benefit expenses."  R. 280-11 at 14 (under seal).  Each of the components of this definition are defined and explained in more detail in other parts of the BPT Instructions, and these component definitions along with the definition of gain/loss margin itself, are subject to change from year to year.  Each bid season, like other Part D sponsors, Humana had to determine the aggregate gain/loss margin at one of three levels:  the contract level, the organization level, or the parent organization level.  R. 280-11 at 15 (under seal).  For CYs 2012 through 2017, Humana was required to calculate the aggregate gain/loss margin for all Part D plans, which included the 35 region-specific Walmart Plans and the 69 other region-specific Part D plans that are not at issue in this case.[1]  In sum, the aggregate gain/loss margin

---

[1] For CY 2011, the BPT Instructions did not require a calculation of aggregate gain/loss margin specifically for Part D plans.  *See* Sept. 28, 2020 Olson Decl., R. 301-2, PageID.44540.

was a single value generated from highly technical and complex calculations that involved inputs

from all 104 Part D plans that Humana sponsored annually during the period in dispute.  It bears

noting that Humana only generated the aggregate gain/loss margin value as defined in the BPT

Instructions for purposes of submitting Part D bids.  Humana did not calculate an aggregate

gain/loss margin for any other purpose in the ordinary course of business.  *See* Sept. 28, 2020

Olson Decl., R. 301-2, PageID.44541.[2]

Humana met with Relator on January 13, 2023 to discuss motions in limine that each

party expected to file prior to trial.  That meet and confer process succeeded in narrowing the

evidentiary disputes between the parties and they have agreed to 11 evidentiary stipulations that

obviate the need to file previously anticipated motions in limine.  During that meet and confer,

however, Humana asked whether Relator would agree to stipulate to exclude evidence and

argument related to the aggregate gain/loss margin reported to CMS for all of Humana's Part D

plans.  *See* Exhibit 1, January 18, 2023 First Meet-and-Confer Letter from Humana to Relator at

2.  Counsel for Humana also explained why the aggregate gain/loss margin is irrelevant to

Relator's FCA allegations and will be confusing to the jury.  Humana's counsel noted that the

aggregate gain/loss margin is calculated for all of Humana's Part D plans—not just the Walmart

Plan—for purposes of comparison with all of Humana's other lines of business, which include

hundreds of non-Part D health insurance plans and products.  Relator's counsel refused the

proposed stipulation and indicated that such evidence was relevant to Humana's motivation for

---

[2] Contrary to Relator's anticipated mischaracterization of this issue, the aggregate gain/loss margin is not synonymous with "profit" as that term is commonly understood by laypersons, and therefore the aggregate gain/loss margin figure identified in Humana's bids cannot be reasonably compared to any internal profit figure.  *See* Sept. 28, 2020 Olson Decl., R. 301-2, PageID.44541 ("Humana does not calculate its profit margins on the same basis as described in the BPT Instructions for its internal budgets, or any other ordinary business purpose, other than for purposes of its bids to CMS.").

allegedly committing fraud and the credibility of Humana's witnesses, among other unexplained reasons. *See* Exhibit 2, January 24, 2023 Second Meet-and-Confer Letter from Relator to Humana at 3.  In his exhibit list filed on February 1, 2023, Relator identified multiple documents that refer to the aggregate gain/loss margin reported by Humana to CMS or that primarily focus upon the aggregate gain/loss margin.  *See* RX-1848 ("Medicare Gain Margin Documentation" memorandum and related material); RX-2390 (email correspondence among Humana, Milliman, and CMS contractor Deloitte entitled "Gain/Loss Margin"); RX-2531 (email correspondence between Humana and CMS entitled "MA PD Gain/Loss Margin Assumptions and Experience"), R. 541-3, PageID.66848, 66885, 66896.

To keep trial manageable and to ensure fairness to all parties, Humana requests that this Court exclude evidence and/or argument regarding the aggregate gain/loss margin that Humana reported to CMS for all of its Part D plans.  Such evidence is irrelevant, unduly prejudicial against Humana, would cause juror confusion, and would needlessly waste time at trial on entirely collateral matters.  Exclusion of this evidence and argument prior to trial will expedite what is expected to be a lengthy and complex proceeding, and allow the Court, the parties, and jurors to focus on the key factual and legal issues in the case.

## LEGAL STANDARD

Motions in limine are a key tool in service of "the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984).  They are "'designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions.'"  *United States v. Walsh*, 654 F. App'x 689, 693 (6th Cir.  2016) (quoting *Louzon v. Ford Motor Co.*, 718 F.3d 556, 561 (6th Cir. 2013)).  Thus, "[m]otions in limine provided in advance of trial are appropriate if they eliminate evidence that has no legitimate use at trial for any purpose."  *Sanderson v. Wal-Mart Stores E., L.P.*, 2018 WL 4656238, at *1 (W.D. Ky. Sept.

