UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:18-CV-00061-GNS-CHL

UNITED STATES OF AMERICA ex rel. STEVEN SCOTT                     PLAINTIFF

v.

HUMANA, INC.                                                      DEFENDANT

## SEALED MEMORANDUM OPINION AND ORDER

This matter is before the Court on Relator's Motions to Exclude (DN 339, 341), Defendant's Motion to Exclude (DN 349), and Defendant's Motion to Strike (DN 380). The motions are ripe for adjudication. For the reasons outlined below, the motion to strike is **GRANTED**, Defendant's motion to exclude is **GRANTED IN PART** and **DENIED IN PART**, and the remaining motions are **DENIED**.

## I.    STATEMENT OF FACTS AND CLAIMS

This is a *quit tam* whistleblower action brought by Relator Steven Scott ("Scott") on behalf of the Plaintiff United States of America asserting claims against Defendant Humana, Inc. ("Humana") for violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729(A)(1)(a)-(b), (g), relating to its Medicare Part D Prescription Drug Plans ("PDPs"). (Compl. ¶¶ 198-205, DN 1). The D PDPs are administered by the Centers for Medicare and Medicaid Services ("CMS"). As this Court has explained:

> Under the federal Medicare Part D Program, private insurers offer insurance coverage for prescription drugs to Medicare eligible individuals. . . . On January 1, 2006, Humana began offering stand-alone [PDPs] under the federal Medicare Part D Program. A PDP is an insurance plan that helps an individual pay for prescription drugs. Prescription drugs are typically divided into three tiers based upon cost. Each tier has a copay level for covered prescription drugs with the health plan setting the copay for the drugs covered in each tier. Tier I typically includes

generic drugs.  Tier II typically includes mid-range copay drugs and covered brand-name drugs that have been selected as Tier II drugs.  Tier III typically includes drugs with the highest copay and includes all other covered prescription drugs.

*In re Humana, Inc. Secs. Litig.*, No. 3:08CV00162-JHM, <u>2009 WL 1767193</u>, at *1 (W.D. Ky. June 23, 2009).

Beginning in 2011, Humana began offering a national PDP referred to as the Humana Walmart-Preferred Rx Plan or the Humana Preferred Rx Plan (collectively "Walmart Plan"). (Compl. ¶ 80, DN 1).  Scott alleges that Humana violated the FCA when it knowingly offered PDP benefits less than what it promised in its Walmart Plan bids for Calendar Years 2011 to 2017. (Compl. ¶ 5, DN 1).

The parties have filed dueling motions to exclude testimony from expert witnesses Robert Moné ("Moné"), Ross Winkelman ("Winkelman"), Margaret Sparks ("Sparks") and Richard Foster ("Foster").  (Relator's Mot. Exclude, DN 339; Relator's Mot. Exclude, DN 341; Def.'s Mot. Exclude, DN 349).  Humana has also moved to strike supplemental expert reports filed by Sparks and Foster.  (Def.'s Mot. Strike, DN 380).  The motions are ripe for decision.

## II.      <u>JURISDICTION</u>

This Court has subject-matter jurisdiction of this matter pursuant to <u>28 U.S.C. § 1331</u> and <u>31 U.S.C. § 3730(b)(1)</u>.

## III.      <u>DISCUSSION</u>

### A.      <u>Relator's Motion to Exclude (DN 339)</u>

In his motion, Scott seeks to exclude the certain opinions of Moné, in particular:  (i) Moné's calculations made in response to the analysis of Dr. Philip Ellis ("Dr. Ellis") regarding the

difference between actual and represented coverage; and (ii) Moné's calculations of CMS payments to Medicare Part D plans.  (Relator's Mot. Exclude 16-25, DN 339).

The admissibility of expert testimony is governed by Fed. R. Evid. 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a)      the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b)      the testimony is based on sufficient facts or data;
> (c)      the testimony is the product of reliable principles and methods; and
> (d)      the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; see also Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("[N]o single factor is necessarily dispositive of the reliability of a particular expert's testimony.").

Under this rule, the trial judge is the gatekeeper to ensure that expert testimony satisfies the requirements of reliability and relevance.  See Mike's Train House, Inc. v. Lionel, L.L.C., 472 F.3d 398, 407 (6th Cir. 2006) (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999)).  As the Sixth Circuit has further noted:

> Parsing the language of the Rule, it is evident that a proposed expert's opinion is admissible, at the discretion of the trial court, if the opinion satisfies three requirements.  First, the witness must be qualified by "knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  Second, the testimony must be relevant, meaning that it "will assist the trier of fact to understand the evidence or to determine a fact in issue."  Id.  Third, the testimony must be reliable.

In re Scrap Metal Antitrust Litig., 527 F.3d 517, 528-29 (6th Cir. 2008) (citing Fed. R. Evid. 702).

Moné is an actuary retained on behalf of Humana to respond to opinions proffered by Dr. Ellis, whose company provides independent consulting services on health policy issues and economic analysis.  (Moné Rebuttal Report ¶ 1, DN 339-4; Ellis Report ¶ 1, DN 339-1).  As noted in his rebuttal report, Moné "currently lead[s] Wakely's National Average Benchmark Projection Model ("NABER"), which projects the national average bid amount ("NABA"), national average

premium, and low-income benchmarks ("LIB") by PDP region, as defined by the Centers for Medicare and Medicaid Services ("CMS")."  (Moné Rebuttal Report ¶ 4, DN 339-4).  Moné previously served as Principal and Consulting Actuary at Milliman, a consulting company providing actuarial services.  (Moné Rebuttal Report ¶ 4, DN 339-4).  In this case, Moné was retained to review and offer his opinions relating to Dr. Ellis' claims adjudication model and net claims subsidies purportedly paid by CMS to Humana for Walmart Plans between 2011 and 2017. (Moné Rebuttal Report ¶ 9, DN 339-4).

### 1.  *Calculations Relating to the Difference Between Actual and Represented Coverage*

First, Scott challenges Moné's calculations of damages based on two hypotheticals rather than the difference between actual and represented coverage as irrelevant.  (Relator's Mot. Exclude 16-19, DN 339).  Scott asserts that Moné's calculations are internally inconsistent, and are based on a hypothetical situation where Humana increases its plan premium to maintain a profit margin, and therefore should be excluded.  (Relator's Mot. Exclude 16-19, DN 339).  Humana contends, however, that Moné's calculations are relevant in addressing flaws with those prepared by Dr. Ellis.  (Def.'s Resp. Relator's Mot. Exclude 15-25, DN 395).

