UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:18-CV-00061-GNS-CHL

UNITED STATES OF AMERICA ex rel. STEVEN SCOTT                    PLAINTIFF

v.

HUMANA, INC.                                                                              DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment (DN 345),

Relator's Motion for Summary Judgment (DN 346), and Relator's Motion for Hearing (DN 488).

For the reasons outlined below, the motions are **DENIED**.

### I.   STATEMENT OF FACTS AND CLAIMS

This is a *quit tam* whistleblower action brought by Relator Steven Scott ("Relator" or

"Scott") on behalf of the Plaintiff United States of America asserting claims against Defendant

Humana, Inc. ("Humana") for violations of the False Claims Act ("FCA"), 31 U.S.C. §

3729(A)(1)(a)-(b), (g), relating to its Medicare Part D Prescription Drug Plans ("PDPs").

(Compl. ¶¶ 198-205, DN 1).   The PDPs are administered by the Centers for Medicare and

Medicaid Services ("CMS").   As this Court has explained:

> Under the federal Medicare Part D Program, private insurers offer insurance
> coverage for prescription drugs to Medicare eligible individuals. . . . On January
> 1, 2006, Humana began offering stand-alone [PDPs] under the federal Medicare
> Part D Program.   A PDP is an insurance plan that helps an individual pay for
> prescription drugs.   Prescription drugs are typically divided into three tiers based
> upon cost. Each tier has a copay level for covered prescription drugs with the
> health plan setting the copay for the drugs covered in each tier.   Tier I typically
> includes generic drugs.   Tier II typically includes mid-range copay drugs and
> covered brand-name drugs that have been selected as Tier II drugs.   Tier III
> typically includes drugs with the highest copay and includes all other covered
> prescription drugs.

*In re Humana, Inc. Secs. Litig.*, No. 3:08CV00162-JHM, <u>2009 WL 1767193</u>, at *1 (W.D. Ky. June 23, 2009).

Beginning in 2011, Humana began offering a national PDP referred to as the Humana Walmart-Preferred Rx Plan or the Humana Preferred Rx Plan (collectively "Walmart Plan"). (Compl. ¶ 80, DN 1).  Scott alleges that Humana violated the FCA when it knowingly offered Medicare Part D PDP benefits less than what Humana promised in its bids submitted to CMS for the Walmart Plan for Calendar Years 2011 to 2017.  (Compl. ¶ 5, DN 1).

Following extensive discovery, Relator and Humana have moved for summary judgment. (Relator's Mot. Summ. J., DN 346; Def.'s Mot. Summ. J., DN 345).  Relator has also moved for a hearing.  (Relator's Mot. Hr'g, DN 488).  The motions are ripe for adjudication.

## II.      <u>JURISDICTION</u>

This Court has subject-matter jurisdiction of this matter pursuant to <u>28 U.S.C. § 1331</u> and <u>31 U.S.C. § 3730(b)(1)</u>.

## III.      <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." <u>Fed. R. Civ. P. 56(a)</u>.  "[A] party moving for summary judgment may satisfy its burden [of showing] that there are no genuine issues of material fact simply 'by pointing out to the court that the [non-moving party], having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.'"  *Minadeo v. ICI Paints*, <u>398 F.3d 751, 761</u> (6th Cir. 2005) (quoting *Street v. J.C. Bradford & Co.*, <u>886 F.2d 1472, 1479</u> (6th Cir. 1989)).  Similarly, the movant may meet its burden by offering evidence negating an essential element of the non-

moving party's claim.  *See Dixon v. United States*, 178 F.3d 1294, 1999 WL 196498, at *3 (6th Cir. 1999).

After the movant either shows "that there is an absence of evidence to support the nonmoving party's case," or affirmatively negates an essential element of the non-moving party's claims, the non-moving party must identify admissible evidence that creates a dispute of fact for trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  While the Court must view the evidence in a light most favorable to the non-moving party, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "The mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.

## IV.   DISCUSSION

### A.   Motions for Summary Judgment (DN 345, 346)

In the Complaint, Relator has alleged claims for violation of the FCA based upon Section 3729(a)(1)(A), (B), and (G).  (Compl. ¶¶ 200-02).  Both Scott and Humana have moved for summary judgment.[1]

#### 1.   *Presentment Claim/False Statement Claim*

In relevant part, Section 3729(a)(1) provides that a person is liable under the FCA if that person "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for

---

[1] Scott and Humana each seek summary judgment for the claims arising under Section 3729(a)(1)(A) and (B).  Scott, however, does not move for summary judgment on his claim under Section 3729(a)(1)(G), but Humana does seek summary judgment on that claim.

payment or approval; [or] (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . ." 31 U.S.C. § 3729(a)(1)(A)-(B). The elements of a Section 3729(a)(1)(A) claim, referred to as a "presentment claim", are: "(1) the defendant made a false statement or created a false record; (2) with scienter; (3) that was 'material to the Government's decision to make the payment sought in the defendant's claim'; and (4) that the defendant submitted to the U.S. government causing it to pay the claim." *United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 892 F.3d 822, 830 (6th Cir. 2018) (quoting *United States ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 408 (6th Cir. 2016)). The elements of a Section 3729(a)(1)(B) claim, or a "false statement claim", are: (1) "the defendant [made] a false statement or create[d] a false record"; (2) the defendant acted "with actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of the information"; (3) "the defendant . . . submitted a claim for payment to the federal government"; and (4) "the false statement or record [was] material to the Government's decision to make the payment sought in the defendant's claim." *Sheldon*, 816 F.3d at 408 (alterations in original) (quoting *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 618 F.3d 505, 509 (6th Cir. 2010)); *see also* 31 U.S.C. § 3729(b)(1) (defining the terms "knowing" and "knowingly", and stating there is no requirement of "specific intent to defraud . . . ."). In the parties' dueling motions, they seek summary judgment for both claims. (Def.'s Mot. Summ. J. 23-34; Relator's Mot. Summ. J. 18-33). Because of the similarity of the elements of presentment and false statement claims, they will be analyzed together.

### a.    False Statement or False Record

The first element requires a showing that Humana made a false statement or created a false record. *See Prather*, 892 F.3d at 822; *Sheldon*, 816 F.3d at 408. As a sister court has

noted, "several federal courts have recognized that summary judgment is properly granted to a defendant in a FCA case when a plaintiff fails to adduce enough evidence from which a reasonable jury could find that the claim at issue was objectively false . . . ." *McComas v. Wells Market*, No. 16-CV-217 (WOB), 2021 WL 1034193, at *2 (E.D. Ky. Mar. 17, 2021) (citations omitted).

According to Scott, each of the 245 bids submitted by Humana for Medicare Part D contracts during the relevant time period "falsely represented that Humana expected the Walmart Plan to cover at least 74.5% of drug costs" at the initial coverage limit ("ICL") phase. (Relator's Mot. Summ. J. 20 (citing Shen Decl. App'x 1, at 2-9, DN 346-2)).  Scott asserts that the undisputed evidence of fraud includes:  (i) two sets of books kept by Humana—one for bid purposes and the other for budgetary purposes; (ii) Humana's reliance on preferred use bid assumptions, which it purportedly acknowledged were not obtainable or realistic and which were higher than its actual projections; (iii) Humana's internal budget projections that it would receive "hundreds of millions of dollars more in government subsidies than represented in its bids"; (iv) Humana reverse-engineered its bid assumptions, so that it could achieve a member cost share in the ICL phase of 25.5% or less; (v) Humana personnel reported "net savings" to its senior management for "failing to provide qualified prescription coverage"; (vi) the preferred use assumptions provided to Walmart were consistent with internal budgets but inconsistent with the assumptions Humana used in its bids submitted to CMS; (vii) Milliman, a company providing actuarial services to Humana, had expressed concerns about whether Humana's preferred use assumptions were realistic and obtainable; and (viii) Humana's practices and policies were altered in response to the civil investigative demand received from the Department of Justice (DN 357-14).  (Relator's Mot. Summ. J. 20-21).

