**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

|  |  |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* STEVEN SCOTT, | |
| Plaintiff, | Civil Action No. 3:18-cv-00061-GNS-CHL |
| v. | |
| HUMANA INC., | |
| Defendant. | |

**DECLARATION OF CLAIRE M. SYLVIA IN SUPPORT OF PLAINTIFF-RELATOR**
**STEVEN SCOTT'S PETITION FOR ATTORNEYS' FEES AND EXPENSES**

I, Claire M. Sylvia, pursuant to 28 U.S.C. § 1746, declare and state as follows:

1.      I am a partner with the law firm of Phillips and Cohen, LLP ("Phillips & Cohen"). I submit this declaration in support of Relator Steven Scott's Petition for Attorneys' Fees and Expenses. I make this declaration based on my own personal knowledge, and if called as a witness, I could and would competently testify to the matters stated herein.

## I.      OVERVIEW OF PHILLIPS & COHEN

2.      Phillips & Cohen is a law firm of 24 attorneys with principal offices in Washington, D.C. and San Francisco that represents whistleblowers under the federal and state False Claims Acts ("FCA") and financial fraud whistleblower programs. Phillips & Cohen is the oldest and most successful law firm exclusively practicing in these areas. Since the firm was founded over thirty years ago, it has recovered over $12.8 billion for the federal treasury. The firm's pathbreaking cases have spawned entire new areas of FCA practice. The firm's lawyers include the pioneers in the FCA and financial fraud whistleblower fields, as well as former federal prosecutors and lawyers with both government experience and private law firm litigation backgrounds. The firm's lawyers are consistently recognized for honors by their peers. The relevant background and experience of Phillips & Cohen and the attorneys who worked on this case are summarized in Exhibit 1.

3.      Phillips & Cohen's expertise in FCA cases is well-known. The firm was founded not long after the 1986 amendments to the FCA were enacted and brought some of the first successful cases under the statute and established lasting precedents on substantive and procedural issues. The firm's early cases involved settlements with major defense contractors, health care providers, and medical labs. In 2002 Phillips & Cohen, together with the government, achieved what was at the time the largest ever FCA case against a healthcare system. The case, which alleged that inflated expenses were claimed in annual Medicare cost

reports, settled for $631 million for the FCA claims and an additional $250 million was paid to resolve administrative liability to the Centers for Medicare and Medicaid Services ("CMS"). Some of the firm's other pathbreaking accomplishments in the over 100 FCA cases it has successfully pursued to settlement or judgment include the following:

a.      The largest healthcare fraud settlement, which alleged that GlaxoSmithKline engaged in nationwide improper marketing practices for drugs, including the use of financial inducements for off-label uses.  That case, initiated by Phillips & Cohen clients, led to a global settlement of $3 billion.

b.      Phillips & Cohen also represented a whistleblower who initiated a suit against Pfizer resulting in a record breaking $2.3 billion settlement to resolve allegations of unlawful off-label marketing of drugs.

c.      Phillips & Cohen has also pursued some of the largest cases involving defense contractors, including a *qui tam* case against Northrop Grumman alleging that it sold the government defective satellite equipment and that resulted in a $425 million settlement.  Last year Phillip & Cohen obtained the largest settlement related to the Iraq War, which resulted in KBR paying $108 million to resolve allegations that it overcharged the military for war supplies.

4.      While many of Phillips & Cohen's cases have resulted in large monetary recoveries, the firm also has a long history of pursuing successful smaller dollar cases that addressed important public safety issues, such as potential harm to patients or military personnel. Additional cases are discussed below and in Exhibit 1.

5.      Phillips & Cohen works on a contingency fee basis, and has an incentive to perform its work as efficiently and cost-effectively as possible.  The firm fronts the costs for its

clients and only recovers when it prevails. Accordingly, devoting the necessary resources to a complex non-intervened *qui tam* case, with payment at risk for years, necessarily limits the number of other matters our small firm can pursue at the same time even when we share the burden with other firms. Attorneys for the firm maintain contemporaneous time records in the same manner that they would if they had clients who paid for their services on a non-contingent basis.

## II.    PHILLIPS & COHEN ATTORNEYS, PARALEGALS, AND OTHER PROFESSIONALS REPRESENTING RELATOR

6.    This section describes the individuals who billed time to this matter during the period from September 2015, when Phillips & Cohen commenced working on this case, through November 30, 2024. All the individuals listed below maintained contemporaneous billing records in compliance with Phillips & Cohen's customary practice, which requires time to be entered into the firm's billing system with a description of tasks performed.

7.    Mr. Arens and I performed most of the work in this case up until we partnered with Kellogg Hansen in 2018, following the grant of Humana's motion to transfer the case from the Central District of California to the Western District of Kentucky, where Humana is headquartered. The case was properly brought in California and we anticipated litigating it there.

