UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:18-CV-00061-GNS-CHL

UNITED STATES OF AMERICA EX REL. STEVEN SCOTT,                    Plaintiff,

v.

HUMANA, INC.,                                                    Defendant.

<u>REPORT AND RECOMMENDATION</u>

Before the Court is the Petition for Attorneys' Fees and Expenses (the "Petition") of Relator Steven Scott ("Relator"). (DN 748.) Chief District Judge Greg N. Stivers referred Relator's Petition to the undersigned for report and recommendation. (DN 755.) Defendant Humana, Inc. ("Humana") filed a response (DN 752), and Relator filed a reply (DN 754). Therefore, this matter is ripe for review.

For the reasons set forth above, the undersigned **RECOMMENDS** that Relator's Petition (DN 748) be **GRANTED IN PART** and **DENIED IN PART** and that Relator be awarded $27,934,664.40 in attorneys' fees and $2,736,833.21 in costs and expenses for a total award of $30,671,497.61.

I.    **FINDINGS OF FACT**

The False Claims Act ("FCA") creates a civil cause of action against "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the United States; "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim"; and/or "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or

decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(A)-(B), (G). Relator brought claims on behalf of the United States against Humana alleging Humana violated these provisions of the FCA relating to a Medicare Part D Prescription Drug Plan it offered beginning in 2011 by knowingly offering plan benefits less than what Humana promised in bids it submitted to the Centers for Medicare and Medicaid Services ("CMS") between 2011 and 2017. (DN 1; DN 1-1.)

Relator's Complaint was filed under seal on January 19, 2016, in the United States District Court for the Central District of California. (DN 1; DN 1-1.) The case was unsealed and service made upon Humana in September 2017 after the United States decided not to intervene. (DN 28.) Humana moved to transfer this matter to this Court (DN 40), and that motion was granted over Relator's objections (DN 47). Years of protracted litigation followed. Ultimately, in 2023, Humana agreed to settle Relator's claims for payment of $90 million to the United States of which Relator would receive a share to be determined by the United States; the settlement was finalized and the signed settlement agreement filed in the record on August 20, 2024.[1] (DN 732.) Humana also agreed to pay Relator's "reasonable attorneys' fees, costs, and expenses" with that amount to be determined by the Court should be Parties be unable to reach an agreement. (*Id.*) After the Parties failed to resolve the fee amount through either private negotiations or a settlement conference with the undersigned (DN 745), the instant briefing followed.

## II.    CONCLUSIONS OF LAW

Relator requested that the Court award him $38,326,163.00 in fees and $2,765,969.21 in expenses and costs for a total award of $41,092,132.21. (DN 754, at PageID # 74960.) This

---

[1] The United States awarded Relator a 29% share of the settlement proceeds. (DN 748, at PageID # 72159.) Of his 29% share, Relator paid his counsel $10.44 million pursuant to his contingency fee arrangement with them. (DN 752, at PageID # 73640-41; DN 752-7, at ¶ 10.)

amount included fees incurred in preparing the reply brief in support of Relator's fee petition.  (*Id.*)  Calculated based on Relator's California- and D.C.-based counsel's customary 2025 rates, Relator urged the Court to recognize the complexity and unusual nature of this case in departing from the community market rule typically applied to attorneys' fee awards in this Circuit.  (DNs 748, 754.)  Predictably, Humana disagreed that such a departure was appropriate and argued that the Court should limit Relator to community market rates, slash the amount of hours requested by Relator, and limit Relator's costs and expenses to award only $9,475,984.56 in attorneys' fees and $2,312.697.08 in costs and expenses for a total award of $11,788,681.85.  (DN 752, at PageID # 73640-41, 73673-74; DN 752-1.)  The Parties submitted voluminous briefs and exhibits in support of their positions.  (DNs 748, 752, 754 (consisting of 121 pages in substantive briefing and 175 exhibits totaling 2940 pages, including 15 individual declarations).)  Having reviewed the Parties' submissions in their entirety, including the exhibits, for the reasons set forth below, the undersigned recommends that Relator be awarded $27,934,664.40 in attorneys' fees and $2,736,833.21 in costs and expenses for a total award of $30,671,497.61.

### A. Legal Standard

Generally, under the "American Rule," each party in a lawsuit bears its own attorneys' fees.  *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975); *Fox v. Vice*, 563 U.S. 826, 833 (2011).  But in some situations, Congress has altered that presumption by statute, and the FCA is one such example.  The FCA provides that where the United States has not intervened in an action, a successful relator, through either an award or settlement, is entitled to "an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs."  31 U.S.C. § 3730(d)(2).  The starting point for calculating any award of fees is the "lodestar" method, which is determined by multiplying the number of

hours reasonably expended on this litigation by a reasonable hourly rate. *Gonter v. Hunt Valve Co.*, 510 F.3d 610, 616 (6th Cir. 2007) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)); *Bldg. Serv. Loc. 47 Cleaning Contractors Pension Plan v. Grandview Raceway*, 46 F.3d 1392, 1401 (6th Cir. 1995).

"To arrive at a reasonable hourly rate, courts use as a guideline the prevailing market rate, defined as the rate that lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record." *Geier v. Sundquist*, 372 F.3d 784, 791 (6th Cir. 2004) (citing *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 350 (6th Cir. 2000)); *see also Linneman v. Vita-Mix Corp.*, 970 F.3d 621, 630 (6th Cir. 2020) (citing *Hadix v. Johnson*, 65 F.3d 532, 535-36 (6th Cir. 1995)) ("This circuit uses the 'community market rule' to calculate a reasonable billing rate."). "Thus, the appropriate rate is not necessarily the exact rate of a particular firm, but the market rate in the venue sufficient to encourage competent lawyers in the relevant community to undertake legal representation." *The Ne. Ohio Coal. for the Homeless v. Husted*, 831 F.3d 686, 715-16 (6th Cir. 2016) (citing *Gonter*, 510 F.3d at 618). To determine the prevailing market rate, the court may "rely on a party's submissions, awards in analogous cases, state bar association guidelines, and its own knowledge and experience in handling similar fee requests." *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 821-22 (6th Cir. 2013) (quoting *Van Horn v. Nationwide Prop. & Cas. Ins. Co.,* 436 F. App'x 496, 499 (6th Cir. 2011), and citing *Dowling v. Litton Loan Servicing LP,* 320 F. App'x 442, 447 (6th Cir. 2009)). "Furthermore, while the district court may take into consideration an attorney's skill level in identifying the market rate, this Circuit holds that 'reasonable' fees need not be 'liberal' fees, and that '[s]uch fees are different from the prices charged to well-to-do clients by the most noted lawyers and renowned firms in a region.' " *Husted*, 831 F.3d 716 (quoting in part *Coulter v. State of Tenn.*, 805 F.2d 146, 149 (6th Cir. 1986)).

However, the Sixth Circuit has cautioned that "as a general proposition, rates awarded in other cases do not set the prevailing market rate—only the market can do that." *B & G Min., Inc. v. Dir., Off. of Workers' Comp. Programs*, 522 F.3d 657, 664 (6th Cir. 2008). Instead, "[r]ates from prior cases can, however, provide some inferential evidence of what a market rate is, just as state-bar surveys of rates provide evidence of a market rate, but themselves do not set the rate." *Id.*

"The party seeking attorneys['] fees bears the burden of documenting his entitlement to the award." *Reed v. Rhodes*, 179 F.3d 453, 472 (6th Cir. 1999) (citing *Webb v. Dyer County Bd. of Educ.,* 471 U.S. 234, 242 (1985)); *Van Horn*, 436 F. App'x at 498 (quoting *Granzeier v. Middleton*, 173 F.3d 568, 577 (6th Cir. 1999)). "Attorneys who seek fees have an obligation 'to maintain billing time records that are sufficiently detailed to enable courts to review the reasonableness of the hours expended' on the case." *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 551-52 (6th Cir. 2008) (quoting in part *Wooldridge v. Marlene Indus. Corp.,* 898 F.2d 1169, 1177 (6th Cir. 1990), *abrogated on other grounds by Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res.,* 532 U.S. 598 (2001)). The party seeking fees "should submit evidence supporting the hours worked and rates claimed," and "[w]here the documentation of hours is inadequate, the . . . court may reduce the award accordingly." *Hensley*, 461 U.S. at 433. However, "explicitly detailed descriptions are not required." *Imwalle*, 515 F.3d at 554 (citing *McCombs v. Meijer, Inc.,* 395 F.3d 346, 360 (6th Cir. 2005)); *see also Hensley*, 461 U.S. at 437 n.12 ("[C]ounsel, of course, is not required to record in great detail how each minute of his time was expended. But at least counsel should identify the general subject matter of his time expenditures."). Instead, "[c]ounsel's billing entries, when read in the context of the billing statement as a whole and in conjunction with the timeline of the litigation, [must] support . . . that the hours charged were actually and reasonably expended in the prosecution of the litigation." *Id.*

(citing *United Slate, Tile & Composition Roofers v. G & M Roofing & Sheet Metal Co.*, 732 F.2d 495, 502 (6th Cir. 1984)).

Once a court has determined the lodestar amount, "there is a strong presumption that the lodestar is sufficient." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 546 (2010); *see also Imwalle*, 515 F.3d at 552 (citing *Pennsylvania v. Del. Valley Citizens Council for Clean Air,* 478 U.S. 546, 564 (1986)) ("[T]he lodestar [calculation] is presumed to be the reasonable fee to which counsel is entitled."). However, in "rare" and "exceptional" circumstances, a court may enhance the lodestar amount. *Perdue*, 559 U.S. at 552. Initially in *Hensley*, the Supreme Court held that such upward enhancements or downward departures could be justified by a court by reference to the factors set forth in *Johnson v. Georgia Highway Express, Inc.*[2] *Hensley*, 461 U.S. at 434 n.9 (citing *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)). But the Supreme Court has since clarified that, because many of those factors are already accounted for in the lodestar calculus, it is inappropriate to deviate upward from the lodestar amount based on factors already "subsumed in the lodestar calculation." *Perdue*, 559 U.S. at 546; *see also Linneman*, 970 F.3d at 631-32. "A party seeking fees has the burden of identifying a factor that the lodestar does not adequately take into account and proving with specificity that an enhanced fee is justified." *Perdue*, 559 U.S. at 546; *see also H.D.V.- Greektown, LLC v. City of Detroit*, 774 F. App'x 968, 972 (6th Cir. 2019).

---

[2] The *Johnson* factors include:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required to perform the legal service properly; (4) the preclusion of other employment due to acceptance of the case by the attorney; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship between the attorney and the client; and (12) awards in similar cases.

*Murphy v. Vaive Wood Prod. Co.*, 802 F. App'x 930, 935 n.5 (6th Cir. 2020) (citing *Johnson*, 488 F.2d at 717-19, and quoting *Planned Parenthood Sw. Ohio Region v. Dewine*, 931 F.3d 530, 543 n.3 (6th Cir. 2019)).

"The primary concern in an attorney fee case is that the fee awarded be reasonable." *Reed*, 179 F.3d at 471 (citing *Blum v. Stenson*, 465 U.S. 886, 893 (1984)). A fee is reasonable if it is "one that is adequately compensatory to attract competent counsel yet which avoids producing a windfall for lawyers." *Adcock-Ladd*, 227 F.3d at 349 (citing *Reed,* 179 F.3d at 471); *see also Gonter*, 510 F.3d at 617 (finding that the "the district court appropriately balanced the twin goals of ensuring adequate compensation for counsel who take on FCA cases and preventing a windfall for lawyers" in its fee award). However, the Supreme Court has also cautioned that "[a] request for attorney's fees should not result in a second major litigation." *Hensley*, 461 U.S. at 437. In awarding fees, "trial courts need not, and indeed should not, become green-eyeshade accountants. The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection." *Fox*, 563 U.S. at 838.

With these general principles in mind, the undersigned turns to the lodestar calculation and the Parties' arguments.

**B.    Reasonable Hourly Rates**

As noted above, the first step in the lodestar calculation is to determine a reasonable hourly rate. The Parties disagree on numerous issues related to which rate(s) should apply. Relator was represented in this action by attorneys from three law firms: Kellogg, Hansen, Todd, Figel, & Frederick, PLLC ("Kellogg Hansen") based in Washington, D.C.; Phillips & Cohen LLP ("Phillips & Cohen") based in San Francisco, California; and Furman Nilsen & Oyler PLCC ("Furman Nilsen") based in Louisville, Kentucky. Relator argued that a reasonable rate for this matter is Relator's counsel's current and customary hourly rate. (DN 748, at PageID # 72165-79; DN 754, at PageID # 74937-50.) Humana disagreed, arguing that Relator's counsel's requested rates should be limited to those charged in the Western District of Kentucky based on the community market

rule because Relator had not met his burden of showing he was entitled to greater rates.  (DN 752, at PageID # 73642-59.)  Relator argued in response that if his counsel was limited to market rates, the relevant market was the Central District of California where this lawsuit was initially filed before Humana successfully had it transferred to this Court.  (DN 748, at PageID # 72179-81; DN 754, at PageID # 74947-48.)  Finally, the Parties disputed whether Relator's counsel should be compensated based on 2025 rates or 2023 rates.  (DN 748, at PageID # 72181-83; DN 752, at PageID # 73659-64; DN 754, at PageID # 74948-50.)  Relator's counsel urged the Court to apply 2025 rates given that the instant fee petition concluding the entirety of the case would likely be decided in 2025.  (DN 748, at PageID # 72181-83; DN 754, at PageID # 74948-50.)  Humana urged the Court to apply 2023 rates because most of the hours in this case were billed before the end of that year.  (DN 752, at PageID # 73659-64.)  Notably, Humana did not argue that the Court should apply historical billing rates based on the rate in effect at the time the work was performed. The undersigned will address each of these disputes below.

### 1.     Out-of-Town Counsel's Customary Rates

Relator contended that his counsel should not be limited to fees based on the prevailing market rate in Louisville, Kentucky or the Western District of Kentucky and that, instead, the Court should award Relator's counsel their customary hourly rates.  (DN 748, at PageID # 72165-79; DN 754, at PageID # 74937-50.)  Those rates as of 2025 are as follows:

| Firm | Timekeeper | Timekeeper Role | 2025 Rate |
|---|---|---|---|
| Phillips & Cohen | Claire Sylvia | Partner | $1,160.00 |
| Phillips & Cohen | Edward Arens | Partner (as of 1/1/2018) | $1,030.00 |
| Phillips & Cohen | Jeffrey Dickstein | Partner | $1,160.00 |
| Phillips & Cohen | Amy Easton | Partner | $1,110.00 |
| Phillips & Cohen | Peter Budetti | Of Counsel | $1,130.00 |

| Firm | Timekeeper | Timekeeper Role | 2025 Rate |
|---|---|---|---|
| Phillips & Cohen | George Collins | Associate | $920.00 |
| Phillips & Cohen | Taeva Shefler | Associate | $920.00 |
| Phillips & Cohen | Emily Stabile | Associate | $920.00 |
| Phillips & Cohen | Alexander D. Westerfield | Associate | $920.00 |
| Phillips & Cohen | Luke Diamond | Associate | $760.00 |
| Phillips & Cohen | Diana DeFrancesco | Paralegal | $380.00 |
| Phillips & Cohen | Jennifer Moir | Paralegal | $270.00 |
| Kellogg Hansen | Andrew C. Shen | Partner | $1,600.00 |
| Kellogg Hansen | James M. Webster | Partner | $1,800.00 |
| Kellogg Hansen | Thomas G. Schultz | Partner | $1,350.00 |
| Kellogg Hansen | Katherine C. Cooper | Partner | $1,250.00 |
| Kellogg Hansen | Lillian V. Smith | Partner | $1,250.00 |
| Kellogg Hansen | Bethan R. Jones | Partner (as of 1/1/2025) | $1,225.00 |
| Kellogg Hansen | Caroline A. Schechinger | Associate | $985.00 |
| Kellogg Hansen | Kimberly A. Briggs | Senior Staff Attorney | $590.00 |
| Kellogg Hansen | Joseph M. Davies | Staff Attorney | $590.00 |
| Kellogg Hansen | Robert L. Moore | Staff Attorney | $590.00 |
| Kellogg Hansen | Bernadette M. Murphy | Paralegal Director | $545.00 |
| Kellogg Hansen | Chandler J. Sella | Paralegal | $475.00 |
| Kellogg Hansen | David M. Burke | Paralegal | $545.00 |
| Kellogg Hansen | Emilia C. Lukeman | Paralegal | $475.00 |
| Kellogg Hansen | James F. Birmingham | Paralegal | $475.00 |
| Kellogg Hansen | Lisa M. Harger | Paralegal | $475.00 |
| Kellogg Hansen | Maura D. MacDonald | Paralegal | $475.00 |

| Firm | Timekeeper | Timekeeper Role | 2025 Rate |
|---|---|---|---|
| Kellogg Hansen | Robyn Sommerfield | Paralegal | $475.00 |
| Kellogg Hansen | James P. Brennan | Litigation Support Specialist | $225.00 |
| Kellogg Hansen | Jason J. Tapkas | Litigation Support Specialist | $215.00 |
| Kellogg Hansen | Ripton A. Marini | Litigation Support Specialist | $215.00 |
| Kellogg Hansen | Carver D. Sinn | Research Manager | $295.00 |
| Furman Nilsen | C. Dean Furman, Jr. | Partner | $600.00 |
| Furman Nilsen | D. Sean Nilsen | Partner | $600.00 |

(DNs 748-87, 754-25, 754-36.)

As set forth above, pursuant to binding precedent, generally, the relevant market rate at issue in a fee petition is the market rate that corresponds with the community in which the court sits. *See Geier*, 372 F.3d at 791; *Linneman*, 970 F.3d at 630; *Adcock-Ladd*, 227 F.3d at 350 (quoting in part *Blum*, 465 U.S. at 895). The Sixth Circuit has even cautioned out-of-town lawyers about their fee expectations, explaining:

> The Sixth Circuit has resolved that, when a counselor has voluntarily agreed to represent a plaintiff in an out-of-town lawsuit, thereby necessitating litigation by that lawyer primarily in the alien locale of the court in which the case is pending, the court should deem the "relevant community" for fee purposes to constitute the legal community within that court's territorial jurisdiction; thus the "prevailing market rate" is that rate which lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record, rather than foreign counsel's typical charge for work performed within a geographical area wherein he maintains his office and/or normally practices, at least where the lawyer's reasonable "home" rate exceeds the reasonable "local" charge.

*Adcock-Ladd*, 227 F.3d at 350 (citing *Hudson v. Reno*, 130 F.3d 1193, 1208 (6th Cir. 1997), *abrogated by Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 847-48 (2001)). Contrary to Relator's assertion, there is no automatic exemption from this rule for FCA cases. *Gonter*, 510 F.3d at 618 (quoting in part *Geier*, 372 F.2d at 791) (applying typical rule that relevant market is the market rate "within the venue of the court of record" in FCA case).

Instead, in appropriate cases, "[d]istrict courts are free to look to a national market, an area of specialization market or any other market they believe appropriate to fairly compensate particular attorneys in individual cases." *Louisville Black Police Officers Org. v. City of Louisville*, 700 F.2d 268, 278 (6th Cir. 1983); *Sigley v. Kuhn*, 205 F.3d 1341, 2000 WL 145187, at *7 (6th Cir. 2000) (unpublished table disposition) (citing *Louisville Black Police*, 700 F.2d at 278); *Wayne v. Vill. of Sebring*, 36 F.3d 517, 533 (6th Cir. 1994) (citing *Louisville Black Police*, 700 F.2d at 278); *McHugh v. Olympia Ent., Inc.*, 37 F. App'x 730, 740 (6th Cir. 2002), *amended on denial of reh'g*, 41 F. App'x 758 (6th Cir. 2002) (citing *Louisville Black Police*, 700 F.2d at 278, and *Wayne*, 36 F.3d at 533). These general pronouncements are further qualified by the "out-of-town specialist" rule announced by the Sixth Circuit in *Hadix v. Johnson*. *Hadix*, 65 F.3d at 535. The *Hadix* court explained,

> When fees are sought for an out-of-town specialist, courts must determine (1) whether hiring the out-of-town specialist was reasonable in the first instance, and (2) whether the rates sought by the out-of-town specialist are reasonable for an attorney of his or her degree of skill, experience, and reputation. A corollary of this rule is that judges may question the reasonableness of an out-of-town attorney's billing rate if there is reason to believe that competent counsel was readily available locally at a lower charge or rate.

*Id.* (citing *Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 768-69 (7th Cir. 1982), and *Maceira v. Pagan,* 698 F.2d 38, 40 (1st Cir. 1983)) (citations omitted). The Sixth Circuit found in *Hadix* that the fee applicant had not met the burden of "showing that it was necessary to resort to an out-of-town specialist" and therefore limited the applicant to local hourly rates. *Id.* at 535, 535-36. But numerous other courts in the Sixth Circuit as well as the Sixth Circuit itself in other cases have found that compensation of an out-of-town specialist at a higher-than-local-market rate was appropriate when the *Hadix* test was met. *See, e.g.*, *Graceland Fruit, Inc. v. KIC Chemicals, Inc.*, 320 F. App'x 323, 329-330 (6th Cir. 2008) (finding that district court properly applied the *Hadix*

test and did not abuse its discretion in awarding out-of-town-specialist rates); *Brian A. v. Hattaway*, 83 F. App'x 692, 694-95 (6th Cir. 2003) (holding that district court did not abuse its discretion in analysis regarding out-of-town specialists); *Grier v. Goetz*, No. 3:79-3107, 2009 WL 10729589, at *7-12 (M.D. Tenn. Aug. 13, 2009) (applying *Hadix* and awarding out-of-town specialist rates); *Miller v. Davis*, 267 F. Supp. 3d 961, 995-96 (E.D. Ky. 2017), *aff'd sub nom. Miller v. Caudill*, 936 F.3d 442 (6th Cir. 2019) (finding that decision to hire out-of-town specialist was reasonable and awarding out of town rates); *Osman v. Grube, Inc.*, No. 3:16-CV-00802-JJH, 2018 WL 2095172, at *4-5 (N.D. Ohio May 4, 2018) (finding *Hadix* satisfied and awarding out-of-town rates). Thus, the first question for the undersigned's resolution is whether Relator has met his burden to show hiring out-of-town specialists to litigate this matter was reasonable.