27, 2018) (citing, *inter alia*, *Jonasson v. Lutheran Child & Fam. Serv.*, 115 F.3d 436, 440 (7th Cir. 1997)).

A motion in limine may be brought to exclude evidence "based on any of the grounds available under the Federal Rules of Evidence." 3 James Wm. Moore, *Moore's Federal Practice* § 16.77(4)(d)(ii) (3d ed.2014). Under Federal Rules of Evidence 401 and 402, only relevant evidence is admissible at trial and relevant evidence includes documents or testimony that "has any tendency to make a fact more or less probable" and "the fact is of consequence in determining the action." Fed. R. Evid. 401 & 402. Courts may exclude irrelevant evidence in advance of trial. *See, e.g., United States v. West*, 534 F. App'x 280, 283 (6th Cir. 2013). And "mere speculation and conjecture" is not enough to demonstrate relevance. *Fairland, Inc. v. U.S. Fid. & Guar. Co.*, 2007 WL 603377, at *2 (E.D. Mich. Feb. 22, 2007) (prohibiting plaintiff's experts from offering a speculative theory that individuals running around a store had triggered a fire when there was no evidence to support those facts). Even if evidence is relevant, it may still be excluded from trial "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *see also United States v. Estephane*, 2017 WL 4927676, at *2 (W.D. Ky. Oct. 31, 2017). It is particularly appropriate to exclude unduly prejudicial evidence prior to trial because the Court cannot "unring the bell" once the jury hears such evidence. *Cf. Cramer v. Sabine Transp. Co.*, 141 F. Supp. 2d 727, 733 (S.D. Tex. 2001) ("Motions in limine are intended to prevent allegedly prejudicial evidence from being so much as whispered before a jury prior to obtaining the Court's permission to broach the topic.").

**ARGUMENT**

The gain/loss margin is a single aggregate figure that Humana develops each year when submitting its Part D bids to CMS.  During the period at issue in this case, the gain/loss margin was based upon the financial performance of all of its Part D plans, which included the 35 region-specific Walmart Plans at issue as well as 69 other region-specific Part D plans.  This margin reflected a comparison of the gain/loss margin for all of Humana's Medicare plans to the gain/loss margin for all of Humana's non-Medicare business, such as commercial health insurance products.  Humana reported annually the aggregate gain/loss margin to CMS as part of the Part D bid process.

Evidence regarding the aggregate gain/loss margin is not relevant to Relator's FCA allegations concerning Humana's forward-looking actuarial projections for average member cost share in the Initial Coverage Limit ("ICL") phase for the Walmart Plan.  Humana's single aggregate gain/loss margin value for all 104 Part D plans was not specific to the Walmart Plan and is of no consequence in assessing Relator's allegations about the Walmart Plan.  In sum, nothing about the aggregate gain/loss margin will make any fact concerning Relator's allegations more or less probable.  Indeed, the 31-page memorandum and associated material entitled "Medicare Gain Margin Documentation," which Relator has identified as Exhibit RX-1848, does not even mention the Walmart Plan, and Relator has failed to explain how this exhibit or any similar exhibits will have any bearing upon Relator's claims for relief or the credibility of Humana's witnesses.  *See* RX-1848.

The BPT Instructions published each year by CMS contained numerous and evolving requirements about the cost components that must be included and excluded in the calculation of the aggregate gain/loss margin, and these components involved many different types of healthcare plans and products, most of which had no connection at all to the Walmart Plan or

even Medicare Part D.  *See*, *e.g.*, RX-2390 at 5 (question number 8 in "Gain/Loss Margin"
correspondence from CMS contractor to Humana and Milliman stating "[a]s you note, the
aggregate D-SNP plan MA margins exceeds the estimated General Enrollment and I/C SNP plan
MA margin by 3.6%, which exceeds the 1% limit specified by the bid pricing instructions.  We
understand that OACT gave Humana permission to price the D-SNP plans with aggregate
margin above the 1% threshold.").[3]  Thus, the inputs to the aggregate gain/loss margin
enumerated in the BPT Instructions make clear that it was not a bid value that is relevant to the
core issues in this case.  Indeed, the aggregate gain/loss margin is mentioned nowhere in the
Complaint.  The jury's consideration of Relator's allegations concerning Humana's forward-
looking projections related to the average member cost share in the ICL phase do not require
consideration of any "additional revenue requirement beyond allowed prescription drug costs
and non-benefit expenses" and "the aggregate D-SNP plan MA margins."  *See* R. 280-11 at 14
(under seal); *see also* RX-2390 at 5.  Put simply, the aggregate gain/loss margin has no practical
connection to the factual issues the jury must decide at trial and should therefore be excluded as
irrelevant under Rules 401 and 402.