In his rebuttal report, Moné opines:

Ellis' calculation of the difference in payments between the so-called "actual coverage" and the so-called "represented coverage" is fundamentally flawed and is internally inconsistent.  Even though he acknowledges that in his calculation of risk corridor payments, the "target amount" under the "represented coverage" "assume[s] a different bid," his calculation of the difference between the "actual coverage" and "represented coverage" does not account for the impact that "a different bid" would have had on direct subsidy payments, low-income subsidy payments, and member premiums—all of which are important Part D revenue streams for PDPs like Humana.  Without accounting for these additional payment streams, Ellis' adjustment to the "target amount" under the "represented coverage" for his risk corridor calculation is flawed.  His methodology also improperly undervalues the risk corridor payments Humana would have received from CMS had the "target amount" been properly calculated, consistent with the methodology

that Ellis utilized for his calculation of other Part D payment streams in this case and the goal of the risk corridor program as defined by Congress and CMS.

(Moné Rebuttal Report ¶ 51, DN 339-4 (internal footnotes omitted)).   As the Sixth Circuit has cautioned, however:

> [A] court must be sure not "to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other."  Instead, the requirement that an expert's testimony be reliable means that it must be "supported by appropriate validation—i.e., 'good grounds,' based on what is known."  The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation.

*In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529-30 (internal citations omitted) (citations omitted).

While couched in terms of reliability, Scott's challenge to Moné's opinions is more properly considered a challenge to his credibility.   Determining a witness's credibility is exclusively the role of the jury.  *See Johnson v. BLC Lexington SNF, LLC*, 478 F. Supp. 3d 578, 590 (E.D. Ky. 2020) ("But 'mere weaknesses in the factual basis of an expert witness opinion . . . bear on the weight of the evidence rather than on its admissibility.'  Again, any issue the defendants take with her calculations is better suited for cross-examination.  This is particularly true where, as here, the defendants argue that their own expert chose a better method of calculation than Johnson's expert."  (internal citation omitted)); *Lackey v. Robert Bosch Tool Corp.*, No. 16-29-ART, 2017 WL 129891, at *8 (E.D. Ky. Jan. 12, 2017 ("If Bosch Tool believes Winter's calculations were off, it may raise those concerns through cross-examination.  What matters now is that the methodology behind Winter's first opinion is, even if imperfect, reasonably reliable and suited to the case."  (internal citation omitted) (citation omitted)); *see also* 29 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 6268.2 (2d ed. Apr. 2021 update) ("[T]rial courts should hesitate to exclude evidence under subdivision (d) based on

questions as to reliability that are within the jury's ability to understand.  Since its inception, the courts have sought to apply Rule 702 in a manner that preserves the jury's traditional power to weigh evidence and determine witness credibility.  *Daubert* is consistent with this policy and explicitly stated that trial judges should permit the jury to resolve many reliability issues." (internal footnotes omitted)).   Accordingly, the Court will deny Scott's motion on this basis.

### 2.   *Calculations of CMS Payments to Medicare Part D Plans*

Scott next seeks to exclude Moné's calculations of CMS payments made to Medicare Part D plans because they are irrelevant and unreliable.  (Relator's Mot. Exclude 20-25, DN 339). Humana responds that the calculations are reliable and relevant to show the flaws in Dr. Ellis' calculations and to assist jury in evaluating Scott's claim for damages.  (Def.'s Resp. Relator's Mot. Exclude 15-25, DN 395).

Factors that may be considered in determining whether the challenged testimony is reliable include:

> (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the technique has a high known or potential rate of error; [] (4) whether the technique enjoys general acceptance within the relevant scientific, technical, or other specialized community[;] [and] [(5)] whether the expert prepared his or her opinion "solely for purposes of litigation."

*Wilden v. Laury Transp., LLC*, 901 F.3d 644, 649 (6th Cir. 2018) (internal citations omitted) (citation omitted).

As Humana notes in its response:

> To perform [his] calculation [of damages], Ellis used a so-called "claims adjudication model" that was developed *exclusively for this litigation* by The Brattle Group, a litigation consulting firm that Relator retained before engaging Ellis.  Under this model, Ellis re-adjudicated CMS's payments to Humana based on "a single change to Humana's actual plan benefit designs": he "fixed" the [initial coverage limit ("ICL")] member cost share "at the percentage represented in the bid."  His calculation of "government overpayments" is limited to two of the five

Part D payment streams: low-income cost sharing subsidies ("LICS") and reinsurance. He conceded that, when performing this analysis, he made no attempt to evaluate two other Part D payment streams:  direct subsidies and low-income premium subsidies. Although he attempted to calculate risk corridor payments, the last Part D payment stream, Ellis concluded that the calculation was speculative and decided to ignore any exchange of risk corridor payments between CMS and Humana when computing the total "government overpayments."

(Def.'s Resp. Relator's Mot. Exclude 4, DN 395 (internal citations omitted) (citation omitted)).

Thus, Scott's contention that Moné invented his methodology appears to ring hollow to the extent those opinions are offered specifically to rebut Dr. Ellis' opinions based on methodology used by Dr. Ellis and specifically developed for this litigation.[1]  (Relator's Mot. Exclude 23, DN 339; Moné Rebuttal Report ¶ 1, DN 339-4; Ellis Dep. 124:11-15, June 12, 2020, DN 339-3 ("Has anyone used this methodology?  Not that I'm—not that I'm aware of, but I mean, my understanding is the model was built for the purpose of this case.  This model—this model was built for the purpose of this case.")).  As an actuary, Moné applied the applicable Actuarial Standards of Practice ("ASOPs") in reviewing and offering his own evaluation of Dr. Ellis' opinions.  (Moné Rebuttal Report ¶¶ 12-13, DN 339-4).  After considering the *Wilden* factors in light of the fact that both experts offer opinions regarding a methodology specifically developed for this litigation, the Court declines to exclude Moné's opinions on reliability grounds.

Nevertheless, the Court also reviews Scott's challenge to Moné's opinions as being more properly characterized as a challenge to his credibility and an attempt to undermine Moné's efforts to point out flaws with Dr. Ellis' calculations.  As Humana notes:

Specifically, the Complaint alleges that if CMS had known that Humana was submitting bids for the Walmart Plan that relied on knowingly false projections, CMS would not have approved the bids.  Compl. ¶¶ 133, 203.  Ellis acknowledged that, in such a scenario, all beneficiaries who obtained their Part D coverage through the Walmart Plan would have had to obtain their coverage from another PDP and

---

[1] "After all, in the law, what is sauce for the goose is normally sauce for the gander."  *Heffernan v. City of Paterson*, 578 U.S. 266, 272 (2016).