Scott contends that Humana used two critical assumptions—preferred pharmacy use and low-income membership—to falsely represent in its bid projections that the Walmart Plan would cover the 74.5% ICL drug costs required for the bids.  (Relator's Mot. Summ. J. 6-18; Relator's Reply Mot. Summ. J. 1).  Scott asserts that the record reflects that Humana's "bid projections consistently exceeded even [its] most optimistic and aggressive internal projections."  (Relator's Reply Mot. Summ. J. 2 (citing Relator's Mot. Summ. J. 12-15)).

As evidence of fraud, Scott maintains that the most dramatic discrepancies are illustrated by looking at what he characterizes as two sets of books—Humana's Walmart Plan bids and its contemporaneous budgets.  (Relator's Mot. Summ. J. 8-10, 20-21; Relator's Reply Mot. Summ. J. 2-3).  Scott rejects Humana's contention that it is inappropriate and misleading to make any comparison between the bid and budget projections.  (Relator's Reply Mot. Summ. J. 3).  In its Eighth Amended and Supplemental Objections and Response to Relator's First Set of Interrogatories, Humana stated:

> Humana identifies the following business units and individuals that Use or Used Budgets and Budgets-at-Bid in connection with Humana's development and submission to CMS of the annual Walmart Basic Plan bids with respect to the projected actuarially equivalent cost sharing in the ICL phase as well as the purposes for which they generally Use or Used the Budgets and Budgets-at-Bid:
> - **Retail Senior Products Actuarial Group** Uses the Budgets and/or Budgets-at-Bid as a part of its development of the Walmart Basic Plan bids, and to support evaluation of Humana's Medicare Part D PDP performance.  . . .
> - **Retail Senior Products Administration** Uses Budgets and/or Budgets-at-Bid to report to stakeholders, update financial planning, evaluate business strategy, and support evaluation of Humana's Medicare Part D PDP performance.  . . .
> - **Financial Operations - Retail** Uses the Budgets and/or Budgets-at-Bid to forecast earnings, track emerging and projected experience, and support evaluation of Humana's Medicare Part D PDP performance.

(Ex. 220, at 91-92, DN 360-19).  Scott asserts that "Humana's interrogatory responses identify specific, contemporaneous budgets that contain assumptions for the exact same metrics in Humana's bids that are at issue here:  ICL member cost share, preferred pharmacy use, and low-

income membership, on a region-by-region basis." (Relator's Reply Mot. Summ. J. 3 (citing Ex. 220, at 43-44, 52, DN 360-19)). Scott contends that the evidence reflects that the assumptions contained with the Walmart Plan bids were significantly different from the assumptions for the same metrics used in Humana's contemporaneous budgets, which Scott asserts resulted in Humana's contemporaneous budgets projecting receipt of hundreds of millions of dollars more in CMS subsidies compared to Humana's bids. (Relator's Mot. Summ. J. 8-11; Relator's Reply Mot. Summ. J. 4-5).

Scott also points to what he describes as reverse engineering of Humana's bids, in which its actuaries requested "more juice" in its bid assumptions to meet the actuarial equivalence required for its bids and "measure the impact of changing the Plan's preferred pharmacy use and low-income-membership assumptions on the 'ICL fix'—the per member per month additional dollar spend on benefits that would be necessary" absent any adjustments to the bid assumptions. (Relator's Mot. Summ. J. 13, 15; Relator's Reply Mot. Summ. J. 6). As Scott's expert, Margaret Sparks, testified:

> Q. What you are suggesting is that Humana engaged in a very common, ordinary practice *in an improper way* by using scenario testing to try to determine what values would allow it to pass the ICL bid test?
> A. In terms of looking at very specifically knowing that the low income percentage and the preferred utilization percentages were going to give them an issue in terms of how they were going to file these bids. So yes.

(Sparks Dep. 341:3-12, July 16, 2020, DN 355-14 (emphasis added)). Contending that Humana acknowledged using different methodologies for its preferred use assumptions between its bids and budgets, Scott asserts that Humana utilized business initiatives to justify its reverse engineering of the bid assumptions. (Relator's Mot. Summ. J. 14-15; Relator's Reply Mot. Summ. J. 7). Scott also argues that the Actuarial Standards of Practice ("ASOPs") did not mandate that Humana account for any impact of those business initiatives in the bids—only to

7

"adjust past experience to account for 'known or expected changes' that are 'likely to have a material effect on expected future results.'" (Relator's Reply Mot. Summ. J. 8).

Scott claims that Humana improperly uses Milliman as a scapegoat for any fraud that Humana may have committed. (Relator's Mot. Summ. J. 16; Relator's Reply Mot. Summ. J. 9-10). As part of the professional services provided by Milliman to Humana, a Milliman actuary certified that "to the best of my knowledge and judgment, the entire bid(s) identified in this certification are in compliance with the applicable laws, rules, [] bid instructions, current CMS guidance, and also comply with the appropriate Actuarial Standards of Practice." (Ex. 12, at 2, DN 350-11; Ex. 13, at 2, DN 350-12; Ex. 14, at 2, DN 350-13; Ex. 15, at 2, DN 350-14; Ex. 16, at 2, DN 350-15; Ex. 17, at 2, DN 350-16; Ex. 18, at 2, DN 350-17; Ex. 19, at 2, DN 350-18; Ex. 20, at 2, DN 350-19; Ex. 21, at 2, DN 351; Ex. 22, at 2, DN 351-1). For Calendar Years 2011 to 2014, the certifications also included the statement that "[t]he data and assumptions used in the development of the bid(s) are consistent with [] [Humana's] current business plan." (Ex. 12, at 2, DN 350-11; Ex. 13, at 2, DN 350-12; Ex. 14, at 2, DN 350-13; Ex. 15, at 2, DN 350-14; Ex. 16, at 2, DN 350-15; Ex. 17, at 2, DN 350-16; Ex. 18, at 2, DN 350-17). As Shelly Brandel, an actuary employed by Milliman, testified:

> Q.     When you were working on the Wal-Mart plans for bid years 2011 through 2018, were you endeavoring to determine whether any of the assumptions that Humana provided you were falsified or intentionally misleading?
>        . . .
>        THE WITNESS:     No.

(Brandel Dep. 79:12-18, Mar. 6, 2019, DN 350-9). Scott notes that several other certifications from corporate representatives were required. (Relator's Resp. Def.'s Mot. Summ. J. 5 n.5 (citing 42 C.F.R. § 423.505(k)(1), (4); Ex. 23, at 22, DN 351-2)).

Finally, Scott argues that the claims for payment submitted by Humana were false due to its failure to disclose its non-compliance with the legal requirements for the Medicare Part D contracts.  (Relator's Mot. Summ. J. 25-26; Relator's Reply Mot. Summ. J. 10).  Numerous federal statutes impose specific requirements upon Humana's participation in the Medicare Part D program.  *See, e.g.*, 42 U.S.C. § 1395w-102(b)(2)(A); 42 U.S.C. § 1395w-111(e)(2); 42 U.S.C. § 1395w-111(c)(1).  Thus, to the extent that the jury believes that claims were false, it would support a finding on this element of the FCA claims.