8.    Once the case was transferred, we sought advice from lawyers at the Ohio-based law firm of Morgan Verkamp, which had previously litigated a case in the Western District of Kentucky. They referred us to Alton Priddy, who had served as their local counsel in that case. We spoke with Mr. Priddy about serving as local counsel in this case and he provided us with initial guidance.

9.    As a small law firm, we have long partnered with other law firms when litigating FCA cases, which can be hard fought, take many years, and are often defended by some of the

4

largest law firms in the country. Given our history in the FCA field, we know most of the law firms that represent relators in complex FCA cases. We are also members of an association of lawyers who represent relators in FCA cases. We were thus familiar with whether there were law firms in Kentucky that would have the resources and specialized *qui tam* experience to litigate this case. We concluded there were no such firms that, in combination with us, would have had the resources to handle a case of this complexity and magnitude. Exhibit 2 is a survey of Kentucky firms that have reported experience representing *qui tam* relators. We have in the past worked closely with Morgan Verkamp, but we concluded that we needed greater resources for a case that we knew O'Melveny would aggressively litigate. We interviewed three larger litigation firms with a national presence and with the resources and experience to pursue this case. We partnered with Kellogg Hansen both because of their excellent reputation generally and because of their significant experience litigating complex and high value FCA cases. Their location in Washington, D.C., meant that they could travel efficiently to and from Kentucky. We joined forces with them in April 2018 and entered an agreement with local counsel Dean Furman.

### A. Phillips & Cohen Partners Representing Relator

10. I am one of the two partners who performed the bulk of the work on this matter for Phillips & Cohen. My work included developing the case, assisting in drafting the complaint, assisting the government in its investigation, selecting experts, and participating in briefing, strategy, coordination with the government, and settlement discussions. I have extensive experience in FCA litigation, having participated in some of the first *qui tam* cases brought after the 1986 amendments to the FCA and having practiced at Phillips & Cohen since 2006. I am the author of a leading treatise on the FCA, published by Thomson Reuters, which is now in its Fourth Edition. Since 2013 I have regularly co-taught a course on the FCA at Berkeley Law and taught the same course at NYU Law School in 2019. I have been recognized as one of

Lawdragon's "500 Leading Plaintiff Financial Lawyers" and one of the "Best Lawyers in America®" in 2023 and 2024 for work on *qui tam* cases. I received my B.A. from Brown University in 1984 and my law degree from Harvard Law School in 1987. After graduating from law school I clerked for the Honorable Mariana Pfaelzer in the U.S. District Court for the Central District of California and then had a fellowship at the Center for Law in the Public Interest. Prior to joining Phillips & Cohen, I was an Assistant Senate Legal Counsel in the Office of the U.S. Senate Legal Counsel from 1989 to 1995, and joined the San Francisco City Attorney's Office as a Deputy City Attorney in 1995. In those government positions I represented government institutions and personnel in state and federal court, assisted with government investigations, and provided advice to government officials on a broad range of legal issues. *See* Exhibit 1 (describing additional background and noteworthy representations). My 2024 hourly billing rate is $1,075 and my 2025 hourly billing rate is $1,160.

11.     Edward Arens is the other Phillips & Cohen partner who together with me performed most of the firm's work on this matter. Mr. Arens was involved in all aspects of developing the case, drafting the complaint, assisting the government in the investigation, developing our damages model and expert reports, preparing government and Kellogg Hansen attorneys for witness interviews and fact and expert depositions, and overseeing briefing and strategy. Mr. Arens has over fifteen years' experience with FCA cases. Most recently he represented the whistleblower in a case against KBR for allegedly defrauding the Army in connection with a contract to supply troops in Iraq and Afghanistan, which settled for $108.75 million. Mr. Arens also was lead counsel for the relator in a managed care case related to California's Medicaid expansion that resulting in settlements totaling $95.5 million in 2023, as well as for relators in a case involving a durable medical equipment provider that settled for $29

million the same year.  He has been recognized as one of Lawdragon's "500 Leading Plaintiff Financial Lawyers" and the "Best Lawyers in America®" in both 2023 and 2024.  Mr. Arens received his B.A. from Georgetown University in 2004 and received his law degree from University of California, Hastings College of the Law in 2008.  Mr. Arens joined Phillips & Cohen in 2009 and became a partner in 2018.  *See* Exhibit 1 (describing additional background and noteworthy representations).  Mr. Arens' 2024 hourly billing rate is $950 and his 2025 hourly billing rate is $1,030.