### a)  Reasonableness of Hiring Out-of-Town Specialists

Relator argued that it was reasonable for him to hire out-of-town counsel/specialists for several reasons. Relator emphasized that this case required both subject matter experts regarding the FCA and Medicare as well as firms with the resources to participate in lengthy litigation. (DN 748, at PageID # 72166.) In his declaration, Relator's local counsel C. Dean Furman, Jr. ("Furman") averred that despite his work on over fifty prior FCA cases, this was the most complex case he has worked on or been aware of that has been litigated in this District. (DN 748-86, at ¶¶ 10, 12.) He indicated that most of the FCA *qui tams* in the Western District tend to "involve a local or state-wide scope of conduct rather than a national reach" such that the cases are smaller in complexity and scope than this one. (*Id.* at ¶ 12.) Relator's expert Kent Wicker echoed Furman's opinion that "this matter is far more complex than the typical False Claims Act case litigated in this district." (DN 748-97, at ¶ 11.) In his declaration, Jeremy Friedman ("Friedman"), an expert offered by Relator on the issue of fees, opined that FCA litigation generally "requires specialized

skills and experience beyond the excellent legal work performed by capable attorneys in the general bars in geographic communities around the country."  (DN 748-95, at ¶ 16.)  In his declaration, Robert J. Nelson ("Nelson"), another expert offered by Relator on the issue of fees, indicated that based on his over twenty years of experience with FCA matters, they typically "take many years, during which time counsel for the relator is obliged to front all of the costs of litigation," that "[n]on-intervened cases are especially challenging and hard fought," and that a "[r]elator's counsel must therefore have the resources necessary to prosecute these cases effectively, typically for many years."  (DN 748-96, at ¶¶ 5-7.)  Relator pointed to the fact that Humana itself chose to hire out-of-town counsel to represent it in this action as proof of the reasonableness of his actions, and the declarations he offered in support of his petition included statements that such a decision is reasonable and typical in FCA cases, especially in cases similar in complexity and scope to this one.  (DN 748, at PageID # 72174-75; DN 748-86, at ¶ 13 ("Large and complex False Claims Act cases often involved national counsel on both the plaintiff and defense side."); DN 748-95, at ¶ 17 ("The legal marketplace for qualified *qui tam* attorneys is a national one."); DN 748-97, at ¶ 9 ("Most cases in this district involving large amounts of potential damages or involving complex regulatory schemes are litigated by counsel with national practices, usually located in New York, Washington, DC, or some other large city.").)

Relator also argued that "[n]o Louisville or Kentucky law firm has been lead counsel in a False Claims Act case of this complexity and scope—much less litigated such a case to a successful resolution."  (DN 748, at PageID # 72169.)  Relator stated that when this case was transferred from California to Kentucky, Phillips & Cohen—who filed the Complaint in the Central District of California on behalf of Relator—conducted a search for Kentucky counsel to assist them.  In her declaration, Claire M. Sylvia ("Sylvia") explained that her firm sought advice from the law firm

of Morgan Verkamp in Ohio, who referred her to attorney Alton Priddy. (DN 748-61, at ¶ 8.) Sylvia represented that since her firm was small, it had always been their policy to partner with other law firms in litigating FCA cases. (*Id.* at ¶ 9.) Her declaration specified that given her firm's history with FCA cases, they "know most of the law firms that represent relators in complex FCA cases" and they "are members of an association of lawyers who represent relators in FCA cases" such that they already knew there were no such firms in Kentucky. (*Id.*) Sylvia in her declaration and Relator in his Petition explained that of the Kentucky firms who advertised/reported experience representing relators, none had the necessary experience or resources for this case. (*Id.*; DN 748-63; DN 748, at PageID # 72169-70.) Of the six firms on the list, most reported working on a single FCA case, one reported qui tam experience but no specific cases, and none had any more than ten lawyers in the firm. (DN 748, at PageID # 72169; DN 748-63.) Relator stated, "None of these firms ha[d] the specialized experience, capability, resources, or ability to litigate this national FCA case for the better part of a decade against the army of at least 67 lawyers hired by Humana." (DN 748, at PageID # 72169-70.) Phillips & Cohen also concluded that Morgan Verkamp, with whom it had partnered in the past, was not a suitable choice because it needed greater resources to litigate against Humana's national counsel, who had already entered an appearance in the case by that point. (DN 748-61, at ¶ 9.) Thus, concluding that no Kentucky counsel was appropriate, Phillips & Cohen reported that they "interviewed three larger litigation firms with a national presence and with the resources and experience to pursue this case" and ultimately selected Kellogg Hansen due to its reputation, experience in FCA cases, and D.C. location, which would make travel to this District easier. (*Id.*) Phillips & Cohen then retained Furman to be local counsel. (*Id.*)

Humana argued that this was not a sufficient showing by Relator that he first tried to obtain local counsel as required by the relevant standard. (DN 752, at PageID # 73648-52.) Humana criticized Relator's petition for specifying that he contacted only one lawyer in his search for local counsel and argued that did not constitute a good faith search. (*Id.* at 73649.) Humana further criticized Relator for not approaching any of the "mid-size or large firms within this District that would have resources to handle this type of litigation," alleging that Relator should have contacted firms such as Frost Brown Todd, Dentons Bingham Greenebaum, Dinsmore & Shohl, Stites & Harbison, Stoll Keenon, Wyatt Tarrant & Combs, Fultz Maddox Dickens, Landrum & Shouse, or Dressman Benzinger Lavelle. (*Id.* at 73649-50.) Humana's expert, R. Kenyon Meyer ("Meyer"), opined that "there are many firms here in Louisville that could have handled or assisted Phillips & Cohen in the litigation of this matter," and "there are many firms in the city that are equipped to litigate complex commercial and regulatory disputes involving large damages claims." (DN 752-2, at ¶ 8.) In his declaration, Meyer asserted,

> I am familiar with most of the mid-size and large firms in the District. Although not every firm in Louisville could have handled a case of this complexity and magnitude, many could. In particular, large firms such as Frost Brown Todd, Dentons Bingham Greenebaum, Stites & Harbison, Stoll Keenon Ogden, Wyatt, Tarrant & Combs, and my firm, Dinsmore & Shohl, have the expertise and the resources to litigate this kind of lawsuit. I am also of the opinion that at least some of the mid-size firms in our city could have done the job, including Fultz Maddox Dickens and Lynch, Cox, Gilman & Goodman, and Tachau Meek.

(*Id.* at ¶ 11.) Meyer concluded that given Phillips & Cohen's FCA expertise, "any number of Louisville firms could have provided the necessary resources and experienced, competent commercial litigators that Relator would have needed to round out that litigation team" such that "Relator could have reasonably constructed a capable litigation team with local lawyers and avoided additional out-of-market rates." (*Id.* at ¶ 12.) Humana also offered a declaration from Victor A. Walton, Jr. ("Walton"), who echoed Meyer's sentiments that firms such as Frost Brown

Todd, Dentons Bingham Greenebaum, Dinsmore & Shohl, Stites & Harbison, Wyatt Tarrant & Combs, Fultz Maddox, Stoll Keenon, Landrum & Shouse, and Dressman Benzinger Lavelle could have taken Relator's case; he opined, "There are sophisticated firms operating in Kentucky with FCA practices." (DN 752-4, at ¶ 16.) Walton also opined that there were firms in Cincinnati that could have done the work and that "Relator here did not need the most experienced relator's counsel in this country to pursue this case." (*Id.* at ¶¶ 17, 19.) Another of Humana's experts, William B. Orberson ("Orberson"), stated in his declaration that despite the admitted complexity of this case, he did not agree "that the amount of work involved was beyond the scope of capabilities of lawyers in this District." (DN 752-3, at ¶ 15.) For all these reasons, Humana urged the Court to find that Relator hadn't met the first *Hadix* prong and hadn't demonstrated that hiring its out-of-town counsel was reasonable.

In his reply, Relator emphasized that he, through Phillips & Cohen, did make a good faith determination "that there were no Kentucky counsel with the specialized experience and resources to litigate this case," again emphasizing that "no Kentucky law firm had been lead counsel in an FCA case of this complexity and scope—much less litigated such a case to a successful resolution—and that no Kentucky firms that have relator-side FCA experience have the resources, staffing, or capability to litigate this non-intervened case against Humana and its national FCA counsel." (DN 754, at PageID # 74941-42; DN 754-33, at ¶ 9 ("As stated in my previous declaration, we searched for co-counsel based on our extensive experience in this specialized field. *See* Sylvia Decl. ¶ 9. The list of firms in Exhibit 2 to my prior declaration simply confirms what we already knew from our experience and interaction with this small bar over many years, which is that there were no Kentucky firms among the few firms nationwide with both the relevant experience and resources needed to prevail in this case.") Relator emphasized that all the firms

cited by Humana have defense-side experience, not experience representing relators.  (DN 754, at PageID # 74942-43; DN 754-33, at ¶ 16 ("Humana does not identify any current representation of a relator in a *qui tam* case among the Kentucky defense firms it lists.").)  In her supplemental declaration, Sylvia exhaustively detailed why each of the firms cited by Humana and its experts would not have been an appropriate choice for Relator with supporting information from those firms own websites.  (DN 754-33, at ¶¶ 12-44; DN 754-45; DN 754-46; DN 754-47; DN 754-48; DN 754-49; DN 754-50; DN 754-51; DN 754-52; DN 754-53; DN 754-54; DN 754-55; DN 754-56; DN 754-57; DN 754-58; DN 754-59; DN 754-60; DN 754-61.)  She also stated that based on her experience, "firms that advertise a defense-side FCA practice are typically unwilling to jeopardize current or future defense-side engagements to undertake the substantial risk associated with representing a relator in a non-intervened case."  (DN 754-33, at ¶ 16.)

Having reviewed the Parties' arguments and submissions, the undersigned finds that Relator has demonstrated that it was reasonable for him to hire out-of-town counsel with specialization in FCA litigation as required to meet the first prong of the *Hadix* test.  *Hadix*, 65 F.3d at 535.  First, given the undersigned's own experience with this case, the undersigned agrees with Relator that this case was unusually complex and specialized in terms of its subject matter such that it was reasonable for Relator to want and need someone with experience in FCA cases and/or Medicare.  Both Relator's Petition and reply and the declarations submitted in support of them persuasively support that both specialized experience and sufficient resources were necessary to litigate this case to a successful conclusion given that the United States did not intervene.  Second, the undersigned concludes that Relator did make a good faith effort to search for local counsel meeting that description before hiring Kellogg Hansen and before persisting in being

represented by Phillips & Cohen.[3]   While the *Hadix* court did not include good faith as the standard, courts have required parties to make a good faith effort to obtain local counsel before turning to out-of-town specialists.  *See Sigley*, 2000 WL 145187, at *6; *United States ex rel. Trakhter v. Provider Servs., Inc.*, No. 1:11-CV-217, 2019 WL 2422422, at *3 (S.D. Ohio June 10, 2019) (citing *Sigley*, 2000 WL 145187, at *7); *Asamoah v. Amazon.com Servs., Inc.*, No. 2:20-CV-3305, 2021 WL 2934711, at *2–3 (S.D. Ohio July 13, 2021), *objections overruled*, No. 2:20-CV-3305, 2022 WL 765212 (S.D. Ohio Mar. 14, 2022) (citing *Trakhter*, 2019 WL 2422422, at *3).  Here, the facts presented militate in favor of a finding that Relator's efforts constitute good faith.  Relator was not required to call every law firm in the District prior to seeking out-of-town representation.[4]   Given the prevalence of information available on the internet, the undersigned is unconcerned that Relator did not make phone calls seeking representation by local lawyers because his filings demonstrate that he searched for local lawyers through other methods and found none.[5]

---

[3] The undersigned notes that Phillips & Cohen is differently positioned than Kellogg Hansen in this analysis because Phillips & Cohen was already in the case when it was originally filed, not retained by Relator at the time the case was transferred to this District.  But for all the same reasons the undersigned details it was reasonable for Relator to turn to Kellogg Hansen, it was reasonable for Relator to persist in being represented by Phillips & Cohen notwithstanding their out-of-town status after the transfer.

[4] Humana's citation to *Scheffler v. Lee* in support of what constitutes a good-faith effort is inapposite of the analysis here.  (DN 752, at PageID # 73649.)  In *Scheffler*, the court considered an attorney-fee award in a civil rights action pursuant to 42 U.S.C. § 1988.  *Scheffler v. Lee*, No. 3:14-CV-373-CRS, 2020 WL 2174449, at *1 (W.D. Ky. May 5, 2020).  In refusing to award plaintiff's Minnesota-based counsel his requested hourly rate, the court observed that generally the relevant market is the community in which the court sits, though it did not cite *Hadix*.  *Id.* at *2.  Plaintiff had offered that he called over twenty attorneys in the Louisville area before hiring his Minnesota-based counsel, and the court stated, "The Louisville Bar Association has more than 3,100 active members, many more than 20 of whom are capable of prosecuting a straightforward civil rights case like the one presented here."  *Id.* The instant case is neither a "straightforward civil rights case" nor even a straightforward FCA case such that *Scheffler*'s statement about calling twenty attorneys is non-dispositive of whether Relator here made a good faith effort to find an appropriate local firm to handle this matter.

[5] Notably, this case is distinguishable from the numerous cases where courts have refused to award out-of-town specialist rates to parties who did not attempt at all to either find local representation or meet the first prong of *Hadix*.  *See Husted*, 831 F.3d at 719 (refusing to award out-of-town specialist rates where no argument was made that "attorneys were out-of-town specialists whose expertise was necessary in this Ohio case"); *Schnatter v. 247 Grp., LLC*, No. 3:20-CV-00003-BJB-CHL, 2024 WL 3165319, at *3 (W.D. Ky. June 25, 2024) (refusing to consider out-of-town specialist rates where movant didn't even attempt to make required showing); *Best Process Sols., Inc. v. Blue Phoenix Inashco USA, Inc.*, No. 1:21-CV-00662, 2024 WL 1141495, at *3 (N.D. Ohio Mar. 15, 2024) (citing *Hadix*, 65 F.3d at 535) (refusing to apply out-of-town specialist rule to intellectual property/patent and trade secret specialist based on failure to present evidence that party or its counsel " 'attempt[ed] to investigate the availability of competent counsel' in the Northern District of Ohio" (alteration in original)); *Asamoah v. Capstone Logistics, LLC*, No. 2:19-

Put another way, the undersigned will not deny Relator out-of-town rates for not making phone calls to firms he could already tell were not suitable choices. The undersigned finds persuasive Relator's argument that he needed firms with relator-side experience and could not hire the list of defense firms identified by Humana. In particular, the undersigned finds the declaration from attorney Meyer unpersuasive on this issue—indeed specious—because he identified his own firm, Dinsmore & Shohl, as one capable of taking Relator's case despite the fact that as Sylvia noted in her declaration his firm has previously represented *Humana*, thus rendering it ineligible to represent Relator here regardless of any other qualifications it might have. (DN 754-33, at ¶ 25 (noting that Meyer's declaration "does not identify a single representation of a *qui tam* relator by his firm" and that "[w]hat Dinsmore & Shohl does advertise on its website is its experience representing *Humana* in commercial litigation").) Similarly, the statements by both Meyer and Orberson that many local firms were capable of handling a case of this complexity is not indicative

---

CV-5292, 2021 WL 422688, at \*3 (S.D. Ohio Feb. 8, 2021) (finding that there was "nothing in the record showing that the Sygma Defendants made any attempt, good faith or otherwise, to investigate the availability of competent counsel in the local market"); *Am. Broad. Companies, Inc. v. Brunner*, No. 1:04CV750, 2008 WL 11450441, at \*9-11 (S.D. Ohio Sept. 30, 2008) (finding that plaintiffs had not shown it was reasonable to resort to an out-of-town specialist in part because "the legal questions presented in the instant case were not so novel nor so complex" and "[c]ompetent counsel was readily available within the relevant community"); *Bio-Med. Applications of Kentucky, Inc. v. Coal Exclusive Co.*, No. CIV. 08-80-ART, 2011 WL 3568249, at \*9-10 (E.D. Ky. Aug. 15, 2011) (noting that "nothing indicates BMA ever attempted to locate competent counsel in the relevant market"); *Asamoah*, 2021 WL 2934711, at \*3 (finding that first *Hadix* prong not met because there was no "suggestion that Amazon investigated the availability of competent counsel in the local market"); *Gathering Spot, LLC v. Gathering Spot at Burlington Vill. LLC*, No. 3:22-CV-7-TRM-JEM, 2023 WL 3612399, at \*4-5 (E.D. Tenn. May 1, 2023), *report and recommendation adopted*, No. 3:22-CV-7, 2023 WL 3611541 (E.D. Tenn. May 23, 2023) (finding that plaintiff did not persuade the court that specialized expertise was necessary that was unavailable in the local market); *Page v. Astrue*, No. CIV.A. 09-210-GWU, 2011 WL 2560265, at \*2 (E.D. Ky. June 28, 2011) (refusing to award out-of-town rates where plaintiff had offered no proof in support of his contention that no Kentucky attorney would take his case); *McKinney v. Astrue*, No. CIV.A. 08-309-GWU, 2009 WL 1956457, at \*2 (E.D. Ky. July 8, 2009) (refusing to award out-of-town rates where plaintiff did not meet prong one of the *Hadix* test); *Harkless v. Husted*, No. 1:06-CV-02284, 2011 WL 2149179, at \*13-15 (N.D. Ohio Mar. 31, 2011), *report and recommendation adopted sub nom. Harkless v. Brunner*, No. 1:06 CV 2284, 2011 WL 2149138, at \*1 (N.D. Ohio May 31, 2011) (refusing to award out of town rates where "[t]he record [wa]s devoid of actual efforts made in this case to contact any Ohio lawyer to undertake the representation"); *Clark v. W. Iris Transp., Inc.*, No. 18-168-DLB-CJS, 2020 WL 2781601, at \*4-5 (E.D. Ky. Feb. 27, 2020), *report and recommendation adopted*, No. CV2018168WOBCJS, 2020 WL 2789910, at \*1 (E.D. Ky. Mar. 19, 2020) (refusing to award out of town rates because Clark had not shown specialized expertise was required that was unavailable in the local market); *York v. Velox Express, Inc.*, No. 3:19-CV-00092-CHL, 2022 WL 20804127, at \*11 (W.D. Ky. Mar. 25, 2022) (refusing to award out-of-town rates where *Hadix* not addressed or met).

of the overall reasonableness of Relator's actions here when considered in context of the type of litigation at issue and the need for counsel to have specialized experience in the field. Neither Meyer nor Orberson held themselves out to be experts on FCA cases or to have any experience litigating them; thus, their opinions are less persuasive than those submitted by Relator. While there are certainly many law firms in the District capable of handling complex matters, Relator has credibly demonstrated that none of those law firms had the requisite combination of experience, necessary resources, and willingness to litigate *this* case. Under those circumstances, his decision to look outside the District was reasonable.

The undersigned likewise finds Humana's position that Relator should have looked to other regional markets before turning to the national market unsupported by either the law or the facts of this case. The only requirement that *Hadix* placed on the relevant inquiry is reasonableness. *Hadix*, 65 F.3d at 535 ("When fees are sought for an out-of-town specialist, courts must determine [ ] whether hiring the out-of-town specialist was *reasonable* in the first instance." (emphasis added)). Nothing about reasonableness requires that in the absence of appropriate local counsel, a relator move out in a radius and stop at the first potentially acceptable firm he or she finds. Thus, the undersigned is unconvinced the Walton declaration's citation to markets centered in Cincinnati, Columbus, or Nashville has any bearing on the instant analysis. Instead, courts interpreting this charge have looked to a number of factors in determining whether such a decision was reasonable, including whether the fee applicant and the out-of-town specialist had a preexisting relationship, whether the issues were so complex that specialized counsel was necessary, whether out-of-town counsel had specialized expertise to apply to the matter, whether the opposing party itself obtained out-of-town counsel, or whether other factors such as the location of relevant documents and witnesses or special characteristics of counsel made the decision to hire out-of-town counsel

reasonable. *See Cernelle v. Graminex, L.L.C.*, 539 F. Supp. 3d 728, 739 (E.D. Mich. 2021), *aff'd*, No. 21-1579, 2022 WL 2759867 (6th Cir. July 14, 2022) (finding that it was reasonable to hire out-of-town specialist "because of the existing relationship with the firm and its involvement in th[e] litigation from its outset"); *Anderson v. Wilson*, 357 F. Supp. 2d 991, 997-98 (E.D. Ky. 2005) (relying in part in determining that hiring out-of-town counsel was reasonable on an affidavit offered supporting that "a specialized attorney was needed in light of the complex First Amendment and election issues"); *Alter Domus, LLC v. Winget*, No. 08-13845, 2024 WL 1307812, at *2–3 (E.D. Mich. Mar. 27, 2024) (finding use of out-of-town firm was reasonable "in light of its long history of involvement in this matter"); *Sigley*, 2000 WL 145187, at *7 (noting that the fact that "non-local counsel possesses specialized expertise in the matter to be litigated" is a relevant consideration); *Saint-Gobain Autover USA, Inc. v. Xinyi Glass N. Am., Inc.*, 707 F. Supp. 2d 737, 758-60 (N.D. Ohio 2010), *as corrected* (Apr. 13, 2010) (noting that it was reasonable for Saint Gobain to use non-local counsel given non-local counsel's patent law expertise and preexisting knowledge of Saint Gobain and its patents); *New London Tobacco Mkt., Inc. v. Kentucky Fuel Corp.*, No. 6:12-CV-91-GFVT-HAI, 2016 WL 11432471, at *8-11 (E.D. Ky. Mar. 16, 2016), *report and recommendation adopted*, No. 12-91-GFVT, 2016 WL 3951086 (E.D. Ky. July 20, 2016) (relying on prior relationship between fee applicant and counsel, the reputation of the out-of-town counsel, and the applicant's representation that most of the relevant witnesses and documents were located in the same city as out-of-town counsel to conclude that hiring out-of-town counsel was reasonable); *Landino v. McLaren Health Care Corp.*, No. 21-CV-11431, 2023 WL 3634266, at *1-2 (E.D. Mich. May 24, 2023) (noting that it was reasonable for deaf plaintiff who communicated in American Sign Language to hire out-of-town attorney both fluent in ASL and familiar with deaf culture); *Hawk Tech. Sys., LLC v. Castle Retail, LLC*, No. 2:20-CV-2766-