In addition, the development of a single aggregate gain/loss margin value for all 104 Part
D plans was a complicated process and any evidence and/or argument on this subject will almost
certainly confuse the issues, mislead the jury, and waste the jury's time on collateral questions.
Given all the other complex information the jurors will need to learn and retain during a six-
week trial, it is clear that introducing evidence related to a complicated calculation that was not
even specific to the Walmart Plan is a needless waste of time that would only cause delay and

---

[3] OACT refers to CMS's Office of the Actuary, which is responsible for the review and approval
of bids for Part D plans.

unnecessary confusion among the jurors. For example, in order to present evidence related to the aggregate gain/loss margin, both parties would be required to expend considerable time educating the jurors on highly technical actuarial and accounting terminology. This will include untangling technical definitions that CMS actually used in the BPT Instructions from the litigation-specific definitions that Relator used in his discovery requests and then changed later in the litigation.[4] In short, introduction of evidence and argument concerning aggregate gain/loss margin will quickly devolve into a distracting mini-trial. Courts have significant discretion to limit the admissibility of evidence on the grounds that it "could result in a trial within a trial." *Burke v. U-Haul Int'l, Inc*., 2007 WL 61844, at *1 (W.D. Ky. Jan. 3, 2007); *United States v. Yu Qin*, 688 F.3d 257, 264 (6th Cir. 2012) (reiterating the court's concern that the admission of certain evidence could result in a "trial within a trial."). During a trial that will already feature complicated actuarial calculations for *relevant* datapoints in the case, the burden on the parties and the jury to dissect yet another aggregate value that is not even limited to the Walmart Plan is an utter waste of time.

Of course, all of these technical explanations would be confusing and difficult for the jury to comprehend even if they had actual bearing on Relator's FCA claims or Humana's defenses. But, they do not. Relator cannot explain cogently how aggregate gain/loss margin for all 104 Part D plans—a topic absent entirely from his Complaint—is relevant to Humana's forward-looking projections for average member cost share in the ICL phase for the 35 region-

---

[4] For instance, Relator's discovery requests expressly defined "aggregate gain/loss margin" as the term "described in the Bid Pricing Tool Instructions for Contract Years 2011-18," but Relator then recharacterized this term as "profit" in discovery-related briefing to the Court. *See* Humana's Opposition to Relator's Motion to Compel a Complete Response to Interrogatory No. 11, R. 280 at 1-3 (under seal). The aggregate gain/loss margin is not synonymous with profit and the changing terminology that Relator used during discovery would almost surely feature in future disputes at trial regarding this subject matter.

specific Walmart Plans.  Should Relator be permitted to present evidence and/or argument on the aggregate gain/loss margin that Humana reported to CMS, the jury will inevitably be confused as to how that value relates in any way to the allegations in Relator's Complaint.  Humana will have no choice but to respond with substantial documentary and testimonial evidence in an effort to untangle the thicket that Relator's presentation will necessarily create.  As a result, whatever probative value might be attributable to evidence about the aggregate gain/loss margin, and Humana submits there is none, it is more than substantially outweighed by the risk of jury confusion, waste of the Court's time on collateral matters, and unfair prejudice to Humana. Thus, under Rule 403, such evidence and argument should not admitted.

## CONCLUSION

For the foregoing reasons, this Court should grant Humana's Motion in Limine No. 9 to preclude Relator from offering evidence and/or argument at trial regarding the aggregate gain/loss margin that Humana reported annually to CMS for all of Humana's Part D plans.

Dated: February 23, 2023

Respectfully submitted,

/s/ Michael P. Abate

Michael P. Abate
Casey L. Hinkle
Rick Adams
Chuck Stinson
KAPLAN JOHNSON ABATE & BIRD LLP
710 W.  Main St., 4th Floor
Louisville, KY 40202
(502) 416-1630
mabate@kaplanjohnsonlaw.com
chinke@kaplanjohnsonlaw.com
radams@kaplanjohnsonlaw.com
cstinson@kaplanjohnsonlaw.com

/s/ William T. Buffaloe

K. Lee Blalack, II*
Elizabeth L. McKeen*
Anna T. Pletcher*
William T. Buffaloe*
Amanda Santella*
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
202-383-5300
lblalack@omm.com
emckeen@omm.com
apletcher@omm.com
wbuffaloe@omm.com
asantella@omm.com

*Admitted pro hac vice

Counsel for Defendant, Humana, Inc.

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 23, 2023, I filed the foregoing motion with the Court and served it on opposing counsel through the Court's CM/ECF system.  All counsel of record are registered ECF users.

/s/ William T. Buffaloe
*Counsel for Defendant Humana Inc.*