> CMS would have had to pay the other PDPs the required Part D subsidies for that coverage. Ellis Tr. 236:7-16. Moné opined that in order to measure the true effect on CMS payments of rejecting the Walmart Plan bids, it is necessary to evaluate whether CMS would have paid more, less, or the same amount in subsidies to other PDPs for providing coverage to these Walmart Plan members who would not have obtained prescription drug coverage from Humana. *See* Moné Rep. ¶ 78. Moné thus corrected Ellis's calculations of the so-called "government subsidies" to account for the financial impact to CMS in the scenario that Relator himself alleges.

(Def.'s Resp. Relator's Mot. Exclude, DN 19-20, DN 395 (citation omitted). Ultimately, the jury will have to determine whether it finds the opinions of Dr. Ellis or Moné more credible.

For these reasons, Scott has failed to articulate a proper basis to exclude Moné's expert testimony. *See Institutional Labor Advisors, LLC v. Allied Res., Inc.*, No. 4:12-CV-00044-JHM, 2014 WL 4211196, at *27 (W.D. Ky. Aug. 25, 2014) ("In short, the fact that each party disagrees about the substance of the other party's expert testimony is not grounds for exclusion."). This motion will be denied.

### B.    Relator's Motion to Exclude (DN 341)

By separate motion, Scott moves to exclude the testimony of Winkelman, an actuary consultant hired by Humana. (Relator's Mot. Exclude, DN 341; Winkelman Report 1, DN 341-2). In particular, Scott seeks to exclude:  (i) Winkelman's opinions regarding the ASOPs; (ii) Winkelman's opinions that CMS does not require "best estimates"; and (iii) Winkelman's analysis of the historical member cost shares of non-Humana plans. (Relator's Mot. Exclude 16-24, DN 341). Winkelman's opinions are based upon:

> [his] experience as a healthcare actuary in developing Medicare Part D Plan ("PDP") bids, the Actuarial Standards of Practice ("ASOPs"), the AAA Code of Professional Conduct ("Code of Professional Conduct"), the Centers for Medicare & Medicaid Services' ("CMS") Medicare Part D Bid Pricing Tool Instructions ("Bid Instructions"), and the allegations in the Complaint filed by [Scott] and other case materials provided by [Humana's counsel].

(Winkelman Report 1, DN 341-2).

1. ***ASOPs***

First, Scott challenges Winkelman's opinions relating to the ASOPs because those "opinions on the applicable ASOPs are [] completely divorced from the facts of the case" and "consist largely of a rote recitation of the text of the ASOPs with virtually no analysis." (Relator's Mot. Exclude 3-5, DN 341).  Humana responds that Winkelman's opinions as to the ASOPs will assist the jury and that his reliance on a reasonableness standard applicable to the bid projections is supported by the record.  (Def.'s Resp. Relator's Mot. Exclude 13-20, DN 393).

Winkelman has extensive experience as an actuary and specifically regarding the development of Medicare Part D Plan bids.  (Winkelman Report 1, DN 341-2).  As this Court has previously noted, "experts often testify as to professional standards of care and whether they have been breached."  *Great Am. Ins. Co. v. Poynter*, No. 1:10-CV-00161-JHM, 2013 WL 1181445, at *13 (W.D. Ky. Mar. 20, 2013); *see also In re Air Crash at Lexington*, No. 5:06-CV-316-KSF, 2008 WL 2954973, at *4 (E.D. Ky. July 30, 2008) ("The jury does not have the specialized knowledge of aviation rules, procedures, training and standards that impacted the pilots' performance. . . . Expert testimony will assist their understanding of regulations . . . . The experts' substantial experience will assist in the jury's understanding of the many factors that Comair claims contributed to pilot confusion prior to the crash.  The testimony will also assist the jury in understanding the management standards for properly hiring, training, and supervising pilots."); *MAR Oil Co. v. Korpan*, 973 F. Supp. 2d 775, 785 (N.D. Ohio 2013) ("Berman does more than merely utter the words 'standard in the industry.'  In addition to his thirty-four years of experience in the oil and gas industry, Berman bases his opinion on industry associations' codes of ethics and training courses on ethics.").

The ASOPs and their proper application are beyond the knowledge of the jury, and Winkelman's ~~testimony may assist~~ the jury in this case.   Accordingly, it is not improper for Winkelman to testify regarding the ASOPs, and the motion will be denied on this basis.

### 2.   *Best Estimates*

Scott also seeks to exclude Winkelman's opinions as to "best estimates" because such opinions are contrary to applicable law and are therefore irrelevant or unreliable.  (Relator's Mot. Exclude 19-21, DN 341).  Humana contends, however, that Scott is misrepresenting Winkelman's testimony and the opinions expressed in his reports.  (Def.'s Resp. Relator's Mot. Exclude 16, DN 393).  In his report, Winkelman states:

> Except as specifically noted by CMS, actuaries are not required to use so-called "best estimates" in PDP bids.  CMS only uses the term "best estimate" with respect to four specific assumptions in the Bid Instructions and does not generally require that actuaries submit bids reflecting their "best estimate" for each assumption.  The Bid Instructions use the term "best estimate" in four specific areas:  1) Incurred claims estimates for the base period experience, 2) the impact of sequestration, 3) Direct and Indirect Remuneration under "Rebate" in the BPT, and 4) the cost of Non-Benefit Expense quality initiatives.  CMS does not use "best estimate" in the Bid Instructions in other areas, including for estimates of trend, membership and preferred pharmacy utilization or even Part D utilization more generally.  The Bid Instructions and key CMS guidance also do not define "best estimate."  The ASOPs relevant to PDP bid submission similarly do not define "best estimate."  As discussed above, the ASOPs apply to the actuaries preparing PDP bids and to the CMS actuaries and contracted actuarial firms that review and approve the bids; therefore, except where CMS specifically states otherwise, there is a range of reasonableness for each assumption in the PDP bids, within which the actuary may select any reasonable value and still comply with the ASOPs and with the Bid Instructions.

(Winkelman Report ¶ 18, DN 341-2).

In support of his motion, Scott points to 42 C.F.R. § 423.505(k), which provides in relevant part:

> Certification of data that determine payment—
> (1)      General rule.  As a condition for receiving a monthly payment under subpart G of this part (or for fallback entities, payment under subpart Q of

this part), the Part D plan sponsor agrees that its chief executive officer (CEO), chief financial officer (CFO), or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to the officer, must request payment under the contract on a document that certifies (*based on best knowledge, information, and belief*) the accuracy, completeness, and truthfulness of all data related to payment.  The data may include specified enrollment information, claims data, bid submission data, and other data that CMS specifies.