In its response to Scott's motion, Humana asserts that its bid projections were not objectively false and do not provide a basis for liability under the FCA.  (Def.'s Resp. Relator's Mot. Summ. J. 21-22).  As it notes, "[y]es, Humana used, and still uses, different actuarial projections in different contexts and for different purposes.  But no evidence proves—and Humana certainly does not concede—that only a subset of these documents contained 'accurate' projections."  (Def.'s Resp. Relator's Mot. Summ. J. 24 (internal citation omitted)).

Similarly, in both its response and in its own summary judgment motion, Humana asserts that the evidence relied upon by Scott consists of mere opinions, which are insufficient to prove falsity.  (Def.'s Resp. Relator's Mot. Summ. J. 22-23).

As the Sixth Circuit has explained, however:

> [O]pinions are not, and have never been, completely insulated from scrutiny.  At the very least, opinions may trigger liability for fraud when they are not honestly held by their maker, or when the speaker knows of facts that are fundamentally incompatible with his opinion. . . . So too, when the maker of an opinion does not believe what he or she is saying—in such a case, the speaker has falsely represented their own state of mind.

*United States v. Paulus*, 894 F.3d 267, 275-76 (6th Cir. 2018) (internal citations omitted); *see also Ominicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 191 (2015) (discussing the difference between an opinion and a misstatement); *United States ex rel.*

*Loughren v. Unum Grp.*, 613 F.3d 300, 310 (1st Cir. 2010) ("[T]he fact that an allegedly false statement constitutes the speaker's opinion does not disqualify it from forming the basis of FCA liability.  An opinion may qualify as a false statement for purposes of the FCA where the speaker 'knows facts "which would preclude such an opinion."'  'Facts' for this purpose are those which the applicant could 'reasonably classify as true or false' as opposed to 'legal argumentation and possibility.'" (internal citations omitted) (citation omitted)).  While Humana denies that it made false statements or presented false records, there is evidence in the record upon which the jury could find that Humana made statements and presented records that it knew were false.  *See United States v. United Techs. Corp.*, 255 F. Supp. 2d 779, 782 (S.D. Ohio 2003) ("[A]n opinion or estimate carries with it an implied assertion, not only that the speaker knows no facts which would preclude such an opinion, but that he does know facts which would justify it." (internal quotation marks omitted) (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 792 (4th Cir. 1999))).

Likewise, however, there is evidence in the record from which the jury could find in favor of Humana that it did not make any false statement or present any false record.  As Humana notes, it worked with Milliman in developing its bid projections, and Humana certified that the projections were reasonable and complied with the applicable ASOPs.  (Def.'s Mot. Summ. J. 30 (citing Brandel Decl. ¶¶ 7, 23, DN 345-89)).  As it continued to develop bids and contract with CMS during the relevant time period, Humana contends that it made adjustments to its bid projects based on its actual experience.  (Def.'s Mot. Summ. J. 31).  The jury could also accept the testimony and opinions of expert witnesses that it was not uncommon for there to be variances between bid and budget assumptions.  (Def.'s Mot. Summ. J. 32 (citing Ex. 10, DN

345-11; Sparks Dep. 202:15-203:11, July 16, 2020, DN 355-14; Winkelman Report ¶¶ 2, 9, 42, DN 341-2)).

For these reasons, when the evidence is considered in the proper light, neither party is entitled to summary judgment on this element of the Section 3279(a)(1)(A) and (B) claims. Accordingly, both motions will be denied.[2]

### b.    Scienter

Relator's claims must also be supported by scienter.  *See Prather*, 892 F.3d at 830; *see also Sheldon*, 816 F.3d at 408 (stating that the plaintiff/relator must prove the defendant acted "with actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of the information . . . .").  In *Universal Health Services, Inc. v. United States ex. rel. Escobar*, 579 U.S. 176 (2016), the Supreme Court explained, a defendant may be liable "for failing to disclose violations of legal requirements" when "the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision." *Id.* at 181.  "The [FCA's] scienter requirement defines 'knowing' and 'knowingly' to mean that a person has 'actual knowledge of the information,' 'acts in deliberate ignorance of the truth or falsity of the information,' or 'acts in reckless disregard of the truth or falsity of the information.'" *Id.* at 182 (quoting 31 U.S.C. § 3729(b)(1)(A)).  Neither the term "knowing" nor "knowingly" require "proof of specific intent to defraud." *Id.* at 187 n.2 (quoting 31 U.S.C. § 3729(b)(1)(B)).

---

[2] In its reply, Humana raises for the first time the argument that it is specifically entitled to summary judgment relating to the Contract Year 2011 and 2012 plans because "Humana submitted those bids before it had even one year of actual experience data for the Walmart Plan." (Def.'s Reply Mot. Summ. J. 19 (citations omitted)).  Because that argument was not raised in its motion, this argument will not be considered.  *See In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 599 (N.D. Ohio 2004) ("It is well-established that a party cannot raise new issues in a reply brief; [it] can only respond to arguments raised for the first time in the opposition." (citing *United States v. Campbell*, 279 F.3d 392, 401 (6th Cir. 2002)).

Scott asserts that the record reflects that Humana acted with actual knowledge that its representations were false or at least were made with reckless disregard. (Relator's Mot. Summ. J. 22; Relator's Reply Mot. Summ. J. 9). Scott points to the same evidence he identified regarding falsity to show that Humana knew its representations were false—namely that Humana knew the legal requirements for Medicare Part D PDP contracts, knew that the Walmart Plans failed to comply with those requirements, and represented to CMS that the plans met those requirements. (Relator's Mot. Summ. J. 21-23). He also notes that the record reflects that Humana disregarded the warnings it received from Milliman "that its preferred use assumptions were unobtainable and completely divorced from actual experience . . . ." (Relator's Mot. Summ. J. 23 (citation omitted)).

Scott also relies upon his own testimony that he confronted actuaries at Humana about use of different assumptions in its budgets and bids. (Relator's Mot. Summ. J. 23 (citing Scott Dep. 46:12-48:9, 80:13-87:12, Oct. 26, 2018, DN 358-2); Def.'s Mot. Summ. J. Ex. 81, DN 345-82). Notwithstanding this warning, Humana allegedly still engaged in the same conduct "and further conducted scenario testing to identify what combinations of assumptions for preferred use and low-income membership percentage would satisfy CMS's actuarial equivalence requirements . . . ." (Relator's Mot. Summ. J. 13, 23 (citing Theiss Dep. 231:18-232:21, Feb. 28, 2019, DN 350-3)).

Scott points to the differences between the bids and budgets as evidence that Humana knew of issues with its bids. (Relator's Resp. Def.'s Mot. Summ. J. 31). He states:

> Although actuarial projections may not match actual experience precisely, Humana's budget assumptions for preferred use, membership, and member cost share did closely match actual experience. *Compare* App'x 2 *with* App'x 4. Humana's bid assumptions, which were prepared by the same actuaries, consistently failed to predict actual experience by dramatic margins, and always in the same direction. *Compare* App'x 1 *with* App'x 4. This was a direct result

12

> of Humana ignoring prior actual experience in setting its bid assumptions, reverse-engineering its bid assumptions to pass the actuarial equivalency test, and choosing to maintain its fraudulently obtained profit margin instead of adequately increasing benefits.

(Relator's Resp. Def.'s Mot. Summ. J. 31 (footnote omitted)).