12.     Two other partners worked on the case briefly.  Jeffrey Dickstein is a former Assistant U.S. Attorney for the Southern District of Florida in Miami, Florida, where he investigated and prosecuted Medicare fraud cases.  Mr. Dickstein joined Phillips & Cohen in 2015.  Mr. Dickstein, who has extensive background litigating FCA cases as a federal prosecutor, provided strategic advice, as well as litigation support when the case was first unsealed.  Mr. Dickstein graduated from Emory University in 1981 and received his law degree from the University of Miami School of Law in 1984.  *See* Exhibit 1 (describing additional background and noteworthy representations).  Mr. Dickstein's 2024 billing rate is $1,075 and his 2025 hourly billing rate is $1,160.

13.     Amy Easton is a former trial attorney in the Department of Justice's Civil Frauds Section where she worked for twelve years before joining Phillips & Cohen in 2016.  Ms. Easton, who had extensive experience prosecuting FCA cases for DOJ, provided strategic advice on the case, as well as litigation support when the case was first unsealed.  Ms. Easton graduated from the University of Michigan in 1995, received her law degree from the Ohio State University College of the Law in 1998, and then clerked for Magistrate Judge John M. Facciola in the U.S. District Court for the District of Columbia.  *See* Exhibit 1 (describing additional background and

noteworthy representations). Ms. Easton's 2024 billing rate is $1,025 and her 2025 hourly billing rate is $1,110.

14. Another partner billed fewer than five hours to the case; this time has been excluded from the lodestar.

**B.    Additional Phillips & Cohen Attorneys Representing Relator**

15. Dr. Peter Budetti, who was formerly the Deputy Administrator at CMS and was the first Director of CMS's Center for Program Integrity, is Of Counsel with Phillips & Cohen. Dr. Budetti has extensive expertise in Medicare Part D and assisted at the outset of the case in developing the legal theories and strategy. His biography is included in Exhibit 1. Dr. Budetti's 2024 billing rate is $1,050, and his 2025 hourly billing rate is $1,130.

16. Phillips & Cohen had five additional attorneys work on this case. (Two additional attorneys billed fewer than five hours to the case and that time has been excluded from the lodestar.) With the exception of George Collins, whose services are described below, most of this work was performed in the early phase of the case. Indeed, with nominal exceptions, the other attorneys did not work on the case after we partnered with Kellogg Hansen in 2018.

17. George Collins is Senior Counsel and Evidentiary Data Scientist at the firm. He specializes in cases involving complex data sets and worked extensively with our experts to develop the damages models used in this case. In this regard, he both directed the experts in the development of a model that would serve as proof of the government's damages and withstand any *Daubert* challenge and was able to accomplish many development tasks himself using his proficiency in multiple coding languages. Many of the services Mr. Collins provided are those that the firm would have otherwise had to secure from outside consultants and, in my experience, at a significantly higher cost. In this case, Mr. Collins consulted with Dr. Goldman and Dr. Ellis to design and implement a model that processed over 400 million individual PDE records from

the Walmart Plan and calculated the difference between what CMS paid Humana and what CMS would have paid had the Walmart Plan operated as represented in Humana's bids. Designing and implementing the model required detailed analysis of the hundreds of millions of PDE records in Humana's production, as further discussed below. Mr. Collins also assisted in preparations for Dr. Ellis's deposition and that of Humana's damages expert. The result of Mr. Collins' work was a damages model that Humana's expert, Robert Mone, agreed was able to reliably adjudicate the PDE records Humana had produced, a conclusion Mr. Mone reached after Humana had engaged a national consulting firm, Berkeley Research Group, to test and validate the model. *See* Dkt. No. 339-2, at 53-60 (Aug. 14, 2020) (Mone deposition testimony). Mr. Collins received his B.A. from Harvard College in 2002 and graduated from Yale Law School in 2012, concurrently receiving a Masters of Environmental Management from the Yale School of Forestry and Environmental Science. Mr. Collins' 2024 rate is $850, and his 2025 hourly billing rate is $920.

18. Luke Diamond, a 2016 graduate of Berkeley Law, performed discrete legal research in 2017 and 2018. Mr. Diamond is no longer with the firm. The hourly rate in 2024 for an associate at Mr. Diamond's seniority is $700, and the hourly rate in 2025 is $760.

19. Taeva Shefler performed document review and some discrete research tasks in 2018. She is a 2013 graduate of N.Y.U. Law School. Ms. Shefler is no longer with the firm. The hourly rate in 2024 for an associate at Ms. Shefler's seniority is $850, and the hourly rate in 2025 is $920.

20. Alexander Westerfield performed research and assisted in drafting the motion to strike certain of Humana's affirmative defenses. Mr. Westerfield is a 2013 graduate of Stanford Law School. Mr. Westerfield is no longer with the firm. The hourly rate in 2024 for an associate at Mr. Westerfield's seniority is $850, and the hourly rate in 2025 is $920.