JPM-TMP, 2023 WL 5826978, at *10 (W.D. Tenn. Sept. 8, 2023) (noting that the out-of-town specialists possessed "expertise in patent law"); *Citizens Ins. Co. of Am. v. KIC Chemicals, Inc.*, No. 1:04-CV-385, 2007 WL 2902213, at *4-6 (W.D. Mich. Oct. 1, 2007), *aff'd sub nom. Graceland Fruit*, 320 F. App'x at 323 (highlighting prior relationship with counsel, cost of getting local counsel up to speed, and "New York connections to case"); *Swapalease, Inc. v. Sublease Exchange.com, Inc.*, No. 1:07-CV-45, 2009 WL 1119591, at *5-6 (S.D. Ohio Apr. 27, 2009) (noting that it "makes sense, however, for a party to retain counsel in its own city in order to reduce costs and to facilitate the efficient prosecution of the case"); *Bendix Com. Vehicle, Sys., LLC v. Haldex Brake Prods. Corp.*, No. 1:09 CV 176, 2011 WL 871413, at *1-2 (N.D. Ohio Mar. 1, 2011) (noting that it was reasonable to hire out-of-town patent lawyers with prior relationship with plaintiff, some of whom had been involved in obtaining the patents at issue); *In re UnumProvident Corp. Derivative Litig.*, No. 1:02-CV-386, 2010 WL 289179, at *6 (E.D. Tenn. Jan. 20, 2010) (emphasizing that "[g]iven the difficulty of litigation involving director liability for failure of corporate oversight, it was reasonable to retain counsel with experience and skill in prosecuting such a case" and that "defendants were represented by skilled attorneys at large New York firms" (internal citations omitted)); *Klopfenstein v. Fifth Third Bank*, No. 1:12CV851, 2025 WL 755153, at *3-4 (S.D. Ohio Mar. 10, 2025) (relying in part on fact that "[t]his [wa]s a national practice case, requiring specialized knowledge and expertise"); *City of Plantation Police Officers' Employees' Ret. Sys. v. Jeffries*, No. 2:14-CV-1380, 2014 WL 7404000, at *13-14 (S.D. Ohio Dec. 30, 2014) ("Given plaintiff's counsel's skill, experience, and reputation, and considering the specialized issues presented in this case, it was reasonable for plaintiff to hire out of district specialists."); *Monroe v. FTS USA, LLC*, No. 208CV02100JTFCGC, 2020 WL 13227389, at *7-8 (W.D. Tenn. Oct. 13, 2020), *aff'd*, 17 F.4th 664 (6th Cir. 2021) ("The Defendants downplay the complexity of

this case and the reasonable decision made by both parties to retain out-of-state counsel who could offer valuable expertise. Given the scale and complex nature of this FLSA class-action lawsuit, the Court finds that it was reasonable for Plaintiffs to retain out-of-town counsel."); *Deal ex rel Deal v. Hamilton Cnty. Dep't of Educ.*, No. 1:01-CV-295, 2006 WL 2854463, at *8 (E.D. Tenn. Aug. 1, 2006), *aff'd sub nom. Deal v. Hamilton Cnty. Dep't of Educ.*, 258 F. App'x 863 (6th Cir. 2008) ("However, some federal courts have determined that a defendant's use of expensive, experienced, non-local attorneys may justify the plaintiffs in hiring comparably experienced, non-local counsel."); *Gilbert v. Abercrombie & Fitch, Co.*, No. 2:15-CV-2854, 2016 WL 4159682, at *14, 14-17 (S.D. Ohio Aug. 5, 2016), *report and recommendation adopted*, No. 2:15-CV-2854, 2016 WL 4449709 (S.D. Ohio Aug. 24, 2016) (concluding that it was reasonable for plaintiff to hire counsel outside the forum because "the issues in this case are complex and not limited to those peculiar to this District," "both plaintiff and defendants are represented in this action by national counsel with substantial experience in securities litigation," and citing "[c]lass counsel's skill, experience, and reputation"). Here, these factors point to a finding that Relator's decision to obtain out-of-town counsel was reasonable.

As to prior relationship, while Relator did not have the type of prior relationship with either Phillips & Cohen or Kellogg Hansen documented in the cases cited above, as to Phillips & Cohen at least, he had been working with them already for over a year by the time the case was transferred to this District. (*Compare* DN 1 (filed January 19, 2016), *with* DN 47 (filed January 29, 2018).) Given their work on the matter up to the point of transfer, it would have been unreasonable to expect Relator to suddenly seek an entirely new team of counsel to replace Phillips & Cohen merely because the case had now been transferred. In particular, despite the allegations in the Parties filings about each side's motivations for their actions, in transferring this matter to this

District, the Central District of California *did not* find that venue was improper in that district. (DN 47.)  Instead, it found that Humana had met its burden of showing that this District would be more convenient for the parties and witnesses pursuant to 28 U.S.C. § 1404(a).  (*Id.*)  Under those circumstances, the undersigned sees Phillips & Cohen as differently positioned in the *Hadix* analysis than an out-of-town firm retained by a litigant from the outset of the case.

As to the complexity of the issues, the undersigned has already found above that this matter was extraordinarily complex in terms of its subject matter.  Relator's Petition and reply also demonstrate the historic nature of this case.  Relator stated in his petition that "[t]he $90 million that Humana has paid as part of settlement is, to our knowledge, the largest non-intervened False Claims Act recovery in the Sixth Circuit and among the ten largest non-intervened FCA recoveries anywhere." (DN 748, at PageID # 72158.)  Humana did not contest this representation and in fact emphasized in its own brief the scope of the potential damages at issue in this case.  (DN 752, at PageID # 73641 ("And while the $90 million monetary settlement was substantial, it was only a small fraction of the billions of dollars in treble damages, and *trillions* of dollars in statutory penalties, that Relator sought in this case." (emphasis in original)).)  This complexity and scope lends itself to requiring counsel with specialized experience, even if that counsel is from outside the venue of the Court.

As to the expertise and specialized experience of counsel, the undersigned finds that both Phillips & Cohen and Kellogg Hansen have demonstrated that as firms they possess the experience necessary for this case.  As noted in Relator's Petition, Phillips & Cohen does exclusively FCA and whistleblower work across the country and has worked on a number of large and complex FCA cases.  (DN 748, at PageID # 72166-67.)  Sylvia explains in her declaration that "Phillips & Cohen is the oldest and most successful law firm exclusively practicing in these areas" and the

24

firm "has recovered over $12.8 billion for the federal treasury." (DN 748-61, at ¶ 2.) Sylvia's declaration and its attachments substantiate that the firm and its counsel possess specialized experience in FCA matters that exceeds that of any of the Kentucky firms identified as possible counsel for Relator in this case. (*Id.* at ¶¶ 2-4; DN 748-62.) Sylvia's declaration also supports that the individual Phillips & Cohen attorneys working on this case have experience in FCA litigation to varying degrees. (DN 748-61, at ¶¶ 10-21.) Relator's Petition demonstrated that Kellogg Hansen was similarly experienced, noting that that firm "has successfully litigated some of the largest and most complex FCA cases in the country on both the plaintiff and defense side." (DN 748, at PageID # 72167.) The Petition and the accompanying declaration of Andrew C. Shen ("Shen") cite numerous cases in which Kellogg Hansen has been counsel of record that demonstrate its specialized experience. (*Id.* at 72167-68; DN 748-20, at ¶¶ 4-10; DN 748-21; DN 748-22.) Shen's declaration also supports that the individual Kellogg Hansen attorneys working on this case have experience in FCA litigation to varying degrees. (DN 748-20, at ¶¶ 16-24.) Humana argued that Relator should have to justify his decision to hire out-of-town specialists on an attorney-by-attorney basis, not by reference to the firm's experience as a whole. (DN 752, at PageID # 73643, 73648, 73651-52.) But none of the cases cited by Humana support that requirement. Humana cited *Linneman v. Vita-Mix Corporation*, but all *Linneman* did was emphasize the application of the community market rule before stating, "Indeed, lawyers must make a specific showing of necessity and reasonableness in order to recover fees as 'out-of-town specialist[s].' " *Linneman*, 970 F.3d at 630 (quoting in part *Husted*, 831 F.3d at 716) (alteration in original). Nowhere does *Linneman* require that the reasonableness of obtaining out-of-town counsel be justified *lawyer-by-lawyer*. Humana also cited *Harmon v. McGinnis, Inc.* in support of its argument that "prevailing relators must make a particularized showing on both unavailability

and the minimum sufficient upward deviation for *each timekeeper* for whom a higher rate is sought." (DN 752, at PageID # 73648 (emphasis in original).)  In *Harmon*, plaintiff had prevailed on his claims under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901-950.  *Harmon v. McGinnis, Inc.*, 263 F. App'x 465, 466 (6th Cir. 2008).  Harmon was initially represented by a local attorney but retained an out-of-town attorney when the fees awarded by the administrative law judge were not timely paid to secure enforcement of the award.  *Id.*  In awarding fees related to the enforcement proceedings, the administrative law judge reduced the out-of-town lawyers rate to a local one, and Harmon appealed the Benefits Review Board's affirmance of the reduced rate.  *Id.*  The Sixth Circuit cited *Hadix* and ultimately found that it had no reason to conclude that the administrative law judge abused his discretion in limiting the out-of-town lawyer to a local rate.  *Id.* at 468-69.  But *Harmon* involved only *one out-of-town lawyer*, so it does not support Humana's position that the first prong of *Hadix* must be demonstrated on a lawyer-by-lawyer basis.  Humana also cited *Zediker v. OrthoGeorgia* in support of its position.  (DN 752, at PageID # 73649.)  But *Zediker* is an Eleventh Circuit case, and therefore, not binding on this court.  *Zediker v. OrthoGeorgia*, 857 F. App'x 600 (11th Cir. 2021) (per curiam).  In *Zediker*, the Eleventh Circuit affirmed the lower court's decision on the award of attorney's fees to an FCA claimant in a three paragraph opinion to which it appended the district court's "well-reasoned 32-page opinion."  *Id.*  Humana cited the case for the proposition that it was appropriate to approve a higher hourly rate to the lead partner but reduce paralegal and associate rates to local ones.  (DN 752, at PageID # 73649.)  While this is a correct summation of the district court's decision, it relates to what specific *rates* the court awarded based on counsel's experience.  *Zediker*, 857 F. App'x at 610.  It says nothing about whether the decision to hire out-of-town counsel was reasonable or should be considered on a lawyer-by-lawyer basis, the proposition Humana said the case

supported.  The undersigned agrees that what rates to be awarded to counsel need to be justified attorney-by-attorney, but that is prong two of *Hadix*, which the undersigned will discuss below. None of Humana's proffered cases support that prong one of *Hadix* must be considered attorney-by-attorney.  And indeed, such a position ignores the way litigation works.  Given that this is not a case where an out-of-town lawyer was hired to handle one issue (e.g. an appellate or Supreme Court brief), it is entirely unreasonable—if not fantastical—to expect Relator to have hired Shen to be lead counsel based on his experience but have Shen be supported by associates and support staff from different firms and offices.  If anything, the undersigned suspects that such an approach would have increased, not decreased, the overall cost of litigating this case.  Thus, the undersigned finds that Relator has demonstrated that both Phillips & Cohen and Kellogg Hansen possessed specialized experience and expertise in FCA litigation that overlapped with the needs presented by this unusually complex case.  These factors point toward the reasonableness of Relator's decision to continue to be represented by Phillips & Cohen after the case was transferred to this District and to hire Kellogg Hansen to represent him notwithstanding their out-of-town status.

As to the actions of Humana, the undersigned finds that Humana's decision to hire out-of-town counsel likewise points to the reasonableness of Relator's decision to hire out-of-town counsel.  While the undersigned does not find this to be a dispositive factor, it is one consideration in the overall calculus of the reasonableness of Relator's decision under prong one of *Hadix*.

The "other factors" cited by the courts above such as the location of witnesses and documents or any specialized skills possessed by counsel (e.g. ASL fluency) do not appear to apply in this matter.

Returning to Humana's argument that Relator should have looked to regional markets instead of national ones, here too, Humana has provided no authority requiring Relator to make

such a choice.  While the undersigned is mindful that it may not always be appropriate for a fee applicant to automatically resort to national firms over regional firms, the scope of expertise and experience Relator sought to have in his representation here is directly proportional to the scope of both the relief he was seeking and the relief he was afforded.  Under those circumstances, the undersigned cannot see how justice would be served by limiting relators generally and in particular Relator here in the way Humana proposes.  The FCA has "the goal of punishing and preventing fraudulent claims for payment from the U.S. Government."  *United States v. Cmty. Health Sys., Inc.*, 666 F. App'x 410, 411 (6th Cir. 2016) (citing *United States v. Bornstein*, 423 U.S. 303, 309 n.5 (1976)).  As the Sixth Circuit has explained,

> The *qui tam* provision is essential to achieving the FCA's purpose "[b]ecause the scope of fraud against the government is much broader than the government's ability to detect it." The FCA thus "provides private actors with a variety of incentives to bring *qui tam* actions, and significant influence over the ensuing development of *qui tam* suits—including 'the right to conduct the action' when the government decides not to intervene." The FCA also recognizes that relators will not come forward (risking, in many cases, their livelihoods), and private attorneys will not undertake the extensive work and expense necessary to represent relators, if they are not fairly compensated for doing so. The Act therefore provides that even if the Government takes over the action, the relator is entitled to a share of "the proceeds of the action or settlement of the claim" and his or her attorney is entitled to "reasonable attorneys' fees and costs."

*Id.* at 411 (quoting in part *United States v. Health Possibilities, P.S.C.*, 207 F.3d 335, 340 (6th Cir. 2000) and 31 U.S.C. § 3730(d)(1)).  If Relator here was not permitted to seek national counsel, it would arguably have a strongly chilling effect on the ability of other relators in cases of similar magnitude to find appropriately experienced counsel to take their cases.

For all these reasons and based on the specific facts in this case, the undersigned concludes that Relator's decision to hire out-of-town counsel/specialists at Phillips & Cohen and Kellogg Hansen was reasonable under the first prong of *Hadix*.

### b)    Reasonableness of Out-of-Town Specialist Rates

Even where a court has concluded that it was reasonable for a fee applicant to hire an out-of-town specialist, "the rates sought by the out-of-town specialist [must be] reasonable for an attorney of his or her degree of skill, experience, and reputation." *Hadix*, 65 F.3d at 535.  But, as set forth above, reasonable fees "are different from the prices charged to well-to-do clients by the most noted lawyers and renowned firms in a region." *Husted*, 831 F.3d 716 (quoting in part *Coulter*, 805 F.2d at 149); *see also Hines v. City of Columbus*, 676 F. App'x 546, 555 (6th Cir. 2017) (citing *Coulter*, 805 F.2d at 149) ("[T]he well-established rule in this circuit [is] that renown alone is not compensable under fee-shifting statutes.").   In particular, because this award is pursuant to a fee-shifting statute, the Court must be even more cognizant than usual that "[t]he appropriate rate . . .  is not necessarily the exact value sought by a particular firm, but is rather the market rate in the venue sufficient to encourage competent representation." *Gonter*, 510 F.3d at 618 (citing *Lamar Adver. Co. v. Charter Twp. of Van Buren,* 178 F. App'x 498, 502 (6th Cir. 2006), and *Auto All. Int'l, Inc. v. U.S. Customs Service,* 155 F. App'x 226, 228 (6th Cir. 2005)).

Relator argued that his out-of-town counsel's customary hourly rates were reasonable and were the rates necessary to induce firms with competent experience to take cases representing relators.  (DN 748, at PageID # 72165-79; DN 754, at PageID # 74937-50).  But Humana hotly contested the reasonableness of Relator's counsel's rates, emphasizing that even if not limited to local market rates, "[a]ny upward deviation should be pegged to the lowest rate necessary to attract competent out-of-town specialists, which logically should be set to the fees charged by FCA specialists within the Sixth Circuit, rather than the highest rates charged by attorneys in the most expensive legal markets in the country." (DN 752, at PageID # 73657.)  Both sides supported their positions with expert opinions.

Relator requested that the Court compensate him for the work of twenty-two Kellogg Hansen timekeepers and twelve timekeepers at Phillips & Cohen.[6]  In addition to the materials discussed above regarding the expertise of Kellogg Hansen and Phillips & Cohen attorneys generally, in their declarations, Shen and Sylvia, partners at Kellogg Hansen and Phillips & Cohen respectively, discussed the relevant background for each firm's timekeepers.  (DN 748-20, at ¶¶ 14-48; DN 748-61, at ¶¶ 10-25.)  To avoid a lengthy and repetitive recitation of either declaration, the undersigned will summarize in chart form below the role, relevant rates sought in various years, and other pertinent information from the declarations that is relevant to the rate analysis, including the timekeeper's years of experience and whether the undersigned finds that he or she has specialized FCA expertise.  In particular, as to the rates sought, because the Parties dispute whether the Court should apply 2023, 2024, or 2025 rates, the undersigned includes all three at this stage:

| Kellogg Hansen Timekeepers | | | | | | |
|---|---|---|---|---|---|---|
| Timekeeper | Role | 2023 Rate | 2024 Rate | 2025 Rate | Years of Experience[7] | FCA Expertise[8] |
| Andrew C. Shen | Partner | $1,350.00 | $1,470.00 | $1,600.00 | 21 | Yes |
| James M. Webster | Partner | $1,500.00 | $1,650.00 | $1,800.00 | 31 | Yes |
| Thomas G. Schultz | Partner | $1,095.00 | $1,195.00 | $1,350.00 | 12 | Yes |
| Katherine C. Cooper | Partner | $1,095.00 | $1,150.00 | $1,250.00 | 12 | Yes |

---

[6] These are not all of the timekeepers who worked on Relator's case.  On his own, Relator determined not to seek compensation for any timekeeper who billed less than fifty hours total of work on the case.  (DN 748, at PageID # 72160-61, 72161 n.4, 72185.)  This resulted in Relator not seeking compensation for the work performed by twenty-eight additional Kellogg Hansen timekeepers consisting of a mix of partners, paralegals, research analysts, and summer associates as well as a research director and a trial coordinator.  (DN 748-20, at ¶ 50; DN 748-26; DN 748-27.)  As to Phillips & Cohen, the reduction eliminated eight timekeepers including paralegals and law clerks.  (DN 748-61, at ¶ 25.)

[7] For attorneys, this figure was calculated by subtracting the attorney's year of graduation listed in Shen's affidavit from 2025.  For paralegals, this figure was either taken directly from Shen's affidavit or calculated by subtracting the year the paralegal joined Kellogg Hansen from 2025.  For other professionals, this figure was based on the individual's years of experience with Kellogg Hansen specifically.

[8] The undersigned concluded that an individual had specialized FCA expertise if Shen's affidavit identified he or she having worked on one or more FCA cases and/or having such experience.

| Kellogg Hansen Timekeepers | | | | | | |
|---|---|---|---|---|---|---|
| Timekeeper | Role | 2023 Rate | 2024 Rate | 2025 Rate | Years of Experience[7] | FCA Expertise[8] |
| Lillian V. Smith | Partner | $990.00 | $1,150.00 | $1,250.00 | 9 | No |
| Bethan R. Jones | Partner | $940.00 | $1,040.00 | $1,225.00 | 9 | Yes |
| Caroline A. Schechinger | Associate | $755.00 | $860.00 | $985.00 | 6 | No |
| Kimberly A. Briggs | Senior Staff Attorney | $530.00 | $555.00 | $590.00 | 25 | No |
| Joseph M. Davies | Staff Attorney | $530.00 | $555.00 | $590.00 | 18 | No |
| Robert L. Moore | Staff Attorney | $530.00 | $555.00 | $590.00 | 22 | No |
| Bernadette M. Murphy | Paralegal Director | $495.00 | $515.00 | $545.00 | 30 | No |
| Chandler J. Sella | Paralegal | $430.00 | $450.00 | $475.00 | 10 | No |
| David M. Burke | Paralegal | $495.00 | $515.00 | $545.00 | 30 | No |
| Emilia C. Lukeman | Paralegal | $430.00 | $450.00 | $475.00 | 4 | No |
| James F. Birmingham | Paralegal | $430.00 | $450.00 | $475.00 | 29 | No |
| Lisa M. Harger | Paralegal | $430.00 | $450.00 | $475.00 | 25 | No |
| Maura D. MacDonald | Paralegal | $430.00 | $450.00 | $475.00 | 15 | No |
| Robyn Sommerfield | Paralegal | $430.00 | $450.00 | $475.00 | 20 | No |
| James P. Brennan | Litigation Support Specialist | $195.00 | $200.00 | $225.00 | 19 | No |
| Jason J. Tapkas | Litigation Support Specialist | $175.00 | $200.00 | $215.00 | 20 | No |
| Ripton A. Marini | Litigation Support Specialist | $175.00 | $200.00 | $215.00 | 21 | No |
| Carver D. Sinn | Research Manager | $295.00 | $295.00 | $295.00 | 26 | No |

(DN 748-20, at ¶¶ 16-48; DN 748-21; DN 754-27.)

| Phillips & Cohen Timekeepers | | | | | | |
|---|---|---|---|---|---|---|
| Timekeeper | Role | 2023 Rate | 2024 Rate | 2025 Rate | Years of Experience[9] | FCA Expertise[10] |
| Claire Sylvia | Partner | $975.00 | $1,075.00 | $1,160.00 | 38 | Yes |
| Edward Arens | Partner | $850.00 | $950.00 | $1,030.00 | 17 | Yes |
| Jeffrey Dickstein | Partner | $975.00 | $1,075.00 | $1,160.00 | 41 | Yes |
| Amy Easton | Partner | $925.00 | $1,025.00 | $1,110.00 | 27 | Yes |
| Peter Budetti | Of Counsel | $950.00 | $1,050.00 | $1,130.00 | Unknown | No |
| George Collins | Associate | $750.00 | $850.00 | $920.00 | 13 | No |
| Taeva Shefler | Associate | $750.00 | $850.00 | $920.00 | 12 | No |
| Emily Stabile | Associate | $750.00 | $850.00 | $920.00 | 12 | No |
| Alexander D. Westerfield | Associate | $750.00 | $850.00 | $920.00 | 12 | No |
| Luke Diamond | Associate | $600.00 | $700.00 | $760.00 | 9 | No |
| Diana DeFrancesco | Paralegal | $250.00 | $350.00 | $380.00 | Unknown | No |
| Jennifer Moir | Paralegal | $250.00 | $250.00 | $270.00 | Unknown | No |

(DN 748-61, at ¶¶ 10-25; DN 748-62; DN 754-38.)  Relator argued that these rates were reasonable

and should be awarded by the Court for several reasons.