. . .

(4)      Certification of bid submission information.  The CEO, CFO, or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to the officer, must certify (*based on best knowledge, information, and belief*) that the information in its bid submission and assumptions related to projected reinsurance and low income cost sharing subsidies is accurate, complete, and truthful and fully conforms to the requirements in § 423.265.

42 C.F.R. § 423.505(k)(1), (4) (emphasis added).  As Humana notes, however, this rule addresses the appropriate standard for certification, not actuarial bid projections.  (Def.'s Resp. Relator's Mot. Exclude 18).

Humana asserts that Winkelman's opinions must be viewed by considering the applicable ASOPs—including ASOP No. 23 which defines the term "data" as "[n]umerical, census, or classification information, or information derived mathematically from such items, but not general or qualitative information.  Assumptions are not data, but data are commonly used in the development of actuarial assumptions." (Def.'s Resp. Relator's Mot. Exclude 18, DN 393; Def.'s Resp. Relator's Mot. Exclude Ex. 6, at 8, DN 393-6)  As Sparks testified regarding ASOP No. 23:

Q.      . . . [A]m I right that ASOP 23 specifies that data and assumptions for actuarial purposes are different concepts?
A.      Yes.
Q.      Okay.  What's the difference between an assumption and data?
A.      So I don't know how fine of a point to put on this.  I mean, data is data.  It's actual numerical information, you know, census, all of those kinds of things.  It's very specific actual stuff that you have today.  Assumptions are developed based on data for use in other purposes.  Assumptions and data are not the same, but assumptions are driven from data or developed from data.
Q.      So data often is and usually is an input in developing an assumption for an actuarial project; is that right?

A.     Yes, that's correct.

(Sparks Dep. 274:9-275:5, July 16, 2020, DN 355-14).  Thus, Scott apparently is attempting to

conflate the standards applicable to bid certifications, and bid assumptions and projections.  To the

extent that the parties seek to attack flaws in an expert's testimony, those are issues for the jury to

resolve at trial.[2]  *See Powell v. Tosh*, 942 F. Supp. 2d 678, 695 (W.D. Ky. 2013) ("Whether

Plaintiffs' insinuations are correct, it is not the Court's role at this juncture to evaluate the

credibility of Waldrop's statements or the correctness of his conclusions."  (citing *In re Scrap

Metal Antitrust Litig.*, 527 F.3d at 529-30)).

Scott selectively cites to Winkelman's testimony, which more completely reflects:

> Q.     One of the questions you were asked to opine on in this litigation is
> whether actuaries are required to use best estimates in submitting PDP bids; is that
> correct?
> A.     That is correct.
> Q.     And the two documents you referenced both pertain to the
> submission of best estimates by actuaries in PDP bids, correct?
> A.     Could you repeat the question, please?
> Q.     Sure.  Both documents you just described, the Milliman presentation
> and the Milliman memo, relate to the use of best estimates by actuaries in
> submitting PDP bids, correct?
> . . .
> A.     Yeah.  That was correspondence between Milliman and Humana, I
> believe, based on my recollection, but, again, I wasn't asked to look at the record
> and—between Humana and Milliman or Humana, CMS, and form an opinion as to
> whether or not, you know, they—you know, that that record supports the fact that
> they were required to use best estimate.
>          It's my opinion that best estimate is not the standard CMS intended,
> and there's really no correspondence between a health plan and their consultants
> that would change my opinion as to what CMS requirements are and/or ASOP
> requirements are with regard to best estimate.

---

[2] While Relator also relies on the declaration of Jennifer Lazio ("Lazio"), who is the Director for
the Parts C&D Actuarial Group at CMS, dated August 7, 2020, in challenging Winkelman's
testimony, Relator has failed to show that the declaration undermines Winkelman's credibility.
Lazio does not address the ASOPs and only mentions the term "best estimates" in one paragraph.
(Lazio Decl. ¶ 11, Aug. 7, 2020, DN 350-5).  As pointed out by Humana, the declaration was filed
only after the closure of expert discovery, so Winkelman never had the opportunity to respond to
her assertion.

> Q.     Well, would you agree that evidence of industry practice would be relevant to your opinion on best estimates?
>
> A.     I can't imagine a situation where I could see, you know, individual correspondence between a consultant and their client related to Part D bid development that would change my opinion based on my experience over a number of years filling out many Part D bids that CMS intended for the standard to be best estimate.
>
> So while I did review those documents, I didn't find it necessary to review anymore to form my opinions.  To me it was just to understand Ms. Sparks' perspective.

(Winkelman Dep. 19:5-21:3, July 10, 2020, DN 341-1; Relator's Mot. Exclude 20, DN 341 (citing Winkelman Dep. 19:14-17, 19:20-20:11)).   When examined in context and compared with Winkelman's Report, his testimony, and ASOP No. 23, Scott's motion is not well-taken.  Scott's motion will be denied on this basis.

### 3.     *Historical Member Cost Shares*

Finally, Scott challenges Winkelman's reliance on historical member cost shares in determining whether other Medicare Part D plans aligned with the legal standard of no more than 25.5% for the intended actuarial value of the member cost-sharing of the ICL phase.  (Relator's Mot. Exclude 21-24, DN 341).  In particular, Scott asserts:

> Based on the flawed and unreliable estimation model that he created for purposes of this litigation, Mr. Winkelman opined that a "substantial majority of non-Humana AE plans experienced actual average member cost sharing in the ICL phase . . . higher than 25.5%."  But Mr. Winkelman does not dispute that his estimation model grossly overstates historical member cost share when applied to the Walmart Plans.  He also does not dispute that, when his estimates of the historical member cost shares of non-Humana plans are adjusted to account for this bias, they show that the non-Humana plans had historical member cost shares within a narrow range of 25% – utterly refuting Mr. Winkelman's conclusions.

(Relator's Mot. Exclude 21-22, DN 341 (internal citation omitted) (citation omitted)).  In opposing the exclusion of this testimony, Humana asserts:

> Winkelman's analysis concluded that the substantial majority of non-Humana AE plans experienced actual average member cost sharing in the ICL phase greater than the 25.5% bid limit.  . . . Winkelman's analysis confirmed that the Walmart Plan's

experience was not unique, as many other AE plans submitted bid estimates of cost sharing in the ICL phase that they did not realize in actual experience.

(Def.'s Resp. Relator's Mot. Exclude 6-7, DN 393 (internal citation omitted)).