Alternatively, Scott asserts that Humana's failure to satisfy the Medicare Part D PDP requirements is at least sufficient to show reckless disregard.  (Relator's Mot. Summ. J. 22).  He argues that Humana ignored Milliman's concerns about the preferred use assumptions being unobtainable and inconsistent with actual use.  (Relator's Mot. Sum. J. 23)  Scott also points to Humana's purported use of bid assumptions based on the financial impact to Humana and use of "scenario testing to identify what combinations of assumptions for preferred use and low-income membership percentage would satisfy CMS's actuarial equivalence requirements . . . ." (Relator's Mot. Summ. J. 23)

While invited to do so by Scott, the Court cannot read any significance into Humana's "two sets of books" for purposes of summary judgment.  Likewise, while Humana wants to characterize its bid estimates as being "optimistic or aggressive" and Scott argues that those estimates are evidence of fraud, that determination must be made by the jury as the factfinder.  A jury could view this proof as evidence of fraud or innocuous depending on whom the jury may ultimately choose to believe.  *See also United States ex rel. Hendow v. Univ. of Phx.*, 461 F.3d 1166, 1169 (9th Cir. 2006) (reversing the dismissal of FCA claims, in part, where the relator alleged that "the University creates two separate employment files for its enrollment counselors—one 'real' file containing performance reviews based on improper quantitative factors, and one 'fake' file containing performance reviews based on legitimate qualitative factors.  The fake file is what the [U.S. Department of Education] allegedly sees.").

13

Scott also asserts that Humana's knowledge that it failed to comply with the applicable CMS regulations also is evidence of falsity.   In particular, as a requirement for payment the regulations require a certification as to "accuracy, completeness, and truthfulness . . . ."   42 C.F.R. § 423.505(k)(1), (3); *see also* 42 C.F.R. § 423.505(k)(2), (3), (4), (5), (6), (7) (requiring a certification that information is "accurate complete and truthful . . . ."). As Jennifer Lazio ("Lazio"), Director of the Parts C&D Actuarial Group in the Office of the Actuary for CMS, stated in one of her declarations, "CMS's actuarial guidelines require that the bids reflect the plan sponsor's best estimate of projected costs, including projected claims." (Lazio ¶ 11, Aug. 7, 2020, DN 350-5).

According to Scott, Humana's purported failure to comply with the applicable ASOPs warrants summary judgment in his favor. (Relator's Mot. Summ. J. 27-28; Relator's Reply Mot. Summ. J. 13-14).   Scott claims that ASOP No. 8 required Humana's actuaries to consider information found in a business plan, but as Rachael Theiss, an actuarial director for Humana, testified:

> Q.     I'm asking how Humana, or if it did, use preferred utilization
> assumptions that are set forth in its budget-at-bids for purposes of setting
> preferred utilization assumptions for purposes of its bids.
> A.     Yeah.  So for 2014 through 2018, in general, the budgets-at-bid
> were not used for purposes of developing the bid.
> Q.     And is that true with respect to preferred utilization assumptions?
> A.     Yes, it is.
> Q.     Is it true with respect to membership?
> A.     Yes, it is.

(Relator's Reply Mot. Summ. J. 13; Theiss Dep. 130:8-20, June 20, 2020, DN 354-3).  Scott also contends that Humana withheld information from Milliman that Humana has since provided through discovery, which undermines any reliance by Humana on Milliman's certifications that it complied with the applicable ASOPs.  (Relator's Reply Mot. Summ. J. 13-14).

Humana insists there is no evidence that it knowingly submitted false certifications. (Def.'s Resp. Relator's Mot. Summ. J. 24-25).  It argues that Scott seeks to impose a "best estimate" standard not legally required for Medicare Part D PDP bids, which must only be based on reasonable bid projections.  (Def.'s Resp. Relator's Mot. Summ. J. 25).  It rejects the notion that differences between the Walmart Plan bids and Humana's internal budgets are evidence of falsity, pointing to Sparks' testimony that "ASOP No. 8 does not require the use of identical use assumptions."  (Def.'s Resp. Relator's Mot. Summ. J. 25 (citing Sparks Report ¶ 143, DN 350-1)).  Humana also challenges Scott's assertion that there is unrebutted testimony of violations of ASOPs Nos. 5, 23, 25, 41, and 45, as contradicted by Milliman's certifications to CMS, Milliman's representation that all requested information was provided by Humana, and Milliman's continued support of its certifications.  (Def.'s Resp. Relator's Mot. Summ. J. 25 (citing Brandel Decl. ¶¶ 8, 40, Aug. 14, 2020, DN 345-89)).

As a defense to the assertion that it committed fraud, Humana argues that a jury could not find that its projections were knowingly false and asserts the defense of good-faith reliance on the information provided by Milliman, as warranting summary judgment in its favor.  (Def.'s Mot. Summ. J. 30-34).  "The elements of a 'reliance defense' include:  '(1) full disclosure of all pertinent facts, and (2) good faith reliance on the [expert's] advice.'"  *United States v. Rozin*, 664 F.3d 1052, 1060 (6th Cir. 2012) (citations omitted).  It is certainly disputed what crucial facts or information Humana may not have provided to Milliman.  Therefore, for the purpose of summary judgment, the Court cannot determine whether this defense would prevail.  *See United States ex rel. Augustine v. Century Health Servs., Inc.*, 136 F. Supp. 2d 876, 892 (M.D. Tenn. 2000) ("Defendants cannot assert good faith reliance on expert advice unless they can show that they provided the expert with all of the necessary information to provide an informed opinion.").

As part of the professional services provided by Milliman to Humana, an actuary employed by Milliman certified that "to the best of my knowledge and judgment, the entire bid(s) identified in this certification are in compliance with the applicable laws, rules, [] bid instructions, current CMS guidance, and also comply with the appropriate Actuarial Standards of Practice."  (Ex. 12, at 2, DN 350-11; Ex. 13, at 2, DN 350-12; Ex. 14, at 2, DN 350-13; Ex. 15, at 2, DN 350-14; Ex. 16, at 2, DN 350-15; Ex. 17, at 2, DN 350-16; Ex. 18, at 2, DN 350-17; Ex. 19, at 2, DN 350-18; Ex. 20, at 2, DN 350-19; Ex. 21, at 2, DN 351; Ex. 22, at 2, DN 351-1). For Calendar Years 2011 to 2014, the certifications also included the statement that "[t]he data and assumptions used in the development of the bid(s) are consistent with [] [Humana's] current business plan."  (Ex. 12, at 2, DN 350-11; Ex. 13, at 2, DN 350-12; Ex. 14, at 2, DN 350-13; Ex. 15, at 2, DN 350-14; Ex. 16, at 2, DN 350-15; Ex. 17, at 2, DN 350-16; Ex. 18, at 2, DN 350-17). As Scott notes in his response, several other certifications from corporate representatives are required.  (Relator's Resp. Def.'s Mot. Summ. J. 5 n.5 (citing 42 C.F.R. § 423.505(k)(1), (4); Ex. 23, at 22, DN 351-2)).

Likewise, there is evidence in the record that could be construed as Humana pressuring Milliman into accepting Humana's assumptions despite Milliman's warnings that the assumptions were too aggressive and unrealistic.  (Relator's Resp. Def.'s Mot. Summ. J. 33 (citing Ex. 186, at 4, DN 359-5; Ex. 140, at 2, DN 356-21)).   In providing its services to Humana, Milliman relied upon the information provided by Humana.   As Shelly Brandel ("Brandel"), another Milliman actuary, testified:

> Q.      . . . My question is why didn't you perform any independent audit of the preferred utilization assumptions for the low income membership assumptions?
> A.      Actuaries are not required to provide audits of information that they are relying on from others.
> Q.      Okay.  Did Humana ask you to conduct an audit of their preferred utilization assumptions or their low income membership assumptions?

A.     No.

Q.     Then it goes on to say, "The data and information was checked for general reasonableness."  Was it the case that Milliman checked the Humana assumptions on preferred utilization and low income membership for general reasonableness?

A.     Yes.

Q.     Then it says, "If the underlying data or information is inaccurate or incomplete, the results of our analysis may likewise be inaccurate or incomplete." Why was that included in the certification?