21.     Emily Stabile performed some legal research for the development and initial drafting of the complaint and meetings with the government.  Ms. Stabile is a 2013 graduate of Berkeley Law.  She was promoted to partner in September 2023.  Her 2024 hourly billing rate is $850, and her 2025 hourly billing rate is $920.

**C.     Phillips & Cohen Paralegals Who Worked on this Matter**

22.     Phillips & Cohen attorneys were assisted by two litigation paralegals.

23.     Diana DeFrancesco assisted in document review and management during the first phase of the case.  Ms. DeFrancesco had extensive experience as a litigation paralegal for the trial team at the San Francisco City Attorney's Office.  Ms. DeFrancesco is no longer with the firm.  The hourly rate in 2024 for a paralegal at Ms. DeFrancesco's seniority is $350, and the 2025 rate is $380.

24.     Jennifer Moir was a paralegal for Phillip & Cohen from March 2022 through October 2023 who assisted in document production and the creation of privilege logs in 2022 and 2023.  Ms. Moir graduated from the University of Edinburgh in 2012 with a degree in law.  She also did some post graduate work at the University of Aberdeen in the UK, receiving a diploma in Professional Legal Practice, and worked as a Solicitor in Scotland before moving to the United States.  Ms. Moir is no longer with the firm.  The hourly rate in 2024 for a paralegal at Ms. Moir's seniority is $250, and the 2025 hourly rate is $270.

25.     Eight other paralegals and law clerks billed fewer than fifty hours to the case and their time has been excluded from the lodestar.

**III.    PHILLIPS & COHEN'S LODESTAR**

26.     Attached hereto as Exhibit 3 are detailed contemporaneous time records.  Privileged information in the publicly filed version of these time records has been redacted.  Unredacted versions will be submitted *in camera* to the Court.  Exhibit 3A is a chart that

summarizes the total hours and lodestar by year, computed at 2025 rates, for which Phillips & Cohen is seeking to be compensated for merits work performed in this case.  The total number of hours through November 2024 for which Phillips & Cohen seeks compensation is 8,479.1 hours, with a corresponding lodestar of $8,365,852.  Exhibit 3B is a chart that summarizes the total hours and lodestar by year through November 2024, computed at 2024 rates.

27.     Phillips & Cohen's 2025 blended hourly rate for all timekeepers in this case (*i.e.*, total lodestar divided by total hours) is $986.64 per hour.[1]

28.     Phillips & Cohen regularly reviews its rates and sets them based on a combination of the role and years of experience for each time-keeper and analysis of rates charged by law firms performing comparable work.  Phillips & Cohen has rarely found it necessary to litigate its attorney fees and regularly collects its fees through settlement.  Typically, our lodestar is far below that of the law firm representing our opponent.  As the declarations of Robert Nelson and Jeremy Friedman attest, our rates are comparable to those of firms that do similar specialized FCA work and that have been approved by courts.

29.     Throughout the litigation, Phillips & Cohen has assigned work efficiently.  This was a complex case that presented novel factual and legal issues.  We staffed the case lightly from the start, with one partner and one then-associate forming the core team.  Roughly ninety percent of the work in this case was performed by me, Mr. Arens, Mr. Collins, and one paralegal. While we were deeply involved throughout the preparation, investigation, and litigation of the case, we coordinated with our co-counsel at Kellogg Hansen to avoid duplicative tasks once the case entered litigation.  We did not expend time on meet-and-confer calls, depositions, and appearances unless it was reasonable to do so.  We have coordinated with Kellogg Hansen

---

[1] The blended rate for 2024 is $911.80 per hour.

attorneys, reviewing and commenting on their work where we had particular expertise or factual knowledge, and working with the government and experts in areas where we had particular expertise. In addition to excluding some billed time, *see infra* ¶ 30, in the exercise of billing judgment we did not bill some time at all even though it was reasonably expended.

30.     I reviewed the time and expense records that form the basis of this declaration to correct any billing errors and to write-off time in accordance with our regular billing practices. In addition, I removed all time entries by timekeepers of any rank with approximately 50 or fewer hours (there were eleven such timekeepers), as well as any time reflecting potentially ministerial tasks, duplicative work, or excess time that had not already been excluded. Those write-offs total 446.6 hours, worth $280,716 at 2025 rates and $259,205 at 2024 rates. The remaining hours, summarized below, were reasonably expended in this groundbreaking case that was vigorously defended by a team of lawyers that vastly outnumbered the relator's side.