First, as to Kellogg Hansen's rates specifically, Relator emphasized that the rates are the

customary and ordinary rates that would be charged to and paid by Kellogg Hansen's billing

clients.  (DN 748, at PageID # 72161, 72176-77.)  In his declaration, Shen emphasized that Kellogg

Hansen does both plaintiff and defense work and has clients that "pay the firm's customary hourly

rates."  (DN 748-20, at ¶ 11.)  Humana argued in its response that "the actual rates counsel bill to

their clients often lag behind a firm's 'standard' rates," hypothesizing that "[g]iven the enormous

number of hours that Relator's attorneys claim in this case, the discount would likely have been

---

[9] For attorneys, this figure was calculated by subtracting the attorney's year of graduation listed in Sylvia's affidavit from 2025.  Sylvia's affidavit did not provide any information about the years of experience of the two paralegals at issue.  Likewise, it did not identify the year that attorney Peter Budetti graduated from law school, nor does that year appear to be available on the firm's website.

[10] The undersigned concluded that an individual had specialized FCA expertise if Sylvia's affidavit identified he or she as having worked on one or more FCA cases and/or having such experience.

substantial." (DN 752, at PageID # 73658.) Relator rejected this speculation in his reply noting that "[t]he majority of Kellogg Hansen's clients pay hourly rates, and [discounts] [are] not the firm's typical practice," and Shen supported this statement in his supplemental declaration. (DN 754, at PageID # 74947; DN 754-22, at ¶ 13 ("During the course of this litigation, I have devoted thousands of hours to other matters where clients have paid my undiscounted 'rack' rates (including my 2025 rack rate of $1,600 per hour) and the 'rack' rates of other Kellogg Hansen lawyers and staff members.").) Shen asserted in his original declaration that Kellogg Hansen did all its work in this matter "in accordance with the firm's usual and customary practices—no different than if the work had been done for a fee-paying client—including staffing, quality, efficiency, timekeeping, hourly rates, and expenses." (DN 748-20, at ¶ 12.) Shen represented that in 2023 and 2024, Kellogg Hansen did more than 80% of its work for fee-paying clients. (*Id.*) As to Phillips & Cohen's rates, in her declaration, Sylvia explained that Phillip & Cohen typically works on a contingency fee basis. (DN 748-61, at ¶ 5.) Despite that, Sylvia affirmed that counsel at "the firm maintains contemporaneous time records in the same manner they would if they had clients who paid for their services on a non-contingent basis." (*Id.*) Sylvia represented that Phillips & Cohen sets its rates "based on a combination of the role and years of experience for each time-keeper and analysis of rates charged by law firms performing comparable work." (*Id.* at ¶ 28.)

Second, Relator argued that "[c]ourts in this District and throughout the country have regularly approved Relator's counsel's customary rates." (DN 748, at PageID # 72172-74; DN 748-20, at ¶ 53.) Relator cited several examples of cases where courts approved Kellogg Hansen's customary rates and provided copies of its cited cases as an exhibit to Shen's declaration. (DN 748-28.) The cases provided by Relator show that:

- On November 15, 2001, in *Conwood Company, L.P. v. United States Tobacco Co.*, the United States District Court for the Western District of Kentucky adopted over

defendants' objections a magistrate judge's recommendation that Kellogg Hansen's fees be awarded "based on its normal Washington, D.C. rates." (*Id.* at PageID # 72793, 72788-94.) However, the District Judge's order adopting the report and recommendation did not specify what those rates were in 2001, and a copy of the September 4, 2001, report and recommendation was neither provided by Relator nor appears to be electronically available though the order adopting the magistrate judge's recommendation totals the fee award at $13,074,600.53. (*Id.* at 72794.)

- On November 18, 2024, in *Emerson v. Florida Dep't of Revenue*, the Circuit Court of the Second Judicial Circuit in and for Leon County, Florida granted a motion for fees finding that the requested hourly rates by Kellogg Hansen were reasonable under Florida law, and the court awarded $16,639,440 in fees. (*Id.* at 72802, 72800-04.) The motion for fees itself that was granted included attorney rates ranging from $1,675.00 per hour to $920.00 for hour for the attorneys who appear to be from Kellogg Hansen (though others are also listed) and requested $450.00 per hour for a paralegal's work.[11] (*Id.* at 72798.)

- On July 27, 2023, in *In re Aearo Technologies LLC*, the United States Bankruptcy Court for the Southern District of Indiana awarded Kellogg Hansen a total of $914,878.50 in fees. (*Id.* at 72848-50.) The application filed by Kellogg Hansen listed rates between $1,250.00 - $1,850.00 per hour for partners, $1,025.00 per hour for of counsel, $755.00-$940.00 for associates, and $495.00 per hour for a paralegal.[12] (*Id.* at 72823-24.)

- On December 20, 2023, in *In re Bestwall, LLC*, the United States Bankruptcy Court for the Western District of North Carolina awarded Kellogg Hansen a total of $678,730.50 in fees. (*Id.* at 72856-58.) The application filed by Kellogg Hansen listed rates between $1,095.00 - $1,850.00 per hour for partners, $755.00 - $940.00 per hour for associates, and $495.00 per hour for a paralegal.[13] (*Id.* at 72855.) On July 8, 2024, the same court later awarded $449,685.50 to Kellogg Hansen. (*Id.* at 72663-65.) The application filed by Kellogg Hansen listed rates between $1,095.00 - $1,850.00 per hour for partners, $755.00 - $940.00 per hour for associates, and $430.00 per hour to $515.00 per hour for paralegals.[14] (*Id.* at 72862.)

---

[11] Given the placement of the footnote, the undersigned presumes the first five listed attorneys were from Kellogg Hansen.

[12] Of particular note are the rates sought by associate Bethan R. Jones ($940.00 per hour) and paralegal David M. Burke ($495.00 per hour). (*Id.* at 72823-24.) These listed rates in the 2023 petition are consistent with the 2023 rates for these individuals listed by Relator in the instant Petition.

[13] Again, paralegal David M. Burke consistently sought compensation at $495.00 per hour, the same rate listed for his 2023 work in the instant Petition. (*Id.* at 72855.) Similarly, partner Katherine C. Cooper sought compensation at $1,095.00 per hour, the same rate listed for her 2023 work in the instant Petition. (*Id.*)

[14] The listed rates for partner Katherine Cooper of $1,095.00 and $1,150.00 per hour, paralegal David. M. Burke of $515.00 and $495.00 per hour, paralegal Lisa M. Harger of $430.00 per hour, and paralegal Emilia C. Lukeman of $430.00 per hour are consistent with the 2023 and 2024 rates of those individuals sought in the instant Petition. (*Id.* at 72862.)

- On August 27, 2021, in *UFCW & Employers Benefit Trust v. Sutter Health*, the Superior Court of California for the County of San Francisco awarded class counsel $152.375 million in fees. (*Id.* at 72867-94.) While the opinion did not include specifics regarding Kellogg Hansen's hourly rates, based on the affidavits before it, the Court stated that it "[wa]s satisfied that the hourly rates claimed here are within the reasonable range, taking into consideration the skill and experience of counsel" even though some of the claimed billing rates were high. (*Id.* at 72881.) Pursuant to the submitted declaration of Daniel G. Bird, the Kellogg Hansen attorneys at issue sought compensation at rates between $890.00 - $1,095.00 per hour for partners, $835.00 for of counsel, $535.00 - $805.00 per hour for associates, $400.00 - $460.00 per hour for staff attorneys, $430.00 per hour for a paralegal director, $275.00 - $430.00 per hour for paralegals, $200.00 for an IT Director, $260.00 for a research manager, and $145.00 for a litigation support specialist.[15] (*Id.* at 72897-98.)

- On August 12, 2020, the United States Court of Federal Claims awarded $497,449.00 in fees and costs for work done by Kellogg Hansen between 2017 and 2020 specifically finding that the requested hourly rates for partners and associates were reasonable. *Haggart v. United States*, 149 Fed. Cl. 651, 668-70, *amended on reconsideration in part*, 151 Fed. Cl. 58 (2020). The requested rates included partner rates between $650.00 - $1,265.00 per hour, associate rates between $395.00 - $750.00 per hour, researcher rates between $150.00 - $455.00 per hour, and paralegal rates between $205.00 - $430.00 per hour. (DN 748-20, at ¶ 53(f); DN 748-28, at PageID # 72922-29.)

- On December 13, 2019, in *In re Anderson News, LLC*, the United States Bankruptcy Court for District of Delaware awarded Kellogg Hansen $68,921.50 in interim fees and $2,940,719.75 in final fees. (DN 748-28, at PageID # 72931-33.) The application at issue listed rates between $415.00 - $1,100.00 per hour for partners, $350.00 - $495.00 per hour for associates, $190.00 - $320.00 per hour for paralegals, and $100.00 - $185.00 per hour for other staff including a researcher and litigation support personnel. (*Id.* at 72936-39.)

- On October 17, 2017, in *Kleen Products LLC v. Int'l Paper Company*, the United States District Court for the Northern District of Illinois awarded class counsel fees, finding the same reasonable under both the percentage of recovery and lodestar approaches. (*Id.* at 72949-50.) There was no information in either the opinion or the other documentation provided by Relator as to the Kellogg Hansen rates at issue.

---

[15] While some of the individuals listed also did work on the instant case, the rates sought in *UFCW* are all lower than the rates sought here. Given that the *UFCW* request for fees was filed in 2021, the undersigned finds that the moderate increases are likely consistent with the yearly increases in the rates of those individuals. For example, in 2021, Carver D. Sinn, research manager, sought $260.00 per hour for his work as compared to the $295.00 per hour sought for his 2023 work here. (*Id.* at 72898.) Likewise, Bernadette Murphy, paralegal director, sought $430.00 per hour for her work in 2021 but $495.00 per hour for her work here. (*Id.* at 72897.) The other moderate increases are comparable with these examples.

- On June 8, 2017, in *In re Cathode Ray Tube Antitrust Litigation*, the United States District Court for the Northern District of California awarded attorneys fees based on a percentage of the settlement with a lodestar crosscheck. (*Id.* at 72957-60.) The Kellogg Hansen rates submitted in support of the petition for fees in that case included partner rates of $850.00 and $900.00 per hour, associate rates of $395.00 per hour, and staff attorney rates of $350.00 per hour. (*Id.* at 72964.)

- On February 16, 2017, in *In re Steel Antitrust Litigation*, the United States District Court for the Northern District of Illinois awarded class counsel, including Kellogg Hansen, fees based on a percentage of the settlement supported by a lodestar crosscheck. (*Id.* at 72966-70.) In doing so, the court noted without analysis that counsel's "billing rates [we]re appropriate and consistent with market rates for attorneys of similar skill doing similar work." (*Id.* at 72968.) But there was no supporting documentation provided regarding what Kellogg Hansen rate were at issue in that case.

As to Phillips & Cohen's rates, while Relator did not provide a similar list of cases where courts have approved the rates, in her declaration, Sylvia indicated that they rarely litigate their fees and most often resolve such issues through settlement, though she believes that Phillips & Cohen's rates "are comparable to those of firms that do similar specialized FCA work and that have been approved by courts." (DN 748-61, at ¶ 28.) The undersigned finds this sufficient in part because Phillips & Cohen's rates are lower than those of Kellogg Hansen.

Third, Relator argued that the Kellogg Hansen and Phillips & Cohen rates sought are comparable to "rates of other firms that serve as plaintiffs' counsel in FCA cases of similar complexity and scope." (DN 748, at PageID # 72175-76.) Relator provided the Court with two declarations supporting a fee petition by other firms Relator offered as comparable examples. Both were offered in support of a motion for attorneys fees in the United States District Court for the Northern District of California in the case of *Brown v. Google LLC* in April 2024. (DNs 748-16, 748-17.) The first was offered by a partner at Susman Godfrey LLP. (DN 748-16.) In it, the declarant, Bill Carmody, listed the 2024 rates for at the firm as being between $850.00 - $2,500.00 per hour for partners, $725.00 - $800.00 per hour for associates, $300.00 - $400.00 per hour for

staff attorneys, and $250.00 - $400.00 per hour for paralegals. (*Id.* at PageID # 72292.) The second was offered by a partner at Boies Schiller Flexner. (DN 748-17.) In it, the declarant, James Lee, listed the rates at the firm, as being between $1,020.00 - $2,330.00 per hour for partners, $1,040.00 - $1,380.00 per hour for counsel, $730.00 - $920.00 per hour for associates, $400.00 - $475.00 per hour for staff attorneys, $310.00 - $420.00 per hour for paralegals, and $390.00 for administrative staff. (*Id.* at PageID # 72318-19.) Relator also offered a list of "peer" firm rates, arguing that Kellogg Hansen's and Phillips & Cohen's rates are less than that of their "peer" firms. (DN 748-18.) The list provided captured rates from certain fee petitions for twenty-three different firms including firms such as Kirkland & Ellis LLP; Latham & Watkins LLP; Paul Hastings LLP; Skadden, Arps, Slate, Meagher & Flom LLP; Sullivan & Cromwell LLP; Susman Godfrey LLP; and White & Case LLP, to name a few. (*Id.*) Some of the firms on the chart overlap with the firms on the Vault "2025 Best Litigation Specialty Law Firms" list presented by Relator on which Kellogg Hansen ranked second to Susman Godfrey. (DN 748-22.) The fee petitions from which the data was collected were filed in bankruptcy courts in the Southern District of New York, the District of Delaware, the District of New Jersey, the District of North Carolina, and the Southern District of Texas and one case in the United States District Court for the Southern District of New York. (*Id.*) Relator also emphasized that Humana's national counsel's own rates were either "on par with or higher than Relator's counsel's 2025 rates." (DN 748, at PageID # 72175.) Having reviewed the documentation provided by Relator of O'Melveny & Myers LLP's rates as compared to Relator's counsel's rates, the undersigned agrees with Relator's summation. (DN 748-15.)

Finally, Relator offered declarations from two experts in support of the reasonableness of Kellogg Hansen's and Phillip's & Cohen's requested rates. In the first, declarant Friedman recited that he has thirty-seven years of experience and extensive FCA experience during that same period,

including both as a litigator and as a faculty panelist speaking at conferences on the FCA over the past two decades.  (DN 748-95, at ¶¶ 1-7.)  He represented that his 2024 hourly rate was $1,275.00 per hour and his 2023 rate was $1,185 per hour.  (*Id.* at ¶ 13.)  He indicated that he has previously given expert testimony regarding fees and that in connection with that testimony, he "ha[s] reviewed extensive data regarding changes in the general legal marketplace that support the rates [he] bill[s] [his] clients, as well as the rates claimed on behalf of relators' counsel."  (*Id.* at ¶¶ 12, 14.)  He opined that in his opinion and based on his experience, the hourly rates requested by Relator's counsel in this matter "are no higher than the range of prevailing market rates for attorneys with comparable experience and qualifications" and that in fact several rates "are in fact at the lower end of the range of rates charged by similarly-experienced attorneys, particularly with their specialized skills."  (*Id.* at ¶ 27.)  He also opined that "the rates claimed for work performed as described and documented are consistent with the rates charged in 2024 by attorneys and paralegals with similar skills and experience" and that "the claimed 2025 rates are consistent with the levels to which [he] would expect by firms in 2025 for similar work."  (*Id.* at ¶ 33.)  Friedman also opined,

> I note that the locations of each of the attorneys and forum district in this case do not indicate a market-based reason for reducing counsel's claimed hourly rates.  In order to provide legal services for persons seeking to serve as a relator under the False Claims Act, counsel must be familiar with, and be willing to engage in, practice in other districts throughout the country.  Relators seeking attorneys with the specialized skills and experience required to litigate *qui tam* cases will frequently search in multiple geographic locations, and attorneys capable of litigating such cases are frequently required to travel to other districts around the country to file and litigate these cases.  In order to maintain a practice with respect to *qui tam* litigation, skilled and experience[d] attorneys who reside and work out of non-major market locations are governed by the forces of a national marketplace more than by the rates charged by even the best local attorneys in other types of general or complex litigation.  Here, Relator's counsel were based in San Francisco and Washington, D.C.  Rates billed by law firms in those cities are comparable to the rates billed by law firms in other major metropolitan cities.  The national legal market forces for competent *qui tam* counsel impact the ability of attorneys in all

of these geographical areas to command high rates.  The rates claimed by Relator's counsel here are thus reasonable and consistent with the market when compared to market rates charged by attorneys with comparable skills and experience in the national marketplace.

(*Id.* at ¶ 34.)  He noted that he had experience with Sylvia, who is uniquely experienced in this field.  (*Id.* at ¶ 29 ("There are several attorneys and firms known for success in this area, but Ms. Sylvia's contributions to the knowledge and understanding of False Claims Act legal developments is unmatched.").)  He likewise noted his experience with attorney Edward Arens ("Arens") and opined that Arens "possessed the knowledge and skills needed to work closely with experts in this complex regulatory environment."  (*Id.* at ¶ 30.)

Relator also submitted a declaration from Nelson, a partner at Lieff, Cabraser, Heimann & Bernstein LLP, which has offices in San Francisco, New York, and Nashville.  (*Id.* at ¶¶ 1-3.) Nelson represented that he has over twenty years' experience with the FCA.  (*Id.* at ¶ 5.)  He opined that in his judgment, the rates of Kellogg Hansen and Phillips & Cohen are reasonable and "not an outlier as compared to the rates charged by other leading firms in California and the District of Columbia for complex litigation, including FCA cases."  (*Id.* at ¶ 10.)  He opined that "Kellogg Hansen's rates, though at the higher end, are also commensurate with their skill and experience and are comparable to the rates of the very most successful and experienced lawyers doing similar work."  (*Id.* at ¶ 14.) He represented that both Sylvia and Arens were "well-known in the *qui tam* bar as leaders in this field" and that he has prior experience as co-counsel with them.  (*Id.* at ¶ 12.) He stated, "Based on my experience, Phillips & Cohen's rates are commensurate with their skill and experience and are comparable to the rates of lawyers doing similar work, including those of my firm" and that the rates for the various Phillips & Cohen timekeepers, including both attorneys and other staff, were comparable to his firm's rates.  (*Id.* at ¶ 13.)  Relator argued that based on all

of this evidence, the Court should find the rates of Kellogg Hansen and Phillips & Cohen reasonable.

Humana argued that the rates charged by Kellogg Hansen and Phillips & Cohen were not reasonable.  But its primary argument on this point was the one the undersigned already rejected above: that Relator should be limited to market rates in the Western District.  (DN 752, at PageID # 73644-54.)  Stripped of that premise, Humana's argument against the reasonableness of Relator's rates continues to put too much emphasis in the undersigned's opinion on finding a rate similar to the local market rate.  For example, Humana argued that should the Court award out-of-market rates, it should do so to only the "most senior partners at Kellogg Hansen and Phillips & Cohen" and should cap those to FCA rates within the Sixth Circuit regional market.  (*Id.* at 73641.)  Humana phrased its argument as one that Relator's proposed "upward rate departures" were unreasonable.  (*Id.* at 73654-59; *see also id.* at 73654 ("Even assuming Relator had carried his burden to prove that it was necessary to retain some out-of-town specialist(s), which he has not, the court must still determine how much above the local market rate Relator had to go to secure adequate counsel").)  But the undersigned finds this to be a misconstruction of *Hadix*.  As set forth above, having found that it was reasonable for Relator to hire out of town counsel, the only question then before the Court is  whether "the rates sought by the out-of-town specialist [must be] reasonable for an attorney of his or her degree of skill, experience, and reputation."  *Hadix*, 65 F.3d at 535.  And while *Hadix* does provide that "judges may question the reasonableness of an out-of-town attorney's billing rate if there is reason to believe that competent counsel was readily available locally at a lower charge or rate," *id.*, the undersigned already found above that competent counsel was not locally available.  Thus, the inquiry before the undersigned at this stage has nothing to do

with "upward deviations" from the local market rate.  The question is merely whether Kellogg Hansen's and Phillips & Cohen's rates were reasonable based on their skill and experience.

Humana emphasized that a "reasonable rate must be sufficient but no greater than necessary to attract competent attorneys."  (DN 752, at PageID # 73654.)  Thus, it argued that because regional firms in "larger markets nearest to the District" like Cincinnati are cheaper than "coastal firms," "a much lower hourly rate would have been more than sufficient to attract not only competent counsel, but industry leading FCA counsel."  (*Id.* at 73655-56.)  It provided a declaration from its own expert, Walton, in support of the relevant rates in a regional market.  (DN 752-4.)  Walton, a partner with Vorys, Sater, Seymour, and Pease LLP, represented that he has thirty-three years' experience defending FCA cases though he has also represented some relators.  (*Id.* at ¶¶ 4, 10.)  He opined that "the rates being sought [in this case] are well above market rates for the work that was performed."  (*Id.* at ¶ 13.)  He emphasized that "Cincinnati is one of the primary markets for plaintiff-side FCA work."  (*Id.* at ¶ 17.)  He spent a large portion of his declaration substantiating his opinion as to the relevant market rates in the Cincinnati-region and that those rates were lower than those charged by Relator's counsel.  (*Id.* at ¶¶ 18-26.)  He concluded that "given the plethora of options that relators had for counsel, a reduction of the coastal rates being sought here would be appropriate."  (*Id.* at ¶ 27.)