In the summary to his report, Winkelman states:

[Humana's counsel] also asked me to determine whether any AE plans, other than Humana's AE plans, experienced actual average member cost sharing in the ICL phase that was higher than 25.5% for Contract Years 2011 through 2016. If other AE plans experienced actual average cost sharing in the ICL phase that was higher than 25.5% during one or more of these Contract Years, [Humana's counsel] asked me to then determine how often non-Humana AE plans had actual average member cost sharing in the ICL phase of greater than 25.5%. To answer these questions, I relied primarily on data and information that CMS produced to Humana in response to a subpoena Humana issued in this litigation. In summary, my conclusions specific to the analysis of the CMS data are as follows:

a.      In each Contract Year, a substantial majority of non-Humana AE plans experienced actual average member cost sharing in the ICL phase that was higher than 25.5%.

b.      In each Contract Year, the 50th percentile or median actual average member cost sharing in the ICL phase was higher than 25.5% and, in at least half of the Contract Years analyzed, the median was more than ▮▮▮ above 25.5%.

c.      In each Contract Year, a notable percentage of non-Humana AE plans experienced actual average member cost sharing in the ICL phase above 30%.

d.      For Contract Years 2011 through 2016, I identified the highest actual average member cost sharing in the ICL phase for a non-Humana AE plan, which I have set forth below:

**Highest Actual Average Member Cost Sharing in the ICL Phase of an Individual Non-Humana AE Plan**

| Experience Year | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
| --- | --- | --- | --- | --- | --- | --- |
| Single Credible Non-Humana AE Plan in Experience Period Exclusively | | | | | | |

(Winkelman Report ¶ 5, DN 341-2 (internal footnotes omitted); *see also* Winkelman Report ¶¶ 38-40, DN 341-2). In Exhibit C to his report, Winkelman explains the methodology he used in his analysis. (Winkelman Report Ex. C, at 1-11, DN 341-2).

Scott's criticism of Winkelman is largely based on his own expert, Foster, who is critical of Winkelman's calculations and points out perceived flaws with those computations. (Relator's

Mot. Exclude 21-22, DN 341).  As this Court has previously noted, however, "[s]uch a 'battle of the experts' is properly resolved by the jury, which must 'weigh the experts' testimony and decide accordingly.'"  *Nelson v. Costco Wholesale Corp.*, No. 3:18-CV-278-BJG-RSE, 2021 WL 2459472, at *11 (W.D. Ky. June 16, 2021) (citing *Magna Elecs., Inc. v. TRW Auto. Holdings Corp.*, No. 1:12-CV-654, 2016 WL 4239185, at *2 (W.D. Mich. Jan. 7, 2016)).

As outlined in his report and as he testified in his deposition, Winkelman applied variations on key assumptions in his model and conducted reasonability tests on the outputs of the model. (Winkelman Report Ex. C, at 1-11, DN 341-2; Winkelman Dep. 184:11-187:17).  While Scott criticizes Winkelman's use of historical member cost shares, ASOP No. 56 specifically recognizes that different validation methods may be used.  Section 3.6.2 of ASOP No. 56 addresses model output validation and states:

> The actuary should validate that the model output reasonably represents that which is being modeled.  Depending on the intended purpose, model output validation may include the following:
> a.    testing, where applicable, preliminary model output against historical actual results to verify that modeled output would bear a reasonable relationship to actual results over a given time period if input to the model were set to be consistent with the conditions prevailing during such period;
> b.    evaluating whether the model applied to hold-out data produces model output that is reasonably consistent with model output developed without the hold-out data, as may be used for predictive models;
> c.    performing statistical or analytical tests on model output to assess their reasonableness;
> d.    running tests of variations on key assumptions to test that changes in the output are consistent with the expectations given the changes in the input; and
> e.    comparing model output to those of an alternative model(s), where appropriate.

(Def.'s Resp. Relator's Mot. Exclude Ex. 16, at 8, DN 393-17).

While couched in terms of reliability, Scott essentially argues that Winkelman's opinions are wrong.  Ultimately, the jury may conclude that Winkelman's opinions are incorrect, but that is

not proper grounds to exclude those opinions on the basis of reliability.  *See Powell*, 942 F. Supp.
2d at 695 (rejecting a motion to exclude in which the plaintiff attacked the correctness of the
expert's opinions).

Scott challenges Winkelman's opinions as being based on a model created for the purpose
of litigation.  (Relator's Mot. Exclude 21).  As this Court has noted:

> Courts draw a distinction between "experts for hire" and experts who testify as to
> matters growing naturally and directly out of their research.  *Johnson v. Manitowoc
> Boom Trucks, Inc.*, 484 F.3d 426, 435 (6th Cir. 2007).  When a purported expert's
> opinion is prepared solely for litigation or when the expert spends the majority of
> their time testifying in trials, that fact may be considered as a basis for exclusion.
> *Banks v. Bosch Rexroth Corp.*, No. 5:12-345-DCR, 2014 WL 1364763, at *3 (E.D.
> Ky. Apr. 7, 2014) (citing *Newell v. Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d
> 521, 527 (6th Cir. 2012)).  If the expert is found to be a "quintessential expert for
> hire," the party offering the expert must show support regarding the expert's
> familiarity with the subject in question.

*Louisville Marketing, Inc. v. Jewelry Candles, LLC*, No. 3:15-CV-00084-DJH, 2016 WL 6595094,
at *5 (W.D. Ky. Nov. 4, 2016) (citing *Johnson*, 484 F.3d at 434).  As noted above, Winkelman is
well-qualified, and his report indicates that he had not testified in a state or federal court proceeding
for four years prior to being retained as an expert in this matter and had only given a deposition
once in that period.  (Winkelman Report 1, DN 341-2).  Thus, this argument is rejected.

Accordingly, the Court will deny Scott's motion to exclude Winkelman's expert opinions.

## C.    Defendant's Motion to Exclude (DN 349)[3]

Humana moves to exclude certain opinions and testimony of Foster and Sparks who were
retained as expert witnesses on behalf of Scott.  (Def.'s Mot. Exclude 9-20, DN 349).  Humana
contends that the following testimony should be excluded:  (i) Foster and Sparks' expert opinions
regarding the reasonableness of Walmart Plan bid projections and whether those projections were

---

[3] Rather than listing the challenged testimony and opinions in its motion, Humana has listed them
in Attachment A to its motion.  (Def.'s Mot. Exclude Attach. A, DN 349-12).

consistent with ASOPs; (ii) Foster and Sparks' testimony regarding the state of mind of Humana and Milliman; (iii) Foster's testimony regarding CMS's anticipated handling of a hypothetical situation; and (iv) Sparks' opinion as to Humana's reverse-engineering of bid projections to avoid significantly altering Walmart Plan benefits.  (Def.'s Mot. Exclude 9-20, DN 349).