A.     That statement basically indicates that if the data or assumptions we used is not accurate or complete, then the results of our analysis similarly may be inaccurate or incomplete.

Q.     Okay.  So is it fair to say that your certification was not verifying the accuracy or completeness of the assumptions on preferred utilization or low income membership in the Wal-Mart plan bids?

A.     Yes.

(Brandel Dep. 68:10-69:14, Mar. 6, 2019, DN 350-9).[3]  In a 2011 email from David Pottschmidt,

the Associate Vice President of Actuarial Analytics/Forecasting of Humana's Senior Actuarial

Rx Department, to others at Humana, he summarized a question from Milliman as:

Walmart Use – We have been using 90% NLI/60% LI as the upper bound of the projected Walmart use.  The projections you provided show about 90% Walmart use (out of total retail use) for both LI and NLI.  It is difficult to imagine that LI use will improve to the same level as NLI in less than a year.  We need to understand more about each of these programs.  For example, why would the network impact only LI use?  There are pricing details that also go along with

---

[3] In her declaration, Brandel states:

In some letters [to Humana], Milliman described certain assumptions as either "conservative" or "aggressive."  When Milliman characterized an actuarial assumption as "aggressive," Milliman was not concluding that the assumption was unreasonable.  Rather, Milliman sometimes used the word "aggressive" to describe its view that greater effort would be necessary to achieve the results anticipated by that assumption.  For instance, in the March 9, 2015 letter with Bates label HUM-000136365, Milliman stated:  "In general, the [Walmart Basic Plan] preferred network use seems aggressive given that use has remained relatively flat or even decreased in recent years."  The use of "aggressive" in describing this assumption does not mean Milliman viewed this assumption as unreasonable at the time.  In fact, it may be appropriate for a Part D plan sponsor to use aggressive assumptions in its Part D bids as long as those assumptions are within the range of actuarial reasonableness.

(Brandel Decl. ¶ 29, Aug. 14, 2020, DN 349-13 (second alteration in original)).

> some of these (specifically, the Network and Tier 1 Price Change programs) that
> we would need to reflect in the bids.

(Ex. 140, at 2, DN 356-21; Pottschmidt Decl. ¶ 2, DN 345-92).   According to Scott, this evidence shows that Humana failed to rely on Milliman's advice in good faith by ignoring Milliman's concerns about Humana's assumptions and that Humana pressed Milliman to accept those assumptions.   (Relator's Resp. Def.'s Mot. Summ. J. 33).   He also argues that Humana failed to disclose that it used different assumptions for preferred use and membership for internal budgets, and provided projections to Walmart that differed from the bid assumptions.   (Relator's Resp. Mot. Summ. J. 32 (citing Relator's Mot. Summ. J. 10; Relator's Mot. Summ. J. App'x 10, DN 346-11)).

To the extent that there are questions as to whether Humana acted in conformity with its representations to Milliman or its certifications to CMS, or whether Humana pressured Milliman, the parties have raised factual disputes that must be resolved at trial as to scienter and preclude the entry of judgment in Humana's favor based upon any good-faith reliance.   Accordingly, neither party is entitled to summary judgment as to this element of the Section 3729(a)(1)(A) or (B) claim.

### c.   Materiality

The parties also dispute whether the materiality requirement of both claims has been met. To prevail on this claim, Scott must present evidence that any falsity was material.  *See Prather*, 892 F.3d at 830-81 (citation omitted); *Sheldon*, 816 F.3d at 408; *see also United States ex rel. Williams v. Renal Care Grp., Inc.*, 696 F.3d 518, 528 (6th Cir. 2012) ("Liability does not require proof of specific intent to defraud, 31 U.S.C. § 3729(b)(1)(B), but does require that the falsity be material to the claim."  (citation omitted)).

In *Escobar*, the Supreme Court noted that "a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." *Escobar*, 579 U.S. at 192. Under the FCA, the term "material" is defined as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). As the Sixth Circuit noted in *Prater*:

> "[M]ateriality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation.'" Something is material if a reasonable person "would attach importance to [it] in determining his choice of action in the transaction" or "if the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter 'in determining his choice of action,' even though a reasonable person would not."

*Prather*, 892 F.3d at 831 (internal citation omitted) (citation omitted). "The materiality standard is demanding." *Escobar*, 579 U.S. at 194. In evaluating materiality:

> Relevant factors include: (1) "the Government's decision to expressly identify a provision as a condition of payment"; (2) whether "the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement" or if, with actual knowledge of the non-compliance, it consistently pays such claims and there is no indication that its practice will change; and (3) whether the "noncompliance is minor or insubstantial" or if it goes "to the very essence of the bargain." None of these considerations is dispositive alone, nor is the list exclusive.

*Prather*, 892 F.3d at 831 (internal citation omitted) (citation omitted); *see also United States ex rel. Escobar v. United Health Servs., Inc.*, 842 F.3d 103, 109 (1st Cir. 2016) ("The language that the Supreme Court used in *Escobar II* makes clear that courts are to conduct a holistic approach to determining materiality in connection with a payment decision, with no one factor being necessarily dispositive.").

### i.      Express Condition of Payment

As the Supreme Court explained in *Escobar*, "[a] misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment." *Escobar*, 579 U.S. at 194. "[T]he Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive." *Id.*

Scott points to the legal requirements for Medicare Part D PDPs and criticizes Humana's position that the requirements are not material.  (Relator's Mot. Summ. J. 29-31; Relator's Reply Mot. Summ. J. 15-18).   These requirements include:   42 U.S.C. § 1395w-111(e)(2)(A) (compliance with Medicare Part D requirements as a requisite for approval of a PDP, which includes Section 1395w-102(a)(1) and (b)(2)(A)'s requirements that qualified prescription drug coverage must include the 25% member cost share in the ICL for each plan member or across all members); 42 C.F.R. § 423.104(d)(2)(i)(B) (the standard prescription drug coverage must satisfy either the requirement of 25% for the ICL member cost share or "[a]ctuarially requirement to an average expected coinsurance of no more than 25 percent of actual cost, as determined through processes and methods established under § 423.65(c) and (d)."); 42 C.F.R. § 423.265(c)(3) (all bids must be prepared in compliance "with CMS actuarial guidelines based on generally accepted actuarial principles" and that a qualified actuary provide a certification of the plan's actual valuation); 42 C.F.R. § 423.272(b) (conditioning approval of Part D plans "only if" there has been compliance with the applicable Part D requirements, which include "the provision of qualified prescription drug coverage and actuarial determinations."); 42 C.F.R. § 423.505(k)(1) (certification of data by a corporate official relating to payment required as to "the accuracy, completeness, and truthfulness of all data relating to payment."); and 42 C.F.R. § 423.505(k)(4)

(certification by a corporate official relating to the bid necessary, stating that "the information in its bid submission and assumptions related to projected reinsurance and low income cost sharing subsidies is accurate, complete, and truthful and fully conforms to the requirements in § 423.265.").

In response to Scott's motion, Humana asserts that these legal requirements are conditions of participation and not payment, which undermines the assertion that violations are material. (Def.'s Resp. Relator's Mot. Summ. J. 30-31). While some of the laws do relate specifically to bids, others clearly also apply to payments, as quoted above. *See, e.g., United States ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 751 n.11 (3d Cir. 2017) (noting that "42 C.F.R. § 423.505(k)[] [] requires, as a condition for payment, that Part D Sponsors certify the 'accuracy, completeness, and truthfulness of all data related to payment.'"). The fact that the regulations do not mention specific data or actuarial equivalence does not undermine the scope of the laws cited above requiring accuracy, completeness, and truthfulness. The language of the statute and regulations certainly indicate approval of the Walmart Plan was conditioned upon compliance, as reflected by the required Humana certifications. Thus, this factor weighs in favor of materiality.