## IV.     PHILLIPS & COHEN'S WORK IN EACH LITIGATION PHASE

31.     To assist the Court in reviewing the work that was performed in this case, Exhibit 3C summarizes the hours billed in this case by my firm on a monthly basis. Relator's counsel have also separated the case into six phases: (1) September 10, 2015 (preparation of the complaint) through January 19, 2016 (filing of the sealed complaint); (2) January 20, 2016 (day after filing of the complaint) through September 13, 2017 (unsealing of the complaint); (3) September 14, 2017 (day after unsealing of the complaint) through July 17, 2020 (close of fact and expert discovery); (4) July 18, 2020 (day after close of fact and expert discovery) through October 28, 2020 (date summary judgment briefing was complete); (5) October 29, 2020 (summary judgment briefing was complete) through June 15, 2023 (date a settlement in principle was reached); and (6) June 16, 2023 (day after a settlement in principle was reached) through November 30, 2024.

32.     Details regarding the hours spent by each timekeeper in connection with each of these phases are set forth below.  They do not include hours spent on the current fees dispute, which are summarized *infra* in Section V.  The descriptions of work that follow for each Phillips & Cohen professional are based on contemporaneous time entries each person submitted as well as my personal supervision of the work in this case.  In addition, I have reviewed contemporaneous time entries submitted by attorneys and staff describing the work they performed.

A.     **Phase 1:  September 10, 2015 (development of complaint) through January 19, 2016 (filing of sealed complaint)**

33.     Phillips & Cohen's lodestar for this phase was $377,487 as detailed in attached Exhibit 4A.[2]  The 371.3 hours expended in this phase were reasonable to research, develop and prepare the complaint and statutorily required disclosures in this complex case.

34.     **Claire Sylvia** (61.1 hours).  In this phase, I interviewed the relator, analyzed his allegations and reviewed his documentary evidence.  I met with Mr. Arens and with Dr. Budetti to evaluate the allegations.  I discussed the case with government counsel before filing it, reviewed and revised the complaint and disclosure statement required by 31 U.S.C. § 3730(b)(2) ("disclosure statement"), and oversaw the preparation and submission of the case.

35.     **Edward Arens** (213.4 hours).  In this phase, Mr. Arens, who was then a senior associate, interviewed the relator and researched and evaluated the allegations in consultation with me and with Dr. Budetti.  Mr. Arens also researched and drafted the complaint and disclosure statement, helped oversee the submission of the case, and researched experts.

_____

[2] Exhibit 4B shows Phillips & Cohen's lodestar for Phase 1 at 2024 rates.

36.     **Dr. Peter Budetti** (21.7 hours).  Dr. Budetti assisted with evaluation of the allegations and the draft complaint, and strategized on the presentation of the case.

37.     **Emily Stabile** (60.7 hours).  Ms. Stabile, who was then an associate, assisted in researching, drafting, finalizing, and filing of the complaint.

38.     **George Collins** (1.8 hours).  Mr. Collins assisted in evaluating the Part D payment structure for calculating damages under the FCA.

39.     **Diana DeFrancesco** (12.6 hours).  Ms. DeFrancesco was the paralegal who assisted with preliminary research, managed documents for the compilation of the disclosure statement, and handled the filing the complaint.

    **B.**     **Phase 2:  January 20, 2016 (day after filing of the complaint) through September 13, 2017 (unsealing of the complaint).**

40.     Phillips and Cohen's lodestar for this phase was $650,296.00, as detailed in attached Exhibit 5A.[3]  The 624.9 hours expended during this phase in which we assisted the government in its investigation through seeking and reviewing documents and interviewing witnesses, as well as preparing memoranda on legal and factual issues, were reasonable for the development of this complex case and helped achieve an end to conduct alleged in the complaint.

41.     **Claire Sylvia** (149.2 hours).  During this phase, I prepared the relator for his interview by the government and attended the interview.  I commented on and revised presentations and white papers for government counsel on liability and damages and met and conferred with them regarding these issues.  I assisted in the drafting the government's Civil Investigative Demands (CIDs) for documents.  Within days of receiving the CID in May 2017, Humana stopped the practice alleged in the complaint, quickly revised its bid submission for

---

[3] Exhibit 5B shows Phillips & Cohen's lodestar for Phase 2 at 2024 rates.

2018, and for the first time in seven years its internal actuarial estimates for the Walmart Plan matched the estimates in its Part D bids submitted to the government. I reviewed the documents produced in response to the CID and created outlines, and compiled exhibits for witness interviews for the government. I interviewed and retained consulting experts. Much of this document review and work product formed the basis for further work performed throughout the litigation. Documents produced to the government and that we reviewed were among the documents later produced in discovery and positions developed during the investigative phase became refined throughout the litigation.

42. **Edward Arens** (395.9 hours). During this phase, Mr. Arens prepared the Relator for his interview by the government and attended the interview. He prepared multiple detailed and annotated presentations and white papers for the government on liability and damages and met with them regarding the same. He assisted in drafting the government's CIDs and consulted with the government on the issuance and timing of the CIDs, which as noted above resulted in a near immediate end to the practice alleged in the complaint. He reviewed documents, created outlines, and compiled exhibits for witness interviews for the government. Much of this document review and work product formed the basis for further work performed throughout the litigation and positions developed during the investigative phase became refined throughout the litigation. He interviewed and retained consulting experts.