The undersigned finds Humana's position unsupported by even the case law it cites.  *See Linneman*, 970 F.3d at 631 (quoting in part *Husted*, 831 F.3d at 716, and citing *Hadix*, 65 F.3d at 535) ("But again, 'reasonable' fees are very 'different from the prices charged to well-to-do clients by the most noted lawyers and renowned firms in a region.' "); *Gonter*, 510 F.3d at 618 ("The appropriate rate, therefore, is not necessarily the exact value sought by a particular firm, but is rather the market rate in the venue sufficient to encourage competent representation."); *Reed*, 179

F.3d at 472 (quoting *Johnson*, 488 F.2d at 719) ("[C]ourts must remember that they do not have a mandate . . . to make the prevailing counsel rich." (alteration in original)).  Humana's citations to these guiding principles leave unchallenged the proof offered by Relator of the reasonableness of his lawyers' rates.[16]  While it is not lost on the undersigned that the total amount of fees sought by Relator is high—much higher than it would have been if a Kentucky firm had done the work—the fact that the total amount of fees or rates are high is not alone enough to demonstrate that the fees are inappropriate.  Relator offered competent evidence that Kellogg Hansen's and Phillips & Cohen's rates are comparable with rates sought by other firms in the national market and offered the Friedman declaration in support of his claim that the national market is the market that should be at issue in this case.  Nothing in Walton's declaration contradicts Friedman's opinion that FCA litigation at this scale is a national practice.  Walton merely notes that FCA work is being done in Cincinnati, and while that may be true, that has no bearing on the appropriateness of Relator seeking national counsel given all the reasons provided above regarding the complexity of this case as compared to the typical FCA case and the scope of the relief sought.  In particular, none of the cases cited by Humana are either factually on all fours with the instant case or explicitly require Relator to have looked to a "regional" market before turning to a national one.  The case law requires Relator to make a reasonable decision.  Relator did so.  Limiting Relator's counsel to rates in a market that is unrelated to this case as proposed by Humana would undercut both the purpose of the FCA's *qui tam* provision and the general rule that the fees awarded should induce counsel to undertake representation.  While Humana's response acts as though Relator retained the most expensive firms in the country to represent him, based on the uncontested proof submitted by

---

[16] The undersigned notes that Humana did not challenge Relator's representations concerning the rates at its "peer" firms.

Relator regarding the fees of its peers, that assumption does not hold true and takes much of the force out of Humana's argument.

This leaves only the question of whether the proof Relator presented was sufficient to justify Kellogg Hansen's rates and Phillips & Cohen's rates. The undersigned finds that it does. Relator credibly demonstrated that in assessing the reasonableness of his counsel's rates, the Court should look to the national market. As set forth above, "[d]istrict courts are free to look to a national market, an area of specialization market or any other market they believe appropriate to fairly compensate particular attorneys in individual cases." *Louisville Black Police*, 700 F.2d at 278 (6th Cir. 1983); *Sigley*, 2000 WL 145187, at *7 (citing *Louisville Black Police*, 700 F.2d at 278); *Wayne*, 36 F.3d at 533 (citing *Louisville Black Police*, 700 F.2d at 278); *McHugh*, 37 F. App'x at 740 (citing *Louisville Black Police*, 700 F.2d at 278, and *Wayne*, 36 F.3d at 533). The undersigned is particularly persuaded by the representations in the Friedman declaration regarding the national marketplace and the trends therein to establish the reasonableness of Kellogg Hansen's and Phillips & Cohen's rates. There is also support for their rates in the opinions Relator provided to the Court where those rates were approved or, in the case of Phillips & Cohen, higher than what is sought here. While several of the opinions did so with little to no analysis, they are still instances where the rates were approved as reasonable. And the consistency between the rates sought in some of the examples provided and the instant Petition further undercuts Humana's supposition that Relator's counsel might have discounted them. These opinions combined with the evidence that other firms in the national market would charge rates greater than or on par with Kellogg Hansen's and Phillips & Cohen's substantiate that the requested rates are reasonable. This includes the evidence provided by Relator that the rates charged by Humana's counsel are on par with or higher than those charged by Kellogg Hansen and Phillips & Cohen. While this factor is not

determinative, it is probative of the reasonableness of Relator's counsel's rates. Humana offered no evidence challenging the reasonableness of Kellogg Hansen's and Phillips & Cohen's rates as measured against rates in the *national* market. And in the absence of conflicting evidence provided by Humana, the undersigned finds the rates sought to be reasonable based on the experience, skill, and reputation of the timekeepers at issue. This includes the rates sought by paralegals and other administrative staff. While those rates are substantially higher that what those professionals would command in this jurisdiction, again, having concluded that it was reasonable for Relator to seek out-of-town specialist counsel, Humana has provided no authority to support that it was unreasonable for Relator's out-of-town counsel to use counsel's own paralegals and administrative staff. While Humana did cite to the *Zediker* case from the Eleventh Circuit in which the Eleventh Circuit reduced the rates of an out-of-town's counsel's paralegal, it did so because "[n]othing in the record support[ed] the reasonableness of the[ ] requested rate[ ]." *Zediker*, 857 F. App'x at 610. This is not the case here as Relator provided sufficient authority to support the reasonableness of the rates requested by paralegals and support staff based on the prevailing rates for professionals of their skill and experience in the relevant national market.

For all these reasons, the undersigned finds that the rates requested by Kellogg Hansen and Phillips & Cohen to be reasonable under the second prong of *Hadix*.[17]

### 2.    Local Market Rates/Furman Nilsen Rates

In addition to compensation for timekeepers from Kellogg Hansen and Phillips & Cohen, Relator also sought compensation for the work of his local counsel at Furman Nilsen. In his Petition, Relator spent his time predominantly arguing the reasonableness of Kellogg Hansen and

---

[17] Because the undersigned has concluded that it was appropriate for Relator to hire out-of-town counsel/specialists and that the relevant market for consideration of those rates was the national market, the undersigned does not reach Relator's alternative argument that if limited to the "local" market, the relevant market would be the Central District of California where the case was filed and not this District.

Phillips & Cohen's rates, noting in a footnote that in the Parties' "meet and confer discussions, Humana did not object to the rates or hours expended by Relator's local counsel at Furman Nilsen & Oyler PLLC."  (DN 748, at PageID # 72165 n.9.)  Humana did not contest the reasonableness of the rates sought by Furman Nilsen in its response, only the issue of whether 2025 rates should be awarded for all time expended, which the undersigned will address below.  (DN 752, at PageID # 73643 ("The Petition requests an *un*reasonable rate for the timekeepers at Kellogg Hansen and Phillips & Cohen.").)

Pursuant to the exhibits to the Petition, Relator sought compensation for the work of two lawyers at Furman Nilsen: Furman and D. Sean Nilsen ("Nilsen").  (DN 748-87.)  Both had 2024 hourly rates of $500.00 per hour and 2025 hourly rates of $600.00 per hour.  (*Id.*)  According to Furman's declaration, the lawyers at his firm "practice in the areas of False Claims Act litigation, commercial litigation, healthcare law, construction law, corporate law, white-collar crime, and personal injury law." (DN 748-86, at ¶ 4.)  Furman graduated from law school in 1993, and Nilsen graduated from law school in 1992, giving them thirty-two and thirty-three years of experience respectively.  (*Id.* at ¶ 6; D. Sean Nilsen, Furman Nilsen & Oyler, PLLC, https://www.lawdean.com/our-attorneys/nilsen-d-sean/ (last visited Apr. 16, 2025).)

Based on the undersigned's own experience in the local market and awards in prior cases, the rates sought by Furman Nilsen are in line with those charged and awarded by lawyers of similar experience in Louisville.  *See Chimney Safety Inst. of Am. v. First Call Chimney Serv., LLC*, No. 3:19-CV-705-CRS, 2020 WL 3065624, at *2 (W.D. Ky. June 9, 2020) (awarding $525.00 per hour for the work of a senior partner at Frost Brown Todd in an intellectual property case); *Honorable Ord. of Kentucky Colonels, Inc. v. Kentucky Colonels Int'l*, No. 3:20-CV-132-RGJ, 2024 WL 3974768, at *2 (W.D. Ky. Aug. 28, 2024) (awarding $525.00 per hour to partner at Wyatt, Tarrant

& Combs); *Structures USA, LLC v. CHM Indus., Inc.*, No. 3:21-CV-458-BJB, 2024 WL 3877281, at *4 (W.D. Ky. Aug. 20, 2024) (approving rates between $435.00 per hour and $535.00 per hour); *GPH Louisville Hillcreek LLC v. Redwood Holdings, LLC*, No. 3:21-CV-63-RGJ, 2024 WL 1913201, at *4 (W.D. Ky. May 1, 2024) (awarding rates between $175.00 and $495.00 per hour). In particular, the latter three cited cases—*Kentucky Colonels*, *Structures USA*, and *GPH Louisville*—utilized the same report proffered by Humana here as evidence of the local market rate: a Price Waterhouse Coopers survey of rates for Kentucky and Tennessee lawyers.  (DN 752-2, at ¶ 21-22.)  While Humana did not submit the full report into evidence, the undersigned was able to pull a copy of it from the *GPH Louisville* docket.  DN 171-4, at PageID # 4024, *GPH Louisville Hillcreek LLC v. Redwood Holdings, LLC*, No. 3:21-CV-63-RGJ-RSE (W.D. Ky. filed Feb. 26, 2024).  The report reflects data as of January 1, 2023.  *Id.*  For equity partners with thirty-one to thirty-five years' experience like Furman and Nilsen, the median rate listed is $646.00 per hour.  *Id.*  Like the other recent cases in this District, the undersigned finds the report reasonable evidence of the market rate, and here, it demonstrates that Furman and Nilsen's rates for both 2024 and 2025 are reasonable given that they are both lower than the median rate for partners of their experience level based on 2023 data.  Accordingly, given the lack of objection by Humana, the significant legal experience of both Furman and Nilsen, the Price Waterhouse Coopers survey data, and the rates recently approved by other courts, the undersigned finds the requested rates for Furman Nielsen to be reasonable.

### 3.      Current v. Historical Rates

Finally, the Parties disputed what year's rates the Court should use in awarding Relator fees.  Relator argued that his counsel should be compensated at their 2025 rates rather than at historical market rates.  (DN 748, at PageID # 72181-83; DN 754, at PageID # 74948-50.)  Relator

argued that using 2025 rates to compensate his counsel rather than historical rates would be appropriate in this case given the multi-year delay in payment and the fact that interest is not available on the fee award. (DN 748, at PageID # 72181.)  He also argued that awarding historical rates could discourage other counsel from taking relator's cases like this one.  (*Id.* at 72183.) Interestingly, while Humana challenged that awarding current rates was automatic under the applicable legal standard, it did not argue that the Court should award the historical rates charged by Relator's counsel in each given year for which services were rendered; instead, it argued that the Court should award Relator's counsel fees based on their 2023 rates because approximately 97.5% of all hours in this case were billed before the end of 2023.  (DN 752, at PageID # 73659-64.)  In his reply, Relator argued that 2023 was an arbitrary selection when his counsel would not be paid until 2025 at the earliest.  (DN 754, at PageID # 74948-49.)

The Sixth Circuit has held that it is sometimes appropriate to award attorneys' fees based on current billing rates.  *Gonter*, 510 F.3d at 617 (citing *Barnes v. City of Cincinnati*, 401 F.3d 729, 745 (6th Cir. 2005)).  But awarding fees based on current rates is not a requirement and is within the discretion of a district court.  *Planned Parenthood*, 931 F.3d at 545 (quoting and citing *Gonter*, 510 F3d at 617).  For example, courts have found it appropriate to award current fees to compensate for multi-year delays in payment.  *See Barnes*, 401 F.3d at 745 (finding district court's use of current rates to compensate for six-year delay in payment within the court's discretion); *Planned Parenthood*, 931 F.3d at 545 (finding district court's use of current rates to compensate for ten-year delay in payment within the court's discretion); *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 684 F. Supp. 953, 958 (N.D. Ohio 1988) (using current rates for the lodestar calculation because it "takes into account the effect of inflation, foregone interest and delay in payment").  *See also Perdue*, 559 U.S. at 556 (noting that "[c]ompensation for [ ] delay [in payment

until the end of the case] is generally made 'either by basing the award on current rates or by adjusting the fee based on historical rates to reflect its present value' ") (quoting *Missouri v. Jenkins*, 491 U.S. 274, 282 (1989)); *Jenkins*, 491 U.S. at 283-84 ("Clearly, compensation received several years after the services were rendered . . . is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed, as would normally be the case with private billings.").

Based on these authorities and on the fact that not even Humana urged the Court to do otherwise, the undersigned finds that compensating Relator's counsel based on something other than historical rates is appropriate. This case was originally filed in 2016 so Relator's counsel has fronted significant fees and expenses for a lengthy period. This has prevented them from seeking other work, including in the case of Kellogg Hansen, fee-paying work. (DN 748-20, at ¶ 13 ("While Kellogg Hansen devoted its time and resources to this matter, it has forgone other legal work for which it could have been compensated at its customary rate. . . . The firm sacrificed work on [ ] paying cases, and others, to work on this matter."); DN 748-61, at ¶ 5 ("[Phillips & Cohen] fronts the costs for its clients and only recovers when it prevails. According, devoting the necessary resources to a complex non-intervened *quit tam* case, with payment at risk for years, necessarily limits the number of other matters our small firm can pursue at the same time even when we share the burden with other firms.").) Further, Relator provided evidence that FCA cases in which the government does not intervene, like this one, "are especially challenging and hard fought," resulting in a recovery only about 10% of the time. (DN 748-96, at ¶ 6.) Given this reality, the undersigned concurs with Relator that awarding fees based on historical rates given the length of time this case took, the amount of work done by counsel, and the fact that the United

States did not intervene would be in contravention of the purpose of the fee-shifting provision of the FCA.

Notwithstanding these reasons, the undersigned finds that to award 2025 rates would result in too much of a windfall to Relator's counsel here. As set forth in the exhibits to Relator's reply, the difference between applying 2023, 2024, and 2025 rates is substantial. Assuming for now that the undersigned does not make any reduction to the number of hours billed, the difference between awarding 2023 rates and 2025 rates is approximately $6,000,000:

| | 2023[18] | 2024[19] | 2025 |
|---|---|---|---|
| Kellogg Hansen | $25,048,274.00 | $27,019,086.00 | $29,774,359.00 |
| Phillips & Cohen | $7,019,591.00 | $7,842,621.00 | $8,481,454.00 |
| Furman Nielsen[20] | $58,625.00 | $58,625.00 | $70,350.00 |
| Total | $32,126,490.00 | $34,920,332.00 | $38,326,163.00 |

(DNs 748-87, 754-25, 754-26, 754-27, 754-36, 754-37, 754-38.) Humana is also correct in pointing out that the vast majority of the 34,577.75 hours for which Relator seeks compensation were billed prior to the end of 2023. Relator's counsel billed 33,071.25 hours between 2015-2023, 1180.00 hours in 2024, and 326.5 hours in 2025. Thus, 95% of the hours in this matter were billed by the end of 2023. It was in mid-2023, on the eve of trial, that the Parties reached an agreement in principle to settle this matter. (DN 718.) The final settlement agreement was not filed in the record until August 2024, after which point the only remaining issues were related to attorney's fees. (DN 732.) Given the limited tasks performed after 2023, the undersigned recommends that the Court compensate Relator's counsel at 2023 rates for tasks performed between 2015-2023 and 2024 and 2025 rates only for tasks performed in those years. The undersigned finds this approach

---

[18] Both Kellogg Hansen and Phillips & Cohen's calculations for 2023 rates apply 2023 rates to work performed between 2015-2023, 2024 rates to 2024 work, and 2025 rates to 2025 work. (DNs 754-27, 754-38.)

[19] As with 2023, both Kellogg Hansen and Phillips & Cohen's calculations for 2024 rates apply 2024 rates to work performed between 2015-2024 and 2025 rates to 2025 work. (DNs 754-26, 754-37.)

[20] Relator did not provide 2023 rates for Furman Nilsen. (DN 748-87.) Therefore, the undersigned's 2023 calculations are based on Furman Nilsen's 2024 rates. The undersigned finds this to be appropriate given that Humana did not contest the reasonableness of Furman Nilsen's 2024 or 2025 rates.

sufficient to compensate Relator for the multi-year delay in payment, but it avoids granting the multi-million dollar windfall that would otherwise result from applying 2025 rates to the entire life of the case despite how comparatively little work on this matter was actually completed in 2025. The undersigned also finds it would be inappropriate to apply 2023 rates to work performed in 2024 and 2025 because doing so would ignore the evidence presented by Relator's counsel about the other opportunities they missed by litigating this case. Presumably those other opportunities would have commanded 2024 or 2025 rates for work performed during those years.

Humana also pointed out that for several timekeepers, Kellogg Hansen sought to be compensated at partner-level rates for work performed when the timekeeper was an associate. (DN 752, at Page ID # 73663-64.) Humana cites the rates requested by Kellogg Hansen timekeepers Thomas G. Schultz, Katherine C. Cooper, Lillian V. Smith, and Bethan R. Jones and Phillips & Cohen timekeeper Arens, who each made partner while this case was pending. (*Id.*) But Humana again referenced as part of its objection the fact that "Relator ha[d] made no showing that these junior attorneys satisfy the out-of-town specialist rule." (*Id.* at 73664.) The undersigned has already rejected Humana's argument on this point above. Further, Humana did not specify what rate the Court should use to calculate the fees for these individuals instead of what Relator requested. Relator argued in opposition that these minor discrepancies are simply part of the idea of compensating for delay by awarding current rates. (DN 754, at PageID # 74950.) The undersigned agrees, particularly because it appears that at least three of the attorneys at issue made partner prior to 2023, and in the case of attorney Arens, he made partner in 2018 prior to this case being transferred to this District. The undersigned sees no unreasonable windfall worked to Relator's counsel for these individuals, and Humana has not provided a detailed argument about the amount of any such windfall for the Court's consideration. In the absence of such an argument,

the undersigned finds that even the rates awarded for the specified individuals should be awarded as recommended above.

### 4.      Conclusion

Having found that it was appropriate under the relevant law for Relator to obtain out-of-town specialist counsel, the rates charged by both out-of-town counsel and local counsel were reasonable for attorneys of similar skill in the relevant markets, and Relator's counsel should be compensated at a combination of their 2023, 2024, and 2025 rates, the undersigned recommends that the Court award the following rates to the following individuals for work performed within the specified time periods:

| Timekeeper | Recommended Rates | | |
|---|---|---|---|
| | For Work Performed 2015-2023 | For Work Performed in 2024 | For Work Performed in 2025 |
| Claire Sylvia | $975.00 | $1,075.00 | $1,160.00 |
| Edward Arens | $850.00 | $950.00 | $1,030.00 |
| Jeffrey Dickstein | $975.00 | $1,075.00 | $1,160.00 |
| Amy Easton | $925.00 | $1,025.00 | $1,110.00 |
| Peter Budetti | $950.00 | $1,050.00 | $1,130.00 |
| George Collins | $750.00 | $850.00 | $920.00 |
| Taeva Shefler | $750.00 | $850.00 | $920.00 |
| Emily Stabile | $750.00 | $850.00 | $920.00 |
| Alexander D. Westerfield | $750.00 | $850.00 | $920.00 |
| Luke Diamond | $600.00 | $700.00 | $760.00 |
| Diana DeFrancesco | $250.00 | $350.00 | $380.00 |
| Jennifer Moir | $250.00 | $250.00 | $270.00 |
| Andrew C. Shen | $1,350.00 | $1,470.00 | $1,600.00 |
| James M. Webster | $1,500.00 | $1,650.00 | $1,800.00 |
| Thomas G. Schultz | $1,095.00 | $1,195.00 | $1,350.00 |
| Katherine C. Cooper | $1,095.00 | $1,150.00 | $1,250.00 |
| Lillian V. Smith | $990.00 | $1,150.00 | $1,250.00 |
| Bethan R. Jones | $940.00 | $1,040.00 | $1,225.00 |
| Caroline A. Schechinger | $755.00 | $860.00 | $985.00 |
| Kimberly A. Briggs | $530.00 | $555.00 | $590.00 |
| Joseph M. Davies | $530.00 | $555.00 | $590.00 |
| Robert L. Moore | $530.00 | $555.00 | $590.00 |
| Bernadette M. Murphy | $495.00 | $515.00 | $545.00 |
| Chandler J. Sella | $430.00 | $450.00 | $475.00 |
| David M. Burke | $495.00 | $515.00 | $545.00 |
| Emilia C. Lukeman | $430.00 | $450.00 | $475.00 |

| Timekeeper | Recommended Rates | | |
|---|---|---|---|
| | For Work Performed 2015-2023 | For Work Performed in 2024 | For Work Performed in 2025 |
| James F. Birmingham | $430.00 | $450.00 | $475.00 |
| Lisa M. Harger | $430.00 | $450.00 | $475.00 |
| Maura D. MacDonald | $430.00 | $450.00 | $475.00 |
| Robyn Sommerfield | $430.00 | $450.00 | $475.00 |
| James P. Brennan | $195.00 | $200.00 | $225.00 |
| Jason J. Tapkas | $175.00 | $200.00 | $215.00 |
| Ripton A. Marini | $175.00 | $200.00 | $215.00 |
| Carver D. Sinn | $295.00 | $295.00 | $295.00 |
| C. Dean Furman, Jr. | $500.00 | $500.00 | $600.00 |
| D. Sean Nilsen | $500.00 | $500.00 | $600.00 |

The undersigned will address below the second portion of the lodestar calculation: the hours reasonably expended on the litigation.

### C.     Hours Reasonably Expended

As noted above, the second step in the lodestar calculation is to determine the number of hours reasonably expended on this litigation.  Relator submitted redacted time records as exhibits to his Petition, and he provided an unredacted copy for the Court to review in camera.  (DNs 748-23, 748-64, 748-88.)  He provided additional time records with his reply.  (DNs 754-24, 754-35.)  In total, Relator provided approximately 550 pages of time records for the Court's review, excluding the time records of his experts.  In their declarations, Shen and Sylvia also provided detailed summaries of the work performed by the various timekeepers throughout the case.  (DN 748-20, at ¶¶ 56-125; DN 748-61, at ¶¶ 31-74.)  Relator also indicated that his counsel had already made preliminary deductions, reducing the total number of hours sought to account for duplicative tasks and to eliminate any timekeeper who billed less than fifty hours on the case.  (DN 748, at PageID # 72160-61, 72161 n.4, 72185.)  These write offs resulted in total reductions of 729.2 hours.  (*Id.* at 72185.)  In view of both the length of this litigation and the volume of documentation provided by Relator, the undersigned is particularly mindful of the Supreme Court's instructions

that "[t]he essential goal in shifting fees . . . is to do rough justice, not to achieve auditing perfection." *Fox*, 563 U.S. at 838. Thus, in lieu of a line-by-line and action-by-action review of Relator's counsel's work on this case, the undersigned will begin by considering the objections raised by Humana to the number of hours billed by Relator's counsel.