Foster is "an independent consulting health actuary, providing actuarial and other technical assistance to policy makers, researchers, health sector organizations, and others."  (Foster Report ¶ 4, DN 349-2).  He previously served in various actuarial positions with the Social Security Administration ("SSA"), including as Chief Actuary and Deputy Chief Actuary for the SSA. (Foster Report ¶¶ 5-7, DN 349-2).  More recently, Foster served as the Chief Actuary for CMS and was in that role when CMS developed and implemented Medicare Part D.  (Foster Report ¶ 8, DN 349-2).

Sparks is also an actuary who has held a variety of consulting positions with pension and health insurance plans.  (Sparks Report ¶¶ 1-4, DN 349-4).  She has served as a pharmacy actuary and most recently served as the Chief Actuary of Optum Rx, a pharmacy benefits management company.  (Sparks Report ¶ 5, DN 349-4).

1.    *Reasonableness*

Humana attacks Foster's testimony as to the reasonableness of Humana's bid projections and whether those bids satisfied the requirements of the relevant ASOPs.  (Def.'s Mot. Exclude 9-14, DN 349).  In addition, Humana objects to Sparks' opinions that the bids were inconsistent with the applicable ASOPs and the Actuarial Code of Professional Conduct.[4]  (Def.'s Mot. Exclude 9-

---

[4] As Sparks noted in her report, "the five United States-based actuarial organizations (the American Academy of Actuaries, the American Society of Pension Actuaries, the Casualty Actuarial Society, the Conference of Consulting Actuaries, and the Society of Actuaries) publish a Code of Professional Conduct that is binding on all member actuaries."  (Sparks Report ¶ 120, DN 349-4; *see also* Sparks Report ¶¶ 180-83, DN 349-4).

14, DN 349 (citing Def.'s Mot. Exclude Attach. A, at 2, DN 349-12)).  Scott contends, however, that the testimony is reliable because those opinions are based on the relevant ASOPs and the Actuarial Code of Professional Conduct.  (Relator's Resp. Def.'s Mot. Exclude 12-18, DN 386).

As discussed above, reliability is not the equivalent of correctness.  As Scott notes in his response, Humana has acknowledged that the discovery produced in this case "consists of more than 410,000 documents, representing 1.6 million pages and 174,000 native files . . . ."  (Relator's Resp. Def.'s Mot. Exclude 12, DN 386 (internal quotation marks omitted) (quoting Def.'s Mot. Summ. J. 4, DN 345)).  To the extent that Foster or Sparks ignored or failed to review documents relevant to his or her analysis, such failings go to the credibility of the expert's opinions, not reliability.  *See Rich v. City of Savannah*, No. 1:02-1222 T/P, 2005 WL 6739798, at *3 (W.D. Tenn. Aug. 25, 2005) ("The fact that Shaffer could have reviewed other materials in formulating his opinion does not disqualify him as an expert.  To the extent that Shaffer did not review certain documents that provide information that is inconsistent with his opinion, the plaintiffs may certainly challenge Shaffer's opinion by vigorous cross-examination and the presentation of contrary evidence."  (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993); *McReynolds v. Sodexho Marriott Servs., Inc.*, 349 F. Supp. 2d 30, 42 (D.D.C. 2004))).  If—as Humana contends—"[t]he documents that Foster and Sparks *did* review are an incomplete and implausible basis for their sweeping proclamations", it will have an opportunity to discredit such testimony through rigorous cross-examination at trial and the presentation of the expert testimony of its own expert witnesses.  (Def.'s Mot. Exclude 12, DN 349).  Humana's motion will be denied on this basis.

> ### 2.    *State of Mind*

Humana also seeks to exclude the testimony of Foster and Sparks to the extent that the witnesses state opinions regarding the state of mind of Humana and Milliman in formulating its Medicare Part D bid proposals.  (Def.'s Mot. Exclude 14-16, DN 349 (citing Def.'s Mot. Exclude Attach. A, at 3-4, 5-6, DN 349-12)).  Humana notes specific examples cited by Foster and Sparks in which they allegedly purport to opine that Humana knew about issues with its bids.  (Def.'s Mot. Exclude 14-15, DN 349 (citations omitted)).  Scott contends, however, that Foster and Sparks are not testifying regarding state of mind but rather what information Humana had at the time relevant business decisions were made.  (Relator's Resp. Def.'s Mot. Exclude 18-21, DN 386).  In particular, Scott notes that ASOP No. 8 specifically requires actuaries to consider "relevant information available to the actuary", which includes "business plans; past experience of the health plan entity or the health benefit coverage; and any relevant industry, government, or academic studies that are generally known and reasonably available to the actuary."  (Relator's Resp. Def.'s Mot. Exclude 18, DN 386 (quoting Ex. 168, at 14, DN 358-7)).

It is true that "[c]ourts have typically barred expert opinions or testimony concerning a corporation's state of mind, subjective motivation, or intent."  *Schall v. Suzuki Motor of Am., Inc.*, No. 4:14-CV-00074-JHM, 2020 WL 1162191, at *6 (W.D. Ky. Mar. 10, 2020) (citing *In re E.I. du Pont de Nemours & Co. C-8 Pers. Injury Litig.*, 348 F. Supp. 3d 698, 718 (S.D. Ohio 2016); *see also Johnson v. Baker*, No. 1:08-CV-00038, 2009 WL 3486000, at *5 (W.D. Ky. Oct. 23, 2009) ("A party's state of mind . . . is not within the knowledge of any expert." (citations omitted)); *MAR Oil Co.*, 973 F. Supp. 2d at 786 ("Under Federal Rule of Evidence 704, an expert witness may opine on ultimate issues to be decided by a jury.  No expert, however, knows a party's state

of mind.   An expert, therefore, cannot opine on a party's state of mind."   (internal citations omitted)).   No state-of-mind testimony will be admitted at trial.

The Court views the challenged testimony, however, as explained by Scott—that the expert witnesses are expressing opinions regarding information Humana had access to and used in making decisions.   This is clearly relevant to Scott's allegations that Humana intentionally manipulated its projections and ultimately violated the FCA, and whether the bid assumptions were consistent with the applicable ASOPs.   Such testimony does not improperly purport to discern Humana's state of mind and will therefore not be precluded from trial.   Humana's motion will be denied on this basis.