### ii.    Past Government Action

Another factor to consider in determining materiality is past government action. *See Prather*, 892 F.3d at 833. As the Supreme Court stated in *Escobar*:

> [P]roof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual

knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

*Escobar*, 579 U.S. at 194-95.

Scott notes that there is no proof in the record that CMS approved any bid or continued to pay any claims relating to the non-compliant Walmart Plans after CMS became aware of Scott's allegations.  (Relator's Mot. Summ. J. 32-33; Relator's Resp. Def.'s Mot. Summ. J. 18).  As Lazio stated in her declaration, "CMS has never approved a PDP bid or awarded a contract for a PDP when the [Bid Pricing Tool] does not meet the actuarial equivalence tests."[4]  (Lazio Decl. ¶ 10, Aug. 7, 2020, DN 345-14).

Scott also argues that Humana cannot and has not asserted that CMS had actual knowledge of Humana's alleged fraudulent conduct.  (Relator's Resp. Def.'s Mot. Summ. J. 19. As the Sixth Circuit has noted, "[w]ithout actual knowledge of the alleged non-compliance, the government's response to the claims . . . has no bearing on the materiality analysis."  *Prather*, 892 F.3d at 834.  As Lazio stated in her declaration:

> 9.  At the time CMS awarded contracts for the Walmart Plan for the years 2011-2017, CMS did not have information about Humana's internal budget forecasts or other financial analysis outside of the bid and supporting documentation submitted to CMS about whether Humana expected the Walmart

---

[4] As Scott's expert, Robert Foster ("Foster"), stated:

> To enable a meaningful review of the actuarial bid submissions made by different Part D insurers, despite the short timeframe, the CMS Office of the Actuary has implemented a standardized "Bid Pricing Tool" (BPT) for insurers to use.  A BPT is submitted for each individual prescription drug plan, showing a summary of the plan's historical experience data, the assumptions used in projecting drug utilization, drug unit prices, rebates, other direct and indirect remuneration, administrative expenses, and other factors affecting the bid, together with the resulting bid amounts.  The information in the BPT represents a subset of the much more detailed modeling and analysis performed by the insurer's actuaries (and/or its outside consultants) in connection with its Part D plans.

(Foster Report ¶ 32, DN 345-13).

Plan to be actually equivalent.  Nor did the audit of one Walmart Plan bid for contract year 2011 reveal whether Humana had expected the bid to be actually equivalent.

10.   CMS has never approved a PDP bid or awarded a contract for a PDP when the BPT does not meet the actuarial equivalence tests.
. . .

12.   Following submission of the bid, the plan sponsor must provide for each BPT an "actuarial certification that the values are calculated according to CMS guidelines on actuarial valuation, including adjustment for the effect that providing alternative prescription drug coverage (rather than defined standard prescription drug coverage) has on drug utilization, if applicable."  *Id.* § 423.265(d)(2).  In the actuarial certification, the actuary must also attest that the bid is in compliance with all applicable laws, rules, bid instructions, and current CMS guidance.  If the actuarial certification is not submitted to CMS, the bid will not be considered for CMS review and approval.

13.   CMS' usual practice would be to engage with the plan sponsor and request a resubmission of the bid, if we had information to suggest that the original bid was not prepared in accordance with CMS actuarial guidelines or that the bid did not comply with applicable laws, rules, bid instructions, and current CMS guidance.

(Lazio Decl. ¶¶ 9-10, 12-13, Aug. 7, 2020, DN 345-14).[5]

The record also addresses Humana's communications with CMS.  As Theiss testified during her Rule 30(b) deposition:

Q.    . . . As Humana's corporate representative, Humana did not communicate to CMS the differences in the assumptions for preferred utilization membership and member cost share that were used for purposes of the budget-at-bids versus the same assumptions that were used for purposes of the bids, correct?
. . .
A.   So, there's no requirement for communications to CMS for the informal budgets-at-bid, so no, I'm not—not aware that they were communicated to CMS.
Q.   All right.  So just so the record is clear, as Humana's corporate representative, you are not aware of any communications of the differences in those assumptions between the budget-at-bids and the bids?
. . .
A.   To the extent there were differences, no, I'm not aware that they were communicated to CMS.

---

[5] While Foster opined CMS would not have approved Humana's bids had it known that the bids were based on unreasonable assumptions supporting actuarial equivalence, that testimony is not admissible as outlined by separate Memorandum Opinion and Order addressing the pending motions in limine.

(Theiss Dep. 32:25-33:19, Feb. 28, 2019, DN 350-3).   Similarly, as Susan Diamond, now

Humana's Segment President for Home Solutions, testified in her Rule 30(b) deposition:

> Q       So just to be clear, to your knowledge and Humana's knowledge,
> CMS was not communicated that there were differences between those three
> assumptions between the final budgets and the bids, correct?
> A       To my knowledge, no.
> Q       And to your knowledge, CMS was not communicated what the
> assumptions were for those three metrics that support the final budgets, correct?
> A       Not to my knowledge.

(Diamond Dep. 166:13-23, Mar. 7, 2019, DN 353-6; Diamond Decl. ¶ 2, DN 345-90).

After this action was filed in April 2016, the U.S. Department of Justice initiated an

investigation and served Humana with a civil investigation demand in May 2017.   (Pl.'s

Statement Interest 1, DN 90 ("Given the serious nature and scope of the allegations, the United

States has dedicated significant time and resources to this investigation both before and after the

case was unsealed."); Ex. 155, at 2, DN 357-14).   When the Complaint was unsealed in this

action in September 2017, CMS reacted by instituting a bid audit in October 2017 of the

Calendar Year 2018 Walmart Plan bid.   (Relator's Resp. Def.'s Mot. Summ. J. Ex. 235 at 5-7,

DN 388-11).

In its motion, Humana contends that CMS pays Medicare Part D PDP sponsor regardless

of whether a plan sponsor actually achieves the average ICL cost share estimated in their bids.

(Defendant's Mot. Summ. J. 26-27).   It points to expert report of Ross Winkelman

("Winkelman") for the proposition that CMS data "demonstrates that the vast majority of non-

Humana AE plans experienced *actual* average ICL cost sharing that exceeded the CMS bid limit

of 25.5% that all AE plan bids must satisfy."  (Def.'s Mot. Summ. J. 26 (Winkelman Report ¶

37, DN 345-7; Winkelman Report Ex. C, DN 345-7)).   That statement, however, overstates

Winkelman's opinion expressed in his report, which stated:

24

> As documented in my analysis (see Exhibit C), *the vast majority of non-Humana AE plans that I evaluated* had actual average member cost sharing in the ICL phase above 25.5% in Contract Years 2011 through 2016, ranging from more than ███ of non-Humana AE plans to ███ of such plans, depending on the year.

(Winkelman Report ¶ 37, DN 345-7 (emphasis added)).   Winkelman's testimony may be persuasive at trial, but for the purpose of ruling on Humana's motion does not warrant summary judgment in light of the conflicting evidence.   Humana's argument and Winkelman's opinions ignore the allegations in this case of knowing or reckless disregard, which may render inapposite a comparison to other plans.