43. **Dr. Peter Budetti** (31.6 hours). Dr. Budetti assisted in identifying and consulting with potential experts, as well as conferring and meeting with the government and client to discuss the case theories and strategy underlying this unique Part D case.

44.     **Amy Easton** (10.5 hours).  Ms. Easton conferred with government counsel regarding the government's investigation and consulted on litigation steps and strategy in the event the case was unsealed.

45.     **Jeffrey Dickstein** (5.1 hours).  Mr. Dickstein conferred with government counsel regarding the government's investigation and consulted on litigation steps and strategy in the event the case was unsealed.

46.     **Emily Stabile** (7.0 hours).  Ms. Stabile assisted with and attended the relator interview.

47.     **Diana DeFrancesco** (25.6 hours).  Ms. DeFrancesco assisted with serving the complaint and preparing the initial disclosure statement, and with preparing and serving supplemental disclosure statements.

## C.     Phase 3:  September 14, 2017 (day after unsealing of the complaint) through July 17, 2020 (close of fact and expert discovery)

48.     Phillips & Cohen's lodestar for Phase 3 was $6,187,015, as detailed in attached Exhibit 6A.[4]  The 6361.6 hours expended in this phase, which included extensive motion practice and fact and expert discovery, were reasonable given the complex tasks involved, including creation of a damages model based on over 400 million pharmacy transaction records.

49.     **Claire Sylvia** (1,212.9 hours).  In this phase, I briefed the opposition to the motion to transfer venue, including consulting with the government, which filed a statement of interest opposing the motion in support of our position.  *See* Dkt. 42.  I identified and retained co-counsel and continued to assist and coordinate with the government, which not only actively monitored the case but also continued to investigate the case after it was unsealed, including by

---

[4] Exhibit 6B shows Phillips & Cohen's lodestar for Phase 3 at 2024 rates.

conducting witness interviews. *See* Dkt. 90, at 1 ("Given the serious nature and scope of the allegations, the United States has dedicated significant time and resources to this investigation both before and after the case was unsealed."). In addition to the opposition to the transfer motion, I was responsible for other initial procedural briefing prior to Kellogg Hansen joining the case. After we partnered with Kellogg Hansen, I participated in litigation strategy, authored, revised, and edited written discovery requests and responses, as well as correspondence and briefing, and prepared for and attended hearings on discovery-related issues.

50. **Edward Arens** (1,763.4 hours). In this phase, Mr. Arens worked initially on opposing the motion to transfer venue, including consulting with the government, which filed a statement of interest opposing the motion. *See* Dkt. 42. He continued to coordinate with the government and help prepare for government witness interviews by preparing outlines and identifying relevant documents. He also worked to identify and retain co-counsel, to retain experts on materiality and damages and to develop their opinions, supporting models, and workpapers, participated in litigation strategy, and advised co-counsel Kellogg Hansen on case development and strategy. He worked with counsel for CMS for the production of documents responsive to Relator's *Touhy* request. He also authored, revised, and edited written discovery requests and responses, as well as correspondence and briefing on discovery issues. He additionally helped prepare Kellogg Hansen attorneys for numerous depositions and court hearings. Of note, during this phase Mr. Arens was using a timekeeping system that did not aggregate time for a single project when the work was conducted at different points in the day, so what may appear as duplicate entries are actually separate amounts of time spent on the same task.

51.        **Jeffrey Dickstein** (121.3 hours).  Once the case was unsealed, Mr. Dickstein conducted discussions with Humana's Washington D.C. counsel, O'Melveny, about next steps in the litigation, including agreements regarding service and other procedural issues prior to Kellogg Hansen joining the case.  He also assisted in obtaining co-counsel and participated in team meetings to discuss and advise on litigation strategy and the ongoing role of the government.

52.        **Amy Easton** (152.3 hours).  Once the case was unsealed, Ms. Easton conducted discussions with Humana's Washington D.C. counsel, O'Melveny, about next steps in the litigation, including agreements with defense counsel about procedures prior to Kellogg Hansen joining the case.  She also assisted in obtaining co-counsel and participated in team discussions to discuss and advise on litigation strategy and the ongoing role of the government.

53.        **Emily Stabile** (16 hours).  Ms. Stabile prepared for the case's transfer to this District and researched Medicare Part D enrollment requirements in preparation for litigation.

54.        **George Collins** (2,378 hours).  During this phase, Mr. Collins was responsible for the development of an FCA damages model using CMS and Humana data, working extensively with Relator's experts to analyze Humana's production, which consisted of over 400 million separate pharmacy transactions (known as "prescription drug events" or "PDEs") stored in a nearly 30 GB database file, and to develop, refine, and run the model that estimated the government's damages using the pharmacy transaction records.