Unfortunately, even though the Supreme Court has cautioned courts reviewing fee petitions not to become "green-eyeshade accountants," *id.*, Humana put its eyeshades to assiduous use and encourages the Court to do so as well. As set forth in the declaration of Humana's counsel Amanda M. Santella, "Humana's [review] process identified 8,902 deficient time entries out of more than 13,300 total time entries." (DN 752-7, at ¶ 9.) In its response, Humana identified seven categories of time entries for which it requested the Court not compensate Relator: (1) time spent on "failed attempts" to convince the United States to intervene; (2) hours spent engaging in "sanctionable discovery misconduct"; (3) time spent drafting requests for admission the Court did not require Humana to answer; (4) time spent on failed attempts to exclude Humana's experts; (5) time spent preparing rebuttal research reports Humana successfully had struck; (6) upleveled work (i.e. associate-level work performed by partners); and (7) vague, block-billed entries. (DN 752, at PageID # 73666-73.) The approximately seven pages of argument on these issues in Humana's response are supplemented by a staggering 1,157 pages of exhibits to Santella's declaration further specifying the time entries Humana believes are at issue and the nature of Humana's objections to the same. (DNs 752-8, 752-9, 752-10, 752-11, 752-12, 752-13, 752-14, 752-15, 752-16.) While some of these exhibits address the same entries in different groupings, the total volume of objections asserted by Humana bears negatively on the credibility of the individual objections themselves. While the case law requires the Court to make a determination of the reasonableness of the hours billed by Relator's counsel, no caselaw—including none cited by Humana—requires

the undersigned to audit Relator's counsel's time entries in the same manner or degree of detail that a paying client might.  With that starting point in mind, the undersigned will proceed to consider Humana's individual categories of objections.

### 1.    Intervention

Humana's first category of time for which it requested the Court not compensate Relator was any time spent on "failed attempts to convince the United States to intervene."[21]  (DN 752, at PageID # 73667-69.)  Humana requested that the Court deduct a total of 1,699.15 hours spent on these efforts.[22]  (*Id.* At 73668; DN 752-12.)

In support, Humana argued that "[p]revailing parties cannot recover fees for time spent pursuing unsuccessful or unmeritorious litigation efforts" or for "fees for litigating collateral matters that do not directly involve the *qui tam* defendant."  (DN 752, at PageID # 73667 (citing *Hensley*, 461 U.S. at 434-35, and *U.S. ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1045-46 (6th Cir. 1994)).)  In *Hensley*, the Supreme Court explained that after a court has determined the lodestar amount, "other considerations," such as the factors identified in *Johnson v. Georgia Highway Express, Inc.*, "may lead the district court to adjust the fee upward or downward, including the important factor of the 'results obtained.' "  *Hensley*, 461 U.S. at 434, 434 n.9 (citing *Johnson*, 488 F.2d at 717-19).  *Hensley* highlighted a situation where a plaintiff "prevailed" even though he or she succeeded on some claims but not others, explaining,

---

[21] The heading in Humana's response captioned this category as being about "prelitigation actions and failed attempts to convince the United States to intervene."  (DN 752, at PageID # 73667.)  But the entirety of the argument in the section that followed was about intervention only.  (*Id.* at 73667-69.)  Humana's exhibit with the relevant time entries was only captioned "correspondence or work product regarding government intervention and other non-compensable work associated with the DOJ investigation."  (DN 752-12.)  Thus, the undersigned will not separate evaluate the prelitigation time spent by Relator's counsel and will presume the heading was a typographical error.

[22] Humana's response and exhibit listed this total as 1,758.88, but it included objections to 59.63 hours spent by Relator's expert Richard Foster and consultant the Lakdawalla Group.  (DN 752, at PageID # 73668; DN 752-12.)  As the lodestar calculation solely addresses attorneys' fees, the undersigned is unconvinced it is appropriate to include these objections in these totals.

> In some cases a plaintiff may present in one lawsuit distinctly different claims for relief that are based on different facts and legal theories. In such a suit, even where the claims are brought against the same defendants—often an institution and its officers, as in this case—counsel's work on one claim will be unrelated to his work on another claim. Accordingly, work on an unsuccessful claim cannot be deemed to have been "expended in pursuit of the ultimate result achieved." The congressional intent to limit awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim.

*Id.* at 434-35 (internal citations omitted) (quoting in part *Davis v. Cnty. of Los Angeles*, No. 73-63-WPG, 1974 WL 180, at *3 (C.D. Cal. June 5, 1974)).  But, the Supreme Court clarified, where "the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories[,] [m]uch of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis." *Id.* at 435.  In those cases, the Supreme Court instructed district courts to "focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation," emphasizing that "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Id.*  Cases following *Hensley* cautioned courts not to "reduce attorney fees based on a simple ratio of successful claims to claims raised." *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1169 (6th Cir.), *opinion amended on denial of reh'g*, 97 F.3d 833 (6th Cir. 1996).  As one district court interpreting these instructions explained, "Any reductions should be based on a broad view of the relief obtained, not a piecemeal parsing of successful and unsuccessful claims or motions." *Lee v. Javitch, Block & Rathbone, LLP*, 568 F. Supp. 2d 870, 879 (S.D. Ohio 2008).

Humana argued that other courts have used these principles to deny relator's fee awards for time spent pursuing intervention where the United States ultimately did not intervene.  (DN 752, at PageID # 73667-68 (citing *United States ex rel. Maxwell v. Anham USA, Inc.*, No. 1:14-

cv-156, 2020 WL 4460364, at *4 (E.D. Va. Aug. 3, 2020); *Zediker*, 857 F. App'x at 612-14).)  The undersigned finds Humana's cited cases distinguishable from this case and that Humana's cited cases do not support that, as a general rule, a relator is not entitled to fees for time spent pursing intervention by the government.  In *Maxwell*, the relator sought compensation for both "fees incurred on performing pre-complaint due diligence and other investigative work" totaling $66,055.04 and fees related to their efforts to convince the United States to intervene totaling $889,199.91.  *Maxwell*, 2020 WL 4460364, at *3-4.  The United States District Court for the Eastern District of Virginia allowed recovery for the former and disallowed the recovery for the latter noting in doing so that "[t]here [wa]s substantial overlap between [r]elators' justification for the work that was performed during the pre-complaint phase and that which was performed during the government investigation phase, the only difference being that the complaint had been filed and the Government began its own investigation."  *Id.* at *4.  Ultimately, the *Maxwell* court did state that "[r]elators' efforts to convince the Government to intervene w[ere not] 'integral' to the case" and that "[i]t was not reasonable to expend nearly 1,419.85 billable hours for efforts that were unsuccessful, and as a result, could not have been necessary to the resolution of the case."  *Id.* (citing *Hensley*, 461 U.S. at 434).  The undersigned finds the instant case distinguishable because the facts present in *Maxwell* about the overlap between the prelitigation phase and the intervention phase are not present here.  Reviewing the time entries challenged by Humana, the undersigned views the tasks completed by Relator's counsel during this period as often being equally applicable to their own preparation to litigate the case as to convincing the United States to intervene.  For example, the time entries include things like "[w]ork on summary of liability issues for DOJ"; "[w]ork on summary of key evidence for DOJ"; "review/revise memo for government on damages"; compiling lists of witnesses and preparing for witness interviews;

investigating potential experts; communicating with potential experts; performing legal research on various issues in the case such as materiality and FCA statutory damages to brief the government; and "draft[ing] timeline of case for government," all of which have applications beyond the mere attempt to convince the government to intervene. (DN 752-12.) Thus, the undersigned is unconvinced *Maxwell*, which is only persuasive authority, mandates a different result here. Humana also cited *Zediker*. In *Zediker*, the Eleventh Circuit reduced the 657.73 hours claimed for "Government Interaction/Investigation," noting in doing so that the "filings in support of fees comprise[d] a self-contradictory and incoherent mess." *Zediker*, 857 F. App'x at 611-12. The Eleventh Circuit noted that the requested hours were both "poorly documented" and excessive "given the almost complete lack of usefulness of counsel's 657.73 hours to the Government," including highlighting that the hours included an excessive 270 hours for time spent preparing memoranda the Government did not use and that the Eleventh Circuit, who had reviewed them, could not "discern how Zediker's counsel could have possibly spent 270 hours preparing them." *Id.* at 612. Thus, the Eleventh Circuit "reduce[d] the claimed hours by 60% for excessive and poorly documented hours." *Id.* at 613. Again, *Zediker* is persuasive authority but more pivotally, the *Zediker* court seemed more concerned with the inadequacy of counsel's documentation than it did with the fact that the United States did not ultimately intervene in the case. Relator's counsel's documentation suffers from no such inadequacies here. Humana also cited *Taxpayers Against Fraud* for the proposition that "fees litigating collateral matters that do not directly involve the *qui tam* defendant" are uncollectable. (DN 752, at PageID # 73667.) But the "collateral matters" at issue in that case for which the Sixth Circuit ruled relators could not recover were fees related to a separate litigation from the *qui tam* case to which the *qui tam* defendant was not a party.

*Taxpayers Against Fraud*, 41 F.3d at 1045-46.  No such collateral litigation occurred here, and therefore, *Taxpayers* does not support denying Relator's time spent on intervention in *this* case.

More broadly speaking, the undersigned questions the application of *Hensley*'s principles regarding unsuccessful *claims* to individual motions or litigation tasks.  This is not a § 1983 case that went to a jury trial where a jury rejected some of Relator's claims and accepted others or even an FCA case where a jury rejected some of a relator's claims.  This action *settled* without any determination on the merits of Relator's claims save for the Court's rulings on dispositive motions, which did not dismiss any of Relator's claims.  (DNs 492, 732.)  As part of that settlement, Humana continued to "expressly den[y] any and all allegations and claims asserted by Relator" and instead "to avoid the delay, uncertainty, inconvenience, and expenses of protracted" litigation, the Parties "reached a full and final mutually agreeable resolution addressing the claims against Humana." (DN 732, at PageID # 72054-55.)  Under these circumstances, the undersigned is unconvinced that it is appropriate to reduce the fees sought by Relator merely because a particular litigation strategy he pursued was unsuccessful.  Instead, the undersigned takes guidance from cases regarding calculating the reasonableness of the hours billed that instruct courts to consider whether the documentation offered by a fee applicant in support of the hours claimed are sufficient to establish "that such hours were actually and reasonably expended in the prosecution of the litigation." *Imwalle*, 515 F.3d at 553 (quoting *United Slate,* 732 F.2d at 502 n.2) ("The key requirement for an award of attorney fees is that '[t]he documentation offered in support of the hours charged must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation.' ").  Applying that principle, the undersigned cannot find either that Relator's documentation is insufficient or that it was unreasonable for Relator to attempt to convince the

United States to intervene in the action.  As discussed above, Relator provided evidence to support that non-intervened FCA actions are extraordinarily difficult for relators; thus, it was reasonable for Relator to attempt to persuade the United States to intervene to avoid that difficulty.  Further, as the undersigned noted in distinguishing Relator's cases, many of the tasks related to intervention appear to be equally as applicable to preparing Relator's counsel to prosecute the case as to convincing the government to intervene such that the undersigned is unconvinced the time was unreasonably expended.

For these reasons and in the absence of binding authority from Humana requiring a different result, the undersigned recommends the Court reject Humana's objection and compensate the Relator for time spent on attempting to convince the United States to intervene.

### 2.    Discovery Misconduct

Humana's second category of time for which it requested that the Court not compensate Relator was any time spent engaging in "sanctionable discovery misconduct" related to "with[olding] the existence and details of Richard Foster's conversations with the government." (DN 752, at PageID # 73669-70.)  Humana requested that the Court deduct a total of 1,362.35 hours spent on these efforts corresponding to the time Humana calculates Relator spent "engaging in and litigating the discovery misconduct related to Foster, including drafting Relator's Motion in Limine No. 12 seeking to exclude Foster's discussions with the government and defending the subsequent depositions that were ordered because of the misconduct."[23]  (*Id.* at 73670; DN 752-16.)

---

[23] As with its challenge to time spent regarding intervention above, Humana included 49.31 hours spent by Foster in its initial request such that its response listed this total as 1,411.66.  (*Id.* at 73670.)  Again, because the lodestar calculation is about attorney's fees, not expert fees, the undersigned finds no basis for including these challenged hours here.

The undersigned is familiar with the issues underlying Humana's request given the number of discovery motions generated on the issue. The Parties first took the deposition of Relator's expert Richard Foster, former Chief Actuary of CMS in July 2020. At that deposition, Humana learned that Foster had several, previously-undisclosed conversations with both the Department of Justice ("DOJ") and CMS, and Relator objected to Humana's questions regarding those conversations on the basis of privilege. Humana filed a motion to compel requesting production of any communications or documents exchanged between Foster and DOJ/CMS that had not been previously disclosed or identified on Relator's privilege log. Relator argued the documents and communications were privileged on several grounds, including because Foster was a consulting expert at the time of the conversations. In an August 31, 2021, Memorandum Opinion and Order, the undersigned found that Relator had not established the disputed documents and communications were protected. (DN 470.) The undersigned ordered Relator to supplement his privilege log, produce any non-privileged documents, supplement his responses to Humana's interrogatories, and produce Foster for an additional deposition. (*Id.*) Relator objected to the undersigned's order, but on June 30, 2022, Chief District Judge Gregory N. Stivers overruled Relator's objections. (DN 502, at PageID # 66416 ("[T]he Court concludes that Scott has failed to show that the Magistrate Judge's decision was clearly erroneous or contrary to law because of the lack of clarity as to Foster's dual roles during the course of this litigation.").) The Parties were given sixty days for Relator to produce a supplemental privilege log and non-privileged communications and ninety days to take Foster's supplemental deposition. (*Id.*) But the Parties could not agree on certain issues related to the scope of the deposition, and Relator ended up filing a motion for protective order. In his January 31, 2023, Memorandum Opinion and Order denying Relator's motion, the undersigned stated, "Relator has again failed to provide information

sufficient to support his assertion of privilege." (DN 537, at PageID# 66586.) The undersigned emphasized that Relator did not even address the very ambiguities that the undersigned had laid out in his prior order and that had led to the previous ruling. Stressing "Relator's failure to provide a sufficient basis for his privilege assertions," the undersigned ordered the Parties to take the supplemental deposition of Foster within three weeks. (*Id.* at 66591, 66598.) The Parties took Foster's supplemental deposition on March 2, 2023. Thereafter, Humana filed a motion for sanctions based on the fact that Relator's counsel continued to instruct Foster not to answer questions during the supplemental deposition on grounds that Humana believed violated the Court's prior orders. In a May 15, 2023, Memorandum Opinion and Order, the undersigned granted in part Humana's motion. (DN 679.) In doing so, the undersigned wrote,

> In his fourth attempt to repackage privilege claims this Court has repeatedly rejected, Relator once again offers only bald assertions without details or substance. Relator's relentless insistence that these documents are privileged, which has now spanned approximately three years and at least three previous Court orders, is without any legitimate basis and is inconsistent with the good faith conduct of discovery.

(*Id.* at PageID # 70677.) The undersigned refused Humana's request for an adverse inference instruction but required Relator to produce "any and all documents created by Foster and sought by Humana in connection with his communications with the government" and to produce Foster for another deposition. (*Id.* at 70681.) The Parties took that deposition on June 2, 2023. Thereafter, Humana filed another motion for sanctions asserting that Relator had "willfully and in bad faith asserted privilege to withhold highly probative evidence from Humana and the Court." (DN 702, at PageID # 71471.) Humana's motion was never ruled on by the Court due to the Parties' settlement. Relator also moved in limine to preclude Humana from questioning Foster at trial regarding his discussions with CMS and DOJ, again asserting claims of privilege. (DNs 665, 709, 709-1.) Relator's motion was likewise never ruled upon given the Parties' settlement.

Relator argued that the Court should not exclude this time because "[a] fee petition is not the place to litigate accusations of discovery misconduct." (DN 754, at PageID # 74955 (citing *U.S. ex rel. Greendyke v. CNOS, P.C.*, No. CIV 04-4105, 2007 WL 2908414, at *7 (D.S.D. Sept. 27, 2007); *United States ex rel. Bryant v. Cmty. Health Sys., Inc.*, 24 F.4th 1024, 1037 (6th Cir. 2022); *U.S. ex rel. Fallon v. Accudyne Corp.*, 97 F.3d 937, 938-39 (7th Cir. 1996)).)  Relator emphasized that the Court never ruled on Humana's second sanctions motion.  But the undersigned finds that fact less than determinative in this case.  Unlike the authorities cited by Relator, which generally involved issues that were not litigated prior to the fee dispute, the Court issued numerous rulings on the merits of Relator's privilege arguments here.  Those rulings found Relator's position unsupported by the facts of the case or the law on multiple occasions, and Relator continued to push the same arguments repeatedly despite the Court's rejection of them.  The undersigned cannot say that the hours identified by Humana related to these issues were reasonably expended on this litigation in light of these numerous rulings.  While Relator is correct that the Court never ruled on Humana's last sanctions motion, sufficient other guidance in the record about the merits of Relator's position exists for the undersigned to make the instant ruling.  These issues go beyond the question of whether Relator succeeded on its motion practice and turn instead on the lack of good faith in Relator repeatedly making the same losing argument, wasting both the Court's time and Humana's as opposed to saving its disagreement for an appeal.  For this reason, the undersigned will in large measure adopt the proposed reduction requested by Humana except as to the initial briefing on these issues and the related briefing on Relator's objection to the undersigned's first order on the topic.  As indicated herein, the reason the undersigned finds the time not reasonably expended is because of the repeated nature of Relator's conduct; therefore, the undersigned does not find it appropriate to exclude any time related to the initial Court rulings on

the issues, only the time not reasonably spent thereafter advancing without substantive factual or legal development the same arguments Relator already lost.

Because all the time at issue was expended prior to the close of 2023, the undersigned recommends the Court reduce the hours expended by the following timekeepers between 2015 – 2023 as follows for a total reduction of 1096.45 hours:

| Firm | Timekeeper | Total Reduction to 2015-2023 Hours |
|---|---|---|
| Kellogg Hansen | Katherine C. Cooper | 262.80 |
| Kellogg Hansen | Andrew C. Shen | 180.60 |
| Kellogg Hansen | James M. Webster | 103.20 |
| Kellogg Hansen | Thomas G. Schultz | 5.10 |
| Kellogg Hansen | Caroline A. Schechinger | 46.90 |
| Kellogg Hansen | Bethan R. Jones | 34.00 |
| Kellogg Hansen | Lillian V. Smith | 8.00 |
| Kellogg Hansen | Maura D. MacDonald | 28.00 |
| Kellogg Hansen | David M. Burke | 19.20 |
| Kellogg Hansen | Emilia C. Lukeman | 20.80 |
| Kellogg Hansen | Robyn Sommerfield | 3.90 |
| Kellogg Hansen | Kimberly A. Briggs | 45.80 |
| Phillips & Cohen | Claire Sylvia | 158.70 |
| Phillips & Cohen | Edward Arens | 106.70 |
| Phillips & Cohen | Amy Easton | 0.90 |
| Phillips & Cohen | Jennifer Moir | 71.60 |
| Furman Nilsen | C. Dean Furman | 0.25 |
| | **TOTAL** | 1096.45 |

This will result in the overall reduction of the lodestar amount by $1,087,974.00 applying 2023 rates to the excluded time.

### 3.    Requests for Admission

Humana also requested that the Court exclude the time Relator's counsel spent drafting and defending the "almost 24,000 requests for admission" Relator served that the Court did not require Humana to answer.  (DN 752, at PageID # 73670.)  Humana's proposed reductions related to this purpose would total 263.8 hours.  (*Id.*; DN 752-13.)  Relator again opposed, arguing that it

was "inappropriate to exclude reasonable efforts to advance the prosecution of the case, even if the Court did not grant the requested relief." (DN 754, at PageID # 74952.)

The undersigned addressed Relator's requests for admission in an August 30, 2019, Memorandum Opinion and Order. (DN 216.) In the order, the Court did find that requiring Humana to respond to Scott's requests for admission and interrogatories would be duplicative because both sought the same discovery. (*Id.* at PageID # 12849.) But it also found that "Humana ha[d] taken faulty positions and rendered incomplete discovery responses." (*Id.*) The Court ultimately ordered Humana to respond only to Relator's Interrogatory No. 1. (*Id.* at 12855.)

The undersigned finds this request by Humana distinguishable from the one above regarding Relator's discovery conduct regarding Foster's communications with the government. Nothing about the undersigned's holding regarding Relator's request for admissions implicated the same type of repeated, contumacious conduct discussed above, and in fact, the undersigned's opinion intimated that to a certain extent, the number of requests served by Relator was a product of Humana's obstreperousness. Accordingly, the undersigned cannot say that the hours Relator spent working on his requests for admission were not reasonable in view of the conduct by Humana discussed in the undersigned's order (DN 216). The undersigned recommends that the Court reject Humana's proposed reduction related to Relator's requests for admission.

### 4.    *Daubert* Challenges

Humana also requested that the Court exclude time Relator spent attempting to exclude two of Humana's experts for a total reduction of 191.80 hours. (DN 752, at PageID # 73670; DN 752-14.) Humana cited in support to *United States ex rel. Palmer v. C&D Techs., Inc.*, 897 F.3d 128, 141 (3d Cir. 2018), for the proposition that is appropriate for a court to reduce fees based on an unsuccessful *Daubert* motion. (DN 752, at PageID # 73670.) The undersigned finds that case

less than supportive of Humana's point because the fee reduction at issue was about the excessiveness of the fees, not whether the underlying motions were successful. *Palmer*, 897 F.3d at 141, 141 n.5 ("[W]e agree with the District Court that a reduction of the excessive *Daubert* motion related fees is in order."). Here, Humana's objection is not that the fees related to Relator's *Daubert* motions are excessive, it is that Relator was unsuccessful. (DN 752, at PageID # 73670.) As above, Relator again opposed on the basis that it was "inappropriate to exclude reasonable efforts to advance the prosecution of the case, even if the Court did not grant the requested relief." (DN 754, at PageID # 74952.) The undersigned concurs with Relator, incorporating the discussion above about why it is not apparent that it is appropriate to reduce fees on the mere basis that one or more efforts was unsuccessful. Nothing about Humana's short objection convinces the undersigned that it was unreasonable for Relator to seek to exclude two of Humana's experts. Therefore, the undersigned recommends that the Court reject Humana's proposed reduction related to Relator's *Daubert* motions.