### 3.   *Hypothetical Situation*

Humana also seeks to exclude Foster from testifying as to what decisions CMS would have made in a hypothetical situation.   (Def.'s Mot. Exclude 16-19, DN 349 (citing Def.'s Mot. Exclude Attach. A, at 3-4, DN 349-12)).   In particular, it contends that Foster has opined that CMS would have rejected Humana's bids if "CMS had learned that key assumptions underlying the tests for actuarial equivalence in Humana's bid[s] . . . were false and/or unreasonable . . . ."   (Def.'s Mot. Exclude 16, DN 349 (citations omitted)).   Scott asserts that Foster, as CMS's former Chief Actuary for 20 years, should be able to testify that CMS would have rejected Humana's bids if CMS knew the key assumptions were false and unreasonable, and such testimony "is helpful, reliable, and admissible."   (Relator's Resp. Def.'s Mot. Exclude 21-22, DN 386).   Scott also argues that "[c]ourts routinely admit expert opinions on what government agencies consider important or how government agencies would react to the discovery of material information.   (Relator's Resp. Def.'s Mot. Exclude 22, DN 386).

Fed. R. Evid. 705 provides that "[u]nless the court orders otherwise, an expert may state an opinion—and give the reasons for it—without first testifying to the underlying facts or data.

But the expert may be required to disclose those facts or data on cross-examination." Fed. R. Evid.

705.  As one learned treatise notes, the drafters of Fed. R. Evid. 705 provided a helpful statement

about the operational effect of that rule:

> While the rule allows counsel to make disclosure of the underlying facts or data as a preliminary to the giving of an expert opinion, if he chooses, the instances in which he is required to do so are reduced.  This is true whether the expert bases his opinion on data furnished to him at secondhand or observed by him at firsthand.

Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 6.25[2][b] (quoting Fed. R. Evid.

705 advisory committee's note).  As Dean Lawson explains:

> In other words, the provision gives the offering party an option to use or not use hypothetical questions (recognizing that legal counsel is best situated to choose the most effective method of presenting expert testimony) but explicitly authorizes the trial court to override a decision by counsel and require the use of a hypothetical question.

*Id.*

While the parties cite conflicting authority, the Sixth Circuit's decision in *United States v.*

*Kalymon*, 541 F.3d 624 (6th Cir. 2008), is the most instructive.  In *Kalymon*, the U.S. government

initiated the process for revoking the citizenship of a naturalized U.S. citizen who had been

involved in war crimes during World War II.  *See id.* at 627.  After the United States prevailed at

trial and his citizenship was revoked, the defendant appealed and challenged the trial court's

admission of expert testimony.  *See id.*  In rejecting the assertion of error, the Sixth Circuit stated:

> [T]he Government offered the immigration witnesses for testimony regarding their experience in the processing of [Displaced Persons Acts] visa applications.  [One of those expert witnesses], in fact, helped to develop the very procedures used by the officials to investigate and report the wartime activities of potential displaced persons.  The witnesses offered testimony to show that, assuming arguendo that officials had known about [the defendant's] wartime activities, the officials would have investigated his background much more closely.

*Id.* at 637.

It would seem self-evident that CMS would have taken some action if it had been aware—as Scott alleges—that Humana was submitting fraudulent bids.  Consistent with the holding in *Kalymon*, Foster may testify as to the types of actions CMS **could have taken** had it been aware of Humana's allegedly fraudulent acts, but he may not testify as to what ultimate decision CMS **would have made**.  Foster's testimony will not be excluded but may be admissible consistent with the foregoing.

### 4.    *Reverse-Engineering*

Finally, Humana challenges the admissibility of Sparks' opinions regarding Human's reverse-engineering of its Walmart Plan bids and asserts that those opinions are based on an erroneous assumption that "Humana did not significantly alter its premium or benefits."  (Def.'s Mot. Exclude 19, DN 349 (citations omitted); Def.'s Mot. Exclude Attach. A, at 8, DN 349-12). Scott responds that Sparks simply analyzed Humana's process in formulating its bids and concluded that Humana's behavior violated the ASOPs.  (Relator's Resp. Def.'s Mot. Exclude 25, DN 386).  Sparks' testimony regarding the bid process and whether Humana's conduct was consistent with the ASOPs is clearly relevant in this case and is admissible at trial.  As Scott notes, there is certainly a question as to whether Humana reversed-engineered its bid assumptions to satisfy the applicable actuarial equivalency requirements.  (Relator's Resp. Def.'s Mot. Exclude 25, DN 386).

In particular, Sparks' Report states:

Humana's practice of working backwards to develop the preferred use and membership assumptions for its bids based on the assumptions needed to achieve actuarial equivalence without significantly altering its premium or benefits is not an actuarially sound or reasonable method, and is inconsistent with numerous ASOPs.
a.    First, Section 3.2.9 of the 2005 revision to ASOP No. 8 and Section 3.12 of the 2014 revision to ASOP No. 8 provide that "the assumptions [that an actuary uses] should be reasonable" and "determined based on the actuary's

professional judgment." Section 2.10 of ASOP No. 1 further explains that the "reasonableness" of an assumption or method should be based on the actuary's "professional judgment." By definition, selecting an assumption based on what is required to pass a CMS test, rather than on what the actuary reasonably believes to be the most likely outcome, does not involve the use of any "professional judgment" and is thus unreasonable. It also violates the precepts of the Actuarial Code of Professional Conduct because it is misleading, deceitful, or fraudulent within the meaning of the Code.

b. Second, as discussed supra, § V.B.2, Section 3.2.4 of the 2005 revision to ASOP No. 8 and Section 3.7 of the 2014 revision to ASOP No. 8 require an actuary to consider past experience when setting bid assumptions. Setting bid assumptions to whatever number is required to pass a CMS test, by definition, does not reasonably consider past experience.

c. Third, as discussed supra, § V.B.1, Section 3.2.3 of the 2005 revision to ASOP No. 8 and Section 3.6 of the 2014 revision to ASOP No. 8 require an actuary to consider business plans when setting bid assumptions. Again, setting bid assumptions to whatever number is required to pass a CMS test, by definition, does not reasonably consider its business plan. In addition, Appendix 8 sets forth the initiatives that Humana relied on each year to justify the preferred use assumptions in its bids and describes whether each initiative was implemented, funding provided to the initiative, and whether Humana has any record of the initiative increasing preferred use.

(Sparks Report ¶ 240, DN 349-4). Humana also challenges portions of Paragraphs 184, 215, 235, 236, 237, 238, and 239 of Sparks' Report relating to the reverse-engineering of bid assumptions. (Def.'s Mot. Exclude Attach. A, at 7, DN 349-12).