While Humana relies on *United States v. ex rel. Janssen v. Lawrence Memorial Hospital*, 949 F.3d 533 (11th Cir. 2020), the court there recognized the circumstances before it suggested that the alleged violations were not material.   *See id*. at 542.   Similarly, the First Circuit's decision in *D'Agostino v. ev3, Inc.*, 845 F.3d 1 (1st Cir. 2016), the court affirmed summary judgment because the court viewed the continued reimbursement even after the relator's allegations as "cast[ing] serious doubt on the materiality of the fraudulent representations . . . ." *Id.* at 7.   In this case, this Court declines to place dispositive significance on CMS's decision to keep making payments to Humana once the conduct allegedly violating FCA stopped, given the conflicting proof.   *See United States ex rel. Bibby v. Mortg. Invs. Corp.*, No. 1:12-CV-4020-AT, 2019 WL 11637354, at *30 (N.D. Ga. July 1, 2019) ("[W]hile the Government is at liberty to close it eyes and do nothing in the face of what may amount to pervasive fraud, such governmental inaction should not be inextricably intertwined with whether the element of materiality has been satisfied.   Put another way, keying materiality to the likely or actual behavior of the Government may lead, in many cases, to the wrong result—immunizing from liability those who would plunder the Government's coffers.   Indeed, such an end result would seem to run completely at odds with Congress's intent in creating and amending the private right

of action provisions—to strengthen the capacity of a knowledgeable private litigant to vindicate the public interest in rooting out fraudulent contractor practices that prey on the Government's funds because of the Government's blindly acceding to business as usual."), *rev'd & remanded on other grounds by* 987 F.3d 1340 (11th Cir. 2021).

For these reasons, there are genuine issues of fact regarding whether past government action weighs for or against materiality.

### iii.       Essence of the Bargain

Finally, the Court may consider whether the "non-compliance is minor or insubstantial" or whether it goes "to the very essence of the bargain." *Prather*, 892 F.3d at 834 (quoting *Escobar*, 579 U.S. at 193 n.5).

In his motion, Scott asserts that that the Humana's failure to comply with the requirements for the Medicare Part D Walmart Plans goes to the heart of the bargain between Humana and CMS.  (Relator's Mot. Summ. J. 31).  Besides the Medicare Part D requirements, Scott maintains that the actuarial equivalence requirement was intended to protected CMS from overpaying plan sponsors like Humana.  (Relator's Mot. Summ. J. 3, 31).  Humana's failure to comply allegedly resulted in CMS overpaying at least $450 million to Humana in low-income cost sharing subsidies ("LICS") and reinsurance subsidies for the relevant plan years.  (Relator's Mot. Summ. J. 31 (citing Ellis Report 43, DN 350-7; Moné Dep. 140:9-141:13, July 17, 2020, DN 353-10)).  Scott asserts that other courts have held that misrepresentations impacting government payments have satisfied this requirement.  (Relator's Mot. Summ. J. 31 (citing *Ruckh v. Salus Rehabilitation, LLC*, 963 F.3d 1089, 1105 (11th Cir. 2020); *United States ex rel. Lemon v. Nurses To Go, Inc.*, 924 F.3d 155, 163 (5th Cir. 2019); *United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632, 639 (7th Cir. 2016); *United States ex rel. Campbell v. KIC Dev.,*

*LLC*, No. EP-18-CV-193-KC, 2019 WL 6884485, at *12 (W.D. Tex. Dec. 10, 2019); *United States ex rel. Rahimi v. Rite Aid Corp.*, No. 2:11-CV-11940, 2019 WL 1426333, at *9 (E.D. Mich. Mar. 30, 2019); *Griffith v. Conn*, No. 7:11-CV-157-KKC-EBA, 2018 WL 1402374, at *4 (E.D. Ky. Mar. 20, 2018))).

Given that the evidence must be construed in the light most favorable to Humana, there are questions of facts as to whether it made false representations, which precludes a determination that any falsity went to the heart of the bargain. The Court will deny Scott's motion on this basis.

Humana correspondingly asserts that any allegedly false bid projections did not defeat the essence of its bargain with CMS. (Def.'s Mot. Summ. J. 28-29). It contends that it is well known by all PDP sponsors in the Part D Program that there are likely to be disparities between bid assumptions and actual costs, and there is no requirement that PDPs achieve equivalence in actual experience. (Def.'s Mot. Summ. J. 28 (citing Foster Dep. 201:6-12, 206:3-9, July 17, 2020, DN 386-2)). Ultimately, the actual experience is resolved through the reconciliation process and risk corridors program in which LICS and reimbursement payments are based on actual costs, and that CMS can recoup a portion of any PDP sponsors' financial gains that exceed projected targets. (Def.'s Mot. Summ. J. 28-29 (citing Foster Dep. 285:21-286:12)). Humana also asserts that CMS received exactly what it contracted for—Humana provided prescription drug coverage in accordance with the terms of its bids—and CMS would not have continued contracting with Humana if it knew Humana's bids were false. (Def.'s Mot. Summ. J. 29).

Humana's arguments strike to the heart of the factual dispute in this case—whether its bids and certifications complied with Medicare Part D PDP requirements regardless of any fraud Humana committed in preparing and submitting them. While the existence of a reconciliation

process and risk corridors program are tacit (if not explicit) recognitions that projections may ultimately not reflect actual consumer usage, these processes do not excuse fraud by a plan sponsor to receive payments under the Medicare Part D Program.  Otherwise, such regulatory requirements would be rendered meaningless because all plan sponsors could simply disgorge their ill-gotten gains through the reconciliation process and risk corridors program.  Thus, for the purpose of Humana's summary judgment motion, the alleged fraud committed by Humana did go the essence of the bargain, which would support the determination of materiality in this case.

As outlined above, there are genuine issues of material fact as to materiality, which preclude summary judgment for either Scott or Humana.  Both motions will be denied on this basis.

### d.       Submission Caused U.S. Government to Pay

Finally, Scott must present evidence that Humana submitted a false statement or record, which caused the U.S. government to pay a claim.  *See Prather*, 892 F.3d at 830-31 (citation omitted); *Sheldon*, 816 F.3d at 408.  There is no question that Humana submitted statements or records to CMS for payment as part of Humana's participation in the Medicare Part D Program.  As discussed above, the parties dispute whether those statements or records were actually false and whether those statements or records caused CMS to pay Humana.  Accordingly, there are factual issues that preclude summary judgment regarding this element of the Section 3729(a)(1)(A) and (B) claims.

For these reasons, there are genuine issues of fact as to whether Scott can prove all elements of the Section 3729(a)(1)(A) and (B) claims.  Accordingly, both summary judgment motions will be denied.

2.    *Reverse-False Claim*

Under Section 3729(a)(1)(G), a person is liable under the FCA if that person "knowingly

makes, uses, or causes to be made or used, a false record or statement material to an obligation to

pay or transmit money or property to the Government, or knowingly conceals or knowingly and

improperly avoids or decreases an obligation to pay or transmit money or property to the

Government . . . ."  This is referred to as a reverse-false claim under the FCA.  *See United States*

*ex rel. Harper v. Muskingum Watershed Conservancy Dist.*, 842 F.3d 430, 433 (6th Cir. 2016).

As the Sixth Circuit has explained:

> The reverse-false-claims provision of the False Claims Act makes liable "any
> person who . . . knowingly makes, uses, or causes to be made or used, a false
> record or statement material to an obligation to pay or transmit money or property
> to the Government, or knowingly conceals or knowingly and improperly avoids or
> decreases an obligation to pay or transmit money or property to the Government."
> 31 U.S.C. § 3729(a)(1)(G).  An obligation includes "the retention of any
> overpayment," 31 U.S.C. § 3729(b)(3), and the current version of the statute
> makes clear that "there is no longer a need to show the affirmative use of a false
> record or statement in connection to the avoidance of an obligation to pay money
> to the United States," so the knowing retention of an overpayment is enough.