55.        Mr. Collins' time entries during this phase of the case reflect his central work on the model, which involved building an "adjudicator" capable of matching how Humana had processed pharmacy transactions under the Walmart Plan.  Relator used the adjudicator to evaluate the difference between what CMS paid for drugs under the Walmart Plan and what

CMS would have paid had the Walmart Plan operated as represented in Humana's bids—the central measure of damages in the case. To build the adjudicator, Mr. Collins and the experts he supervised analyzed hundreds of millions of lines of patient-level PDE data. The PDE data contained numerous transactions that adjusted or deleted other transactions, requiring Mr. Collins to reconcile different transactions using CMS's rules so that the model would take into account the final data relevant to each beneficiary. The phrases "A/D Reconciliation" and "A/D Resolution" in Mr. Collins' time entries refer to the reconciliation of additions and deletes (or "A/D"). In addition, Mr. Collins had to account for pharmacy claims that caused a beneficiary to move from one Part D coverage phase to the next (referred to in Mr. Collins' time entries as "split" or "split phase"). He also had to link individual beneficiaries to LICS enrollment data, use National Drug Code (NDC) identifiers to link drugs to information about their tier and generic/brand status, and address anomalies in the CMS data (referred to in Mr. Collins' time entries as "drug tier imputation" and "G/B correction" respectively). Mr. Collins' ongoing work also involved continuous improvements in the efficiency of the adjudication model (referred to as "dataflow"), which otherwise would have required multiple days to run, and detailed analysis of the model's performance in replicating Humana's pharmacy claims adjudication and evaluating the difference between what CMS paid and what it would have paid absent Humana's fraud. Specific work in these areas referenced in his time entries involve "exclusion code" (to identify mismatches with the CMS adjudication and addressing them in re-adjudication) and "waterfall code" (identifying which beneficiaries were handled by which stages of the model). Mr. Collins also assisted in the preparation of Dr. Ellis's expert report, analyzed the report submitted by Humana's rebuttal expert, Mr. Mone, and prepared Kellogg Hansen attorneys for Mr. Mone's deposition.

56.     **Alexander Westerfield** (108.3 hours). Prior to Kellogg Hansen joining the case, Mr. Westerfield researched and drafted the motion to strike Humana's affirmative defenses, which was granted. (Dkt. 110).

57.     **Luke Diamond** (63.9 hours). Mr. Diamond researched various legal issues related to Humana's discovery, including spousal privilege and attorney client privilege.

58.     **Taeva Shefler** (169.2 hours). Ms. Shefler performed document review.

59.     **Dr. Peter Budetti** (6.2 hours). Dr. Budetti advised on experts to address core legal issues in the case, case strategy, and damages theories.

60.     **Diana DeFrancesco** (370.1 hours). Ms. DeFrancesco managed the discovery productions and assisted in document review for discovery requests and responses.

   **D.     Phase 4:  July 18, 2020 (day after close of fact and expert discovery) through October 28, 2020 (date summary judgment briefing was complete)**

61.     Phillips & Cohen's lodestar for Phase 4 was $257,098, as detailed in attached Exhibit 7A.[5] The 234.4 hours expended during this phase, which included summary judgment and Daubert briefing, were reasonably expended to ensure that the best legal and factual arguments on the central issues in the case could be presented so that the case could proceed to trial.

62.     **Claire Sylvia** (120.1 hours). In this phase, I assisted in developing summary judgment arguments with co-counsel, reviewed and commented on the legal issues and consulted with the government to obtain a statement of interest supporting our position. (Dkt. 403).

63.     **Edward Arens** (113.4 hours). In this phase, Mr. Arens reviewed and edited all summary judgment and *Daubert* briefing. Mr. Arens also coordinated with co-counsel and the

---

[5] Exhibit 7B shows Phillips & Cohen's lodestar for Phase 4 at 2024 rates.

government throughout this phase and worked to obtain a statement of interest from the government supporting Relator's position, *see supra*, para. 62.

64.     **Amy Easton** (0.8 hours).  Ms. Easton consulted on discussions with the government related to litigation strategy.

65.     **George Collins** (0.1 hours).  Mr. Collins spent a small amount of time reviewing his notes from the Mone expert deposition.

   **E.     Phase 5:  October 29, 2020 (day after summary judgment briefing was complete) through June 15, 2023 (date settlement in principle was reached)**

66.     Phillip & Cohen's lodestar for Phase 5 was $682,784, as detailed in attached Exhibit 8A.[6]  The 693 hours spent in this phase were reasonably expended to prepare for trial and to engage in the mediation sessions that resulted in a settlement just before commencement of the trial.