### 5.    Rebuttal Reports

Humana next requested that the Court exclude time Relator spent preparing rebuttal reports that Humana successfully moved to strike. (DN 752, at PageID # 73670.) If accepted, the reduction would total 94.4 hours.[24] Relator's position is the same as with the requests for admission and *Daubert* motions: just because Relator didn't win doesn't mean the hours weren't reasonably expended. (DN 754, at PageID # 74952.) And again, the undersigned concurs with Relator. Nothing about Humana's one sentence-objection convinces the undersigned to exclude these hours solely on the basis that Relator was unsuccessful in obtaining permission to use his

---

[24] As with some of Humana's other objections above, Humana included 3.66 expert witness hours in its total of 98.06 hours of reduction listed in its brief. (DN 752, at PageID # 73670; DN 752-15.) The undersigned again finds this inappropriate to consider as part of the lodestar calculation.

supplemental reports.  Therefore, the undersigned recommends that the Court reject Humana's proposed reduction related to Relator's rebuttal reports.

### 6.    Upleveled Work

Humana next argued that the Court should reduce the number of hours billed for "up-leveled work."  (DN 752, at PageID # 73672-73.)  Humana explained in support that "[t]he firms representing Relator also frequently had partners perform tasks that are usually assigned to associates and therefore billed at a substantially lower rate," citing examples where partners prepared pro hac motions, reviewed redactions, did document review, or performed legal research.  (*Id.* at 73672.)  Humana argued that the Court should "apply a 33% reduction to upleveled entries to approximate the rate that should have been charged for that time" for a total deduction of 747.71 hours.  (*Id.* at 73673.)  Humana provided a chart of the relevant entries it believed should be subject to reduction.  (DN 752-9.)  In support, Humana cited to one opinion in which the undersigned reduced a sanctions fee award.  In *Schnatter v. 247 Grp., LLC*, the undersigned found the number of hours spent prosecuting a motion unreasonable.  *Schnatter*, 2024 WL 3165319, at *4.  The undersigned explained that the time entries demonstrated that multiple attorneys worked inefficiently and duplicatively on the motion papers and that in particular, when one examined the time entries, "[a] trend started to develop across the invoices where an associate drafts and then a partner revises for almost as much time as the associate spent writing."  *Id.*  The undersigned concluded that "the ratio of associate to partner time is unquestionably out of balance in the subject invoices."  *Id.*

In response, Relator argued that this Court should not " 'second-guess' the judgment of Relator's counsel in staffing and making strategic decisions on how to most efficiently prosecute this action."  (DN 754, at PageID # 74958 (quoting in part *Gautreaux v. Chicago Hous. Auth.*, 491

F.3d 649, 661 (7th Cir. 2007)).)  Relator cited numerous cases in support of its position.  *See Gautreaux*, 491 F3d at 661 (citing *Kurowski v. Krajewski*, 848 F.2d 767, 776 (7th Cir. 1988)) ("Use of one or more lawyer[s] is a common practice, primarily because it often results in a more efficient distribution of work. It allows more experienced, accomplished, and expensive attorneys to handle more complicated matters and less experienced, accomplished, and expensive counsel to handle less complicated ones." (internal citations omitted)); *Am. Petroleum Inst. v. U.S. E.P.A.*, 72 F.3d 907, 916 (D.C. Cir. 1996) (refusing to adjust allocation of time spent between partners and associates and noting that "[p]resumably the skill and experience of the partners places them further along the learning curve and enhances their ability to operate efficiently so that the higher partner rate is likely to be offset, at least in part, by a reduction in the number of hours multiplying that rate" and that "[a]lso, in most instances when associates are employed to work under the supervision of a partner, there is some duplication of time in that the associate must report and the partner must review, creating new billable hours not present when the partner does the work directly"); *Chaid v. Glickman*, No. C98-1004 WHO JCS, 1999 WL 33292940, at *15, 13-16 (N.D. Cal. Nov. 17, 1999) ("[T]his Court is reluctant to become embroiled in decisions involving staffing of individual cases or the structuring of the firms that come before it. That level of scrutiny vastly exceeds the typical review where fees are sought, where a court decides whether a particular task was necessary, unnecessary, or the time spent on it excessive. If we were to examine the individual staffing decisions of each firm before us, we would have to consider the minutia behind such a decision, including the availability of associates in the market, whether it made sense for other reasons for the firm not to hire them, whether there are other associates at the firm, what the workload of those associates was like, and similar such individual matters."); *Imapizza, LLC v. At Pizza Ltd.*, No. 17-CV-2327 (TJK/GMH), 2021 WL 2410713, at *21 (D.D.C. June 8, 2021), *report*

*and recommendation adopted*, No. CV172327TJKGMH, 2021 WL 3168132, at *1 (D.D.C. July 27, 2021) (rejecting upleveling challenge and noting that "Plaintiff has not pointed to any specific instances where counsel billed for inappropriate tasks, such as clerical work, and Defendants' counsel are part of a small, boutique law firm without junior-level staff"); *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, No. IP 96-1718-C-H/K, 2002 WL 1801647, at *6 (S.D. Ind. July 5, 2002) ("The court views CPI's criticism as misguided, at least as applied to the tasks at issue in this case. The criticism reflects a persistent but not always accurate caricature of law practice in which senior partners do relatively little hands-on work while more junior minions do the bulk of the work. The criticism also tends to undervalue legal research and writing, which are often decisive, especially when dealing with complex and unusual issues."); *Chen v. BMW of N. Am., LLC*, No. 21-CV-03531-DMR, 2022 WL 18539356, at *6 (N.D. Cal. Nov. 14, 2022) (declining request to reduce fees for drafting opposition to motion to compel arbitration simply because lead counsel performed the work and noting that "[g]iven his knowledge of the case and the small size of the firm, the court cannot say that drafting the Opposition should have been assigned to a less experienced timekeeper."); *Ridgeway v. Wal-Mart Stores Inc.*, 269 F. Supp. 3d 975, 991 (N.D. Cal. 2017) ("In light of the various partners' in-depth knowledge of the case and the small size of the firms involved, the Court cannot say that the complained of tasks should have been assigned to a less experienced timekeeper.").  Relator argued that Humana's proposed reductions for up-leveling were indiscriminate, and Relator provided a competing chart of entries with tasks he contended were appropriately performed by partners, not by associates as Humana asserted.  (DN 754, at PageID # 74959; DN 754-15.)

Having examined the accused entries as identified by Humana and counter-chart provided by Relator (DNs 752-9, 754-15), the undersigned is unconvinced of the appropriateness of the

deduction requested.   In particular, Humana's chart does not at all explain *with context* why particular entries contain work that should have been performed by an associate, not a partner. Unlike the limited issues before the undersigned in the *Schnatter* case, the out-of-context time entries provided by Humana do not, standing alone, address any of the sufficient details for the undersigned to conclude that improper upleveling occurred.   The undersigned finds persuasive the reasoning of the cases cited by Relator indicating that particularly in complex and unusual cases, it is not always inappropriate for a partner to do work that could have been performed by an associate.   *See, e.g.*, *Am. Petroleum*, 72 F.3d at 916 ("Presumably, the clients came to the law firm they employed, not because of the skill of the associates but that of the partners in dealing with such complex and difficult litigation."); *Cardiac Pacemakers*, 2002 WL 1801647, at *6 ("Having a smart and experienced lawyer do some of the legal research on an unusual and pivotal issue was a reasonable choice").   Humana has presented no binding authority to convince the undersigned that reasonableness requires the cheapest timekeeper to always perform the work even when a more experienced timekeeper could do the same work more efficiently or bring to that work the lens of experience necessary to ensure that the work completed is correct and strategically-sound. Further, given the length of time this case was pending and the number of associates who made partner during the interim, the mere dividing line between those two categories of timekeepers offers nothing about the relative knowledge of either the case or the law that those individual timekeepers would have applied to their tasks.   Likewise, as noted in one of the cases cited by Relator, context regarding timing and who was available to perform various tasks at various times is missing from the briefing.   Without more of these details, the undersigned cannot conclude that this case was unreasonably staffed as between partners and associates.   And while there may be a handful of lower-hanging fruit, *e.g.*, preparation of *pro hac* filings, isolating them would require

extensive use of the green eyeshade.  Therefore, the undersigned recommends that the Court reject Humana's proposed deductions for up-leveling.

### 7.    Vague and Block-Billed Entries

Lastly, Humana argued that the Court should reduce certain time entries of Relator's counsel based on a combination of block-billing and vagueness.[25]  (DN 752, at PageID # 73671.) Humana noted that both this Court and others have regularly reduced fees on these bases.  (*Id.* at 73671-72 (citing cases).)  Humana provided the Court with a chart of entries it believed suffered from these deficiencies, though that chart did not specifically identify on which basis the entry was challenged.  (DN 752-10.)  Humana argued that the Court should apply a 30% reduction to the identified entries, resulting in a total reduction of 8,752.71 hours.  (DN 752, at PageID # 73672.)

In response, Relator argued that Humana's proposals were inconsistent with the law as his counsel's "contemporaneous and detailed time entries more than satisfy th[e] [relevant legal] standard."  (DN 754, at PageID # 74956.)  Relator distinguished the authorities relied upon by Humana and stated that while it would be "unproductive to respond to every entry," he provided a competing chart of "egregious examples of entries that Humana mislabel[ed] as block-billed (even though they involve one task) or vague (when they are detailed)."  (*Id.* at 74958, 74957-58; DN 754-13.)

As a starting point, the undersigned finds Humana's presentation of these issues unnecessarily confusing.  First, as previously noted, the 453-page, size 7.5 font chart it provided of "Vague and Block-Billed Time Entries" does not specify on which grounds Humana's objection to each listed time entry is based.  (DN 752-10.)  And when the undersigned compares it with his

---

[25] Even though Humana's response briefly mentions duplicative time entries in conjunction with its block-billing and vagueness objections, the charts it provided in support provide no additional support for this contention.  Thus, the undersigned will not evaluate it here.

magnifying glass to the 525-page, size 5 font chart Humana provided of "All Deficiencies and Proposed Reductions to Relator's Time Entries," it does not appear that Humana even contends that every entry that is block-billed is also vague.  (DN 752-8 (including columns marking time entries as "block-billing" or "vague").)  Second, as the undersigned has noted in footnotes for some of Humana's other objections above, Humana's chart of "Vague and Block-Billed Time Entries" contains numerous people who are not employees of either Kellogg Hansen, Phillips & Cohen, or Furman Nilsen.  (DN 752-10 (including entries by Abdel-Khalik, Aly; Bell, Eric; Bowie, Findley; Bratten, Camila; Brunet, Joffre; Cameron, Lisa; Carrington, Robert; Chapman, Ryan; Ellis, Phillip; Foster, Richard; Goel, Divya; Goldman, Dana; Green, Newton; Gulbhi, Skanda; Harris, Christine; Hua, Hugo; Lakdawalla, Darius; Liu, Rachel; Lubben, Laura; Mahaparta, Sohini; Nunez, Fabricio; Pfander, Charles Adam; Randall, Andrew; Romley, John; Sacks, Benjamin; Sakyi, Nana; Sparks, Margaret; Thesing, Ben; Williams, Britanya; Wurgaft, Olivia; Yang, Ivy).)  Though not identified by Humana as such, it appears that these individuals are either Relator's expert witnesses or consultants or the staff of the same.  (DNs 748-42, 748-43, 748-44, 748-45, 748-84, 748-85, 748-90, 748-91, 748-93, 748-94.)   But Humana neither acknowledges nor provides any support for the proposition that these individuals' timesheets should be held to the same standard as that of the law firm timekeepers.  Without such authority, the undersigned finds it inappropriate to consider these individuals' billing at this stage as part of the lodestar calculation.  This results in an overall reduction of Humana's objection by approximately 951.91 hours.[26]

---

[26] It appears that though what is listed on the chart provided to the Court was each column to the hundredths place, Humana's actual total of 8,752.71 was based on the complete 30% calculation that yielded digits beyond that place. For example, the final entry in the chart as to timekeeper Ivy Yang lists in the "Hours" column 1.75, but in the "Hours Reduction" column lists 0.53 though 30% of 1.75 is actually 0.525.  It is only when those full values are taken into account that Humana's total is accurate.  Adding purely the numbers listed in the hours reduction column yields a total of 8,754.54.  Accordingly, the undersigned has likewise calculated the expert hours to remove from Humana's total based on the full value of the 30% reduction, not the value rounded to the nearest hundredth.  That resulted in a total of 951.912 hours, which the undersigned then rounded to 951.91.

Third, Humana organized its chart by timekeeper, then by date.  (DN 752-10.)  This method of organization deprives the undersigned of the ability to read each time entry in the context in which it was made, something that might provide clarity into language and references that would in a vacuum be vague or confusing.  Notwithstanding these issues, the undersigned will endeavor to consider the merits of Humana's objections.

As set forth above, the standard for the time records of an attorney seeking fees is a relatively liberal one.  Time records must be " 'sufficiently detailed to enable courts to review the reasonableness of the hours expended' on the case." *Imwalle*, 515 F.3d at 551-52 (quoting in part *Wooldridge*, 898 F.2d at 1177).  "[E]xplicitly detailed descriptions are not required." *Id.* at 554 (citing *McCombs*, 395 F.3d at 360); *see also Hensley*, 461 U.S. at 437 n.12 ("[C]ounsel, of course, is not required to record in great detail how each minute of his time was expended. But at least counsel should identify the general subject matter of his time expenditures.").  Instead, "[c]ounsel's billing entries, when read in the context of the billing statement as a whole and in conjunction with the timeline of the litigation, [must] support . . . that the hours charged were actually and reasonably expended in the prosecution of the litigation." *Imwalle*, 515 F.3d at 554 (citing *United Slate*, 732 F.2d at 502).  Specifically as to block-billing, the Sixth Circuit has held that "block billing 'can be sufficient' if the description of the work performed is adequate." *Husted*, 831 F.3d at 705 n.7 (quoting in part *Smith v. Serv. Master Corp.*, 592 F. App'x 363, 371 (6th Cir. 2014)); *Nat'l Lab. Rels. Bd. v. Bannum, Inc*, 102 F.4th 358, 364 (6th Cir. 2024) (quoting in part *Miller*, 267 F. Supp.3d at 997); *Hemlock Semiconductor Operations, LLC v. SolarWorld Indus. Sachsen GmbH,* 702 F. App'x 408 (6th Cir. 2017) (finding district court did not abuse discretion in refusing to reduce fee award due to block billing given the district court's finding that the hours documentation provided "described tasks in sufficient detail to be evaluated for

reasonableness"); *Howe v. City of Akron*, 705 F. App'x 376, 383 (6th Cir. 2017) ("As the district court noted, block billing is not per se prohibited."); *Wallace v. Oakwood Healthcare, Inc.*, 954 F.3d 879, 899 (6th Cir. 2020) ("Likewise, the district court correctly found that block billing is permissible in this Circuit, 'provided the description of the work is adequate.' "). *Cf. Perry v. AutoZone Stores, Inc.*, 624 F. App'x 370, 373 (6th Cir. 2015) (finding block-billing inappropriate in case where "there [we]re more than a dozen time entries with the bald description 'Prepare and Draft Appellee Brief.' In some instances, it is difficult to ascertain whether counsel's time was reasonably expended without a more detailed description of the work that was done"); *Hubbell v. FedEx SmartPost, Inc.*, 933 F.3d 558, 575-76 (6th Cir. 2019) (finding district court did not abuse its discretion in applying 35% reduction "due to the lack of specificity and duplication in the attorneys' billing records").

Applying these authorities here, the undersigned finds Humana's objections to Relator's block billing to be without merit.  Relator's block billing does not prevent the undersigned from assessing generally the tasks performed for reasonableness.  Again, while the undersigned understands that some paying clients may not like block billing, nothing about it in this case prevents the undersigned from assessing "that such hours were actually and reasonably expended in the prosecution of the litigation" as required.  *Imwalle*, 515 F.3d at 553 (quoting *United Slate*, 732 F.2d at 502 n.2).  While Humana is correct that any block-billing will prevent either Humana or the Court from knowing exactly how much time was spent on particular tasks, having reviewed the time entries at issue, the undersigned does not find them insufficiently detailed to raise concerns about time being spent on unrelated tasks.  Many of the block-billed entries involve interconnected tasks such that separating them out would have actually been less clear than combining them.  For example, on October 20, 2025, Arens spent 3.90 hours with the following description: "[d]rafted

complaint; performed case and legal research re: same." (DN 752-10.)  While in a sense those are separate tasks, because they all ultimately relate to the content of the Complaint, grouping them together doesn't deprive the undersigned of the ability to review them for reasonableness.  And even for other entries such as the one identified by Humana in its response from Bethan Jones, the undersigned does not find the description insufficient to find that it was unreasonable that Jones spent the number of hours listed on the combination of specific tasks detailed.  (DN 752, at PageID # 73671-72 ("For example, on November 20, 2018, Bethan Jones billed 9 hours to 'Review Milliman production; review Relator's RFAs; draft errata for S. Scott deposition.' ").)  Humana has provided no authority—and the undersigned is aware of none—requiring the undersigned to assess and pundit the time spent on each and every task completed by each and every timekeeper through the life of this nearly ten-year old case, which is the only thing that block-billing would arguably prevent the undersigned from doing.  *See, e.g.*, *Fox*, 563 U.S. at 838 (noting that the goal of fee-shifting "is to do rough justice, not to achieve auditing perfection"); *Gordon v. Dadante*, 804 F. App'x 317, 328 (6th Cir. 2020) ("As the appointing judge observed, the district court's task is to ensure reasonable compensation to the Receiver and not to 'fly-speck' each line item of a Receiver's bills for a fourteen-year period.").  Given that this is not required and having reviewed the entries identified by Humana, the undersigned finds no reason to recommend the Court adopt any reduction for block billing.

Similarly, the undersigned finds Humana's objections to the vagueness of the law firm time entries without merit.  The undersigned has reviewed the time entries Humana identified as vague on its collective chart of "all deficiencies."  (DN 752-8.)  As noted above, the undersigned must read the time entries in the context of both the billing statements and the litigation as a whole. *Imwalle*, 515 F.3d at 554 (citing *United Slate*, 732 F.2d at 502). In that context, the undersigned

finds that Humana's vagueness objections are often too hypercritical to justify any reduction of the hours billed.  For example, Humana marked as vague a number of time entries by Arens in late 2015 that referenced phrases like "case documents" and "case materials."  (DN 752-8.)  Given that these entries were before suit was filed, it is reasonable to interpret these general phrases as references to the initial documents about the case gathered from or provided by Relator.  In another example, on April 24, 2019, George Collins billed 7.40 hours to "Continued work on data pipeline; looked at more efficiency issues."  (*Id.*)  While these words mean little to nothing out of context, when considered in the context of the overall billing entries provided by Phillips & Cohen and, in particular, earlier entries such as April 20, 2019's "[c]ontinued work on data pipeline for integration with expert process," (DN 748-64), as well as Sylvia declaration's stating that Collins worked with Relator's experts on developing a damages model (DN 748-61, at ¶ 17), the entry is not vague at all.  Similarly, numerous entries about deposition preparations or transcripts that do not on their face identify which deponent is at issue are clarified by the surrounding entries that do identify the deposition.  Thus, entries like these are not vague in context, and Humana merely listing an entry with a "yes" in the "Vague" column on its chart provides nothing by way of argument for the undersigned's analysis.  Humana also marked many, many entries as "vague" that are unquestionably detailed.  For example, entries like:

| Date | Timekeeper | Description | Hours |
|------|-----------|-------------|-------|
| 4/10/2019 | Arens, Edward | TC with Brattle re: expert report on damages; reviewed and edited draft CMS declaration on materiality; emailed draft declaration to CMS. | 3.80 |
| 4/2/2018 | Cooper, Katherine C. | Review correspondence from team and OMM regarding discovery issues; attend weekly team call; research motions to quash and timing rules; telephone call with S. Scott regarding search terms, repositories, custodians; review Humana responses and objections to RFPs; review P&C draft | 3.80 |

| Date | Timekeeper | Description | Hours |
|------|-----------|-------------|-------|
| | | presentation to government; attend meet and confer with Humana regarding search terms; review Walmart objections and responses to subpoena; correspondence with OMM regarding meet and confer on RFPs. | |
| 8/2/2017 | Sylvia, Claire | confer client re status of investigation and potential witness interviews/issues related to unsealing and review eha letter to expert | 1.00 |
| 7/9/2018 | Shen, Andrew C. | Discuss Walmart issues with K. Cooper; review motion for protective order filed by Walmart; revise contention interrogatory argument notes; participate in weekly telephone call. | 3.50 |
| 9/15/2022 | Schechinger, Caroline A. | Review case background materials provided by B. Jones; telephone calls with T. Schultz regarding drafting a protective order motion regarding Foster's deposition; study background materials relating to Foster's deposition (email thread between the parties; the magistrate's order; the district's court order; the parties' briefing for both orders); study cases cited in the district court's order (ECF No. 502) regarding privilege issues; search iWOV for example protective order motions; research case law for use in the protective order motion regarding Foster's deposition. | 7.70 |
| 4/27/2022 | Jones, Bethan R. | Review Humana stipulation regarding 30(b)(6) testimony. | 0.20 |

And these are just a handful of examples; the undersigned could supply numerous others, including many highlighted by Relator in his counter-chart (DN 754-13). The chart provided by Humana is replete with instance of similarly detailed entries that are marked as "vague." The application of that label to entries like these dilutes the credibility of Humana's objection to an untenable degree. While in the undersigned's review of the time entries, the undersigned can find a few arguably vague entries such as the entry pointed about by Humana in its response for "review documents"

or some entries for "reviewed and responded to e-mails" or even "e-mails with co-counsel," these entries do not occur with such frequency to make a fee reduction reasonable, let alone an across-the-board 30% reduction.  There are but a handful of such examples as compared to the overall volume of detailed time entries.  Instead, viewing the billing entries as a whole, the undersigned finds Humana's vagueness objections without merit and does not recommend any reduction on this basis.