Humana clearly disagrees with any assertion that it reverse-engineered its bid assumptions as part of a scheme in violation of the FCA and believes that Sparks' opinions are flawed. These issues, however, are more properly addressed through vigorous cross-examination and do not warrant the exclusion of Sparks' testimony at trial. *See McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) ("[M]ere 'weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility.'" (citation omitted)).

For these reasons, Humana's motion to exclude Sparks' testimony will be denied.

### D.   **Defendant's Motion to Strike (DN 380)**

Humana moves to exclude the supplemental reports of Sparks (DN 380-3) and Foster (DN 380-4) on the basis the reports are untimely and improper, and do not satisfy Fed. R. Civ. P. 37(c)(1).  (Def.'s Mot. Strike 5-10, DN 380).  Scott contends, however, that such supplemental reports were required by Fed. R. Civ. P. 26(e)(2).  (Relator's Resp. Def.'s Mot. Strike 6-14, DN 408).

In relevant part, Fed. R. Civ. P. 26 provides:

> For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition.  Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due.

Fed. R. Civ. P. 26(e)(2).  As this Court has noted:

> A party who has made an expert testimony disclosure under Rule 26(a) must supplement its disclosure "in a timely manner if the party learns that in some material respect the disclosure . . . is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A); *see Sibley v. Sprint Nextel Corp.*, No. 08-2063-KHV, 2013 WL 1819773, at *3 (D. Kan. Apr. 30, 2013) (finding that "[c]ourts have made clear . . . that Rule 26(e)(2) does not permit a party to use the supplementing procedure to submit an amended or rebuttal report not based on new information").  On the other hand, a rebuttal report is "intended solely to contradict or rebut evidence on the same subject matter identified by another party."

*Morris v. Tyson Chicken, Inc.*, No. 4:15-CV-00077-JHM, 2019 WL 6499460, at *1 (W.D. Ky. Dec. 3, 2019) (quoting Fed. R. Civ. P. 26(a)(2)(D)(ii)); *see also In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 159 (S.D. Ind. 2009) ("[T]he purpose of supplementary disclosures is just that—to supplement.  Such disclosures are not intended to provide an extension of the expert designation and report production deadline."  In other words, "although Fed. R. Civ. P. 26(e) requires a party to 'supplement or correct' disclosure upon information later acquired, that

provision does not give license to sandbag one's opponent with claims and issues which should have been included in the expert witness' report."  (internal citation omitted) (citation omitted)).

Expert discovery ended on July 17, 2020.  (Order 2, DN 281).  In response to the declaration signed by Lazio on August 7, 2020, Sparks and Foster prepared supplemental reports. (Sparks Suppl. Report, DN 380-3; Foster Suppl. Report, DN 380-4).  Sparks' supplemental report consists of seven numbered paragraphs on one page, stating in part:

> 3.   I am submitting this Supplemental Report based on additional information that has been provided to me since submitting my Rebuttal Report on June 15, 2020.
>
> 4.   In my Affirmative Report and my Rebuttal Report, I opined that the Centers for Medicare & Medicaid Services ("CMS") required Part D sponsors to use bid assumptions that reflected their "best estimates."  See Affirmative Report ¶¶ 136, 147-148, 214(e); Rebuttal Report ¶¶ 18-32.
>
> 5.   On August 7, 2020, Jennifer Lazio, the Director of the Parts C&D Actuarial Group at CMS, submitted a sworn declaration ("Lazio Decl.") regarding CMS's actuarial guidelines.  Ms. Lazio stated that "CMS' s actuarial guidelines require that the bids reflect the plan sponsor's best estimate of projected costs, including projected claims."  Lazio Decl. ¶ 11.
>
> 6.   Ms. Lazio's Declaration provides further support for my prior opinions that CMS requires sponsors to use "best estimates" for their assumptions regarding ICL member cost share, preferred use, and membership.  ICL member cost share is a component of both "projected costs" and "projected claims," which as set forth in Ms. Lazio's Declaration, must be based on best estimates.  *Id*.  As explained in my Affirmative Report, membership and preferred use are necessary inputs into ICL member cost share.  See Affirmative Report ¶¶ 55-60.

(Sparks Suppl. Report ¶¶ 3-6, DN 380-3).  Similarly, Foster's supplemental report states in relevant part:

> 4.   In my opinion, Ms. Lazio has concisely and correctly summarized the nature and importance of the actuarial equivalence requirement for Part D prescription drug plans.
>
> . . .
>
> 6.   Ms. Lazio's statements regarding the purpose and importance of the requirement for actuarial equivalence are consistent in all respects with my previous opinions and statements on this subject, and further support my opinions.
>
> . . .

> 8.      In my opinion, Ms. Lazio has again correctly and concisely summarized
>         what would occur if OACT identified problems with a plan's actuarial bid
>         submission . . . .
>
> . . .
>
> 10.     As before, Ms. Lazio's statements are fully consistent with my own
>         opinions and other findings on this subject . . . .

(Foster Suppl. Report ¶¶ 3-10, DN 380-4).

While characterized as supplemental reports, these reports do not correct any error or omission contained in the experts' original reports.  Rather, these experts are seeking to buttress their opinions with a declaration provided after their reports were drafted, merely reaffirming the veracity of the statements contained in the declaration.  Because the opinions contained in the supplemental reports were due at the time of the pretrial disclosures under Fed. R. Civ. P. 26(a)(3), these supplemental reports were not timely and will be excluded.

For these reasons, Humana's motion to strike is granted, and the parties shall not introduce these supplemental reports at trial or proffer expert opinions relating to these supplemental reports.

## IV.      CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1.      Relator's Motion to Exclude (DN 339) is **DENIED**.

2.      Relator's Motion to Exclude (DN 341) is **DENIED**.

3.      Defendant's Motion to Exclude (DN 349) is **GRANTED IN PART** and **DENIED IN PART**.

4.      Defendant's Motion to Strike (DN 380) is **GRANTED**, and the parties shall not present these supplemental reports or proffer expert opinions relating to these supplemental reports at trial.

5.      This Memorandum Opinion and Order is provisionally sealed.  To the extent that any party wishes it to remain sealed, the party shall file a motion within **30 days** of the entry of

this Memorandum Opinion and Order outlining the basis upon which it should remain sealed. Otherwise, it shall be unsealed following the expiration of the 30-day period.

Greg N. Stivers, Chief Judge

United States District Court

March 31, 2022

cc:      counsel of record

27