*Prather*, 838 F.3d at 774 (internal citation omitted).  Humana claims that it is entitled to

summary judgment on this claim because:  (i) the FCA does not impose liability predicated on

prospective payments by CMS because any overpayments would be have to be based on the

reconciliation occurring after the end of each contract year; (ii) the record does not show that

CMS made any payments based on any allegedly false bid assumptions; and (iii) the reverse-

false claim is a restatement of Relator's claims under Section 3729(a)(1)(A) and (B).  (Def.'s

Mot. Summ. J. 34-35).

a.    **Prospective Payments**

In the context of the Medicare and Medicaid program, federal law defines an

"overpayment" as "any funds that a person receives or retains . . . to which the person, after

29

applicable reconciliation, is not entitled . . . ."  42 U.S.C. § 1320a-7k(d)(4)(B).  Based on that definition, Humana asserts that prospective LICS and reinsurance subsidies paid by the federal government prior to reconciliation are not covered and cannot form the basis for liability under the FCA.  (Def.'s Mot. Summ. J. 34-35).  Similarly, 42 C.F.R. § 360 defines an "[o]verpayment means funds that a Part D sponsor has received or retained under title XVIII of the Act to which the Part D sponsor, after applicable reconciliation, is not entitled under such title."  42 C.F.R. § 423.360(a); *see also id.* § 423.360(e) ("Any overpayment retained by a Part D sponsor is an obligation under 31 U.S.C. 3729(b)(3) if not reported and returned in accordance with paragraph (d) of this section.").

As Scott notes, however, he is asserting a FCA claim relating to post-reconciliation overpayments and cites to 42 C.F.R. § 423.360(a).  (Relator's Resp. Def.'s Mot. Summ. J. 34 n.35).  Contrary to Humana's argument, the Complaint does not allege that Relator's Section 3927(a)(1)(G) claim is premised on prospective payments.  Thus, Humana is not entitled to summary judgment on this basis.

**b.    Reliance on False Bid Assumptions**

Humana also asserts that it is entitled to summary judgment because any LICS and reinsurance subsidies that were retained post-reconciliation were not based on false bid assumptions.  (Def.'s Mot. Summ. J. 35).  As Scott points out, however, the Sixth Circuit has made clear that under the current version of the FCA, "'there is no longer a need to show the affirmative use of a false record or statement in connection to the avoidance of an obligation to pay money to the United States,' so the knowing retention of an overpayment is enough."  *Prather*, 838 F.3d at 774 (internal citation omitted).  Humana has failed to show that summary judgment is warranted for this reason.

c.      **Duplicative of Section 3729(a)(1)(A)-(B) Claims**

Humana contends that the reverse-false claim is duplicative of Scott's other claims in Count I of the Complaint.  (Def.'s Mot. Summ. J. 35; Def.'s Reply Mot. Summ. J. 20).  While Humana relies upon *United States ex rel. Sobek v. Education Management, LLC*, No. 10-131, 2013 WL 2404082 (W.D. Pa. May 31, 2013), and *Graves v. Plaza Medical Centers Corp.*, 276 F. Supp. 3d 1335 (S.D. Fla. 2017), those cases do not support its argument.

In *Sobek*, the court concluded that the reverse-false claim should be dismissed because the relator failed to identify the statutory basis for the claim.  *See Sobek*, 2013 WL 2404082, at *29.  The Complaint here, however, has specifically cites Section 3927(a)(1)(G) as the statutory basis for the reverse-false claim, which renders *Sobek* inapposite.  (Compl. ¶ 202).

In *Graves*, the court denied the defendant's motion for summary judgment premised, in part, on the argument that the reverse-claim was duplicative because "[t]he purpose of a reverse false claim [under 31 U.S.C. § 3729(a)(1)(G)] is 'not to provide a redundant basis to state a false statement claim' but to create a separate liability where there is a clear obligation to return an overpayment."  *Graves*, 276 F. Supp. 3d at 1346 (second alteration in original) (quoting *United States ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*, 906 F. Supp. 2d 1264, 1272-73 (N.D. Ga. 2012)).  That reasoning equally applies here and defeats Humana's motion.

Accordingly, Humana's motion will be denied as to Scott's reverse-claim under the FCA.

3.      ***FCA Damages & Statutory Penalties***

Finally, Scott seeks summary judgment on the damages for the alleged FCA violations and FCA statutory penalties.  (Relator's Mot. Summ. J. 33-35).

The FCA "authorizes treble damages against anyone found liable, making the penalties 'essentially punitive in nature.'"  *Prather*, 892 F.3d at 826 (quoting *Escobar*, 579 U.S. at 182).

Scott broadly asserts that the amount of damages is undisputed.  (Relator's Mot. Summ. J. 34). As Humana notes, it has presented expert testimony to challenge Relator's damages proof, resulting in a factual dispute that must be resolved at trial.  (Def.'s Resp. Relator's Mot. Summ. J. 33 (citing Moné Rebuttal Report, DN 345-20)).  Because there are factual disputes regarding damages, Scott's motion will be denied.

Scott also seeks statutory penalties under Section 3729(a)(1)-(2) for prescription drugs events ("PDEs") submitted by Humana to CMS.  (Relator's Mot. Summ. J. 34-35).  As a sister court has noted, "PDE records[] [] are used by CMS for payment purposes . . . .  Indeed, . . . CMS's Prescription Drug Benefit Manual specifically envisions False Claims Act liability for the certification and submission of inaccurate or false PDE data."  *United States ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 150 (E.D. Pa. 2012); *see also id.* at 167 ("According to the CMS Instructions, '[e]very time a beneficiary fills a prescription covered under Part D, plans must submit a . . . PDE record to CMS.'  'The PDE record contains prescription drug cost and payment data ***that will enable CMS to make payment*** to plans and otherwise administer the PDE benefit.'  They go on to note that '[t]he submitted data components fit together to allow calculation of payment under the four legislated payment mechanisms.'  These PDE records are 'condition[s] of payment' that are 'necessary for CMS to carry out payment provisions . . . of the Act.'  Later in the Instructions, CMS 'list[s] the required data elements that must be submitted on PDE records ***for payment***.'"  (alterations in original)).  While Humana seeks to distinguish *Spay*, its reliance on *United States v. Krizek*, 111 F.3d 934 (D.C. Cir. 1997), is misplaced because it involved CPT codes[6] rather than PDEs.  *See id.* at 936.  Because there are factual issues as to

---

[6] CPT codes are "a five-digit code identifying the services for which reimbursement is sought.  A list of the five-digit codes is contained in the American Medical Association's Current Procedures Terminology Manual ("CPT")."  *See id.* at 936.

whether fraudulent conduct led to the creation of the PDEs, summary judgment must also be denied as to the statutory penalties.

**B.**   **Relator's Motion for Status Conference/Hearing (DN 488)**

Scott has requested a case management conference pursuant to Fed. R. Civ. P. 16, which was docketed as a motion for a hearing subject to LR 7.2(f).  (Relator's Mot. Status Conference, DN 488).  The Court previously referred all pretrial matters including litigation planning issues to Magistrate Judge Lindsay.  (Order, DN 59).  A hearing is unnecessary to resolve the pending motions.  This motion will be denied.

**V.**   **CONCLUSION**

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1.   Defendant's Motion for Summary Judgment (DN 345), Relator's Motion for Summary Judgment (DN 346), and Relator's Motion for Status Conference (DN 488) are **DENIED**.

2.   This Memorandum Opinion and Order is provisionally sealed.  To the extent that any party wishes it to remain sealed, the party shall file a motion within **30 days** of the entry of this Memorandum Opinion and Order outlining the basis upon which it should remain sealed. Otherwise, it shall be unsealed following the expiration of the 30-day period.

Greg N. Stivers, Chief Judge
United States District Court

March 31, 2022

cc:   counsel of record

33