67.     **Claire Sylvia** (343.8 hours).  In this phase, I drafted, and/or reviewed, and advised on pre-trial motions, including motions *in limine*, discovery-related issues, jury instructions, and the trial brief.  I participated in three formal mediation conferences during this phase.

68.     **Edward Arens** (248.6 hours).  In this phase, Mr. Arens drafted, reviewed, and/or advised on pre-trial motions, including motions *in limine*, discovery-related issues, jury instructions, and the trial brief.  Mr. Arens participated in three formal mediation conferences and residual discovery-related issues.

69.     **Amy Easton** (0.9 hours).  Ms. Easton reviewed communications with the government for the privilege log.

---

[6] Exhibit 8B shows Phillips & Cohen's lodestar for Phase 5 at 2024 rates.

70.      **Jennifer Moir** (99.7 hours).  Ms. Moir prepared the privilege log and assisted in the production of documents.

   F.      **Phase 6:  June 16, 2023 (day after settlement in principle was reached) through November 30, 2024.**

71.      Phillips & Cohen's lodestar for the merits litigation in Phase 6 was $66,156, as detailed in attached Exhibit 9A.1.[7]  The 61.4 hours spent in this phase of the case were reasonably expended in an effort to effectuate and finalize the settlement.

72.      **Claire Sylvia** (23 hours).  In this phase, I participated in negotiation of the settlement agreement and interactions with the government and Humana regarding the settlement.  After the settlement in principle, the settlement was not signed until more than a year later, during which Humana contested a standard provision that the United States includes in FCA settlement agreements and that the Government had advised Humana by letter at the time of settlement in principle would be required in any final settlement agreement.

73.      **Edward Arens** (38.3 hours).  In this phase, Mr. Arens participated in negotiation of the settlement agreement and interactions with the government and Humana regarding the settlement.

74.      **Jennifer Moir** (0.1 hours).  Ms. Moir followed up on her assignments in light of developments in the case.

## V.      PHILLIPS & COHEN'S WORK RELATING TO THE FEE PETITION

75.      Exhibit 9A.2 details the firm's lodestar for fees-related work.[8]  This included negotiating fees with Humana, preparing for and participating in a mediation before the Judge

---

[7] Exhibit 9B.1 shows Phillips & Cohen's merits lodestar for Phase 6 at 2024 rates.

[8] Exhibit 9B.2 shows Phillips & Cohen's lodestar for fees related work at 2024 rates.

Lindsay on November 15, 2024, and compiling the fee petition and supporting exhibits (including compiling and redacting billing records).

## VI.   PHILLIPS & COHEN'S COSTS AND EXPENSES

76.     After write-offs, Phillips & Cohen has expended a total of $721,926.06 in unreimbursed costs and expenses in connection with the prosecution of this litigation.  Phillips & Cohen incurred all of these expenses in accordance with the firm's customary practices and they were reasonable and necessary to pursue this case.

77.     Exhibit 10 summarizes Phillips & Cohen's direct out-of-pocket direct expenses by category.  Exhibit 11 provides the details of the non-expert expenses.  These expenses, which total $65,605.37, were incurred on behalf of Relator by my firm on a contingent basis, have not been reimbursed, and are listed as actual costs with no administrative overhead applied.  The expenses incurred in this action are reflected on the books and records of my firm.  These books and records are prepared from expense vouchers, receipts, check records, and other source materials and represent an accurate recordation of the expenses incurred.  Humana has informed Relator's counsel that it is not challenging these non-expert related costs, and accordingly we have not attached the actual receipts.

78.     Phillips & Cohen paid a total of $656,320.69 in expert fees that were reasonably and necessarily incurred in this matter.  Exhibit 12 details the expert witness fees Phillips & Cohen paid to Relator's expert Richard Foster, a total of $497,290.00.  Mr. Foster, a former Chief Actuary for CMS, submitted a 30-page expert report with appendices and a 2-page supplemental report, and was deposed during expert discovery.  He also worked with Relator's counsel in preparation for his testimony at trial.  Mr. Foster also discussed the case with the Government at the Government's request and those discussions were the subject of two subsequent depositions of Mr. Foster.

79.     Exhibit 13 details the expert witness fees Phillips & Cohen paid to Relator's experts Dana Goldman and Darius Lakdawalla and their staff, a total of $159,030.69.  These experts consulted with the firm to create a damages model that would show the amount the Government paid that it would not have paid if Humana had truthfully represented in its bids the prescription drug coverage it was providing in each of the years at issue.  The Group's invoices reflect hourly charges, during which time they worked closely with Mr. Collins and Brattle to develop and refine the model, including presenting preliminary model results to the government.

80.     I have carefully reviewed the time and expenses that comprise Phillips & Cohen's reported lodestar and out-of-pocket expenses.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on December 20, 2024

*/s/ Claire M. Sylvia*
Claire M. Sylvia