### 8.    General Reasonableness Review

Having in large measure recommended rejection of Humana's objections to the reasonableness of Relator's hours billed, the undersigned turns to an overall review of the time entries provided by Relator.  Having reviewed most of the same through Humana's objections, the undersigned is generally convinced of the reasonableness of the hours sought.  In particular, the undersigned is motivated to make no grand departures from the number of hours sought by Relator's counsel in view of the Supreme Court's guidance that "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee.  Normally this will encompass all hours reasonably expended on the litigation."  *Hensley*, 461 U.S. at 435.  Despite Humana's attempts to belittle Relator's recovery as having been only a fraction of his claimed damages, as noted above, Humana did not contest Relator's assertions that the $90 million settlement in this case is "the largest non-intervened False Claims Act recovery in the Sixth Circuit and among the ten largest non-intervened FCA recoveries anywhere."  (DN 748, at PageID # 72158.)  This fact and the size of the settlement itself convince the undersigned that Relator's counsel should recover a fully compensatory fee in this case with only minimal deductions.  As noted above, Relator's billing records are sufficiently detailed for the undersigned to conclude that most hours were reasonably spent on this litigation.

However, the one exception on which the undersigned expresses some level of concern is that of duplicative work.  Given the number of lawyers and law firms involved, that duplicative work was done is an unavoidable conclusion.  For example, on October 17, 2019, the Court held a conference regarding discovery issues after which it gave Relator through November 1, 2019, to file a motion to compel.  (DN 242.)  In the intervening period, six attorneys worked on the twenty-page motion (DN 245) in some capacity and participated in internal conferences about it including Sylvia, Arens, Katherine Cooper, Shen, James M. Webster, and Furman.  (DNs 748-23, 748-64, 748-88.)  Similarly, on October 16, 2018, after a discovery dispute conference the Court gave both Parties leaves to file simultaneous briefs regarding the number of interrogatories served by Relator.  (DN 115.)  Five attorneys and one paralegal worked on and conferenced about Relator's eighteen-page brief (DN 123) in some capacity including Sylvia, Katherine Cooper, Thomas G. Schultz, Bethan Jones, Shen, and Maura MacDonald.  (DNs 748-23, 748-64.)  While the undersigned has not done the same analysis for each and every filing made by Relator, the undersigned finds it likely that similar examples are replete throughout the record.  Relator goes to great pains in his Petition to point out that his counsel worked more efficiently than Humana's counsel in terms of their hours billed, but that is only probative of these issues up to a point.  Accordingly, the undersigned finds that a modest deduction for duplication of effort is warranted.  *Hensley* indicated that it is appropriate for a court to either "attempt to identify specific hours that should be eliminated" or to "simply reduce the award," *Hensley*, 461 U.S. at 436, and other courts have found that percentage reductions are appropriate for billing deficiencies.  *See, e.g.*, *Richard v. Caliber Home Loans, Inc.*, 832 F. App'x 940, 947 (6th Cir. 2020); *Hubbell*, 933 F.3d at 576 ("Although the reduction was substantial, we cannot say that the court exceeded the scope of its authority in reducing the number of billed hours by 35 percent due to the lack of specificity and duplication in

the attorneys' billing records."). Given the length of this litigation and the Supreme Court's instruction to avoid attempting to achieve "auditing perfection," *Fox*, 563 U.S. at 838, the undersigned concludes that a percentage reduction for duplication of efforts is appropriate and will recommend a 10% reduction of the overall hours billed by Relator's counsel.

### 9.    Conclusion

In conclusion and as set forth above, though the undersigned largely finds the hours billed by Relator's counsel to be reasonable, the undersigned recommends that the Court reduce the hours billed to exclude certain time billed for discovery efforts not reasonably expended related to privilege issues and Relator's expert Foster and to apply an overall 10% reduction to the total number of hours billed for duplication of efforts among the lawyers working at the three firms hired by Relator. The reductions will reduce the total amount of hours for which Relator seeks compensation as follows:

| Timekeeper | Subtotal Hours 2015-2023 | Deductions for Discovery Misconduct | Total Reduced Hours 2015-2023 | Total Hours 2024 | Total Hours 2025 | Total Overall Hours | Hours with 10% Reduction |
|---|---|---|---|---|---|---|---|
| Claire Sylvia | 1912.70 | 158.70 | 1754.00 | 87.40 | 27.70 | 1869.10 | 1682.19 |
| Edward Arens | 2753.90 | 106.70 | 2647.20 | 106.20 | 23.10 | 2776.50 | 2498.85 |
| Jeffrey Dickstein | 126.40 | 0.00 | 126.40 | 0.00 | 0.00 | 126.40 | 113.76 |
| Amy Easton | 164.50 | 0.90 | 163.60 | 0.00 | 0.00 | 163.60 | 147.24 |
| Peter Budetti | 59.50 | 0.00 | 59.50 | 0.00 | 0.00 | 59.50 | 53.55 |
| George Collins | 2379.90 | 0.00 | 2379.90 | 8.20 | 3.30 | 2391.40 | 2152.26 |
| Taeva Shefler | 169.20 | 0.00 | 169.20 | 0.00 | 0.00 | 169.20 | 152.28 |
| Emily Stabile | 83.70 | 0.00 | 83.70 | 0.00 | 0.00 | 83.70 | 75.33 |
| Alexander D. Westerfield | 108.30 | 0.00 | 108.30 | 0.00 | 0.00 | 108.30 | 97.47 |
| Luke Diamond | 63.90 | 0.00 | 63.90 | 0.00 | 0.00 | 63.90 | 57.51 |
| Diana DeFrancesco | 408.30 | 0.00 | 408.30 | 0.00 | 0.00 | 408.30 | 367.47 |
| Jennifer Moir | 99.80 | 71.60 | 28.20 | 0.00 | 0.00 | 28.20 | 25.38 |
| Andrew C. Shen | 4531.30 | 180.60 | 4350.70 | 187.80 | 95.50 | 4634.00 | 4170.60 |
| James M. Webster | 2251.20 | 103.20 | 2148.00 | 110.80 | 3.80 | 2262.60 | 2036.34 |
| Thomas G. Schultz | 2779.80 | 5.10 | 2774.70 | 0.00 | 0.00 | 2774.70 | 2497.23 |

| Timekeeper | Subtotal Hours 2015-2023 | Deductions for Discovery Misconduct | Total Reduced Hours 2015-2023 | Total Hours 2024 | Total Hours 2025 | Total Overall Hours | Hours with 10% Reduction |
|---|---|---|---|---|---|---|---|
| Katherine C. Cooper | 4018.20 | 262.80 | 3755.40 | 0.00 | 0.00 | 3755.40 | 3379.86 |
| Lillian V. Smith | 172.70 | 8.00 | 164.70 | 0.00 | 0.00 | 164.70 | 148.23 |
| Bethan R. Jones | 3338.40 | 34.00 | 3304.40 | 29.10 | 46.00 | 3379.50 | 3041.55 |
| Caroline A. Schechinger | 799.80 | 46.90 | 752.90 | 54.20 | 23.10 | 830.20 | 747.18 |
| Kimberly A. Briggs | 671.10 | 45.80 | 625.30 | 1.80 | 0.00 | 627.10 | 564.39 |
| Joseph M. Davies | 319.50 | 0.00 | 319.50 | 1.20 | 0.00 | 320.70 | 288.63 |
| Robert L. Moore | 1563.10 | 0.00 | 1563.10 | 158.90 | 97.40 | 1819.40 | 1637.46 |
| Bernadette M. Murphy | 70.30 | 0.00 | 70.30 | 0.00 | 0.90 | 71.20 | 64.08 |
| Chandler J. Sella | 94.40 | 0.00 | 94.40 | 0.00 | 0.00 | 94.40 | 84.96 |
| David M. Burke | 261.60 | 19.20 | 242.40 | 0.00 | 0.00 | 242.40 | 218.16 |
| Emilia C. Lukeman* | 805.50 | 20.80 | 784.70 | 348.90 | 3.90 | 1137.50 | 1023.75 |
| James F. Birmingham | 71.90 | 0.00 | 71.90 | 0.00 | 0.00 | 71.90 | 64.71 |
| Lisa M. Harger | 63.50 | 0.00 | 63.50 | 0.00 | 0.00 | 63.50 | 57.15 |
| Maura D. MacDonald | 2124.60 | 28.00 | 2096.60 | 70.10 | 0.80 | 2167.50 | 1950.75 |
| Robyn Sommerfield | 268.50 | 3.90 | 264.60 | 11.90 | 1.00 | 277.50 | 249.75 |
| James P. Brennan | 125.60 | 0.00 | 125.60 | 0.00 | 0.00 | 125.60 | 113.04 |
| Jason J. Tapkas | 103.40 | 0.00 | 103.40 | 0.50 | 0.00 | 103.90 | 93.51 |
| Ripton A. Marini | 107.30 | 0.00 | 107.30 | 0.00 | 0.00 | 107.30 | 96.57 |
| Carver D. Sinn | 85.20 | 0.00 | 85.20 | 0.00 | 0.00 | 85.20 | 76.68 |
| C. Dean Furman, Jr. | 102.25 | 0.25 | 102.00 | 3.00 | 0.00 | 105.00 | 94.50 |
| D. Sean Nilsen | 12.00 | 0.00 | 12.00 | 0.00 | 0.00 | 12.00 | 10.80 |
| **TOTALS** | | | | | | 33481.30 | 30133.17 |

This results in an overall reduction of the number of hours sought by Relator of approximately 4,444.58, down from the 34,577.75 hours he claimed.  (DN 754-1.)

### D.    Lodestar Figure and Appropriate Adjustments

Having determined the reasonable rates and the hours reasonably expended on this litigation, the undersigned calculates the appropriate lodestar figure as follows:

| Timekeeper | Total Hours 2015-2023 | 2023 Rate | Total Hour 2024 | 2024 Rate | Total Hours 2025 | 2025 Rate | Total with 10% Reduction[27] |
|---|---|---|---|---|---|---|---|
| Claire Sylvia | 1754.00 | $975.00 | 87.40 | $1,075.00 | 27.70 | $1,160.00 | $1,652,613.30 |
| Edward Arens | 2647.20 | $850.00 | 106.20 | $950.00 | 23.10 | $1,030.00 | $2,137,322.70 |
| Jeffrey Dickstein | 126.40 | $975.00 | 0.00 | $1,075.00 | 0.00 | $1,160.00 | $110,916.00 |
| Amy Easton | 163.60 | $925.00 | 0.00 | $1,025.00 | 0.00 | $1,110.00 | $136,197.00 |
| Peter Budetti | 59.50 | $950.00 | 0.00 | $1,050.00 | 0.00 | $1,130.00 | $50,872.50 |
| George Collins | 2379.90 | $750.00 | 8.20 | $850.00 | 3.30 | $920.00 | $1,615,437.90 |
| Taeva Shefler | 169.20 | $750.00 | 0.00 | $850.00 | 0.00 | $920.00 | $114,210.00 |
| Emily Stabile | 83.70 | $750.00 | 0.00 | $850.00 | 0.00 | $920.00 | $56,497.50 |
| Alexander D. Westerfield | 108.30 | $750.00 | 0.00 | $850.00 | 0.00 | $920.00 | $73,102.50 |
| Luke Diamond | 63.90 | $600.00 | 0.00 | $700.00 | 0.00 | $760.00 | $34,506.00 |
| Diana DeFrancesco | 408.30 | $250.00 | 0.00 | $350.00 | 0.00 | $380.00 | $91,867.50 |
| Jennifer Moir | 28.20 | $250.00 | 0.00 | $250.00 | 0.00 | $270.00 | $6,345.00 |
| Andrew C. Shen | 4350.70 | $1,350.00 | 187.80 | $1,470.00 | 95.50 | $1,600.00 | $5,672,079.90 |
| James M. Webster | 2148.00 | $1,500.00 | 110.80 | $1,650.00 | 3.80 | $1,800.00 | $3,070,494.00 |
| Thomas G. Schultz | 2774.70 | $1,095.00 | 0.00 | $1,195.00 | 0.00 | $1,350.00 | $2,734,466.85 |
| Katherine C. Cooper | 3755.40 | $1,095.00 | 0.00 | $1,150.00 | 0.00 | $1,250.00 | $3,700,946.70 |
| Lillian V. Smith | 164.70 | $990.00 | 0.00 | $1,150.00 | 0.00 | $1,250.00 | $146,747.70 |
| Bethan R. Jones | 3304.40 | $940.00 | 29.10 | $1,040.00 | 46.00 | $1,225.00 | $2,873,475.00 |
| Caroline A. Schechinger | 752.90 | $755.00 | 54.20 | $860.00 | 23.10 | $985.00 | $574,024.50 |
| Kimberly A. Briggs | 625.30 | $530.00 | 1.80 | $555.00 | 0.00 | $590.00 | $299,167.20 |
| Joseph M. Davies | 319.50 | $530.00 | 1.20 | $555.00 | 0.00 | $590.00 | $153,000.90 |
| Robert L. Moore | 1563.10 | $530.00 | 158.90 | $555.00 | 97.40 | $590.00 | $876,688.65 |
| Bernadette M. Murphy | 70.30 | $495.00 | 0.00 | $515.00 | 0.90 | $545.00 | $31,760.10 |

[27] Although above, the undersigned calculated the 10% reduction in hours by reference to the sum of the hours worked in 2015-2025, the undersigned awarded separate rates for hours worked within that period in 2015-2023, 2024, and 2025 respectively. Therefore, the monetary totals in this column were calculated by reference to the following formula applied on a timekeeper-by-timekeeper basis: ((Timekeeper's Total Hours 2015-2023 x 0.9) x Timekeeper's 2023 rate) + ((Timekeeper's Total Hours 2024 x 0.9) x Timekeeper's 2024 rate) + ((Timekeeper's Total Hours 2025 x 0.9) x Timekeeper's 2025 rate).

| Timekeeper | Total Hours 2015-2023 | 2023 Rate | Total Hour 2024 | 2024 Rate | Total Hours 2025 | 2025 Rate | Total with 10% Reduction[27] |
|---|---|---|---|---|---|---|---|
| Chandler J. Sella | 94.40 | $430.00 | 0.00 | $450.00 | 0.00 | $475.00 | $36,532.80 |
| David M. Burke | 242.40 | $495.00 | 0.00 | $515.00 | 0.00 | $545.00 | $107,989.20 |
| Emilia C. Lukeman | 784.70 | $430.00 | 348.90 | $450.00 | 3.90 | $475.00 | $446,650.65 |
| James F. Birmingham | 71.90 | $430.00 | 0.00 | $450.00 | 0.00 | $475.00 | $27,825.30 |
| Lisa M. Harger | 63.50 | $430.00 | 0.00 | $450.00 | 0.00 | $475.00 | $24,574.50 |
| Maura D. MacDonald | 2096.60 | $430.00 | 70.10 | $450.00 | 0.80 | $475.00 | $840,116.70 |
| Robyn Sommerfield | 264.60 | $430.00 | 11.90 | $450.00 | 1.00 | $475.00 | $107,647.20 |
| James P. Brennan | 125.60 | $195.00 | 0.00 | $200.00 | 0.00 | $225.00 | $22,042.80 |
| Jason J. Tapkas | 103.40 | $175.00 | 0.50 | $200.00 | 0.00 | $215.00 | $16,375.50 |
| Ripton A. Marini | 107.30 | $175.00 | 0.00 | $200.00 | 0.00 | $215.00 | $16,899.75 |
| Carver D. Sinn | 85.20 | $295.00 | 0.00 | $295.00 | 0.00 | $295.00 | $22,620.60 |
| C. Dean Furman, Jr. | 102.00 | $500.00 | 3.00 | $500.00 | 0.00 | $600.00 | $47,250.00 |
| D. Sean Nilsen | 12.00 | $500.00 | 0.00 | $500.00 | 0.00 | $600.00 | $5,400.00 |
| | | | | | | **TOTAL** | **$27,934,664.40** |

This lodestar figure is subject to a strong presumption that it is sufficient. *Perdue*, 559 U.S. at 546; *Imwalle*, 515 F.3d at 552 (citing *Del. Valley,* 478 U.S. at 564). While the Court may enhance or decrease this amount in "rare" and "exceptional" circumstances, "[a] party seeking fees has the burden of identifying a factor that the lodestar does not adequately take into account and proving with specificity that an enhanced fee is justified." *Perdue*, 559 U.S. at 546, 552. Relator has argued for no such enhancement. Likewise, Humana has argued for no such departure from the lodestar amount. Instead, both Parties couched their various arguments in terms of the factors to be considered at various points within the lodestar analysis above. The undersigned addressed those arguments at the appropriate stage of his lodestar analysis. Therefore, the undersigned

recommends no enhancements or reductions to the lodestar figure and recommends that Relator's counsel be awarded $27,934,664.40 in attorney's fees.

## E.    Costs and Expenses

In addition to reasonable attorneys' fees, 31 U.S.C. § 3730(d)(2) entitles a relator in a non-intervened case who has settled his or her claims to "an amount for reasonable expenses which the court finds to have been necessarily incurred." 31 U.S.C. § 3730(d)(2).  Relator requested a total of $2,765,969.21 in expenses and costs.  (DN 754-1.)  He itemized that amount as consisting of $2,009,245.75 in expert-related expenses and $756,723.46 in non-expert related expenses.  (*Id.*)  Humana did not challenge Relator's non-expert related expenses but requested that the Court reduce Relator's expert-related expenses to $1,555,973.83.  (DN 752, at PageID # 73640-41; DN 752-1.)

But Humana did not separately provide the Court with any case law regarding the appropriateness of reducing expert fees claimed by a relator.  As noted above, Humana merely grouped its objections to the reasonableness of the expert fees claimed by Relator into its overall lodestar calculation objections.  But those objections included objections to the adequacy of the documentation offered by Relator's experts in support of their claimed fees.  The undersigned is aware of no authority requiring a party's expert to follow the same authorities as attorneys in keeping records of the time that expert worked.  Without such authority, the undersigned finds Humana's objections to Relator's expert witness fees to be without merit.  Relator submitted documentation in support of his claimed fees substantiating that the work performed by Relator's experts was reasonably expended.  (DNs 748-42, 748-43, 748-44, 748-45, 748-84, 748-85, 748-89, 748-90, 748-91, 748-92, 748-93, 748-94.)  This documentation is sufficient to substantiate the reasonableness of the fees claimed by Relator and his experts.  In particular, though the

descriptions in the invoices and summaries provided may be more general than that a court would permit an attorney to submit, in the context of the entire bills provided and the description of the work performed by those experts in Relator's Petition, (DN 748, at PageID # 72188-91), the undersigned easily concludes that, in most cases, the work was "necessarily incurred." *See E.E.O.C. v. Peoplemark, Inc.*, 732 F.3d 584, 595 (6th Cir. 2013) ("Each entry itemized the work done and the time expended on the task. While the entries listed the work performed in a single word or short phrase—such as 'research,' 'document preparation,' and 'telephone conference and review'—in the context of the entire bill, these general descriptions are enough for us to conclude that the district court did not abuse its discretion when it found that the fees were sufficiently documented.").

As to those objections that were more substantive—such as the time Relator's experts spent assisting with intervention, time related to Foster's privilege issues, and time related to supplemental expert reports—the undersigned rejected two out of the three arguments as to the attorneys' fees at issue and sees no reason to reach a different result as to the expert/consultant fees. Put another way, if it was reasonable for the attorneys to spend time on those tasks, the undersigned finds it was reasonable for those attorneys to seek assistance from their experts/consultants as necessary to complete them. The only substantive objection that bears further review is the time spent by Foster related to the discovery conduct for which the undersigned did not recommend that Relator be awarded fees. Pursuant to Humana's itemization, Foster spent 48.56 hours on supplemental depositions and document productions.[28] (DN 752-16.) The undersigned found above that Relator's counsel's time was not reasonably expended on

---

[28] For the same reasons the undersigned concluded above that Relator's counsel should still receive fees related to the initial motion practice and objection to the undersigned's order, the undersigned likewise finds that the 0.75 hours expended by Foster related to the same are compensable. (DN 752-16.)

perpetuating arguments they had already lost.  It likewise stands to reason that if Relator incurred expert fees related to his counsel's unreasonable efforts, those expenses were not "necessarily incurred" as required by the statute.  Therefore, the undersigned recommends that the expert expenses sought by Relator be reduced by the 48.56 hours expended by Foster on supplemental depositions and document productions that were only incurred due to Relator's counsel's unreasonable conduct.  This results in a total reduction of Relator's expert expenses of $29,136. (DN 752-16, at PageID # 74908-09 (identifying offending time entries by Foster); DN 748-84, at PageID # 73338-42 (containing invoices documenting that Foster charged $600.00 per hour for the relevant time entries).)

Accordingly, the undersigned recommends that Relator be awarded the full amount of non-expert expenses he requested in the amount of $756,723.46 and reduced expert expenses of $1,980,109.75 for a total award of costs and expenses of $2,736,833.21.

## III.     RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that Relator's Petition

(DN 748) be **GRANTED IN PART** and **DENIED IN PART** and that Relator be awarded

$27,934,664.40 in attorneys' fees and $2,736,833.21 in costs and expenses for a total award of

$30,671,497.61 and that the Parties be directed to confer and submit a proposed agreed order

within ten days of the final disposition of the Petition (DN 748) regarding how much time Humana

has to pay the total award.

Colin H Lindsay, Magistrate Judge
United States District Court


cc:  Counsel of record

April 30, 2025

### Notice

Pursuant to 28 U.S.C. § 636(b)(1)(B)-(C), the undersigned Magistrate Judge hereby files with the
Court the instant findings and recommendations.  A copy shall forthwith be electronically
transmitted or mailed to all parties.  28 U.S.C. § 636(b)(1)(C).  Within fourteen (14) days after
being served, a party may serve and file specific written objections to these findings and
recommendations.  Fed. R. Civ. P. 72(b)(2).  Failure to file and serve objections to these findings
and recommendations constitutes a waiver of a party's right to appeal.  *Id.; United States v.
Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981); *see also Thomas v. Arn,* 474 U.S. 140 (1985).